**HOGAN LOVELLS US LLP**
Trenton H. Norris (CA Bar No. 164781)
David M. Barnes (CA Bar No. 318547)
Alexander Tablan (CA Bar No. 346309)
4 Embarcadero Center, Suite 3500
San Francisco, California 94111
Telephone:   (415) 374-2300
Facsimile:   (415) 374-2499
trent.norris@hoganlovells.com

**DLA PIPER LLP**
Gregory G. Sperla (CA Bar No. 278062)
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
Telephone:   415.836.2500
Facsimile:   415.836.2501
greg.sperla@dlapiper.com

Attorneys for Plaintiff
THE PERSONAL CARE PRODUCTS COUNCIL

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE PERSONAL CARE PRODUCTS COUNCIL,<br><br>             Plaintiff,<br><br>     v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>             Defendant. | No.  2:23-CV-01006-TLN-JDP<br><br>**SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:          Hon. Troy L. Nunley<br>Hearing:       November 14, 2024<br>Time/Room:  2:00 p.m. in Courtroom 2<br>Action Filed:  May 26, 2023 |

| **Undisputed Facts** | **Supporting Evidence** |
|---|---|
| 1. Titanium dioxide (TiO2) is a mineral used as an ingredient in cosmetic and personal care products, including color cosmetics (e.g., eyeshadow), sunscreens, and toothpastes. | Expert Report of Amy Madl ("Madl Report") ¶ 13; IARC Monographs on the Evaluation of Carcinogenic Risks to Humans (Vol. 93) ("IARC Monograph Vol. 93"), Norris Decl. Ex. A at 7-10. |
| 2. Titanium dioxide has been used as a whitening pigment (among other things) since the 1930s, in the United States and most other countries around the world. | Declaration of Thomas Myers ("Myers Decl.") ¶ 6, ECF No. 27-19; IARC Monograph Vol. 93, Norris Decl. Ex. A at 7-10. |
| 3. The U.S. Food & Drug Administration (FDA) has concluded that titanium dioxide may be safely used as a color additive in many products, including cosmetics, food and supplements, drugs, and sunscreen. | 21 C.F.R. § 73.2575(b) (cosmetics); *id.* § 73.575 (food and supplements); *id.* § 73.157 (drugs); 21 U.S.C. § 355h(a)(2) (sunscreen). |
| 4. In 2010, the International Agency for Research on Cancer (IARC) classified titanium dioxide as a Group 2B agent ("possibly carcinogenic") based on "sufficient evidence in experimental animals" but "inadequate evidence [of carcinogenicity] in humans." | Madl Report ¶ 14; IARC Monograph Vol. 93, Norris Decl. Ex. A at 81, 83. |
| 5. As to human evidence, IARC stated that "the studies d[id] not suggest an association between occupational exposure to titanium dioxide . . . and risk for cancer." | *Id.* |
| 6. IARC performs hazard assessments of various substances or agents; it does not make health or policy recommendations. | IARC Monographs on the Identification of Carcinogenic Hazards to Humans, *Questions and Answers* (Dec. 10, 2019) ("IARC Q&A"), Norris Decl. Ex. B at 3-4. |
| 7. Findings from IARC's assessments are published as Monographs, in which IARC "identified cancer hazards but does not evaluate the risks associated with specific levels or circumstances of exposure." | *Id.* |
| 8. An agent is considered a cancer hazard by IARC if it is capable of causing cancer under some circumstances. | IARC Q&A, Norris Decl. Ex. B at 4. |
| 9. Risk measures the probability that cancer will occur, taking into account the level of exposure to the agent. | IARC Q&A, Norris Decl. Ex. B at 4. |
| 10. IARC identifies cancer hazards even when risks are very low with known patterns of use or exposure. | IARC Q&A, Norris Decl. Ex. B at 4. |

2

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS; CASE NO. 2:23-CV-01006-TLN-JDP

| | |
|---|---|
| 11. IARC classifies agents into four groups—Group 1, Group 2A, Group 2B, and Group 3—based on the strength of evidence that an exposure is carcinogenic. Group 1 agents have stronger evidence than Group 2A agents, which have stronger evidence than Group 2B agents. | IARC Monograph Preamble (Jan. 2019), at 31, 35 [attached as Ex. C to Norris Decl.]; Norris Decl. Ex. J at 73:6-16; *see also* Order Granting Preliminary Injunction, ECF No. 40, at 4 n.2. |
| 12. Group 1 ("carcinogenic to humans") applies whenever there is "sufficient evidence of carcinogenicity in humans." | IARC Monograph Preamble, Norris Decl. Ex. C at 35. |
| 13. Group 2A ("probably carcinogenic to humans") applies when IARC has made at least two of the following evaluations, including at least one that involves either exposed humans or human cells or tissues:<br>• Limited evidence of carcinogenicity in humans,<br>• Sufficient evidence of carcinogenicity in experimental animals,<br>• Strong evidence that the agent exhibits key characteristics of carcinogens. | IARC Monograph Preamble, Norris Decl. Ex. C at 35. |
| 14. Group 2B ("possibly carcinogenic to humans") applies when only one of the following evaluations has been made:<br>• Limited evidence of carcinogenicity in humans,<br>• Sufficient evidence of carcinogenicity in experimental animals,<br>• Strong evidence that the agent exhibits key characteristics of carcinogens. | IARC Monograph Preamble, Norris Decl. Ex. C at 36.; Norris Decl. Ex. J at 73:12-16. |
| 15. Group 3 applies when the agent is "not classifiable as to its carcinogenicity to humans." | IARC Monograph Preamble, Norris Decl. Ex. C at 36. |
| 16. Under IARC's framework, a strength of evidence indicator of "inadequate evidence" is assigned where the "available studies are of insufficient quality, consistency, or statistical precision" to demonstrate the presence or absence of a causal relationship "or no data on cancer in humans is available." | IARC Monograph Preamble, Norris Decl. Ex. C at 31. |
| 17. "Inadequate evidence regarding carcinogenicity" is the second weakest strength of evidence indicator under IARC's framework. | IARC Monograph Preamble Norris Decl. Ex. C at 31-32. |
| 18. IARC assigns its weakest indicator, "evidence suggesting lack of carcinogenicity," only where "several high-quality studies covering the full range of levels of exposure that humans are known to encounter" are "mutually consistent in not showing a positive association." | IARC Monograph Preamble, Norris Decl. Ex. C at 32. |

3
SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS; CASE NO. 2:23-CV-01006-TLN-JDP

| | | |
|---|---|---|
| 19. | If sufficient evidence does not exist to demonstrate that a chemical should be classified in this lowest threshold, IARC conservatively assigns the "inadequate evidence" indicator. | IARC Monograph Preamble, Norris Decl. Ex. C at 31-32. |
| 20. | IARC based its Group 2B designation of TiO2 on two animal studies involving rodent inhalations:<br>• K.P. Lee, *et al.*, Pulmonary response of rats exposed to titanium dioxide (TiO2) by inhalation for two years, 79 *Toxicology and Applied Pharmacology* 179-92 (1985); and<br>• U. Heinrich, *et al.*, Chronic Inhalation Exposure of Wistar Rats and two Different Strains of Mice to Diesel Engine Exhaust, Carbon Black, and TiO2, 7 *Inhalation Toxicology* 533-56 (1995). | Madl Report ¶ 27; IARC Monograph Vol. 93, Norris Decl. Ex. A at 33-34.. |
| 21. | The two studies relied upon by IARC for its 2B classification of TiO2 exposed rats to lung overload conditions. | Madl Report ¶¶ 27-32 (explaining that Lee and Heinrich studies involved lung overload conditions); Norris Decl. Ex. J 123:2-12 ("The lung overload [wa]s the mechanism by which . . . the lung tumors were formed in the rat lung."). |
| 22. | The Lee and Heinrich studies have been shown by governmental bodies and other scientists to have little to no relevance to humans. | Madl Report ¶ 32 (describing them as "scientifically unreliable for informing the potential carcinogenic nature of titanium dioxide of any form and predicant effects in humans in non-overload conditions"); *id.* (citing researchers, international inhalation toxicology experts, and government bodies that have come to the same conclusion). |
| 23. | Rats in both inhalation studies were exposed to excessive doses of titanium dioxide—for 6 hours (Lee) or 18 hours (Heinrich) per day, 5 days per week for 2 years | Madl Report ¶¶ 28-32 (citing Heinrich et al. 1995; Lee, *et al*. 1985a, 1985b, 1986). |
| 24. | The excessive doses to which the rats in both inhalation studies were exposed were well beyond overload thresholds for retained particulate mass in the lungs. | *Id.* |
| 25. | The mechanism by which TiO2 caused cancer in rats in the Lee and Heinrich studies is lung overload. | Norris Decl. Ex. J 233:2-5 (stating that lung overload is "important" from "the standpoint of the animal studies because it's the mechanism by which it causes cancer in the lungs of the rats"); *see also id.* at 123:10-22. Madl Report ¶¶ 28-29, 32. |

| | |
|---|---|
| 26. Humans have not been shown to experience particle overload stemming from exposure to TiO2. | Norris Decl. Ex. J 115:11-14 ("[I]t hasn't been documented there is particle overload in humans for titanium dioxide as it relates to lung cancer"); *see also id.* at 232:12-13; *id.* at 156:19-22 ("I'm not aware of any information on [whether lung overload occurs in humans].") Madl Report ¶ 32. |
| 27. Particle clearance—the process by which respirable solid particles like titanium dioxide are cleared from the lungs—and translocation pathways vary between rodents and non-rodent species like humans. | Madl Report ¶¶ 21, 36; Norris Decl. Ex. J. 138:12-20. |
| 28. The variance in particle clearance between rodents and humans is due in part to anatomical and physiological differences including the size and number of pulmonary macrophages between the species. | *Id.* |
| 29. Adverse outcome pathways (AOP)—the sequential progression of events in an organism from the first contact of a toxicant at a molecular level to a final adverse outcome at the individual level—are species-specific. | Madl Report ¶¶ 25, 35-36, 39, 41; Norris Decl. Ex. J 138:21-139:4. |
| 30. The AOP for particle overload leading to tumorigenic responses is exclusive to rats. | *Id.* |
| 31. In 2017, the Committee for Risk Assessment of the European Chemicals Agency determined that the Lee study was not reliable, finding that the "exposure conditions represent excessive exposure which invalidates the results of the Lee et al. (1985) study." | European Chemicals Agency, Committee for Risk Assessment, *Opinion regarding risk assessment of TiO2* (Sept. 14, 2017), Norris Decl. Ex. D at 39; Madl Report ¶ 32. |
| 32. In 2022, the European Court of Justice annulled an EU regulation for titanium dioxide after determining that reliance on the Heinrich (1995) study was "manifest error" because the excessive lung overload conditions "invalidated the results." | European Court of Justice, Judgment and Decision re *CWS Powder Coatings GmbH v. European Commission* (Nov. 23, 2022), Norris Decl. Ex. E at 14, ¶¶ 78-103; Madl Report ¶ 32. |
| 33. Based solely on IARC's classification of TiO2, in 2011, California's Office of Environmental Health Hazard Assessment (OEHHA) added titanium dioxide (airborne, unbound particles of respirable size) ("Listed TiO2") to the Proposition 65 list of chemicals that are known to the State to cause cancer. | Answer ¶¶ 5, 43; OEHHA's Notice of Intent to List Titanium Dioxide (2011), Norris Decl. Ex. H. |

| | |
|---|---|
| 34. OEHHA made no determination that Listed Titanium Dioxide or any other form of titanium dioxide causes cancer in humans, and it has not done so in the intervening 13 years since listing Listed Titanium Dioxide. | Answer ¶ 6. |
| 35. IARC classified glyphosate as a Group 2A ("probably carcinogenic to humans") agent, concluding that there is "*limited* evidence in humans" but "sufficient evidence in experimental animals for the carcinogenicity of glyphosate." | IARC Monographs on the Evaluation of Carcinogenic Risks to Humans (Vol. 112), Norris Decl. Ex. F at 398. |
| 36. IARC classified acrylamide as a Group 2A ("probably carcinogenic to humans") agent, concluding that there is "*inadequate* evidence in humans" but "sufficient evidence in experimental animals for the carcinogenicity of acrylamide." | IARC Monographs on the Evaluation of Carcinogenic Risks to Humans (Vol. 60), Norris Decl. Ex. G at 425. |
| 37. PCPC's expert, Dr. Stephen Nowlis, conducted a survey to assess how consumers understand a Proposition 65 cancer warning on cosmetic products ("Nowlis Survey"). The findings from the Nowlis Survey show that the majority of respondents (73.1 to 77.8 percent) reading a cancer warning for Listed Titanium Dioxide on a cosmetic product understood it to convey that the product will cause them to get cancer or increase their risk of cancer. | Expert Report of Stephen Nowlis ("Nowlis Report") ¶¶ 6-9. |
| 38. Dr. Nowlis previously designed and conducted a consumer survey similar to the one here in another lawsuit, the *CalChamber* case. That survey examined whether California consumers interpret a Prop 65 cancer warning for acrylamide on food to convey that consuming the product increases their chances of getting cancer. The results of that survey indicated that upwards of 70 percent of consumers believed that consuming the food would increase their risk of cancer. | Nowlis Report ¶ 10 n.4; *California Chamber of Commerce v. Becerra* ("*CalChamber*"), Case No. 2:19-cv-02019-KJM (E.D. Cal.) (Declaration of Stephen M. Nowlis, ECF No. 95-25). |
| 39. The consumer survey Dr. Nowlis designed in the *CalChamber* case was accepted by Chief Judge Mueller and cited in support of her opinion granting plaintiff's motion for a preliminary injunction. That decision was affirmed by the U.S. Court of Appeals for the Ninth Circuit, which also cited the Nowlis survey in concluding that the Prop 65 warning at issue was misleading. | *California Chamber of Commerce v. Becerra*, 529 F. Supp. 3d 1099, 1117 (E.D. Cal. 2021), *aff'd sub nom. California Chamber of Commerce v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022). |
| 40. Defendant retained a professor of environmental studies, Dr. Joseph Arvai, to critique the design of the Nowlis Survey and audit whether the Nowlis Report's conclusions were supported by the survey data. | Expert Report of Joseph Arvai ("Arvai Report"), ECF No. 42 at 5, 7-8 |

| | | |
|---|---|---|
| 1 | 41. Dr. Arvai has never conducted a survey or designed a survey for use in litigation. | Norris Decl. Ex. K at 35:18-20. |
| 2 | 42. Dr. Arvai has never published an evaluation of another expert's survey. | Norris Decl. Ex. K at 37:12-14. |
| 3 | 43. Dr. Arvai has never published a study evaluating warnings. | Norris Decl. Ex. K at 41:15-42:7. |
| 4 | 44. Dr. Arvai did not conduct a survey on the Proposition 65 warning at issue in this litigation. | Norris Decl. Ex. K at 47:22-24. |
| 5 | 45. Dr. Arvai performed a reanalysis of the raw data associated with the open-ended responses to QF1, QF1a, Q3, and Q5 of the Nowlis survey. Dr. Arvai coded these responses according to a modified key that he created to assess whether the Nowlis Report's conclusions are supported by the survey data. Responses were assigned one of six codes. | Arvai Report, ECF No. 42 at 19-21. |
| 6 | 46. In this reanalysis by Dr. Arvai, only responses that were coded a (4) or (5) were factored into Dr. Arvai's calculation of the percentage of respondents interpreting the warning on the eyeshadow package to convey the message that using the product increases their risk of getting cancer. | Arvai Report, ECF No. 42 at 20. |
| 7 | 47. In this reanalysis by Dr. Arvai, a response was assigned a code (4) if it suggested that using the eye shadow "will cause cancer" or "will lead to an increased risk of cancer." | Arvai Report, ECF No. 42 at 19. |
| 8 | 48. Also in this reanalysis by Dr. Arvai, a response was assigned a code (5) if it suggested that the respondent would "think twice about using the eye shadow" or "stop using the eye shadow altogether. Arvai inferred from this that the respondent believed using the eye shadow will cause cancer or increase their risk of cancer. | Arvai Report, ECF No. 42 at 19-21. |
| 9 | 49. A response was assigned a code (3) if it indicated that using the eyeshadow can or might increase their risk of cancer (as opposed to *will* increase their risk of cancer). Dr. Arvai explained that "[t]hese are important distinctions because consumers understand that many products have been linked to cancer risk" but "may not (a) increase their level of risk relative to their current baseline, or (b) definitively cause cancer." | Arvai Report, ECF No. 42 at 19. |
| 10 | 50. Applying Dr. Arvai's methodology, Nowlis assessed the net percentage of respondents associated with codes (4) or (5) across all open-ended questions (Q1, Q1a, QF3, and QF5) of Test Survey 1, as well as Test Survey 2. | Norris Decl. Ex. I at 175:16–177:2; Supplemental Declaration of Stephen Nowlis ("Suppl. Nowlis Decl.") ¶ 3, Ex. A. |

| | |
|---|---|
| 51. Recoding the open-ended responses in Test Survey 2 (short-form warning) with Dr. Arvai's methodology, Dr. Nowlis determined that – across QF1, Q1a, QF3, and QF5 – 25.49% of respondents who read the short-form warning indicated that using the eyeshadow product will increase their risk of cancer. | Norris Decl. Ex. I at 177:7-22; Suppl. Nowlis Decl. ¶ 3, Ex. A. |
| 52. Across the open-ended questions in Test Survey 1, 27.86% of respondents who read the long-form warning indicated that using the eyeshadow product will increase their risk of cancer. | Norris Decl. Ex. I at 177:2-7; Suppl. Nowlis Decl. ¶ 3, Ex. A. |
| 53. No scientist or government authority has concluded that titanium dioxide is a human carcinogen. | Expert Report of Paolo Boffetta ("Boffetta Report"), ¶ 50 ("[N]o scientific or medical organization has identified TiO2 exposure as a risk factor for lung, bladder, or any other cancer in humans."); Norris Decl. Ex. J 74:18 – 75:1 ("The data is not strong enough to satisfy the criteria of a known human carcinogen."); *id.* at 79:2-7 (admitting that, to his knowledge, no "expert in the field of toxicology" has opined that titanium dioxide is a "known human carcinogen"). |
| 54. The authors of the Lee study acknowledged that, "based on the excessive dust loading and overwhelmed clearance mechanisms in the lungs of [the] [experimental] rats," the "biological relevance of lung tumors to man appears to be negligible." | Madl Report ¶ 29 ("[T]he relevancy of these lung tumors and other TiO2-induced lesions under excessive exposure conditions is questionable relative to the human-use situation.") (quoting Lee et al. 1985, 1986). |
| 55. There is a decades-long debate over the human risk relevance of chronic inhalation studies where rats exposed to poorly soluble low toxicity particles develop particle-overload related lung tumors. | Madl Report ¶ 35; Norris Decl. Ex. J 117:4-20; *id.* at 232:8-23. |
| 56. Cosmetic and personal care product companies, including PCPC's members, experience a significant burden as a result of Proposition 65 enforcement on Listed Titanium Dioxide. | Declaration of Thomas Myers ("Myers Decl.") ¶¶ 8-14 (ECF No. 27-19); Norris Decl. ¶¶ 17-41. |
| 57. PCPC members currently embroiled in dozens of lawsuits alleging failure to warn of Listed Titanium Dioxide and threatened with additional claims will continue to incur expenses and damages for litigation, reformulation and testing, and/or unwarranted warnings. | Norris Decl. ¶¶ 15-23. |

| | |
|---|---|
| 58. Since titanium dioxide was listed under Proposition 65, six private enforcers have issued 572 notices of violation and have pursued enforcement actions against manufacturers and retailers of cosmetics and personal care products, securing hundreds of thousands of dollars in settlement payments. | Norris Decl. ¶ 16. |
| 59. This includes 561 notices of violation to manufacturers and retailers since July 7, 2021 which have resulted in settlement agreements with more than 50 companies for $221,100 in civil penalties and $1,998,900 in attorney's fees. | Norris Decl. ¶ 20. |
| 60. The notices field since July 2021 have to date resulted in 124 lawsuits by private enforcers, most of which are now consolidated before the San Francisco Superior Court. | Norris Decl. ¶ 21. |
| 61. Notices of violation of Proposition 65 as to Listed Titanium Dioxide continue to be served on cosmetic companies, with the most recent one issued on August 29, 2024. | Norris Decl. ¶ 22. |
| 62. The epidemiological data to date does not support the hypothesis that exposure to titanium dioxide, in any form, increases the risk of lung or any other cancer in humans. | Boffetta Report ¶¶ 7, 75, 97-99. |
| 63. The studies instead suggest that exposure to titanium dioxide does not cause cancer. | *Id.* |
| 64. There is one study of mortality among workers employed in TiO2 production in Europe: Paolo Boffetta, Anne Soutar, John Cherrie, et al., *Mortality among workers employed in the titanium dioxide production industry in Europe,* 15 Cancer Causes Control, 697, 697–706 (2004) ("Boffetta 2004"). | Boffetta Decl. ¶ 58. |
| 65. Boffetta 2004 was a mortality follow-up study of 15,017 TiO2 production workers (95% male) first employed before 1990 and employed for more than a year in one of eleven (11) plants in six European countries (Finland, France, Germany, Italy, Norway, and the United Kingdom). | Boffetta Decl. ¶ 58. |
| 66. Boffetta 2004 did not find a dose-response effect from exposure to TiO2. | Boffetta Decl. ¶ 59. |
| 67. Overall, the results of Boffetta 2004 do not support the hypothesis that exposure to TiO2 is a cause of lung or other cancers. | Boffetta Decl. ¶ 61. |
| 68. There are three original studies of TiO2 exposure in examining the U.S. DuPont cohort: Chen and Fayerweather 1998, Ellis 2010, and Ellis 2013. | Boffetta Decl. ¶¶ 72, 74-76. |

| | |
|---|---|
| 69. Chen and Fayerweather (1998) examined mortality and cancer incidence in a cohort of 1,576 male workers exposed to TiO2 who were employed for at least a year before 1984 at two DuPont TiO2 production plants in the U.S. | Boffetta Decl. ¶ 72. |
| 70. Chen and Fayerweather (1998) found that the observed rate of lung cancer deaths in the study population was significantly *lower* than the expected lung cancer mortality rate in the U.S. | Boffetta Decl. ¶ 72. |
| 71. Chen and Fayerweather (1998) concluded: (1) Their "cohort analyses suggested that the risks of developing lung cancer and other fatal respiratory diseases were no higher for TiO2-exposued employees than for the rest of the DuPont Company or for the overall U.S. white population. In fact, statistically significant deficits of lung cancer deaths were observed for this cohort based on the general population"; and (2) "Nested case-control analyses found no significant associations between TiO2 exposure and risk of lung cancer…." | Boffetta Decl. ¶ 72. |
| 72. Ellis 2010 examined mortality among 5,054 workers between ages 31 to 60 employed at three TiO2 plants in the U.S, including the two plants included in the analyses above, with an average length of follow-up of 29 years. | Boffetta Decl. ¶ 74. |
| 73. Fewer lung cancer deaths were observed in the Ellis 2010 study population compared to the U.S. general population, although the difference was not statistically significant (SMR = 0.90; 95% CI: 0.75-1.05) ("With lung, the target organ of interest, no increases in malignant or nonmalignant respiratory disease were observed"). | Boffetta Decl. ¶ 74. |
| 74. Elizabeth Ellis, Janice Watkins, William Tankersley, et al., *Occupational exposure and mortality among workers at three titanium dioxide plants*, 56 Am. J. Ind. Med., 282, 282–291 (2013) ("Ellis 2013") was a follow-up study of workers at the same three TiO2 production facilities and examined the exposure–response relationship between cumulative exposure to TiO2 and TiCl4, and mortality. | Boffetta Decl. ¶ 75. |
| 75. When comparing the observed mortality rates of the exposed workers with the U.S. mortality rates, the authors of Ellis 2013 observed fewer deaths from (1) all causes (SMR 0.84 (95% CI: 0.78-0.90); all cancers (SMR 0.93 (95% CI: 0.82-1.06); and (3) lung cancer (SMR 0.98 (95% CI 0.78-1.21). | Boffetta Decl. ¶ 75. |

| | |
|---|---|
| 76. Ellis 2013 concluded that "the results of this study are consistent with those of other studies of TiO2. There is no indication of a positive association between occupational exposure to TiO2 … and death from all causes, all cancer, non-malignant respiratory disease or all heart disease." | Boffetta Decl. ¶ 75. |
| 77. None of these studies of the U.S. DuPont Cohort supports the hypothesis that exposure to TiO2 is a cause of lung or other cancers. | Boffetta Decl. ¶ 76. |
| 78. There is one study of the U.S. muli-plant cohort studying exposure to TiO2 in workers: Jon Fryzek, Bandana Chadda, Donald Marano, et al., *A cohort mortality study among titanium dioxide manufacturing workers in the United States,* 45 J Occup. Environ. Med., 400, 400–409 (2003) ("Fryzek 2003"). | Boffetta Decl. ¶ 77. |
| 79. Fryzek 2003 conducted a retrospective cohort mortality study of 4,241 workers (90% male, 58% white, and 20% unknown race) employed for more than 6 months after January 1, 1960 at four TiO2 production facilities in the United States and followed the workers through December 31, 2000. | Boffetta Decl. ¶ 77. |
| 80. Fryzek 2003 concluded that "[t]he data indicate that workers at the United States plants have not experienced risks of lung cancer or other significant adverse health effects as a result of their occupational exposure to TiO2." | Boffetta Decl. ¶ 77. |
| 81. There are four case-control studies from Montreal studying exposure to TiO2 in workers: Jack Siemiatycki, Risk Factors for Cancer in the Workplace, Boca Raton, FL, CRC Press (1991) ("Siemiatycki 1991"); Jack Siemiatycki, R. Dewar, L. Nadon, et al.., *Occupational risk factors for bladder cancer: results from a case-control study in Montreal, Quebec, Canada*, 140 Am. J. Epi. 1061, 1061–1080 (1994) ("Siemiatycki 1994"); Paolo Boffetta, V. Gaborieau, L. Nadon, et al., *Exposure to titanium dioxide and risk of lung cancer in a population-based study from Montreal*, 27 Scand. J. Work Environ. Health, 227, 227–232 (2001) ("Boffetta 2001"); and Agnihotram Ramanakumar, Marie-Elise Parent, Benoit Latreille, et al., *Risk of lung cancer following exposure to carbon black, titanium dioxide and talc: results from two case-control studies in Montreal,* 122 Int. J. Cancer, 183, 183–189 (2008) ("Ramanakumar 2008"). | Boffetta Decl. ¶¶ 79-83. |

11
SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS; CASE NO. 2:23-CV-01006-TLN-JDP

| | |
|---|---|
| 82. Siemiatycki 1991 observed no excess lung cancers for any exposure to TiO2. | Boffetta Decl. ¶ 79. |
| 83. Siemiatycki 1994 reported additional results on bladder cancer. | Boffetta Decl. ¶ 80. |
| 84. In Siemiatycki 1994, the corresponding fully adjusted Odds Ratio for non-substantial exposure were 1.3 (95% CI 0.8-2.2) and for substantial exposure was 1.8 (95% CI 0.4-7.6). The Odds Ratio was higher for medium/high exposure concentration than for low concentration but was higher for 1-10 years of exposure than it was for exposures greater than 10 years. | Boffetta Decl. ¶ 80. |
| 85. Boffetta 2001 assessed the risk of lung cancer from TiO2 exposure, and concluded that ""occupational exposure to titanium dioxide is probably not associated with a substantial increase in lung cancer risk." | Boffetta Decl. ¶ 81. |
| 86. Ramanakumar 2008 concluded that "workers in our study base with occupational exposure to carbon black, **titanium dioxide**, industrial talc and cosmetic talc did not experience any excess risk of lung cancer. These findings are consistent with the evaluations of the IARC working group that reviewed these substances." | Boffetta Decl. ¶ 82. |
| 87. In its assessment of 13 substances in the Titanium-containing Substances Group (of which titanium dioxide is a part), the Canadian Government conclude that those 13 substances "are not harmful to human health or the environment at levels of exposure considered in the assessment." | Government of Canada, *Titanium-Containing Substances Group - Information Sheet*, (Dec. 11, 2023), [attached as Ex. L to Norris Decl.]; *see also* Government of Canada, Titanium-containing Substances Group, available at https://www.canada.ca/en/health-canada/services/chemical-substances/chemicals-management-plan-3-substances/titanium-containing-substances-group.html. |
| 88. The World Health Organization's Joint Expert Committee on Food Additives (JECFA) has concluded that "the available data d[oes] not provide convincing evidence of genotoxicity" of titanium dioxide and reaffirmed its "not specified" acceptable daily intake level first established in 1969. | World Health Organization, Joint Expert Committee on Food Additives, "ECFA's Risk Assessment of Titanium Dioxide Risk Released – Background Information" (Nov. 24, 2023) [attached as Ex. M to Norris Decl.]. |

Dated: September 10, 2024

Respectfully submitted,

By: */s/ Trenton H. Norris*
Trenton H. Norris (CA Bar No. 164781)
HOGAN LOVELLS US LLP
Four Embarcadero Center, 35th Floor
San Francisco, CA 94111
Tel:  (415) 374-2300
trent.norris@hoganlovells.com

*Attorneys for Plaintiff*
*Personal Care Products Council*