**HOGAN LOVELLS US LLP**
Trenton H. Norris (CA Bar No. 164781)
David M. Barnes (CA Bar No. 318547)
Alexander Tablan (CA Bar No. 346309)
4 Embarcadero Center, Suite 3500
San Francisco, California 94111
Telephone:   (415) 374-2300
Facsimile:   (415) 374-2499
trent.norris@hoganlovells.com

**DLA PIPER LLP**
Gregory G. Sperla (CA Bar No. 278062)
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
Telephone:   415.836.2500
Facsimile:   415.836.2501
greg.sperla@dlapiper.com

Attorneys for Plaintiff
THE PERSONAL CARE PRODUCTS COUNCIL

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PERSONAL CARE PRODUCTS COUNCIL,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>Defendant. | Case No. 2:23-CV-01006-TLN-JDP<br><br>**DECLARATION OF TRENTON H. NORRIS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:   November 14, 2024<br>Judge:            Hon. Troy L. Nunley<br>Action Filed:    May 26, 2023 |

**DECLARATION OF TRENTON H. NORRIS**

I, Trenton H. Norris, declare as follows in support of the Motion for Summary Judgment filed by Plaintiff the Personal Care Products Council ("PCPC") in the above captioned action:

1. I am an attorney, member of the State Bar of California, and admitted to practice before this Court. I am a partner in the law firm of Hogan Lovells US LLP and lead counsel to Plaintiff in the above-captioned matter. I have advised and defended hundreds of businesses in Proposition 65 matters for over 25 years. I have personal knowledge of the matters set forth herein. If called and sworn as a witness, I could and would testify competently thereto.

2. Attached hereto as Exhibit A is a true and correct copy of an excerpt from the International Agency for Research on Cancer's *Monographs on the Evaluation of Carcinogenic Risks to Humans*, Vol. 93 (2010), available at https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Carbon-Black-Titanium-Dioxide-And-Talc-2010 [last visited September 4, 2024].

3. Attached hereto as Exhibit B is a true and correct copy of the International Agency for Research on Cancer's *Monographs on the Identification of Carcinogenic Hazards to Humans Questions and Answers*, available at https://monographs.iarc.who.int/wp-content/uploads/2018/07/IARCMonographs-QA.pdf [last visited September 4, 2024].

4. Attached hereto as Exhibit C is a true and correct copy of the International Agency for Research on Cancer's *Monographs on the Identification of Carcinogenic Hazards to Humans Preamble* (2019), available at https://monographs.iarc.who.int/wp-content/uploads/2019/07/Preamble-2019.pdf [last visited September 4, 2024].

5. Attached hereto as Exhibit D is a true and correct copy of the European Chemicals Agency's *Committee for Risk Assessment Opinion Proposing Harmonised Classification and Labelling at EU Level of Titanium Dioxide* (2017), available at https://echa.europa.eu/documents/10162/682fac9f-5b01-86d3-2f70-3d40277a53c2 [last visited September 4, 2024].

6. Attached hereto as Exhibit E is a true and correct copy of the European Court of Justice's *Judgment of the Court* (2022), available at

https://curia.europa.eu/juris/document/document.jsf?text=&docid=268096 [last visited September 4, 2024].

7. Attached hereto as Exhibit F is a true and correct copy of an excerpt from the International Agency for Research on Cancer's *Monographs on the Evaluation of Carcinogenic Risks to Humans*, Vol. 112 (2017), available at https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Some-Organophosphate-Insecticides-And-Herbicides-2017 [last visited September 4, 2024].

8. Attached hereto as Exhibit G is a true and correct copy of an excerpt from the International Agency for Research on Cancer's *Monographs on the Evaluation of Carcinogenic Risks to Humans*, Vol. 60 (1994), available at https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Some-Industrial-Chemicals-1994 [last visited September 4, 2024].

9. Attached hereto as Exhibit H is a true and correct copy of OEHHA's Notice of Intent to List Titanium Dioxide (2011), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-titanium-dioxide-airborne-unbound-particles-respirable-size [last visited September 4, 2024].

10. Attached hereto as Exhibit I is a true and correct copy of selected excerpts of the transcript of Dr. Stephen M. Nowlis's deposition held on August 7, 2024 in the above-captioned case.

11. Attached hereto as Exhibit J is a true and correct copy of selected excerpts of the transcript of Dr. Charles Jameson's deposition held on August 9, 2024 in the above-captioned case.

12. Attached here to as Exhibit K is a true and correct copy of selected excerpts of the transcript of Dr. Joseph Arvai's deposition held on August 9, 2024 in the above-captioned case.

13. Attached hereto as Exhibit L is a true and correct copy of an official publication from the Government of Canada, *Titanium-Containing Substances Group - Information Sheet* (Dec. 11, 2023), available at https://www.canada.ca/en/health-canada/services/chemical-substances/fact-sheets/chemicals-glance/titanium-containing-substances-group.html [last visited Sept. 9, 2024].

14. Attached hereto as Exhibit M is a true and correct copy of the World Health Organization's Joint Expert Committee on Food Additives "ECFA's Risk Assessment of Titanium Dioxide Risk Released – Background Information" (Nov. 24, 2023), available at https://www.who.int/publications/m/item/jecfa-risk-assessment-of-titanium-dioxide-risk-released-background-information [last visited Sept. 9, 2024].

**Proposition 65 Enforcement Action Over Titanium Dioxide in Cosmetic Products**

15. On September 2, 2011, the California Office of Environmental Health Hazard Assessment ("OEHHA") added titanium dioxide (airborne, unbound particles of respirable size) ("Listed Titanium Dioxide") as a chemical known to the state to cause cancer. Since its listing became effective on September 2, 2012, Listed Titanium Dioxide has been the target of significant Proposition 65 enforcement activity, particularly with respect to cosmetic and personal care products.

16. The California Attorney General maintains a database of Proposition 65 "notices of alleged violation" filed by private litigants under Proposition 65 (the "AG Notice Database"). These notices are precursors to litigation under the statute, which requires that private plaintiffs not initiate suit until at least "60 days" after presenting the notice of alleged violation. Cal. Health & Safety Code § 25249.7(d). The AG Notice Database can be accessed at: https://oag.ca.gov/prop65/60-day-notice-search. The AG Notice Database reports that private enforcers have issued 572 notices of violation for alleged exposures to Listed Titanium Dioxide. A true and correct screenshot from the AG Notice Database is attached to Plaintiff's Request for Judicial Notice, filed herewith, as Exhibit N. The 572-notice figure includes notices of violation that are amended and/or withdrawn (meaning that the actual number of "unique" notices of violation for Listed Titanium Dioxide is less than 572). At my direction, attorneys at Hogan Lovells US LLP reviewed the AG's Notice Database to determine the number of unique notices of violation and the time periods in which they were issued. The results of this search are described below.

17. The AG Notice Database shows that, by April 2013, a private enforcer known as the Center for Environmental Health had issued two notices of violation based on alleged exposure to Listed Titanium Dioxide from spray sunscreens. This first round of notices named 10 manufacturers

and three retailers.

18. The AG Notice Database also shows a second round of notices occurring two months later. On June 12 and June 24, 2013, another private enforcer called Public Interest Alliance LLC named approximately 135 manufacturers of cosmetic products. These notices resulted in settlement payments of $826,500 ($100,000 in civil penalties and $726,500 in attorney fees) by over 60 companies. For those noticed manufacturers who did not settle, this second set of notices resulted in more than a year's worth of expensive litigation, including extensive fact and expert discovery.

19. The AG Notice Database also shows a third round of notices occurring less than six months later. On December 2, 2020, another private enforcer named Piyush Yadav issued notices to seven manufacturers of cosmetic products. One of these notices settled out of court for $20,000. Another pair of notices from this private enforcer became the basis of an enforcement action, which recently settled for $120,000 ($18,000 in civil penalties and $102,000 in attorney fees).

20. The AG Notice Database also shows a fourth round of notices beginning on July 7, 2021 and continuing to this day. It includes more than 561 unique notices of violation to manufacturers and retailers. This has resulted in settlement agreements with over fifty companies for $2,220,000 ($221,100 in civil penalties and $1,998,900 in attorney fees).

21. This fourth round of notices has resulted in the filing of 124 lawsuits across California state trial courts spanning five counties. A petition to coordinate 108 of these suits was accepted by the state Judicial Council on May 8, 2023 and later granted on August 30, 2023.

22. Private enforcers continue to issue notices on cosmetic companies for alleged exposures to Listed Titanium Dioxide, with the most recent notice issued on August 29, 2024.

23. The AG Notice Database shows that, although Listed Titanium Dioxide has been on the Proposition 65 list for more than a decade, the number of pre-litigation notices for Listed Titanium Dioxide has grown significantly in recent years: 7 companies in 2020, 18 companies in 2021, 198 companies in 2022, 174 companies in 2023, and 199 companies in 2024 thus far. Several of PCPC's members have been the targets of these notices and the lawsuits filed on their basis.

Based on this trend and my years of experience with Proposition 65, it is my opinion that, absent a permanent injunction barring new lawsuits, more companies are likely to be future targets of Proposition 65 enforcement actions alleging failure to warn about Listed Titanium Dioxide in cosmetic and personal care products.

**Prior Proposition 65 Consent Judgments**

24. In addition to the AG Notice Database, the California Attorney General maintains a related database of court-approved consent judgments in Proposition 65 matters ("AG Settlement Database"). The database can be accessed at https://oag.ca.gov/prop65/annual-settlement-reports.

25. Review of the AG Settlement Database performed under my direction shows that the overwhelming majority of court-approved consent judgments include as injunctive relief a specific requirement that the defendant provide a Proposition 65 warning, most often prescribing the specific language to be used. I describe the results of this review in the following paragraphs.

26. There were 1,215 unique court-approved consent judgments issued between September 1, 2016 and October 15, 2020.

27. Of those 1,215 court-approved consent judgments, 1,025 included as injunctive relief a specific requirement that the defendant provide a Proposition 65 warning. The other 190 judgments did not include a warning requirement, because they instead required the defendant to reformulate its product or cease selling the product in California.

28. Of the 1,025 court-approved consent judgments that included a Proposition 65 warning requirement, 1,009 specified the precise language that the warning must include. In every one of those cases, the specified warning included the words "known to cause" or "known to the State to cause" or "known to the State of California to cause" cancer and/or reproductive harm when describing the chemical at issue.

29. The other 16 court-approved judgments that included a Proposition 65 warning requirement did not include specific warning language. Instead, they provided that either: (i) the warning shall comply with the Clear and Reasonable standard pursuant to 27 California Code of Regulations section 25601 (which was in effect until August 30, 2018 and provided that, in order to be "clear and reasonable," a warning must "clearly communicate that the chemical in question is

known to the state to cause cancer, or birth defects or other reproductive harm") and utilize the safe harbor warning language set forth in 27 California Code of Regulations section 25603.2; or (ii) the warning shall be "clear and reasonable" within the meaning of Proposition 65.

**Efforts to Comply with Proposition 65 with Respect to Titanium Dioxide in Cosmetics**

30. I have counseled many businesses (and trade associations of businesses) that sell and/or manufacture cosmetic and personal care products containing titanium dioxide on compliance with Proposition 65. The information provided to me by these clients, and my advice to them, is privileged and confidential, and I have no intention of disclosing—or ability to disclose—such information. Nevertheless, my experience has made me familiar with the types of decisions these businesses are forced to make and the costs they frequently incur to reduce their risk of Proposition 65 enforcement litigation, and below I summarize that experience and my observations without disclosing privileged and confidential information.

31. Many businesses have conducted expensive testing to determine whether their cosmetic and personal care products contain the listed form of titanium dioxide, i.e., airborne, unbound particles of respirable size. Because OEHHA has not defined these terms, there is ambiguity about how to determine whether Listed Titanium Dioxide is present in a product. Plaintiff's counsel in Proposition 65 enforcement actions have their litigation positions on this issue, which businesses also have to take into account.

32. Ordinarily, businesses can rely on a safe harbor No Significant Risk Level ("NSRL") set by OEHHA as an affirmative defense against allegations that their products contain a cancer-causing chemical. Although proving that an exposure to a chemical falls below the NSRL is costly, the availability of this default safe harbor level is a valuable tool for many companies. Where products containing Listed Titanium Dioxide are concerned, however, businesses do not enjoy the benefit of this safe harbor because OEHHA has not set a default NSRL for Listed Titanium Dioxide.

33. From my experience advising companies that sell cosmetics and other products containing listed chemicals without a default NSRL, defending against Proposition 65 claims in these circumstances is especially difficult because, in the absence of a safe harbor level, a private enforcer need only detect a listed chemical in *any amount* (and a plausible route of exposure) before

issuing a notice of violation and file a lawsuit. As a result, companies who wish to defend themselves must undertake an even costlier and more uncertain battle to establish an NSRL in the first place, before proving that their products fall below that safe harbor threshold. Establishing an NSRL in the course of litigation is a highly time- and cost-intensive endeavor, as it involves competing testimony from epidemiological and toxicological experts.

34. Many businesses have also evaluated the feasibility of reformulating their products to reduce the likelihood of airborne exposure to titanium dioxide, whether through the addition or replacement of ingredients. Such alternative formulations, however, are often undesirable due to a variety of reasons, including the high expense and negative effects on the characteristics of the products.

35. To avoid the expense of asserting the safe harbor defense and reformulating their products, some businesses decide to provide a Proposition 65 cancer warning for their cosmetic and personal care products that contain Listed Titanium Dioxide, even though they believe that such a warning is unfounded. This is especially true for smaller business owners who cannot afford to litigate because of the significant legal fees and expert costs necessary to prove an NSRL defense at trial.

36. All these impacts on businesses are ongoing. Businesses that produce cosmetic and personal care products must continually assess their Proposition 65 litigation risk for each new product they produce that may contain Listed Titanium Dioxide. In addition, businesses that use alternative formulations to reduce the presence of Listed Titanium Dioxide must incur these costs on an ongoing basis for each unit they produce. Finally, as discussed above, private enforcers have shown no signs of slowing their pace in targeting new cosmetic and personal care products with pre-litigation notices for alleged exposures to Listed Titanium Dioxide.

**Lack of Governmental Control of Proposition 65 Private Enforcement**

37. Neither the California Attorney General nor OEHHA has any legal ability to block a private enforcer of Proposition 65 from filing a non-meritorious lawsuit against a business and pursuing that lawsuit to its conclusion. The California Attorney General can, during a 60-day window following service of a pre-litigation notice of violation by a private enforcer, sue the

business that is named in the notice and thereby take over the litigation and prevent the private enforcer from proceeding, but the longstanding policy of the Attorney General's office is not to do so unless it believes a violation of Proposition 65 has occurred. As a result, when the California Attorney General believes a private enforcer's claim lacks merit, its only tool is to attempt to persuade the private enforcer not to proceed. Indeed, Proposition 65 was amended a few years ago to require that:

> If, after reviewing the factual information sufficient to establish the basis for the certificate of merit and meeting and conferring with the noticing party regarding the basis for the certificate of merit, the Attorney General believes there is no merit to the action, the Attorney General shall serve a letter to the noticing party and the alleged violator stating the Attorney General believes there is no merit to the action.

Cal. Health & Safety Code section 25249.7(e)(1)(A). The private enforcer, however, need not yield to the views of the California Attorney General. Indeed, Proposition 65 begins with the statement: "The people of California find that . . . state government agencies have failed to provide them with adequate protection . . . ."

38. One example is *Physicians Committee for Responsible Medicine v. McDonald's Corp., et al.*, Los Angeles Superior Court, Case No. BC383722, in which I served as counsel of record for McDonald's Corporation and other defendants. The lawsuit was brought by Physicians Committee for Responsible Medicine ("PCRM") against McDonald's and other restaurants under Proposition 65, alleging that their grilled chicken sandwiches and other offerings expose Californians to the listed carcinogen 2-Amino-1-methyl-6-phenylimidazol[4,5-b]pyridine ("PhIP"). PhIP is created in grilling most meat products (whether at home or in a restaurant). PCRM is a vegan activist organization that advocates for a diet devoid of meat.

39. The California Attorney General reviewed the scientific basis for PCRM's claim, with the assistance of an expert, and "concluded that the level of PhIP present in cooked chicken falls far below the level that would require a warning under Proposition 65 . . . ." *See* Letter from Edward G. Weil, Supervising Deputy Attorney General, to Richard A. Raymond, M.D., Under Secretary, United States Department of Agriculture, and Marc I. Kesselman, General Counsel, United States Department of Agriculture at 6-7 (Dec. 5, 2006). PCRM nevertheless pursued its

8

Proposition 65 claims in court against McDonald's and several other restaurant chains in expensive litigation that lasted more than six years and resulted in two opinions of the California Court of Appeal. In the course of that litigation, the Attorney General's conclusion was repeatedly presented to the Superior Court and the Court of Appeal, but that did not stop the case from proceeding, and the scientific issues were never litigated.

### Warnings That Differ from the Safe Harbor Warning

40. A business that warns for exposures to listed chemicals using language or methods that differ from the safe harbor warning must be prepared to defend its warning as clear and reasonable at trial. Below I describe two prominent examples where slight variances from the safe harbor language precluded early resolution of litigation that instead ran for many years.

### *McDonald's*

41. When the *PCRM* case described above was filed, McDonald's had been providing a Proposition 65 warning that had been approved by the Los Angeles Superior Court in a consent judgment that resolved a prior enforcement action over acrylamide in french fries brought by a different bounty-hunter, the Center for Education and Research on Toxics, and by the California Attorney General. This warning included language that almost precisely incorporated the safe harbor language that covers all chemicals and all foods, and this warning had been approved by a court. Nevertheless, PCRM sued McDonald's for failing to provide what PCRM considered to be a "clear and reasonable" warning specifically for PhIP in grilled chicken.

42. The court-approved McDonald's warning at issue in the PCRM lawsuit tracked the specific language of the safe harbor warning language for all foods served in restaurants that is prescribed in the Proposition 65 regulations. 27 Cal. Code Regs. § 25603.3(a). But it also contained additional language about acrylamide. The differences in the two warnings are shown below:

| Safe Harbor Warning | McDonald's Warning |
|---|---|

| WARNING: Chemicals known to the State of California to cause cancer, or birth defects or other reproductive harm may be present in foods or beverages sold or served here. | WARNING: Chemicals known to cause cancer, or birth defects or other reproductive harm may be present in foods or beverages sold or served here. Cooked potatoes that have been browned such as French fries and baked potatoes, contain acrylamide, a chemical known to the State of California to cause cancer. Acrylamide is not added to our foods, but is created whenever potatoes and certain other foods are browned. The FDA has not advised people to stop eating baked or fried potatoes. For more information see www.fda.gov |
|---|---|

43. McDonald's filed a demurrer to PCRM's complaint, in part because its warning included, nearly verbatim, the language set forth as the safe harbor warning for all chemicals in all foods served in restaurants. The Los Angeles Superior Court nevertheless overruled McDonald's demurrer to the extent it was premised on use of the safe harbor warning, holding that the court "cannot conclude as a matter of law that the additional language does not 'contradict or obfuscate' otherwise acceptable warning language." A true and correct copy of the court's tentative ruling is attached hereto as Exhibit O. The term "contradict or obfuscate" is found in the California Attorney General's regulations. *See* 11 Cal. Code Regs § 3202(b) (noting that "clear and reasonable" warnings cannot contain "additional words or phrases that contradict or obfuscate otherwise acceptable warning language").

44. Accordingly, whether McDonald's warnings were clear and reasonable was a disputed issue of fact because its warning was not precisely the same as the safe harbor warning language prescribed in the regulations of OEHHA. Although McDonald's had used very similar language, its warning was not sufficient to end the litigation at the demurrer stage.

### *Disneyland*

45. In late 2010, the Mateel Environmental Justice Foundation, an active Proposition 65 enforcer, gave notice to Walt Disney Parks and Resorts U.S., Inc. ("Disneyland") of its allegation that brass rails and stanchions at Disneyland expose visitors to lead. In the course of long-running litigation in which I served as counsel of record to Disneyland, Disneyland moved for summary

adjudication on the grounds that it had provided clear and reasonable warnings since 2012 via extensive signage at the Disneyland Resort. *Mateel Environmental Justice Foundation v. Walt Disney Parks and Resorts U.S., Inc.*, Orange County Superior Court, Case No. 30-201300635953.

46. The content of Disneyland's warnings was virtually identical to the safe harbor warning set out for consumer products and services (27 Cal. Code Regs. § 25603.2(a)), as well as the safe harbor warning set out for environmental warnings (27 Cal. Code Regs. § 25605.2(a)), except that the words "This product" or "This area" (respectively) had been replaced with the more descriptive term, "The Disneyland Resort," as shown in the following table:

| Safe Harbor Warnings | Disneyland's Warning |
|---|---|
| WARNING:<br><br>This product contains a chemical known to the State of California to cause cancer.<br><br>[and][1]<br><br>This product contains a chemical known to the State of California to cause birth defects or other reproductive harm.<br><br>WARNING:<br><br>This area contains a chemical known to the State of California to cause cancer.<br><br>[and]<br><br>This area contains a chemical known to the State of California to cause birth defects or other reproductive harm. | WARNING:<br><br>The Disneyland Resort contains chemicals known to the state of California to cause cancer and birth defects or other reproductive harm.<br><br>Proposition 65, California Health & Safety Code Section 25249.6 et seq. |

47. In May 2014, the Orange County Superior Court denied Disneyland's motion for summary adjudication on the grounds that it did "not use[] the exact language of the safe harbor warnings or a substantially similar variation thereof and therefore is not entitled to safe harbor protection." A true and correct copy of the court's order is attached hereto as Exhibit P.

48. Accordingly, whether Disneyland's warnings were clear and reasonable was a

---

[1] The regulations provide separate Regulatory Default Warnings for carcinogens and reproductive toxicants. 27 Cal. Code Regs. § 25603.3(a). The wording for these two warnings is commonly combined into a single warning that is also considered to be "clear and reasonable."

11

disputed issue of material fact to be resolved at trial, and Disneyland was forced to litigate further because its warning was not precisely the same as the safe harbor warning language prescribed in the OEHHA regulations. This litigation involved two lawsuits and was ultimately dismissed voluntarily by the Plaintiff after approximately four years.

    I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 10th day of September, 2024, at San Francisco, California.

*/s/ Trenton H. Norris*
Trenton H. Norris