# EXHIBIT  E

JUDGMENT OF THE GENERAL COURT (Ninth Chamber, Extended Composition)

23 November 2022 ([*])

(Environment and protection of human health – Regulation (EC) No 1272/2008 – Classification, labelling and packaging of substances and mixtures – Delegated Regulation (EU) 2020/217 – Classification of titanium dioxide in powder form containing 1% or more of particles with a diameter of 10 μm or less – Criteria for classifying a substance as carcinogenic – Reliability and acceptability of studies – Substance inherently capable of causing cancer – Calculation of pulmonary particle overload – Manifest errors of assessment"

In Joined Cases T-279/20 and T-288/20 and in Case T-283/20,

**CWS Powder Coatings GmbH,** established in Düren (Germany), represented by R. van der Hout, C. Wagner and V. Lemonnier,[lawyers],

applicant in Case T-279/20,

supported by

**Billions Europe Ltd,** established in Stockton-on-Tees (United Kingdom), and the other interveners whose names appear in the annex ([1]), represented[by J.]-P. Montfort, T. Delille and P. Chopova-Leprêtre, lawyers,

by

**Ettengruber GmbH Abbruch und Tiefbau,** established in Dachau (Germany),

**Ettengruber GmbH Recycling und Verwertung,** established in Dachau,

represented[by Es van] der Hout, Wagner and Lemonnier, lawyers,

and by

**TIGER Coatings GmbH & Co. KG,** established in Wels (Austria), represented by M es van der Hout, Wagner and Lemonnier,[lawyers],

interveners in Case T-279/20,

**Billions Europe Ltd,** established in Stockton-on-Tees, and the other applicants whose names appear in the annex ([2]), represented by Ms Montfort, Ms Delille and Ms Chopova-Leprêtre,[lawyers],

applicants in Case T-283/20,

supported by

**European Chemical Industry Council (Cefic),** established in Brussels (Belgium), represented by D. Abrahams, Z. Romata and H. Widemann, lawyers,

by

**European Council of the Paints, Printing Inks and Art Colours Industry (CEPE),** established in Brussels,

1

**British Coatings Federation Ltd (BCF),** established in Coventry (United Kingdom),

**American Coatings Association, Inc. (ACA),** established in Washington, DC (United States),

represented by D. Waelbroeck and I. Antypas, lawyers,

and by

**Mytilineos SA,** established in Maroussi (Greece),

**Delfi-Distomon Anonymos Metalleftiki Etaireia,** established in Maroussi,

represented by Ms Montfort, Delille and Chopova-Leprêtre, lawyers,

interveners in Case T-283/20,

**Brillux GmbH & Co. KG,** established in Münster (Germany),

**Daw SE,** established in Ober-Ramstadt (Germany),

represented by Es van der Hout, Wagner and Lemonnier, lawyers,

applicants in Case T-288/20,

supported by

**Billions Europe Ltd,** established in Stockton-on-Tees, and the other interveners whose names appear in the annex,(3) represented by Montfort, Delille and Chopova-Leprêtre, lawyers,

by

**Sto SE & Co. KGaA,** established in Stühlingen (Germany), represented by Ms van der Hout, Wagner and Lemonnier, lawyers,

and by

**Rembrandtin Coatings GmbH,** established in Vienna (Austria), represented by Ms van der Hout, Wagner and Lemonnier, lawyers,

interveners in Case T-288/20,

against

**European Commission,** represented in Joined Cases T-279/20 and T-288/20 by S. Delaude, R. Lindenthal and M. Noll-Ehlers and, in Case T-283/20, by A. Dawes, M. Delaude and M. Lindenthal, acting as Agents,

Defendant

supported by

**Kingdom of Denmark,** represented by M. Søndahl Wolff, acting as Agent,

by

**2**

**French Republic,** represented in Joined Cases T-279/20 and T-288/20 by T. Stéhelin, W. Zemamta, G. Bain and J.-L. Carré and, in Case T-283/20,[by E.] de Moustier and M. Zemamta, acting as Agents,

by

**Kingdom of the Netherlands,** represented in Case T-279/20[by M.] Bulterman and C. Schillemans, in Case T-283/20[by Ms] Bulterman and J. Langer and, in Case T-288/20,[by Ms] Bulterman, Ms Langer and[Ms] Schillemans, acting as Agents,

by

**Kingdom of Sweden,** represented in Joined Cases T-279/20 and T-288/20[by C.] Meyer-Seitz and, in Case T-283/20, by O. Simonsson, Meyer-Seitz, A. Runeskjöld, Salborn Hodgson, H. Shev, H. Eklinder and R. Shahsavan Eriksson, acting as Agents,

by

**European Chemicals Agency (ECHA),** represented[by A.] Hautamäki and J.-P. Trnka, acting as Agents,

interveners in Joined Cases T-279/20 and T-288/20 and in Case T-283/20,

by

**Republic of Slovenia,** represented[by V.] Klemenc, acting as Agent,

intervener in Case T-283/20,

by

**European Parliament,** represented[by C.] Ionescu Dima, W. Kuzmienko[and B.] Schäfer, acting as Agents,

and by

**Council of the European Union,** represented[by A.]-L. Meyer and T. Haas, acting as Agents,

interveners in Joined Cases T-279/20 and T-288/20,

THE GENERAL COURT (Ninth Chamber, Extended Composition),

composed, at the time of the deliberations,[of M.J.] Costeira (Rapporteur), President, M. Kancheva, T. Perišin, P. Zilgalvis and I. Dimitrakopoulos, Judges,

Registrar: S. Jund and I. Kurme, Administrators,

having regard to the written part of the procedure, in particular the order of 11 March 2022 joining Cases T-279/20 and T-288/20 for the purposes of the oral part of the procedure and the decision closing the proceedings,

further to the hearings of 12 May 2022, in Joined Cases T-279/20 and T-288/20, and of 18 May 2022, in Case T-283/20,

makes the present

1 By their actions under Article 263 TFEU, the applicants, CWS Powder Coatings GmbH ('the first applicant'), Billions Europe Ltd and the other applicants whose names appear in the annex ('the second applicants') and Brillux GmbH & Co. KG and Daw SE ('the third applicants'), seek annulment of Commission Delegated Regulation (EU) 2020/217, of 4 October 2019 amending, for the purposes of adapting to technical and scientific progress, Regulation (EC)$^{No}$ 1272/2008 of the European Parliament and of the Council on classification, labelling and packaging of substances and mixtures and correcting that Regulation (OJ 2020 L 44, p. 1) ('the contested regulation'), as regards the harmonised classification and labelling of titanium dioxide in powder form containing 1% or more particles with a diameter of less than or equal to 10 μm.

### I. Background to the dispute

2 The applicants are manufacturers, importers, downstream users and suppliers of titanium dioxide.

3 Titanium dioxide is an inorganic chemical substance, the molecular formula of which is TiO2, which may be found in nature or be industrially produced and which is used, in particular in the form of a white pigment, for its colouring and covering properties, in various products, such as paints, coating materials, varnishes, etc. plastics, laminated paper, cosmetics, medicines or toys.

4 In May 2016, the French Agency for Food, Environmental and Occupational Health and Safety (ANSES, France) ('the French competent authority') submitted to the European Chemicals Agency (ECHA), in accordance with Article 37(1) of Regulation (EC)$^{No}$ 1272/2008 of the European Parliament and of the Council of 16 December 2008 on classification, labelling and packaging of substances and mixtures, amending and repealing Directives 67/548/EEC and 1999/45/EC and amending Regulation (EC)$^{No}$ 1907/2006 (OJ 2008 L 353, p. 1), a dossier proposing the harmonised classification and labelling of titanium dioxide as a category 1B carcinogen by inhalation (Carc. 1B, H350(i) ('the classification proposal').

5 On 31 May 2016, the dossier submitted to ECHA by the French competent authority was published, in accordance with Article 37(4) of$^{Regulation\ No}$ 1272/2008. Several interested parties submitted their comments within the prescribed period.

6 On 14 September 2017, in accordance with Article 37(4) of$^{Regulation\ No}$ 1272/2008, the ECHA Committee for Risk Assessment ('the RAC') adopted an opinion on titanium dioxide ('the RAC opinion'). The RAC opinion, adopted by consensus, concluded that the classification of titanium dioxide as a category 2 carcinogen, with the hazard statement 'H351 (inhalation)', was justified.

7 On the basis of the RAC's opinion, the European Commission drew up a draft regulation on the harmonised classification and labelling of, inter alia, titanium dioxide, which was submitted for public consultation between 11 January and 8 February 2019.

8 On 18 February 2020, on the basis of the RAC's opinion, the Commission adopted the contested regulation, by which it carried out, inter alia, the harmonised classification and labelling of titanium dioxide (recitals 2 and 5 of the contested regulation).

9 In that regard, first, the contested regulation inserted, in Table 3 of Part 3 of Annex VI to$^{Regulation\ No}$ 1272/2008, which contains the list of harmonised classifications and labelling, a new row containing the chemical identification 'titanium dioxide (in the form of a powder containing 1% or more of particles with a diameter ≤ 10 μm)', the hazard class 'carcinogenicity', the hazard category '2', the hazard pictogram code 'GHS 08 Wng' and the hazard statement code 'H351 (inhalation)' (Article[1](3) and point 2(c) of Annex III to the contested regulation).

**4**

10 In addition, the contested regulation added, to point 1.1.3.1 of Part 1 of Annex VI to Regulation No 1272/2008, the following note (Article 1(3) and point 1(a) of Annex III to the contested regulation):

"Note W:

Carcinogenicity of this substance has been observed to occur when respirable dust is inhaled in quantities that result in a significant reduction in the mechanisms of particulate matter removal in the lung.

The purpose of this note is to describe the particular toxicity of the substance, and does not constitute a criterion for classification under this Regulation' ('Note W').

11 Secondly, the contested regulation added, to point 1.1.3.2 of Part 1 of Annex VI to Regulation No 1272/2008, the following note (Article 1(3) and point 1(b) of Annex III to the contested regulation):

"Note 10:

Classification as an inhalation carcinogen applies only to mixtures in powder form containing 1% or more of titanium dioxide that is in the form of particulate matter or that is incorporated into particulate matter having an aerodynamic diameter $\leq 10$ μm."

12 Thirdly, the contested regulation inserted, in Part 2 of Annex II to Regulation No 1272/2008, a new point 2.12 concerning the terms EUH211 and EUH212 which must be included on the label of the packaging of mixtures, respectively, liquid and solid, containing titanium dioxide. Section 2.12 is worded as follows (Article 1(1) of and Annex I to the contested regulation):

'2.12. Mixtures containing titanium dioxide

The package label of liquid mixtures containing 1% or more of titanium dioxide particles with an aerodynamic diameter of 10 μm or less shall bear the following statement:

EUH211: "Attention! Dangerous respirable droplets may form when spraying. Do not breathe aerosols or mists."

The package label for solid mixtures containing 1% or more of titanium dioxide shall be labelled as follows:

EUH212: "Warning! Dangerous respirable dust may form during use. Do not breathe this dust."

In addition, the label of the packaging of liquid and solid mixtures not intended for the general public and not classified as hazardous, which bear the words EUH211 or EUH212, must bear the word EUH210. »

13 Fourthly, the contested regulation incorporated, in Part 3 of Annex III to Regulation No 1272/2008, concerning 'labelling elements/additional information on certain mixtures', those hazard statements EUH211 and EUH212 in all the official languages of the European Union (Article 1(2) of and Annex II to the contested regulation).

14 In addition, the contested regulation introduced, updated or abolished the harmonised classification and labelling of certain other substances, on the basis of other opinions adopted by the RAC (recitals 3, 4, 6 and 8 and Article 1 of the contested regulation).

15 Pursuant to Article 3 of the contested regulation, the amendments to Regulation No 1272/2008 concerning the harmonised classification and labelling of titanium dioxide in powder form containing 1% or more of

particles with a diameter of 10 µm or less ('the contested classification and labelling') are to apply from [1] October 2021.

## II. Forms of order sought by the parties

16 The first applicant, supported by the second applicants, Ettengruber GmbH Abbruch und Tiefbau, Ettengruber GmbH Recycling und Verwertung and TIGER Coatings GmbH & Co. KG, the second applicants, supported by the European Chemical Industry Council (Cefic), the European Council of the Paints, Printing Inks and Art Colours Industry (CEPE), British Coatings Federation Ltd (BCF), American Coatings Association, Inc. (ACA), Mytilineos SA and Delfi-Distomon Anonymos **Metalleftiki** Etaireia, and the third applicants, supported by the second applicants, Sto SE & Co. KGaA and Rembrandtin Coatings GmbH, claim that the Court should:

– annul the contested regulation as regards the contested classification and labelling;

– order the defendant to pay the costs.

17 The Commission, supported by the Kingdom of Denmark, the French Republic, the Kingdom of the Netherlands, the Kingdom of Sweden, the Republic of Slovenia and the ECHA, contends that the Court should:

– dismiss the actions;

– order the applicants to pay the costs.

18 The European Parliament and the Council of the European Union contend, in support of the Commission, that the plea of illegality raised in the context of the ninth plea in Case T-279/20 and Case T-288/20 should be rejected.

## III. Law

19 Since the parties have heard oral argument in that regard and have not raised any objections, the Court decides to join Case T-283/20 with Joined Cases T-279/20 and T-288/20 for the purposes of the decision closing the proceedings, in accordance with Article 68(1) of the Rules of Procedure of the General Court.

20 In support of their actions, the first and third applicants raise, in Case T-279/20 and Case T-288/20 respectively, the same nine pleas in law, which overlap for the most part with the six pleas raised by the second applicants in Case T-283/20. In essence, the pleas may be presented as follows.

21 In the first place, in the context of the second plea, the first and fifth parts of the seventh plea and the eighth plea in Joined Cases T-279/20 and T-288/20 and the arguments raised by the second applicants in their statements in intervention in those cases, and the first plea in Case T-283/20, The applicants and the interveners in their support claim, in essence, that the contested classification and labelling are vitiated by manifest errors of assessment and that they do not comply with the criteria laid down by Regulation[No] 1272/2008 for the classification of a substance as carcinogenic.

22 In the second place, in the context of the third and fourth pleas, the seventh and eighth parts of the seventh plea and the eighth plea in Joined Cases T-279/20 and T-288/20 and the second plea in Case T-283/20, the applicants submit, in essence, that the imposition of the words EUH211 and EUH212 on the label of liquid and solid mixtures containing titanium dioxide infringes Article 25, (6) of[Regulation No] 1272/2008 and the principle of legal certainty.

6

23  In the third place, in the context of the sixth plea and the fifth part of the seventh plea in Joined Cases T-279/20 and T-288/20 and the third plea in Case T-283/20, the applicants submit that the contested classification and labelling infringe the principle of proportionality.

24  In the fourth place, in the context of the fifth plea and the second part of the seventh plea in Joined Cases T-279/20 and T-288/20 and the sixth plea in Case T-283/20, the applicants allege infringement of the Interinstitutional Agreement of 13 April 2016 between the European Parliament, the Council of the European Union and the European Commission on Better Law-Making (OJ 2016, L 123, p. 1) and the absence of an impact assessment before the adoption of the contested regulation.

25  In the fifth place, in the context of the third part of the seventh plea in Joined Cases T-279/20 and T-288/20 and the fourth plea in Case T-283/20, the applicants submit that the Commission wrongly exercised its discretion and that it infringed the duty of diligence. Those pleas overlap for the most part with those referred to in paragraph 21 above, in that they allege manifest errors of assessment.

26  In the sixth place, in the context of the first plea in Joined Cases T-279/20 and T-288/20, the first applicant and the third applicants allege infringement of Article 53c of Regulation No 1272/2008, in the context of the fourth part of the seventh plea, they allege infringement of the principle of equal treatment, and, in the context of the ninth plea, they claim, in the alternative and by way of exception, that Regulation No 1272/2008 is inapplicable, on the ground of infringement of Article 290 TFEU.

27  In the seventh place, in the context of the fifth plea in Case T-283/20, the second applicants allege infringement of Article 37(4) of Regulation No 1272/2008, of the principle of sound administration and of the right to be heard.

### A. Preliminary considerations on the harmonized classification and labelling of substances in the carcinogenicity hazard class

28  As a preliminary point, it should be noted that, in accordance with recital 1 and Article 1(1) thereof, the purpose of Regulation No 1272/2008 is to ensure a high level of protection of human health and the environment and the free movement of chemical substances, mixtures and certain specific articles within the EU market. As is apparent in particular from recitals 5 to 8, 10 and 27 thereof, the objective of that regulation is to determine the intrinsic properties of substances which must lead to their classification as dangerous products, so that the hazards presented by those substances (and mixtures containing such substances) can be correctly identified and communicated. To that end, in accordance with Article 1(1)(a) thereof, that regulation is intended, inter alia, to 'harmonise the criteria for the classification of substances and mixtures, as well as the rules on the labelling and packaging of dangerous substances and mixtures'.

29  In addition, it is apparent from recitals 4 to 8 in the preamble to Regulation No 1272/2008 that the EU legislature intended to contribute to the general harmonisation of the classification and labelling criteria not only at United Nations level, but also by incorporating into EU law the criteria of the internationally established Globally Harmonised System of Classification and Labelling of Chemicals ('GHS'). To that end, Annex I to that regulation reproduces almost all the provisions of the GHS identically (judgment of 22 November 2017, Commission v Bilbaína de Alquitranes and Others, C-691/15 P, EU:C:2017:882, paragraph 42).

30  As regards the classification of hazardous substances and mixtures, it should be borne in mind that, according to Article 3 of Regulation No 1272/2008, a substance or mixture which satisfies the criteria relating to physical, health or environmental hazards, as set out in Annex I, is dangerous and is classified in one of the hazard classes set out in this Annex.

31  In that regard, Title V of Regulation No 1272/2008 lays down a procedure for harmonising the classification and labelling of substances throughout the European Union, the subject of which is to substances which satisfy

the criteria set out in Annex I for the hazards set out in Article 36(1) of that regulation, including for the hazard of carcinogenicity. That regulation also lays down, inter alia in Articles 5, 9 and 13, a self-classification obligation for manufacturers, importers and downstream users, which covers substances as well as mixtures.

32 The procedure for harmonising the classification and labelling of substances is, first of all, triggered by the manufacturers, importers and downstream users of a substance or by the competent authority of a Member State, by the submission of a proposal to the ECHA, in accordance with Article 37(1) and (2) of Regulation No 1272/2008. The RAC then adopts an opinion on the proposal submitted, giving the parties concerned the opportunity to comment, and the ECHA forwards that opinion and all comments to the Commission, in accordance with Article 37(4). Finally, where the Commission considers that the harmonisation of the classification and labelling of the substance concerned is appropriate, it is to adopt a delegated act, in accordance with Articles 37(5) and 53a of that regulation, in order to amend Annex VI by including the substance in question and the relevant classification and labelling elements in Annex VI, Part 3, Table 3, of the Regulations.

33 That harmonised classification and labelling of substances, pursuant to Title V of Regulation No 1272/2008, is intended to determine the intrinsic properties of substances which must lead to their classification as dangerous products, so that the hazards of those substances, as well as mixtures containing such substances, can be correctly identified and communicated.

34 As regards the hazard of carcinogenicity, Article 36(1)(c) of Regulation No 1272/2008 provides that, if a substance satisfies the criteria set out in Annex I to that regulation for the hazard of carcinogenicity, it is generally to be subject to harmonisation of classification and labelling. Those criteria are set out in Section 3.6 of Part 3 of Annex I to Regulation No 1272/2008.

35 In particular, point 3.6.1.1 of Part 3 of that annex, in its original version, in force on the date of adoption of the contested regulation, provided as follows:

'3.6.1.1. "Carcinogen" means a chemical substance or mixture of substances which induces or increases the incidence of cancer. Substances that have caused benign and malignant tumours in animals in properly conducted experimental studies are also presumed to be carcinogenic or likely to be carcinogenic, unless it is clear that the mechanism of tumour formation is not relevant to humans. »

36 That point 3.6.1.1, in the version resulting from Commission Regulation (EU) 2019/521 of 27 March 2019 amending, for the purposes of adapting to technical and scientific progress, Regulation No 1272/2008 (OJ 2019 L 86, p. 1), provides as follows:

'3.6.1.1. "Carcinogenicity" means the development of cancer or an increase in the incidence of cancer resulting from exposure to a substance or mixture. Substances and mixtures that have caused benign and malignant tumours in animals in properly conducted experimental studies are also presumed to be carcinogenic or likely to be carcinogenic in humans, unless it is clear that the mechanism of tumour formation is not relevant to humans.

The classification of a substance or mixture in the carcinogenicity hazard class is determined by its intrinsic properties and does not provide information on the level of carcinogenic risk to humans associated with the use of that substance or mixture. »

37 In addition, point 3.6.2.2.1 of Annex I to Regulation No 1272/2008 provides as follows:

'3.6.2.2.1. The classification of a carcinogen shall be based on data obtained from reliable and acceptable studies and shall cover substances which are intrinsically capable of causing cancer. Assessments are based on all available data, published peer-reviewed studies, and other data that may be accepted. »

**8**

38 In addition, point 3.6.2.1 of Annex I to Regulation No 1272/2008 provides that that classification 'divides substances into two categories according to the weight of evidence and other considerations (weight of indices)' and that, 'in certain circumstances, a classification according to the route of exposure may be justified, if it can be formally proven that no other route of exposure leads to the same hazard'. As regards Category 2, it is apparent from Table 3.6.1 of Section 3.6.2.1 that 'the classification of a substance in Category 2 shall be based on results from human and/or animal studies, but which are not sufficiently convincing to classify the substance as Category 1A or 1B, and shall take into account the weight of evidence and other considerations [referred to in point 3.6.2.2]' and that '[t]he classification of a substance in Category 2 shall be based on indications from carcinogenicity studies, carried out in humans or animals".

39 Furthermore, it should be borne in mind that$^{\text{Regulation No}}$ 1272/2008 relates to the hazard assessment of substances and that that assessment must be distinguished from the risk assessment provided for in Regulation (EC)$^{\text{No}}$ 1907/2006 of the European Parliament and of the Council of 18 December 2006 concerning the Registration, Evaluation and Authorisation of Chemicals, as well as the restrictions on these substances (REACH), establishing a European Chemicals Agency, amending Directive 1999/45/EC and repealing Council Regulation (EEC)$^{\text{No}}$ 793/93 and Commission Regulation (EC)$^{\text{No}}$ 1488/94 as well as Council Directive 76/769/EEC and Directives 91/155/EEC, 93/67/EEC, Commission 93/105/EC and 2000/21/EC (OJ 2006 L 396, p. 1, corrigendum OJ 2007 L 136, p. 3). Hazard assessment is the first step in the risk assessment process, which is a more specific concept. Thus, a hazard assessment of the intrinsic properties of substances should not be limited to specific circumstances of use, as in the case of a risk assessment, and may be carried out validly regardless of the place of use of the substance (laboratory or otherwise) or possible levels of exposure to the substance (see, to that effect, judgment of 21 July 2011, Nickel Institute, C-14/10, EU:C:2011:503, paragraphs 81 and 82).

### B. Preliminary considerations on the intensity of the Court's review

40 As regards the intensity of the Court's review, it should be borne in mind that, according to settled case-law, in order to be able to classify a substance under$^{\text{Regulation No}}$ 1272/2008, and in view of the complex scientific and technical assessments which it must carry out, the Commission must be allowed a broad discretion (see judgment of 22 November 2017, Commission v Bilbaína de Alquitranes and Others, C-691/15 P, EU:C:2017:882, paragraph 34 and the case-law cited).

41 The exercise of that power is not, however, exempt from judicial review. It is settled case-law that, in the context of that review, the Courts of the European Union must determine whether the procedural rules have been complied with, whether the facts relied on by the Commission have been accurately stated and whether there has been a manifest error of assessment of those facts or a misuse of powers (see judgment of 18 July 2007 in Industrias Químicas del Vallés v Commission, C-326/05 P, EU:C:2007:443, paragraph 76 and the case-law cited).

42 In particular, where a party alleges a manifest error of assessment on the part of the competent institution, the Courts of the European Union must review whether that institution has examined carefully and impartially all the relevant aspects of the individual case on which that assessment is based. That duty of diligence is inherent in the principle of sound administration and applies generally to the activities of the EU administration (see judgment of 22 November 2017, Commission v Bilbaína de Alquitranes and Others, C-691/15 P, EU:C:2017:882, paragraph 35 and the case-law cited).

43 Furthermore, the limitation of review by the Courts of the European Union does not affect their duty to verify whether the evidence relied on is factually accurate, reliable and consistent, or to determine whether that evidence contains all the relevant information which must be taken into account in order to assess a complex situation and whether it is capable of substantiating the conclusions drawn from it. to that effect, judgment of 6 November 2008, Netherlands v Commission, C-405/07 P, EU:C:2008:613, paragraph 55 and the case-law cited).

**9**

44 Furthermore, as regards the assessment of scientific studies, the Court has already ruled that the Commission must be allowed a broad discretion as regards that assessment, as well as the choice of studies which must take precedence over the others, irrespective of their chronology. Thus, it is not sufficient for the applicant to rely on the age of a scientific study in order to call into question its reliability, but it must also provide sufficiently precise and objective evidence to support the argument that any recent scientific developments would call into question the merits of the conclusions of such a study (see, to that effect, judgment of 24 October 2018, Deza v Commission, T-400/17, not published, EU:T:2018:712, paragraph 95).

45 In the present case, the contested regulation, in so far as it carries out the contested classification and labelling, was adopted by the Commission on the basis of the opinion of the RAC and following the classification proposal, submitted to the ECHA by the competent French authority (see paragraphs 4, 6 and 8 above).

46 The contested classification and labelling relate to the substance with the chemical identification of 'titanium dioxide (in the form of a powder containing 1% or more of particles with a diameter ≤ 10 μm)', which was classified as a category 2 carcinogen, by inhalation, that is to say, as a substance suspected of being carcinogenic to humans, by inhalation (see paragraph 9 above).

47 It is in the light of those considerations that it is necessary to examine, first of all, the pleas and arguments alleging manifest errors of assessment and infringement of the criteria laid down by Regulation[No] 1272/2008 for the classification of a substance as carcinogenic.

### *C. The pleas and arguments alleging manifest errors of assessment and failure to comply with the criteria laid down by Regulation[No] 1272/2008 for the classification of a substance as carcinogenic*

48 As set out in paragraph 21 above, by the second plea, the first and fifth parts of the seventh plea and the eighth plea in Joined Cases T-279/20 and T-288/20 and by the arguments raised by the second applicants in their statements in intervention in those cases, as well as by the first plea in Case T-283/20, The applicants and the interveners in their support claim, in essence, first, that the contested classification and labelling are vitiated by manifest errors of assessment and, secondly, that they do not comply with the criteria laid down by[Regulation No] 1272/2008 for the classification of a substance as carcinogenic.

49 The present pleas and arguments are divided into two parts. The first part alleges manifest errors of assessment and infringement of the criteria laid down by[Regulation No] 1272/2008 for the classification and labelling of a substance as carcinogenic, as regards the acceptability and reliability of the Heinrich and Others (1995) study ('the Heinrich study') on which the RAC's opinion was based. The second part alleges manifest errors of assessment and infringement of the criteria laid down by[Regulation No] 1272/2008 for the classification and labelling of a substance as carcinogenic, in that the contested classification and labelling do not refer to a substance inherently capable of causing cancer.

### *1. The first part, alleging manifest errors of assessment and infringement of the criteria laid down by Regulation No 1272/2008 for the classification and labelling of a substance as carcinogenic, as regards the acceptability and reliability of the Heinrich study on which the RAC opinion was based*

50 The applicants claim, in essence, that the RAC's opinion is based on the Heinrich study and that the RAC made several manifest errors in its assessment of the reliability and acceptability of that study. The contested classification and labelling are therefore not based on data obtained from reliable and acceptable studies, as required by point 3.6.2.2.1 of Annex I to[Regulation No] 1272/2008. They submit, inter alia, that the Heinrich study had been considered by the competent French authority to be unreliable, in view of the fact that it had been conducted only in female rats and had used a single excessive test dose.

51 The applicants claim, moreover, that the contested classification and labelling are based on carcinogenicity due to the effects of lung overload of titanium dioxide particles ('lung overload') and that the RAC made

**10**

manifest errors in its assessment of the level of lung overload that occurred during the Heinrich study, in concluding, wrongly, that it was not excessive.

52 In that regard, the second applicants claim, in their application in Case T-283/20 and their statements in intervention in Joined Cases T-279/20 and T-288/20, that the RAC erred in the particle density which it chose to calculate lung overload. In order to verify the level of lung overload in the Heinrich study, as well as in the Lee and Others (1985) study ('the Lee study'), the RAC adopted the method proposed by the Morrow studies (1988 and 1992) ('the Morrow overload calculation') and, on that basis, it considered that the lung overload in the Lee study had been excessive and that the lung overload in the Heinrich study was acceptable. That conclusion is based on a factual clerical error as regards the particle density used by the RAC in the Morrow overload calculation.

53 For the purposes of applying the Morrow overload calculation to the Heinrich and Lee studies, the RAC used the same density value of 4.3 $g/cm^3$, corresponding to the density of the primary non-agglomerated particles ('the particle density'), whereas it should have used the density of the agglomerates of the particles ('the density of the agglomerates'), whose value would be indicated in scientific studies as being 1.6 $g/cm^3$ for nanometric particles of the "P25" type. In that regard, it has been established, in particular by the studies Laux and Others (2017), Gebel and Others (2012) and Pauluhn (2011), that nano-sized particles agglomerate and that the density of agglomerates is lower than the density of particles, given the lower density of the empty spaces between particles in agglomerates. In addition, it is established that the density of agglomerates for titanium dioxide particles of the 'P25' type is 1,6 $g/cm^3$. In addition, because the density of agglomerates is lower than that of primary particles, agglomerates of particles take on more volume than non-agglomerated particles. Therefore, the volume of lung overload in the Heinrich study would be much higher than that calculated by the RAC. If the RAC had used the correct density in the Morrow overload calculation, namely the density of agglomerates, it should have concluded that the Heinrich study had been conducted under conditions of excessive lung overload.

54 The Commission disputes those arguments. As a preliminary point, it submits, first, that the applicants' arguments exceed the limits of limited judicial review, given that the applicants do not claim that the RAC or the Commission did not take into account all the relevant factors, but that they merely reach a scientific conclusion different from that contained in the RAC opinion. The Court cannot substitute its own assessment for that of the RAC concerning factual elements of a scientific and technical nature. Secondly, the Commission submits that the RAC opinion is based not only on the Heinrich study, but also on the Lee study, as well as on other available data and on a weight-of-evidence approach, in accordance with point 3.6.2.1 of Annex I to Regulation No 1272/2008.

55 As regards the manifest error of assessment concerning the density of the particles, the Commission contends, in essence, that the RAC did not err in calculating the lung overload of the Heinrich study. First, the RAC correctly applied the density value of 4.3 $g/cm^3$, which is a standard density value for titanium dioxide particles, irrespective of their size or shape. The RAC is entitled to rely on that value in a context where the actual extent of agglomeration and particle settlement in the Heinrich study was not known. Similarly, the larger particles tested in the Lee study would also be likely to clump together and their effective density would likely be lower.

56 Secondly, and consequently, by using the standard density of 4.3 $g/cm^3$ for both the Heinrich study and the Lee study, the RAC avoided introducing an uncertainty factor which would have undermined the reliability of the comparisons between those two studies.

57 Thirdly, the Commission submits that, although the density of 1.6 $g/cm^3$ is indicated in the Pauluhn (2011) study as being the value of the density of the agglomerates of nanometric particles of titanium dioxide, the RAC could not use that density for the Heinrich study, given that there were differences between the studies and that, in the Heinrich study, neither the density of the particles nor the extent of agglomeration

and settlement of the particles is known, so that it cannot be assumed that the density of the agglomerates was 1.6 g/cm$^3$.

58 Fourthly, the Commission submits that the conditions of lung overload in the Heinrich study were not assessed by the RAC solely on the basis of the Morrow overload calculation, but also on the basis of other benchmarks. First, the RAC took into account that the half-time of pulmonary elimination in that study was barely more than one year and therefore close to the limit recommended by the Organisation for Economic Co-operation and Development (OECD). Secondly, in comparing the exposure levels in the Heinrich and Lee studies, the RAC took into account the concentration of the substance and the mean aerodynamic diameter (DAM), the latter being included, in both studies, in the range of recommended values in point 3.1.2.3.2 of Annex I to that regulation.

59 ECHA adds that neither the density of the particles nor the extent of the agglomeration of the particles in the Heinrich study were known, but that those factors were not among the main factors to be taken into consideration. In addition, the density of the agglomerates in the Heinrich study could not immediately be assumed to be 1.6 g/cm$^3$, given the differences between the scientific study which indicated that value and the Heinrich study. In addition, the micron-sized particles used in the Lee study would also tend to agglomerate and thus the density of the agglomerates, which was also unknown, could also be lower. Thus, in the absence of information on the density of titanium dioxide agglomerates in the Heinrich and Lee studies and in order to calculate the lung overload according to the Morrow overload calculation, it would be appropriate to apply the particle density of 4.3 g/cm$^3$, which is well known for these two studies.

60 The ECHA further adds that the degree of lung overload in the Heinrich study could not have been greater than in the Lee study, in view of the lower level of daily exposure to the substance. In addition, the MAD values are very close to the values set out in point 3.1.2.3.2 of Annex I to[Regulation No] 1272/2008, which are the recommended values for inhalation studies. In addition, a sufficient number of rats in the Heinrich study survived to the end of the experimental period to allow conclusions to be drawn on carcinogenicity, which is also supported by the elimination half-life time at the end of the study, which is close to that recommended by the OECD.

61 The Court considers it appropriate to examine, first of all, the manifest error of assessment, alleged by the applicants, concerning the value of the particle density. However, as a preliminary point, it is necessary to examine certain arguments of the Commission and the ECHA relating to the intensity of the General Court's review and the relevance of the Heinrich study for the contested classification and labelling, in so far as they are capable of rendering the appellants' arguments ineffective.

*(1) The intensity of the General Court's review*

62 The Commission contends, as a preliminary point, that the applicants' arguments exceed the limits of limited judicial review, given that they merely reach a scientific conclusion different from that contained in the RAC opinion (see paragraph 54 above). However, contrary to the Commission's submissions, the applicants' arguments are not limited to reaching a scientific conclusion different from that contained in the RAC opinion.

63 The applicants claim that the RAC's opinion and, consequently, the contested regulation are vitiated by a manifest error of assessment as regards the assessment of the reliability and acceptability of the Heinrich study and, in particular, the assessment of the level of lung overload that occurred during that study. In that regard, they allege, inter alia, a clerical error of fact, and a failure to take into account all the relevant factors. In addition, the applicants submit that, because of the alleged error, the contested classification and labelling infringe point 3.6.2.2.1 of Annex I to[Regulation No] 1272/2008, in that it requires that the classification of a substance be based on data obtained from reliable and acceptable studies.

64 It follows that the applicants' arguments raise both the issue relating to the verification of compliance with the condition laid down in point 3.6.2.2.1 of Annex I to[Regulation No] 1272/2008, relating to the reliability and acceptability of the studies on which the classification must be based, and a manifest error in the assessment of that reliability and acceptability as regards the Heinrich study. They are therefore questions which are not immune from judicial review, the intensity of which has the limits set out in paragraphs 41 to 44 above.

65 Accordingly, the Commission's argument that the applicants' arguments in the context of the first part exceed the limits of judicial review must be rejected.

*(2) The relevance of the Heinrich study to the contested classification and labelling*

66 The Commission submits that the RAC's opinion is based not only on the Heinrich study, but also on the Lee study and on other available information (see paragraph 54 above). In addition, in response to a question from the Court, at the hearing on 12 May 2022 in Joined Cases T-279/20 and T-288/20, the Commission submitted that, of the four inhalation studies mentioned in the RAC opinion, the Heinrich and Lee studies were the only ones to identify carcinogenic effects and were therefore considered relevant, primarily, to evaluate the properties of titanium dioxide.

67 In those circumstances, it is necessary to examine whether the Heinrich study was, in itself, decisive for the contested classification and labelling, failing which the applicants' arguments challenging the reliability and acceptability of that study would have to be rejected as ineffective.

68 As has been pointed out in paragraph 37 above, point 3.6.2.2.1 of Annex I to[Regulation No] 1272/2008 provides, inter alia, that the classification of a carcinogen is to be based on data obtained from reliable and acceptable studies and that assessments are to be based on all existing data, published peer-reviewed studies and other data that can be accepted.

69 In the present case and in the first place, it must be held that both the classification proposal, submitted by the competent French authority, and the RAC opinion are based, in essence, on studies in laboratory animals conducted by inhalation.

70 In the second place, it is apparent from the RAC's opinion that it referred to four inhalation studies in animals, among which it highlighted the Lee and Heinrich studies. Those two studies, which were the only ones to reveal the development of tumours following exposure to titanium dioxide, including, in the first study, benign tumours and, in the second, malignant tumours, were, according to the RAC, the 'key inhalation carcinogenicity studies' justifying a comparative analysis of their results. On the other hand, the other two studies which did not identify tumours, namely the Muhle (1989) and Thyssen (1978) studies, were characterised, according to the RAC, by an insufficient level or duration of exposure.

71 In the third place, as regards the Lee and Heinrich studies, it is apparent from the files in the present cases that the assessments of those studies by the RAC and by the competent French authority do not coincide.

72 As regards the competent French authority, it based its proposal for the classification of titanium dioxide as a category 1B carcinogen by inhalation, essentially, on the Lee study, to which it gave a rating of 2, corresponding to 'reliable with restrictions', in the Klimisch rating scale (as described in the article by Klimisch, H.J., Andreae, M., and Tillmann, U., 'A Systematic Approach for Evaluating the Quality of Experimental Toxicological and Ecotoxicological Data', Regulatory Toxicology and Pharmacology, Elsevier, 1997, vol. 25, pp. 1 to 5) ('the Klimisch rating scale').

73 As regards the Heinrich study, the French competent authority considered that that study was of 'lower quality', in view of the lack of information on the degree of purity of the substance and the defects in the exposure protocol, since the study had been carried out only in female animals and had tested a single level of exposure, which had varied during the experiment. It gave it a rating of 3, according to the Klimisch rating scale. According to the applicants' statement, which is not disputed on that point by the Commission

**13**

or the 'Vaughan' or 'Lindenschmidt 6' summarisch rating scale, corresponds to the 'unreliable' category. However, the French competent authority considered that, despite those shortcomings, the carcinogenic effects observed in the Heinrich study should be considered 'relevant', as they were 'consistent' with those of other studies.

74 As regards the RAC, it based its proposal for the classification of titanium dioxide as a category 2 carcinogen, by inhalation, for the most part, on the Heinrich study. It is apparent from the RAC's opinion that it considered that the Lee study should not have a 'decisive influence' on the classification of titanium dioxide, given that the exposure conditions during that study had been excessive, leading to a complete cessation of the particle removal mechanisms at the level of the alveolar macrophages of the lungs ('the particle removal mechanisms'), which, according to the ERC, corresponded to "excessive exposure of dubious relevance to humans". In addition, it is stated in the RAC opinion that it considered that those excessive exposure conditions during the Lee study 'invalidated the results of that study, on their own, for classification purposes'.

75 As regards the Heinrich study, the RAC found that the level of lung overload in that study had been significantly lower than that of the Lee study, which had not led to the complete cessation of the particle removal mechanisms and that, although the Heinrich study had not been carried out in accordance with the standard test recommendations, its results were 'sufficiently reliable, relevant and adequate for the assessment of the carcinogenic potential of [titanium dioxide]'.

76 It follows that, of the two studies which, according to the RAC, were the key studies on inhalation carcinogenicity, the RAC considered that the Heinrich study took precedence over the Lee study, since the latter was not, in itself, decisive or sufficient to support the proposal for the classification of titanium dioxide, as, moreover, the Commission acknowledged in response to a question from the Court, at the hearing on 12 May 2022 in Joined Cases T-279/20 and T-288/20.

77 In the fourth place, it should be noted that, in addition to those two key studies, the RAC opinion mentions other studies, but it does so only as a support or supplement to the results of the Heinrich study. Thus, the RAC stated, inter alia, that the results of the Heinrich study were 'consistent' with the results of the Gebel (2012) study, which concerned the inhalation carcinogenicity in rats of other substances known as 'poorly soluble particles with a low degree of toxicity'

78 It follows from the foregoing that the Heinrich study was the decisive study on which the RAC's opinion, and therefore the contested classification and labelling, was based. The other studies, including the Lee study, were taken into account only as a supplemental measure, since the RAC considered that the latter studies were not sufficient, on their own, to support its classification proposal.

79 Consequently, the Commission's argument that the RAC's opinion is not based solely on the Heinrich study must be rejected.

*(3) The manifest error of assessment relating to the value of the density of the particles*

80 The second applicants claim, in their application in Case T-283/20 and their statements in intervention in Joined Cases T-279/20 and T-288/20, that the RAC erred in using a particle density value of 4.3 $g/cm^3$ when applying the Morrow overload calculation to the Heinrich study and that that error led the RAC to conclude, wrongly, that this study was conducted under acceptable conditions of lung overload.

81 As a preliminary point and in the first place, it should be noted that that study is entitled 'Chronic inhalation exposure of wistar rats and two different strains of mice to diesel engine exhaust, carbon black and titanium dioxide'. carbon black and titanium dioxide) and was based on inhalation exposure of rats and mice to diesel engine exhaust, carbon black and titanium dioxide.

82 In the second place, as regards the relevance of lung overload in the context of the contested classification and labelling, it should be recalled, first of all, that the classified substance has the chemical identification

**14**

'titanium dioxide (in the form of a powder containing 1% or more of particles with a diameter ≤ 10 μm)' and that it was classified as a substance suspected of being a category 2 carcinogen, by inhalation (see paragraph 9 above).

83 Next, it should be noted that it is apparent from recital 5 of the contested regulation that the contested classification and labelling are based on inhalation carcinogenicity, associated with the inhalation of respirable titanium dioxide particles and the retention and low solubility of those particles in the lungs. In addition, it is stated in footnote W that the contested regulation added to Annex VI to Regulation No 1272/2008 (see paragraph 10 above) that 'the carcinogenicity [of titanium dioxide] occur[s] when respirable dust [was] inhaled in quantities giving rise to a significant reduction in the mechanisms of particle removal in the lung'.

84 Lastly, in the RAC opinion, it acknowledges that the tumours observed in the lungs of rats during the Heinrich and Lee studies developed only under conditions of 'marked reduction of the mechanisms of particle elimination'.

85 In the third place, as regards the Morrow overload calculation, the RAC considered that, even if that calculation was not a generally accepted concept, it should be used in order to assess whether the level of lung overload to which the animals had been subjected during the Lee and Heinrich studies had been marked or excessive.

86 In that regard, it is apparent from the RAC's opinion, and from the Commission's reply to a question put by the Court by way of a measure of organisation of procedure in Joined Cases T-279/20 and T-288/20, that Morrow's overload calculation relates the quantity of particles inhaled and the reduction in the operation of the particle removal mechanisms with the volume occupied by the particles in the alveolar macrophages of the lungs.

87 In addition, the RAC stated, in its opinion, that the Morrow overload calculation made it possible to determine that adequate lung overload in experimental animals occurred when 6 to 60% of the volume of alveolar macrophages was occupied by particles. On the one hand, the volume of occupied alveolar macrophages had to be greater than 6%, to lead to a significant reduction in the mechanisms of particle removal, which is essential for the onset of chronic inflammation and the carcinogenic effects observed. On the other hand, the volume occupied by the particles must have been less than 60%, since, at this level, there was an almost complete cessation of the particle elimination mechanisms, which demonstrated excessive lung overload, which invalidated the results.

88 In the fourth place, as regards the assessment of the level of lung overload in the Lee and Heinrich studies on the basis of the Morrow overload calculation, it is apparent from the RAC's opinion that, first of all, the RAC carried out that calculation by taking into account, in essence, two elements, namely, in the first place, the "exposure level", which takes into account the dose and concentration of the substance in milligrams per cubic metre, and secondly, the density of the particles in grams per cubic centimetre. For the Lee study, the RAC indicated that the exposure levels were between 10, 50 and 250 mg/m³ and that the particle density was $4.3 \text{ g/cm}^3$. For the Heinrich study, the RAC selected an exposure level of 10 mg/m³ and the same density of $4.3 \text{ g/cm}^3$.

89 Next, the RAC stated that, for exposure to titanium dioxide particles with a density of $4.3 \text{ g/cm}^3$, the acceptable lung overload (situated, according to the Morrow overload calculation, between 6% and 60% of the volumetric load of alveolar macrophages, as indicated in paragraph 87 above) was equivalent to a load of between 6.5 and 65 mg of particles per rat lung.

90 Lastly, on the basis of those premisses, the RAC concluded that, in the context of the Heinrich study, the lung overload had been approximately 40% and, therefore, within the acceptable range, whereas, in the context of the Lee study, the lung overload had exceeded 60% of the volumetric load of the alveolar macrophages, which corresponded to an almost complete cessation of the particle removal mechanisms.

91 It is in the light of those considerations that the error relied on by the second applicant concerning the density of the particles must be examined.

92 In the present case, it is common ground that the Heinrich and Lee studies did not indicate the density of the particles tested. The studies indicated only certain characteristics of those particles, namely, in the case of the Lee study, micrometre-sized particles and, in the case of the Heinrich study, nano-sized particles of the 'P25' type. Those different characteristics of the particles tested in the Lee and Heinrich studies are, moreover, mentioned in the RAC opinion, in particular as regards the nanometric particles of the 'P25' type tested in the latter study.

93 It is also common ground that the RAC used the density value of 4.3 g/cm$^3$ when applying the Morrow overload calculation to those two studies (see paragraph 88 above).

94 In addition, it is apparent from the pleadings of the Commission and the ECHA, and from their replies to questions put by the Court at the hearings on 12 and 18 May 2022, that the value of 4.3 g/cm$^3$ is a standard value, usually indicated in the scientific community as the density of titanium dioxide particles, which, moreover, the applicants do not dispute.

95 However, the applicants claim that the RAC was wrong, for the purposes of the Morrow overload calculation, to use the particle density of 4.3 g/cm$^3$, whereas it should have taken into account the density of the agglomerates of nanometric particles of titanium dioxide of the 'P25' type, that density being, According to the scientific studies indicated by the applicants, 1.6 g/cm$^3$ (see paragraph 53 above).

96 The Commission and the ECHA submit, in essence, that the RAC was right to take into account the density of the particles, given that the Heinrich study did not indicate either the density of the particles tested or the extent of agglomeration and settlement of those particles and that, in those circumstances, it was appropriate for the RAC to take into account the standard density value of titanium dioxide particles.

97 In that regard, it should be noted that, irrespective of the question of what is the exact density value that had to be taken into account by the RAC for the purposes of calculating the Morrow overload, a question, in any event, which it is not for the Court to examine, the appellants' arguments raise first and foremost the question whether the RAC made a manifest error of assessment concerning the type of density It was chosen because it took into account the density of the particles instead of the density of the agglomerates of nanometric particles of titanium dioxide.

98 In the present case, the fact, relied on by the applicants, that titanium dioxide particles and, in particular, nanometre-sized particles of the 'P25' type, such as those tested in the Heinrich study, tend to agglomerate is not disputed. The Commission and the ECHA do not dispute that specific point, as is apparent from their pleadings and their replies to the questions put by the Court at the hearings on 12 and 18 May 2022. In addition, as the second applicants in Joined Cases T-279/20 and T-288/20 submit, the Heinrich study mentioned agglomerates of titanium dioxide particles and stated that they were 'particularly suitable for exerting toxic effects mainly on alveolar macrophages and on the alveolar clearance of particles'. In addition, with regard to aerosols, i.e. airborne particles, whose environment is, admittedly, different from that of the lungs, the RAC opinion also mentions that "primary particles, in particular nano-sized particles, tend to agglomerate".

99 In addition, it is common ground between the parties, as is apparent from their pleadings, their written replies to questions put by way of measure of organisation of procedure in Joined Cases T-279/20 and T-288/20, and their answers to the questions put by the Court at the hearings on 12 and 18 May 2022, that the density of agglomerates of nanoscale particles of titanium dioxide is lower than the density of particles, since agglomeration creates empty spaces that are less dense than the material. Therefore, because the density of agglomerates is lower than that of primary particles, particle agglomerates occupy more volume than non-agglomerated particles.

**16**

100 It is true that the Heinrich study did not provide any indication as to the extent of agglomeration and settlement of the titanium dioxide particles tested. However, by adopting a density value corresponding to the particle density of 4.3 g/cm$^3$ and, therefore, a density that is always higher than the density of the agglomerates of nanometric titanium dioxide particles (see paragraph 99 above), the RAC did not take into account all the relevant elements of the present case, namely the characteristics of the particles tested in the Heinrich study, in particular their nanometric size and their 'P25' type, the fact that those particles tended to agglomerate and the fact that the density of the agglomerates of the particles was lower than the density of the particles and that, consequently, the agglomerates of particles occupied more volume in the alveolar macrophages of the lungs (see paragraphs 98 and 99 above).

101 In addition, contrary to what the ECHA appears to claim, those elements were relevant to the Morrow overload calculation since the density value was one of the two values for carrying out that calculation, which was adopted by the RAC in order to assess the level of lung overload in the Lee and Heinrich studies (see paragraph 88 above). In response to a question from the Court at the hearing on 12 May 2022, the Commission also acknowledged that density was important for the calculation of Morrow overload.

102 It follows that the density of the particles was an essential element for the calculation of the Morrow overload adopted by the RAC and that that density could not, at the obvious risk of discrediting the results of that calculation, be presumed to be the density of the particles, when it was known that the nanometric particles in question formed agglomerates, that the density of the agglomerates was lower and that, therefore, the volume occupied by the particles in the lungs was higher.

103 Therefore, by failing to take into account the factors set out in paragraph 100 above, the RAC failed to take into account all the relevant factors in order to calculate lung overload in the Heinrich study by means of the Morrow overload calculation and therefore made a manifest error of assessment. That error renders implausible the result of the application of that calculation to that study and, consequently, the RAC's conclusions that the lung overload in that study was acceptable and that the results of that study were sufficiently reliable, relevant and adequate for the assessment of the carcinogenic potential of titanium dioxide (see paragraphs 75 and 90 above) are, they too were vitiated by a manifest error of assessment. Consequently, in so far as the Commission based the contested classification and labelling on the opinion of the RAC (see paragraph 8 above), it made the same manifest error of assessment when it adopted the contested regulation.

104 The arguments of the Commission and the ECHA do not call that conclusion into question.

105 In the first place, it is necessary to reject their arguments that the RAC is entitled to rely on a density corresponding to the density of the particles because, in the Heinrich study, the density of the particles and the extent of the agglomerates of particles were not known. Those arguments do not invalidate the fact that the RAC did not take into account all the elements necessary for the determination of the density, in particular the nanometric size of the particles in question and their tendency to form agglomerates, of which the RAC was aware and which, moreover, was mentioned in its opinion (see paragraph 98 above).

106 In addition, it should be noted that the question raised by the manifest error of assessment relied on by the applicants is not whether the RAC had in its possession the information necessary to determine the density of agglomerates, but, on the other hand, whether the RAC took into account all the relevant factors in order to verify the level of lung overload in the Heinrich study by means of the overload calculation of Morrow.

107 As is apparent from paragraphs 92 and 100 above, the RAC adopted a value corresponding to the density of the particles which was not indicated in the study, while neglecting the elements indicated therein, in particular the nanometric size of the particles and their tendency to agglomerate, even though it was certain that those elements, and in particular agglomeration, had an impact on the density value and that the density value, in turn, had an impact on the volume occupied by particles in the rats' lungs, and thus on the level of lung overload.

**17**

108 Those factors, and the decision on the present case, since the Morrow overload calculation, which the RAC decided to adopt, was specifically intended to calculate the volume of alveolar macrophages occupied by particles in the lungs of rats, in order to determine whether the Heinrich study had been carried out under conditions of marked lung overload or excessive lung overload and therefore to determine whether the results of that study could serve as a basis for the Classification of titanium dioxide.

109 Accordingly, the argument of the Commission and the ECHA that, in the circumstances of the present case, it would be 'appropriate' for the RAC to take into account the density of the particles is not convincing and does not make it possible to compensate for the failure to take into account all the relevant elements for the purposes of calculating lung overload, all the more so since these elements showed that the density value used by the CER did not reflect the reality of the particles tested during the Heinrich study.

110 In the second place, contrary to what the Commission and the ECHA appear to claim, the objectives of facilitating a comparison between the Lee and Heinrich studies and of avoiding introducing a factor of uncertainty into that comparison cannot justify the failure to take into account all the elements necessary for the determination of the density value. The need for comparison between those two studies cannot take precedence over the need, put forward by the RAC itself, to examine, in the light of Morrow's calculation of overload, whether, in those studies, the lung overload had been excessive or not, since, in the latter case, the results of those studies could not, on their own, Justify the proposed classification of titanium dioxide. It is, moreover, for the same reason and in accordance with that same calculation that the RAC considered that the lung overload in the Lee study had been excessive (see paragraph 74 above).

111 In the third place, as regards ECHA's argument that micrometre-sized particles, such as those tested in the Lee study, also have a tendency to agglomerate, first, it is sufficient to note that that study was not decisive for the RAC's classification proposal (see paragraph 76 above). Secondly, the application of the Morrow overload calculation to that study had, according to the RAC, shown that the lung overload was excessive, even taking into account the particle density value, which is always higher than that of the agglomerate density. Therefore, any errors on the part of the RAC in the assessment of that study cannot have any influence on the manifest error of assessment found in paragraph 103 above.

112 In the fourth place, as regards the arguments of the Commission and the ECHA that the assessment of the Heinrich study by the RAC was not carried out solely on the basis of the Morrow overload calculation, or even was not dependent on that calculation, it should be noted that those arguments are contradicted by the RAC's opinion.

113 Admittedly, the RAC identified a number of factors concerning the conditions of exposure during the Lee and Heinrich studies, and in particular the half-time of pulmonary elimination and the level of exposure on the basis of the dose and concentration of the substance. It referred to those elements in a chapter of its opinion entitled 'General conclusion', in which it concluded that the excessive exposure conditions in the Lee study 'invalidated the results of that study, on their own, for classification purposes' and that the results of the Heinrich study were 'sufficiently reliable, relevant and adequate for the assessment of the carcinogenic potential of [titanium dioxide]' (see paragraphs 74 and 75 above). In particular, as regards the Lee study, the RAC mentioned an excessive half-time of pulmonary elimination at the maximum exposure level of 250 mg/m³ and, as regards the Heinrich study, it noted that the exposure level of 10 mg/m³ was relatively low.

114 However, in that general conclusion, the RAC also pointed out that the lung overload in the Lee study was not in the acceptable range, having led to an almost complete halt in the particle elimination mechanisms, which was not the case in the Heinrich study, where the lung overload was in the acceptable range (see paragraph 90 above).

115 It follows that, in order to verify the level of pulmonary overload in the Lee and Heinrich studies and, more specifically, the volume of alveolar macrophages occupied by the particles, the RAC adopted the Morrow overload calculation and it was on the basis of that calculation that it drew its conclusions as to whether the pulmonary overload in the Heinrich study had been acceptable (see paragraph 87 at 90 above).

18

116 In those circumstances, while it is true that the RAC mentioned the dose and concentration of the substance, as well as the half-time of pulmonary elimination, the fact remains that it was not on the basis of those factors that it drew its conclusions on the level of lung overload during the Heinrich study and therefore on the acceptability of the results of that study.

117 Similarly, the arguments of the Commission and the ECHA alleging that the MAD values were comparable between the two studies at issue and that those values were close to those indicated in point 3.1.2.3.2 of Annex I to<sup>Regulation No</sup> 1272/2008 cannot succeed. Even if it is accepted that, as the Commission contends, the value of DAM may have an influence on the distribution and deposition of particles in the respiratory tract, it must be held that, in any event, the value of DAM was not taken into account by RAC in carrying out the calculation of Morrow overload and, therefore, it cannot have a decisive influence on the conclusions of the RAC concerning the level of lung overload in the Heinrich study and the acceptability of its results.

118 In addition, ECHA's argument based on the number of rats that survived to the end of the experimental period of the Heinrich study must be rejected, since it is apparent from the RAC's opinion that it did not consider that that data was, in itself, sufficient to draw a conclusion as to whether the level of lung overload in that study was acceptable.

119 For the same reasons, the Commission's argument that the RAC confirmed the validity of the Heinrich study on the basis of the Thompson and Others (2016) study must be rejected. Even if that study were able to validate the Heinrich study, which is not common ground in the present case, that validation would not detract from the fact that it was on the basis of the Morrow overload calculation that the RAC drew its conclusions on the acceptability of the level of pulmonary overload in the Heinrich study.

120 Therefore, contrary to what is claimed by the Commission and the ECHA, the Morrow overload calculation was decisive in substantiating the RAC's conclusions that the lung overload in the Heinrich study was within the acceptable range and that the results of that study were sufficiently reliable, relevant and adequate, those conclusions being vitiated by a manifest error of assessment, as has been pointed out in paragraph 103 above.

121 It follows from all of the foregoing that, in so far as the contested regulation, as regards the contested classification and labelling, is based on the opinion of the RAC (see paragraph 8 above) and in so far as the Heinrich study was decisive for the RAC's proposal for the classification of titanium dioxide (see paragraph 78 above), the manifest error of assessment referred to in paragraph 103 above renders implausible the RAC's conclusion, which was followed by the Commission when adopting the contested regulation, that the results of the Heinrich study were sufficiently reliable and adequate, within the meaning of point 3.6.2.2.1 of Annex I to<sup>Regulation No</sup> 1272/2008, to support the contested classification and labelling.

122 Accordingly, the first part must be upheld, without there being any need to examine the other arguments raised by the applicants in the context of that part.

123 However, in the interests of the sound administration of justice, it is appropriate to continue the examination of the action and to rule on the second part, in order to bring a complete solution to the dispute.

### *2. The second part, alleging manifest errors of assessment and infringement of the criteria laid down by Regulation No 1272/2008 for the classification and labelling of a substance as carcinogenic, in that the The impugned classification and labelling do not apply to a substance inherently capable of causing cancer*

124 In the context of the second part, the applicants claim, inter alia, that the contested classification and labelling infringe the criterion laid down in Article 3(1) and Article 36(1)(c) of<sup>Regulation No</sup> 1272/2008,

read in conjunction with point 3.6.2.1 of Annex I to that regulation, for the classification of a substance as carcinogenic, in that it does not target a substance that is intrinsically capable of causing cancer.

125 In that regard, the first applicant and the third applicants claim, inter alia, in Joined Cases T-279/20 and T-288/20, that the contested classification and labelling are based solely on the shape and size of the titanium dioxide particles, which are not intrinsic properties of titanium dioxide, since they are modifiable and result from the treatment of this substance. Moreover, in its opinion, the RAC accepted that the contested classification and labelling did not refer to an intrinsic danger in the traditional sense of the term. In addition, the fact that the toxicity observed is 'particle toxicity', resulting from the mere accumulation of particles of a certain size in the lungs, follows from the RAC's opinion and from recital 5 in the preamble to the contested regulation, from which it is apparent that the responsible for the observed toxicity were the deposited particles and not the solutes of the titanium dioxide molecules.

126 In the latter regard, the second applicants submit, in their application in Case T-283/20 and their statements in intervention in Joined Cases T-279/20 and T-288/20, that the fact that the particles deposited are responsible for the toxicity observed shows that it is 'particle toxicity', which does not constitute an intrinsic hazard within the meaning of Regulation No 1272/2008, but which, on the other hand, is a new concept, which is not covered by that regulation.

127 In addition, the second applicants claim that the development of tumours in the lungs of rats, which is the origin of the RAC opinion and of the contested classification and labelling, is a confounding or secondary effect, common moreover to other dusts, which results from excessive lung overload and not from an alleged carcinogenic potential of titanium dioxide.

128 The Commission disputes those arguments. In the first place, in Joined Cases T-279/20 and T-288/20, it submits that it is indeed apparent from the RAC's opinion that the shape of titanium dioxide was decisive for classification. However, the carcinogenicity of a given form of titanium dioxide powder had to be regarded as an intrinsic property for the purposes of classification according to the criteria of Regulation No 1272/2008. The concept of 'intrinsic' property should be understood as referring to the intrinsic hazard emanating from both a substance and a certain form or physical state of a substance, including the toxicity of particulate matter, in accordance with Articles 5(1), 6(1), 8(6) and 9(5), Regulation No 1272/2008. The systematic statement of that rule in the provisions of those regulations would emphasize the paramount importance of physical forms and states and the foreseeable use of substances. It is possible for a substance to be dangerous in a particular form and not in another form, as is the case with titanium dioxide.

129 In addition, the Commission submits that particle size may be relevant for determining hazard in the context of Regulation No 1272/2008, as is apparent in particular from the part of the ECHA Guidance on the application of the criteria of Regulation No 1272/2008 concerning the hazard class relating to specific target organ toxicity, with repeated exposure, called "STOT-RE".

130 In addition, the Commission submits that, although the RAC opinion observed the absence of intrinsic property in the traditional sense of the term, it ultimately concluded that there was an intrinsic toxicity, relevant for harmonised classification and labelling under Regulation No 1272/2008.

131 In addition, the Commission contends, in Case T-283/20, that the carcinogenic effects mentioned in the RAC opinion are not a 'confounding effect', but that they are due to the physicochemical characteristics of the respirable particles of titanium dioxide, in particular their size and, therefore, to the intrinsic properties of the substance. In addition, the carcinogenicity of titanium dioxide has been established, in animal studies, on the basis of a marked, but not excessive, lung overload which is relevant to humans.

132 Furthermore, the Commission contends, in Joined Cases T-279/20 and T-288/20, that other substances in powder form have already been classified, such as lead powder or nickel powder, which are listed in Part 3 of Annex VI to Regulation No 1272/2008.

**20**

133 In that regard, the Kingdom of Denmark and the Kingdom of Sweden add that several substances have been classified as carcinogenic on the basis of their physical properties, in particular refractory ceramic fibres and asbestos fibres, the classification of which is based on their shape and low solubility.

134 ECHA adds that the examples of lead and nickel cited by the Commission, as well as that of glass microfibres, illustrate cases where particle size, among other relevant intrinsic properties, was taken into account for the classification, without that approach having the consequence of rendering the classification illegal.

135 As a preliminary point, first of all, it should be noted that it follows from Regulation[No] 1272/2008 that harmonised classification and labelling are intended to determine the intrinsic properties of substances which must lead to their classification as dangerous products, so that the hazards of those substances (and of the mixtures containing them) can be correctly identified and communicated (see paragraph 28 above).

136 Thus, harmonised classification and labelling under Regulation[No] 1272/2008 are intended to provide information on the hazards associated with the intrinsic properties of substances (see, to that effect and by analogy, judgment of 21 July 2011, Nickel Institute, C-14/10, EU:C:2011:503, paragraph 81).

137 Next, as regards the classification of a substance as carcinogenic, it should be borne in mind that that classification refers to substances inherently capable of causing cancer, in accordance with Article 36 of[Regulation No] 1272/2008 and point 3.6.2.2.1 of Annex I to that regulation (see paragraphs 34 to 37 above).

138 Lastly, as regards the concept of 'intrinsic properties', it should be noted that, although that concept is absent from[Regulation No] 1272/2008, it must be interpreted in its literal sense, as designating the 'properties of a substance which belong to it in its own right'.

139 That interpretation of the expression 'intrinsic properties' is consistent with the objectives and purpose of harmonised classification and labelling under[Regulation No] 1272/2008, from which it follows that only the specific properties of a substance must lead to its classification as a hazardous product, so that the hazard associated with such properties can be correctly identified and communicated (see paragraphs 135 and 136 above).

140 That interpretation is also consistent with the GHS criteria, incorporated into EU law (see paragraph 29 above), of which point 1.1.1.6 and[footnote 1 and] point 1.1.3.1.1, in the 2013 version in force on the date of adoption of the contested regulation, make a distinction between, inter alia, the intrinsic properties of a substance, that are part of the hazard classification process, and other properties that are not specific to the substance.

141 In addition, that interpretation is consistent with the fact that the harmonised classification and labelling under[Regulation No] 1272/2008 refer to the hazard assessment, and not the risk assessment, provided for by[Regulation No] 1907/2006. As is apparent from the case-law referred to in paragraph 39 above, the assessment of the hazards associated with the intrinsic properties of a substance must not be limited to specific circumstances of use, as in the case of a risk assessment, and may be carried out validly irrespective of the place of use of the substance or any levels of exposure to the substance.

142 It is therefore in the light of that concept of intrinsic properties that Article 3(1) and Article 36(1)(c) of[Regulation No] 1272/2008, read in conjunction with point 3.6.2.2.1 of Annex I to that regulation, must be interpreted, from which it follows that the harmonised classification and labelling of a substance as carcinogenic may be based only on the intrinsic properties of the substance which determine its capacity intrinsic to cause cancer, i.e. the substance's own properties that determine its ability to cause cancer on its own.

143 In the present case, it should be noted that the contested classification and labelling are intended to identify and communicate a category 2 carcinogenicity hazard, by inhalation, which was described in the RAC opinion on the basis, in essence, of the results of the Heinrich study, in which malignant tumours were observed in the lungs of laboratory rats following a pulmonary overload of titanium dioxide particles of a nanometric size (see paragraphs 70 and 78 above).

144 The hazard of carcinogenicity referred to in paragraph 143 above is classified, by the RAC's opinion, as being 'non-intrinsic in the classical sense', the RAC having concluded that 'the mode of action of carcinogenicity in rats could not be considered as intrinsic toxicity in the classical sense'. In addition, it is apparent from Note W that the Commission considered it necessary to accompany the contested classification and labelling with a description of the 'particular toxicity of the substance' (see paragraph 10 above).

145 The 'non-intrinsic in the classical sense' or 'particular' nature of the carcinogenicity hazard referred to in the contested classification and labelling stems from a number of factors, mentioned in the RAC opinion and in the contested regulation.

146 In the first place, the hazard of carcinogenicity referred to in the contested classification and labelling is linked only to certain respirable particles of titanium dioxide, where they are present in certain forms, physical states, sizes and quantities. It is for that reason that the Commission considered it necessary to 'define respirable titanium dioxide particles in the entry for that substance' (see recital 5 of the contested regulation), departing from the RAC's proposal to classify the substance with the chemical name 'titanium dioxide' without any further physicochemical description.

147 Thus, it is apparent from the chemical identification of the substance, which appears in the entry in Table 3 of Part 3 of Annex VI to$^{Regulation No}$ 1272/2008, added by the contested regulation, that the carcinogenicity hazard referred to in the contested classification and labelling is linked only to titanium dioxide particles which, cumulatively, have a specific shape and physical state (powder), a certain size (aerodynamic diameter less than or equal to 10 micrometres), are present in a certain amount (1% or more), and are respirable (inhalation route).

148 In the second place, the carcinogenicity hazard referred to in the contested classification and labelling manifests itself only under conditions of lung overload, that is to say, during the inhalation of large quantities of particles, giving rise to a significant reduction in the mechanisms of particle elimination in the lung.

149 It should be noted that Note W expressly states that carcinogenicity 'occurs when respirable dust is inhaled in quantities resulting in a significant reduction in the mechanisms of particle elimination in the lung'. Similarly, it is stated in recital 5 of the contested regulation that carcinogenicity is associated with the inhalation of respirable titanium dioxide particles and with the retention and low solubility of those particles in the lungs (see paragraph 83 above).

150 In addition, it is apparent from the RAC's opinion that the tumours were observed in the rats always under conditions of lung overload. It is, moreover, in view of that context of lung overload that the RAC considered it necessary to use Morrow's overload calculation in order to assess whether the lung overload, to which the animals were subjected during the Lee and Heinrich studies, had been marked or excessive (see paragraph 85 above).

151 In the third place, the hazard of carcinogenicity referred to in the contested classification and labelling corresponds, according to the very wording of the RAC's opinion, to a 'toxicity of particulate matter', the culprits of which 'are the deposited particles, and not the solutes of titanium dioxide molecules'. In addition, it is apparent from the RAC opinion that the development of the tumours observed in the rats was not triggered by the direct contact of the titanium dioxide particles with the epithelial cells of the lung, but by the high particle load in the alveolar macrophages of the lungs and the consequent significant reduction in the mechanisms of particle removal, which caused marked and prolonged inflammatory reactions.

22

152 Those assessments are supported by the W note, from which it follows that carcinogenicity manifests itself following a significant reduction in the mechanisms of particle elimination in the lung, when the particles are inhaled in sufficient quantities for that purpose.

153 Furthermore, it is apparent from the RAC's opinion that the toxicity observed, which is not exclusive to titanium dioxide particles, but is common to other poorly soluble particles with a low degree of toxicity, is not linked either to the specific hazards of certain fibres, identified by the World Health Organisation (WHO) ('WHO fibres'), nor to additional specific toxicity of titanium dioxide particles due to surface coatings.

154 It is in the light of the factors set out in paragraphs 146 to 153 above that, first of all, the RAC concluded that 'the mode of action of carcinogenicity in rats could not be regarded as inherent toxicity in the classical sense', and secondly, it considered that, nevertheless, it had to be taken into consideration in the context of harmonised classification and labelling under$^{Regulation No}$ 1272/2008 and, lastly, the Commission followed that opinion, adopting the contested regulation and considering it necessary to introduce the W note to describe the 'particular toxicity of the substance' (see paragraph 144 above).

155 The question that arises in the present case is whether the Commission, in adopting the contested regulation, made a manifest error of assessment when applying the criterion of 'substance intrinsically capable of causing cancer', laid down in point 3.6.2.2.1 of Annex I to$^{Regulation No}$ 1272/2008.

156 It is true that the hazard of carcinogenicity referred to in the contested classification and labelling is associated with particles of titanium dioxide with certain properties, namely a certain size, shape and low solubility (see paragraph 83 above). However, it should be noted that, according to the RAC's opinion, the causes of the observed toxicity are not the properties of the titanium dioxide particles themselves, but the deposition and retention of those particles in the alveolar macrophages of the lungs in sufficient quantities to give rise to lung overload which leads to a significant reduction in the mechanisms of particle removal in the lung (see paragraphs 151 and 152 above).

157 Thus, even if it is accepted that the properties of particles, such as their size, shape and low solubility, play a role in their accumulation in the lung, and irrespective of whether those properties are intrinsic within the meaning of$^{Regulation No}$ 1272/2008, as the Commission maintains, the fact remains that the mode of action of the carcinogenicity described in the RAC opinion which, According to the latter, could not be considered as "intrinsic toxicity in the classical sense", does not relate to an intrinsic capacity of titanium dioxide particles to cause cancer.

158 One of the key elements of the toxicity observed is the quantity of particulate matter inhaled, which must be sufficient to cause a significant reduction in the mechanisms of particle elimination and it is that reduction which is essential for the occurrence of chronic inflammation, which, in turn, leads to the carcinogenic effects observed (see paragraphs 146 to 153 above). An accumulation of particles in the lung in sufficient quantities to cause a significant reduction in the mechanisms of particle elimination, which is verified only when certain quantities of particles are inhaled, cannot be regarded as falling within the intrinsic properties of the particles in question.

159 Thus, contrary to the wording of the second paragraph of Note W, that note does not merely describe a 'particular toxicity' of the substance, which '[would] not constitute a criterion for classification under Regulation$^{No}$ 1272/2008'. By contrast, that note describes a hazard which does not fall within the classification criterion for the hazard of carcinogenicity, referred to in point 3.6.2.2.1 of Annex I to$^{Regulation No}$ 1272/2008, according to which the substance must be inherently capable of causing cancer.

160 Therefore, by upholding the RAC's conclusion that 'the mode of action of carcinogenicity in rats could not be regarded as inherent toxicity in the classical sense', but which had to be taken into consideration in the context of harmonised classification and labelling under$^{Regulation No}$ 1272/2008, the Commission made a

manifest error of assessment when applying the criterion for classifying a substance as carcinogenic laid down in Article 3(1) and Article 36(1) of Regulation No 1272/2008, read in conjunction with point 3.6.2.2.1 of Annex I to Regulation No 1272/2008.

161 It must therefore be held that the contested regulation, as regards the contested classification and labelling, was adopted in breach of Article 3(1) and Article 36(1) of Regulation No 1272/2008, read in conjunction with point 3.6.2.2.1 of Annex I to that regulation.

162 Furthermore, the fact that the contested classification and labelling relate to category 2 of the carcinogenicity hazard class (see paragraph 46 above) does not call those conclusions into question. The classification criterion for the hazard class of carcinogenicity, referred to in paragraph 160 above, is always the same for the two respective hazard categories, those two categories differing only on the basis of the weight of evidence and the weight of the indicia, in accordance with the provisions of point 3.6.2.1 and Table 3.6.1 of Annex I to Regulation No 1272/2008, referred to in paragraph 38 above.

163 The arguments put forward by the Commission and by the interveners in its support do not call those conclusions into question.

164 In the first place, the Commission submits, in essence, that the concept of 'intrinsic' capacity or property should be understood as referring to the intrinsic danger which emanates both from a substance and from a certain form or physical state of a substance or mixture, in accordance with Article 5(1) and Article 6(1), Article 8(6) and Article 9(5) of Regulation No 1272/2008.

165 In that regard, it should be noted that Article 5(1), Article 6(1), Article 8(6) and Article 9(5) of Regulation No 1272/2008, relied on by the Commission, do not directly concern the procedure for harmonising the classification and labelling of substances, provided for in Title V of that regulation, nor even less fall within the criteria established for the harmonised classification and labelling of a substance as carcinogenic.

166 On the other hand, those provisions concern the obligation, referred to in paragraph 31 above, for a substance or mixture to be self-classified by the manufacturer, importer or downstream user, where the substance or mixture in question does not have a harmonised classification and has dangerous properties. Therefore, the information relevant for the purpose of determining whether a substance poses a hazard, as well as the evaluation of that information, and, where appropriate, the application of the classification criteria for each hazard class must relate to the forms or physical states in which the substance is placed on the market or is used by the individuals or undertakings to which such an obligation is imposed.

167 Furthermore, even if it is accepted that, as the Commission contends, harmonised classification and labelling may relate to an intrinsic hazard arising from a certain form or physical state of a substance, the fact remains that, in order to comply with the criteria laid down for harmonised classification and labelling, it is essential that the hazard arises either from the intrinsic properties of the substance, or the intrinsic properties of a certain physical state or form of the substance, which is not the case here, for the reasons set out in paragraphs 157 and 158 above.

168 In the second place, the Commission submits that the contested classification and labelling were based on the physicochemical characteristics of the titanium dioxide particles, without, however, putting forward any specific argument capable of calling into question the fact that the toxicity observed is attributed, according to the very wording of the RAC opinion, not to the particles themselves, but to their deposition in the lung in quantities giving rise to a significant reduction in the mechanisms of particle removal, which is only verified if a certain threshold of exposure to particles is reached.

169 In addition, as is apparent from the RAC's opinion, the carcinogenicity observed is not attributed either to the solutes of the titanium dioxide molecules, or to the direct contact of the titanium dioxide particles with

the epithelial cells of the lungs, or to the instrument morphology, or to a surface coating of those particles relevant from a toxicological point of view (see paragraphs 151 and 153 above).

170 In the third place, it should be noted that, contrary to what is claimed by the Commission and the interveners in support of it, the contested classification and labelling are not similar to the harmonised classifications and labelling to which they refer.

171 Thus, as regards lead, it should be observed that both solid lead and lead powder are classified and that, in both cases, the classification was made for the hazard class 'toxic to reproduction', with the difference that a specific concentration limit was established for powdered lead (see Annex VI, Part 3, Table 3, of Regulation No 1272/2008).

172 Similarly, both solid nickel and nickel powder were classified in the carcinogenicity hazard class, category 2, with the difference that nickel powder was also classified as 'hazardous to the aquatic environment' (see Table 3 of Part 3 of Annex VI to Regulation No 1272/2008).

173 It follows that the classifications of nickel and lead and their respective powders are not comparable to that of titanium dioxide, of which only particles of a certain size, but not the massive substance, are the subject of the contested classification and labelling, which, moreover, relate to a different class of health hazard.

174 As regards asbestos fibres, it is the substance itself, and not its particles of a given size, which is classified as carcinogenic (see Table 3 of Part 3 of Annex VI to Regulation No 1272/2008).

175 As regards glass microfibres, it is apparent from the RAC opinions of 4 December 2014, on the basis of which they were classified (see Commission Regulation (EU) 2016/1179 of 19 July 2016 amending, for the purposes of adapting to technical and scientific progress, Regulation No 1272/2008 (OJ 2016 L 195, p. 11)), that the classification of these fibres as carcinogenic is the result of a toxicity determined, in essence, by their shape and size, but also by their surface chemistry and biopersistence. It follows that that classification is not comparable to that of titanium dioxide, the particles tested of which had a minor or no toxicological surface coating (see paragraph 153 above).

176 As regards refractory ceramic fibres, they have been classified as carcinogenic, category 1B (see Table 3 of Part 3 of Annex VI to Regulation No 1272/2008). As is apparent from the Commission's reply to a question put by way of a measure of organisation of procedure in Joined Cases T‑279/20 and T‑288/20, and from its reply to a question put by the Court at the hearing on 12 May 2022, that classification was based on a mode of action of carcinogenicity linked to the properties of those fibres, such as length, diameter and biopersistence, like WHO fibres. Unlike refractory ceramic fibres, the titanium dioxide particles tested did not have biopersistence as a characteristic and had a non-fibrous morphology, which did not satisfy the WHO criteria for WHO fibres, as is apparent from the RAC's opinion (see paragraph 153 above).

177 Accordingly, the examples mentioned above illustrate only cases in which the shape and size of the particles were indeed taken into account, but where, nevertheless, certain properties specific to the substances in question were decisive for their classification, which does not correspond to the present case. Thus, the contested classification and labelling are not similar to any of the examples mentioned, contrary to the Commission's submissions.

178 In the light of the foregoing, the second part must be upheld, without there being any need to examine the applicants' other arguments in the context of that part.

179 It follows from all of the foregoing that the second plea and the first and fifth parts of the seventh plea and the arguments raised by the second applicants in their statements in intervention in Joined Cases T‑279/20 and T‑288/20 and the first plea in Case T‑283/20, alleging manifest errors of assessment and infringement of the established criteria, Regulation No 1272/2008 provides for the classification and labelling of a substance as carcinogenic to be allowed.

180 Consequently, the contested regulation must be annulled as regards the contested classification and labelling, without there being any need to examine the applicants' other pleas and arguments.

**Costs**

181 Under Article 134(1) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Since the Commission has been unsuccessful, it must be ordered to bear its own costs and to pay those incurred in Case T-279/20 by the first applicant and the second applicants, Ettengruber GmbH Abbruch und Tiefbau, Ettengruber GmbH Recycling und Verwertung und TIGER Coatings, in Case T-283/20, by the second applicants and by Cefic, CEPE, BCF, ACA, Mytilineos and Delfi-Distomon and, in Case T-288/20, by the third applicants and by the second applicants, Sto SE & Co. and Rembrandtin Coatings, in accordance with the form of order sought by the latter.

182 Under Article 138(1) of the Rules of Procedure, the Member States and institutions which have intervened in the proceedings are to bear their own costs. According to Article 1(2)(f) of the Rules of Procedure, the term 'institutions' means the institutions of the European Union referred to in Article 13(1) TEU and the bodies, offices or agencies established by the Treaties or by an act adopted for their implementation and which may be parties to the proceedings before the Court. According to Article 100 of Regulation[No] 1907/2006, ECHA is a body of the European Union. It follows that the Kingdom of Denmark, the French Republic, the Kingdom of the Netherlands, the Kingdom of Sweden, the Republic of Slovenia, the Parliament, the Council and the ECHA must bear their own costs.

For these reasons,

THE GENERAL COURT (Ninth Chamber, Extended Composition)

hereby declares and decrees:

**1. Joins Cases T-279/20 and T-288/20 and Case T-283/20 are joined for the purposes of the judgment;**

**2. Annuls Commission Delegated Regulation (EU) 2020/217 of 4 October 2019 amending, for the purposes of adapting to technical and scientific progress, Regulation (EC) No 1272/2008 of the European Parliament and of the Council on classification, labelling and packaging of substances and mixtures and correcting that regulation as regards the harmonised classification and labelling of titanium dioxide in powder form containing 1% or more of particles with a diameter of less than or equal to 10 μm.**

**3. Orders the European Commission to bear its own costs and to pay the costs incurred in Case T-279/20 by CWS Powder Coatings GmbH, Billions Europe Ltd and the other interveners whose names appear in the annex, Ettengruber GmbH Abbruch und Tiefbau, Ettengruber GmbH Recycling und Verwertung und TIGER Coatings GmbH & Co. KG, in Case T-279/20.283/20, by Billions Europe and the other applicants whose names appear in the annex, the European Chemical Industry Council (Cefic), theEuropean Council of the Paints, Printing Inks and Art Colours Industry (CEPE), British Coatings Federation Ltd (BCF), American Coatings Association, Inc. (ACA), Mytilineos SA and Delfi-Distomon Anonymos Metalleftiki Etaireia and, in Case T-288/20, by Brillux GmbH & Co. KG, Daw SE, Billions Europe and the other interveners whose names appear in the annex, Sto SE & Co. KGaA and Rembrandtin Coatings GmbH.**

**4. Orders the Kingdom of Denmark, the French Republic, the Kingdom of the Netherlands, the Kingdom of Sweden, the Republic of Slovenia, the European Parliament, the Council of the European Union and the European Chemicals Agency (ECHA) to bear their own costs;**

26

Costeira                              Kancheva                              Perišin

Zilgalvis                                                          Dimitrakopoulos

Delivered in open court in Luxembourg on 23 November 2022.

Signatures

Table of Contents

I. Background to the dispute

II. Forms of order sought by the parties

III. Law
    A. Preliminary considerations on the harmonized classification and labelling of substances in the carcinogenicity hazard class
    B. Preliminary considerations on the intensity of the Court's review
    C. The pleas and arguments alleging manifest errors of assessment and failure to comply with the criteria laid down by Regulation No 1272/2008 for the classification of a substance as carcinogenic
        1. The first part, alleging manifest errors of assessment and infringement of the criteria laid down by Regulation No 1272/2008 for the classification and labelling of a substance as carcinogenic, as regards the acceptability and reliability of the Heinrich study on which the RAC opinion was based
           (1) The intensity of the General Court's review
             (2) The relevance of the Heinrich study to the contested classification and labelling
             (3) The manifest error of assessment relating to the value of the density of the particles
        2. The second part, alleging manifest errors of assessment and infringement of the criteria laid down by Regulation No 1272/2008 for the classification and labelling of a substance as carcinogenic, in that the contested classification and labelling do not refer to a substance inherently capable of causing cancer

Costs

---

\* Languages of the case: German and English.

---

1 The list of the other interveners shall be annexed only to the version notified to the parties.

---

2 The list of the other applicants shall be annexed only to the version notified to the parties.

---

3 The list of the other interveners is annexed only to the version notified to the parties.

**27**