# EXHIBIT  J

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3

     THE PERSONAL CARE PRODUCTS          )
4    COUNCIL,                            )
                                         )
5              Plaintiff,                )
                                         )Case No.
6         vs.                            )2:23-cv-01006-TLN-JDP
                                         )
7    BOB BONTA, IN HIS OFFICIAL          )
     CAPACITY AS ATTORNEY GENERAL        )
8    OF THE STATE OF CALIFORNIA,         )
                                         )
9              Defendant.                )
     _____)

10

11

12

13          DEPOSITION OF CHARLES W. JAMESON, Ph.D.

14                  Los Angeles, California

15                 Friday, August 9, 2024

16                      VOLUME I

17

18

19

20   Stenographically Reported by:
     RENEE D. ZEPEZAUER, RPR, CRR
21   CSR No. 6275
     JOB No. 6831015
22   PAGES 1 - 266

23

24

25

                                            Page 1

```
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF CALIFORNIA
 3
    THE PERSONAL CARE PRODUCTS       )
 4  COUNCIL,                         )
                                     )
 5      Plaintiff,                   )
                                     )Case No.
 6      vs.                          )2:23-cv-01006-TLN-JDP
                                     )
 7  BOB BONTA, IN HIS OFFICIAL       )
    CAPACITY AS ATTORNEY GENERAL     )
 8  OF THE STATE OF CALIFORNIA,      )
                                     )
 9      Defendant.                   )
    _____)
10
11
12
13      Deposition of CHARLES W. JAMESON,
14  Ph.D., VOLUME I, taken on behalf of
15  Plaintiff at 2000 Avenue of the Stars,
16  Suite 400, North Tower, Los Angeles,
17  California, beginning at 9:07 a.m. and
18  ending at 6:37 p.m., Friday, August 9,
19  2024, before RENEE D. ZEPEZAUER,
20  Certified Shorthand Reporter No. 6275.
21
22
23
24
25
                                        Page 2
```

```
 1                  INDEX
 2  WITNESS                  EXAMINATION
 3  CHARLES W. JAMESON, Ph.D.
    VOLUME I
 4
 5      BY MR. SPERLA   8, 246, 257, 259
 6      BY MR. HURTADO    226, 254, 258
 7
 8              EXHIBITS
 9  NUMBER         DESCRIPTION        PAGE
10  Exhibit 1   Plaintiff's Notice of Deposition   10
11      of Dr. Charles W. Jameson
12  Exhibit 2   Rebuttal Expert Report of Dr.     13
13      Charles William Jameson, Ph.D.
14  Exhibit 3   Expert Report of Dr. Amy Madl     55
15  Exhibit 4   Expert Report of Paolo Boffetta,  61
16      M.D. MPH
17  Exhibit 5   IARC Monographs on the Evaluation 84
18      of Carcinogenic Risks to Humans
19  Exhibit 6   Article titled "The Relevance of  130
20      the Rat Lung Response to Particle
21      Overload for Human Risk
22      Assessment:  A Workshop Consensus
23      Report ILSI Risk Science Institute
24      Workshop Participants"
25
                                        Page 4
```

```
 1  APPEARANCES:
 2
 3  For Plaintiff:
 4      DLA PIPER LLP (US)
 5      BY:  GREGORY G. SPERLA and ALBERTO CORONA
 6      Attorneys at Law
 7      555 Mission Street, Suite 2400
 8      San Francisco, California  94105-2933
 9      (415)836-2500
10      Greg.Sperla@us.dlapiper.com
11      Alberto.Corona@us.dlapiper.com
12
    For Defendant Rob Bonta, in his Official Capacity as
13  Attorney General of the State of California:
14      ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA
15      BY:  RAFAEL J. HURTADO
16      Deputy Attorney General
17      600 West Broadway, Suite 1800
18      San Diego, California  92101
19      (619)321-5780
20      Rafael.Hurtado@doj.ca.gov
21
22
23
24
25
                                        Page 3
```

```
 1          INDEX (Continued):
 2              EXHIBITS
 3  NUMBER         DESCRIPTION        PAGE
 4  Exhibit 7   Article titled "Relevance of the   141
 5      rat lung tumor response to
 6      particle overload for human risk
 7      assessment - Update and
 8      interpretation of new data since
 9      ILSI 2000"
10  Exhibit 8   Article entitled "Possible        143
11      Mechanisms to Explain Dust
12      Overloading of the Lungs"
13  Exhibit 9   Contemporary Issues in Toxicology 145
14      - Dust Overloading of the Lungs:
15      Update and Appraisal
16  Exhibit 10  Casarett and Doull's Toxicology   157
17      The Basic Science of Poisons,
18      Sixth Edition, Chapter 4
19  Exhibit 11  Document entitled "Pulmonary      174
20      Response to Toner upon Chronic
21      Inhalation Exposure in Rats"
22
23
24
25
                                        Page 5
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1 contractor who helped us gather the information, and
2 they would draft a report, but I was the one who would
3 review the entire report, make sure that everything was
4 in there that was needed to use the criteria for listing
5 something in the Report on Carcinogens so that could be
6 applied, and sign off on the report before it was sent
7 out to our reviewers.
8    Q    Would it be fair to say you were the supervisor
9 for the report in question -- strike that.
10       How would you describe it?
11    A    I was responsible for the report that was
12 prepared. I was supervising its preparation, but I had
13 to read through and agree with everything that was being
14 stated in it and sign off on it before it was released.
15    Q    Did you communicate with any of the other
16 experts in this case?
17    A    No.
18    Q    In forming your opinions in this case, did you
19 rely on any facts provided by another expert in this
20 case?
21    A    Well, I mean, I reviewed Dr. Madl's report and,
22 you know, responded to that. So from that standpoint, I
23 guess, I would say I did look at other experts'
24 opinions, but she was the only one.
25    Q    Okay. Let's give you a copy of Dr. Madl's
                                                    Page 54

1 report. Actually everybody gets a copy of Dr. Madl's
2 report. And we'll mark this as Exhibit 3.
3       (Exhibit 3 was marked for identification by
4 the court reporter and is attached hereto.)
5 BY MR. SPERLA:
6    Q    Dr. Jameson, is this the expert report of
7 Dr. Amy Madl that you refer to in your expert report?
8    A    It appears to be, yes.
9       MR. SPERLA: For the record, we are marking
10 this document as Exhibit 3.
11    Q    And you say "appears to be." Do you want to
12 take a minute to flip through it?
13    A    Yeah, this is the report.
14    Q    Okay. I'm going to go back to your report,
15 it's Exhibit 2, and page 5. Here's my question: Do you
16 interpret Dr. Madl's report as primarily a critique of
17 IARC's hazard determination that TiO2 is a possible
18 human carcinogen?
19    A    No, I wouldn't say -- if it's supposed to be a
20 critique, it's not a very good one, no.
21    Q    What -- how would you summarize Dr. Madl's
22 opinion?
23       MR. HURTADO: Narrative. Vague and ambiguous.
24       THE WITNESS: Dr. Madl appears to be only
25 focusing on the inhalation -- as far as the animal
                                                    Page 55

1 studies are concerned, only focusing on the inhalation
2 studies that were performed and ignores the other
3 studies that were done on titanium dioxide to determine
4 the carcinogenicity in animals and there were some
5 additional studies not mentioned in her report where it
6 was studied by -- that's the Pott's study we were
7 talking about earlier.
8    Q    For endotracheal?
9    A    They did endotracheal implantation and got lung
10 tumors but Dr. Madl doesn't talk about that or doesn't
11 address that in the report. Also her evaluation of the
12 epidemiology data is -- in my mind questionable or weak,
13 I guess would be a better term, because she's not
14 looking at the data critically, leaving out some issues
15 that most of the epidemiology studies are inadequate and
16 that's what IARC said, all the epidemiology studies are
17 pretty much inadequate because of confounding and -- the
18 exposure estimate is very poorly done, the populations
19 that they chose were relatively young, so latency of
20 lung tumors, latency of formation of lung tumors would
21 not be covered in a lot of the people and some of the
22 studies the data for early employment was not available
23 to them so they didn't know what the exposures were
24 early on in a person's employment.
25       All those kinds of things as outlined by IARC
                                                    Page 56

1 lead to the epidemiology studies being very weak or
2 inadequate. And so since the epidemiology data are
3 inadequate, that's why IARC came to the conclusion that
4 the epidemiology on titanium dioxide, the epi data is
5 inadequate for an evaluation.
6    Q    When you say epi --
7    A    I was going to say Dr. Madl is saying that they
8 are negative. They are showing negative studies, but
9 the data is inadequate to make a determination if it's
10 positive or negative. So she's basing an evaluation on
11 very poor data from these studies.
12    Q    I just want to be clear for the record. When
13 you say "epi data," what do you mean?
14    A    The epidemiological studies that were published
15 in the literature.
16    Q    Can we agree the term epi can refer to
17 epidemiological?
18    A    No problem. I'm sure it is easier to say epi.
19    Q    It sure is. Let's go to Dr. Madl's report.
20 Bottom of page 2 where it starts. You see the caption
21 where it starts "summary of opinions"?
22    A    Yes.
23    Q    All right. Go to the next page. And do you
24 see the five bullet points on page 3?
25       MR. HURTADO: We're looking at your own report.
                                                    Page 57

15 (Pages 54 - 57)

1 BY MR. SPERLA:
2   Q   It's the exhibit marked 3.
3   A   I'm looking at my report.  Sorry.
4   Q   Starting at bottom of 2.  Summary of opinions.
5 Next page.
6   A   Gotcha.
7   Q   Do you see the five bullets?
8   A   Yes.
9   Q   Did you read these?
10  A   Yes.
11  Q   Okay.  This summarizes Dr. Madl's opinions,
12 doesn't it?
13  A   That's what it says, yes.
14      MR. HURTADO:  Vague and ambiguous.  And
15 speculation.
16 BY MR. SPERLA:
17  Q   Okay.  You wrote in your report on page 5 that
18 Amy Madl has a critique of IARC's hazard determination.
19  A   Okay.
20  Q   It's in the middle of the page.
21  A   Okay.  I gotcha.
22  Q   And you say that you disagree with her critique
23 of IARC's hazard determination.  Is that right?
24  A   Yeah.  I disagree with it, yes.
25  Q   In her summary of her opinions, does she

Page 58

1 mention IARC?  And by that I mean, on page 3 of
2 Dr. Madl's report.
3      MR. HURTADO:  The report speaks for itself.
4      THE WITNESS:  In skimming through this, I don't
5 see IARC mentioned.
6 BY MR. SPERLA:
7   Q   So is your -- are your opinions in this case
8 fairly summarized as a defense of the IARC monograph for
9 TiO2?
10      MR. HURTADO:  Vague and ambiguous.
11      THE WITNESS:  My report is explaining that IARC
12 did a hazard identification determination of TiO2 and
13 based on the data and the application of the criteria in
14 IARC preamble for listing materials, titanium dioxide
15 meets the criteria for listing as a possible human
16 carcinogen.
17 BY MR. SPERLA:
18  Q   2B?
19  A   2B.
20  Q   And you don't take issue with IARC's finding of
21 inadequate human data?
22  A   No.  Because as I explained earlier, the data
23 is inadequate.  I mean, the epi studies show some
24 positive tendencies in some of the reports.  They are
25 finding an increased incidence of lung tumors in some

Page 59

1 cases.  They are finding increased incidence of kidney
2 tumors, increased incidence of bladder tumors.  So
3 there's -- you know, all of that data is kind of
4 pointing to, hey, something is happening with exposure
5 to TiO2, but the data that they have for it is
6 inadequate because of the exposure assessments, the loss
7 of documents for documenting exposure.  Some of the
8 cohorts or cases that they looked at were young,
9 relatively young, and didn't take into account or --
10 they were looked at before the latency period for the
11 formation of lung tumors in these workers would have
12 appeared.
13      So, you know, all of those things lead to an
14 evaluation that the epidemiology data is suggestive, but
15 it's inadequate to make a definitive determination.
16  Q   I'm going to put you on the spot.  Do you
17 believe IARC -- the IARC working group was wrong to not
18 find that the human data was sufficient?
19  A   No.  That was their determination based on
20 their evaluation of the epidemiology data.
21  Q   And as you sit here today, you don't disagree
22 with that determination?
23  A   I'm comfortable with it.  I don't disagree with
24 it, no.
25  Q   Okay.  Thank you.  Told you I'd put you on the

Page 60

1 spot.
2      Okay.  You said earlier you reviewed
3 Dr. Boffetta's report; correct?
4   A   I skimmed through it.  I really didn't read it
5 in any detail.
6   Q   Okay.  Let's mark that as an exhibit now.
7      (Exhibit 4 was marked for identification by
8 the court reporter and is attached hereto.)
9      MR. SPERLA:  Can we go off the record for two
10 minutes?
11      THE WITNESS:  Huh-uh.
12      MR. SPERLA:  Please.
13      THE WITNESS:  Sure.
14      (Recess.)
15      MR. SPERLA:  Let's go back on the record.
16  Q   Dr. Jameson, are you ready to go back on?
17  A   Yes, sir.
18  Q   Okay.  We have passed out a copy of Dr. Paolo
19 Boffetta's expert report in this case.  We are going to
20 mark it Exhibit 4.  The references start on page 30.
21  A   That's the CV.
22  Q   You said you reviewed the report of
23 Dr. Boffetta.  Skip that.  Skimmed the report of
24 Dr. Boffetta.  This is the report, the document marked
25 Exhibit 4.

Page 61

16 (Pages 58 - 61)

1   Q   I think you're talking about the Boffetta data
2   that we --
3   A   Maybe it was Boffetta.  I don't remember.
4   Q   We can come back to it.
5   A   But -- so none of the studies demonstrated a
6   dose response effect from exposure to TiO2.
7       I think based on my review of the epi data, I
8   think that's accurate.  But still the data is inadequate
9   for making a definitive determination of lung cancer.
10  Q   Is the data inadequate to say -- strike that.
11  Let me rephrase.
12      The data -- when you say the data is
13  inadequate, you don't mean that it's -- you're not
14  capable of determining whether there was a dose-response
15  effect reported in the epi data, are you?
16  A   No.  I'm saying the data is inadequate because
17  of the design of the studies are faulted and inadequate.
18  So the data you gather from those studies is faulty and
19  therefore you can't accept it as being the absolute
20  fact.
21  Q   I just want to be clear.  That doesn't change
22  your prior response that none of the studies showed a
23  dose response.
24  A   The studies didn't show -- with the data that
25  they generated, it didn't show a dose response.  But the

Page 66

1   data was inaccurate.  Or inadequate, sorry.  Inadequate.
2   Q   Now I have to ask you the same question.  That
3   doesn't -- you said but the data is inadequate.  Still,
4   the human epi data on TiO2 writ large -- none of those
5   studies showed a dose response?
6   A   None of those studies showed a dose response
7   based on the inadequate data they had for determination.
8   Q   You only skimmed the Boffetta report; correct?
9   A   That's correct.
10  Q   And you were not asked to provide an opinion as
11  an epidemiologist for this case?
12  A   They did not ask me to comment on the Boffetta
13  report, no.
14  Q   It's close to my question.  Because you said
15  earlier that you are familiar with epidemiology.
16  A   Right.
17  Q   Correct me if I'm wrong, you would not consider
18  yourself an epidemiologist?
19  A   That's correct.
20  Q   Therefore you would not characterize your
21  testimony in this case -- excuse me, your opinions, as
22  the opinions of an epidemiologist?
23  A   Well, there are opinions of my -- my opinions
24  are based on my over 30 years of experience in reviewing
25  epidemiology data and given opinions as to what the data

Page 67

1   is saying.  So my opinions in this case are based on the
2   same principles that I am very familiar with
3   epidemiology studies, I can review the data and form an
4   opinion and give you an opinion as to what the data is
5   saying, but I don't profess to be an epidemiologist.
6   Q   Okay.  And in your report, you discuss many of
7   the epi studies on TiO2; correct?
8   A   Correct, yes.
9   Q   But you did not review Dr. Boffetta's expert
10  report that also discusses those same studies; correct?
11  A   Like I said, I skimmed through it, but I did
12  not address his report in my report.
13  Q   Okay.  Dr. Boffetta was part of the IARC
14  working group that looked at the TiO2 epi data.
15  A   I think he was on the staff of IARC when that
16  review was conducted, yes.
17  Q   Let's look at Dr. Boffetta's report.  This is
18  the exhibit marked 4.  Let's go to page 2, please.
19  Paragraph 7, go down to where the bullets are, A and B.
20  Do you see that?
21  A   Yes.
22  Q   Dr. Boffetta writes -- actually we have to go
23  above that.  He writes that "The weight of epidemiology
24  evidence and the potential association between exposure
25  to TiO2 and the risk of lung or other cancers in

Page 68

1   humans:"  Bullet point A, "strongly suggests that
2   exposure to TiO2, in any form, does not increase the
3   risk of any cancer in humans."
4       Let's stop there.  Did you read that portion?
5   A   Strongly suggests -- I'm sorry.  Strongly
6   suggests that exposure to TiO2 in any form does not
7   increase the risk of any cancer in humans.  That's what
8   it says here, yes.
9   Q   Okay.  And did you -- were you asked to
10  evaluate this statement for this case?
11  A   This statement from Dr. Boffetta?  No.
12  Q   And did you perform any analysis for your
13  opinions in this case that would permit you to evaluate
14  the accuracy of this statement?
15      MR. HURTADO:  Vague and ambiguous.
16      THE WITNESS:  Yes, I think so.
17      MR. HURTADO:  Lacks foundation.
18  BY MR. SPERLA:
19  Q   Do you agree Dr. Boffetta is an authoritative
20  expert on the epidemiological data for TiO2?
21      MR. HURTADO:  Vague and ambiguous.  Out of
22  scope.
23      THE WITNESS:  I can say he's -- what was the
24  term you used?
25  //

Page 69

18 (Pages 66 - 69)

**Page 70**

1 BY MR. SPERLA:
2    Q   Authoritative.
3    A   He is an authoritative expert in epidemiology.
4 I don't know about his knowledge in TiO2.
5    Q   And let's go to B.  It's the next bullet.
6    A   Okay.
7    Q   It says, you know -- comes from the prior
8 paragraph that the weight of epidemiological evidence,
9 et cetera, B, "Certainly does not support the hypothesis
10 that exposure to TiO2, in any form, increases the risk
11 of lung or any other cancer in humans."
12        Did you evaluate that statement for purposes of
13 this case?
14    A   No.
15    Q   Did you review all of the epidemiological
16 evidence cited in Dr. Boffetta's report?
17        MR. HURTADO:  Lacks foundation.
18        THE WITNESS:  Like I said, I skimmed the report
19 so I can't say absolutely.  But if he looked at all the
20 epi data on titanium dioxide, I feel like I -- my
21 literature search and what have you on TiO2 would have
22 pulled up all of the data as well.
23 BY MR. SPERLA:
24    Q   Dr. Boffetta here says, "The weight of
25 epidemiological evidence does not support the hypothesis

**Page 71**

1 that there is an association between TiO2 and lung
2 cancer."  Correct?
3    A   That's what it says here, yes.
4    Q   Do you agree with that statement?
5    A   Well, based on the fact that the epidemiology
6 data is inadequate as documented by the IARC monograph
7 review, then this statement makes sense that it does not
8 support the hypotheses that exposure to TiO2 in any form
9 increases the risk of lung or any other cancer in humans
10 because the data is inadequate.
11    Q   So back to A which says, "The weight of
12 evidence strongly suggests that it does not increase the
13 risk of cancer in humans."
14        Do you agree with that statement?
15    A   No.
16        MR. HURTADO:  Out of scope.
17        THE WITNESS:  Sorry.  No.
18 BY MR. SPERLA:
19    Q   Let's go five more minutes.
20    A   Sure.
21    Q   Let's go to your report.  I believe it is
22 marked Exhibit 2.
23        Are all the opinions you currently intend to
24 offer in this case contained in your expert report?
25    A   Yes.  Unless some new data comes up that is

**Page 72**

1 relevant to the particular issue, then I reserve the
2 right to give an opinion on that.
3    Q   Okay.  Let's go to page 6 of your report,
4 please.  Okay.  Bottom of 6, it says, "Importantly, a
5 carcinogen is a substance that has been identified as
6 causing cancer in humans and/or animals."
7        Do you see that?
8    A   Yes.
9    Q   Is it your opinion that a substance is a known
10 carcinogen if it's classified by IARC as a 2B possible
11 carcinogen?
12    A   Could you repeat that, please?
13        (Record read.)
14        MR. HURTADO:  Vague and ambiguous.
15        THE WITNESS:  So you're asking if something is
16 identified as a known human carcinogen is also known as
17 a possible human carcinogen; is that what you're saying?
18 BY MR. SPERLA:
19    Q   I'm not sure if that's how I would put it.
20    A   Okay.  Then I don't understand your question.
21    Q   Let's have the reporter read it one more time,
22 please.
23        (Record read.)
24        MR. HURTADO:  Legal analysis and conclusion.
25        THE WITNESS:  So what you're saying if IARC

**Page 73**

1 identifies something as a possible carcinogen, then it's
2 a known carcinogen that's what you're saying.  That's my
3 interpretation of what you're saying.  I'm sorry.
4 BY MR. SPERLA:
5    Q   I think so.
6    A   Well, being a possible human carcinogen is not
7 the same thing as being a known human carcinogen.
8 Because of the weight of the evidence or the, you know,
9 the strength of the evidence for listing something in
10 each of those categories is different.  So you have to
11 have a significant amount of positive data in humans to
12 be listed as a known human carcinogen.  Whereas a
13 possible human carcinogen you can have inadequate
14 evidence in humans and strong evidence in animals and
15 supporting mechanistic evidence, and that would meet the
16 criteria to define it as a possible human carcinogen.
17    Q   Whose criteria?
18    A   IARC's criteria as listed in their preamble.
19    Q   Is it fair to say that's your criteria as well?
20    A   I use the very similar criteria for my
21 determination of that.
22    Q   How -- you say "similar."  How is it different?
23 To be clear, how is your criteria different from IARC's?
24    A   Basically it's the same criteria.  I say it's
25 similar, because I had to work with two sets of criteria

19 (Pages 70 - 73)

1 in my past career. I had to work with the IARC
2 monographing with the Report on Carcinogens, and the
3 wording is a little bit different in both of them, but
4 they are essentially the same as far as what the
5 criteria is saying.
6    Q    Okay. Let's use both of them, then.
7    A    Okay.
8    Q    Reasonably anticipated carcinogen. That's a
9 poor paraphrasing.
10    A    No, that's group.
11    Q    And IARC group 2, roughly the same?
12    A    2A or B, true.
13    Q    Okay. Then group 1 is what?
14    A    Group 1 is a known human carcinogen where you
15 have sufficient evidence from human studies. Studies in
16 humans.
17    Q    Okay. So it is your opinion -- I'm going to
18 put words in your mouth -- is it your opinion that
19 titanium dioxide is not a known human carcinogen?
20    A    The data on titanium dioxide meets the hazard
21 criteria for being identified as a possible human
22 carcinogen.
23    Q    But it does not meet the criteria as a known
24 carcinogen?
25    A    The data is not strong enough to satisfy the

Page 74

1    A    Well, if you read the whole statement, she
2 says, "Titanium dioxide production workers are not at an
3 increased risk of lung cancer and thus any exposures to
4 titanium dioxide from the use of powdered cosmetic
5 products would also not pose an increased risk of
6 cancer."
7         But the first part of bullet 5 is not true.
8 "Titanium dioxide workers are not at an increased risk
9 of lung cancer." You can't say that because the data is
10 inaccurate or -- inadequate, excuse me, the data is
11 inadequate to make a determination to that. So it's a
12 leap of faith to say that titanium dioxide is -- does
13 not increase risk for lung cancer. And so if that
14 premise is inaccurate -- or inadequate or wrong because
15 of the inadequacy of the data, then the second part
16 would be inadequate.
17    Q    I'm going to have you jump all the way to the
18 end, it's page 24. Paragraph 54.
19    A    Okay.
20    Q    We have a premise conclusion situation here
21 again.
22    A    Okay.
23    Q    If you wouldn't mind, could you read that
24 paragraph 54, please.
25    A    Sure.

Page 76

1 criteria of a known human carcinogen. That is accurate.
2    Q    Okay. So if I said titanium dioxide is a known
3 human carcinogen, would that statement be accurate?
4         MR. HURTADO: Calls -- sorry. Argumentative.
5 Out of scope.
6         THE WITNESS: It's -- well, it doesn't meet the
7 criteria for known human carcinogen, but it meets the
8 criteria for a possible human carcinogen. There is data
9 suggestive that it has a carcinogenic effect and so more
10 data is needed.
11 BY MR. SPERLA:
12    Q    Okay. I think I want to go back to Dr. Madl's
13 report and that's Exhibit 3. I want to go to page 3 of
14 Exhibit 3.
15         MR. HURTADO: What page did you say?
16         MR. SPERLA: 3.
17    Q    And the fifth bullet.
18    A    Yes.
19    Q    It ends with "thus any exposures to titanium
20 dioxide from the use of powdered cosmetic products would
21 also not pose any increased risk of cancer."
22         Do you see that?
23    A    That's what it says.
24    Q    And you don't have -- do you have an opinion on
25 this statement?

Page 75

1         "In conclusion, the available animal
2         toxicology, human epidemiology, and
3         mechanistic information support that
4         titanium dioxide in any form is not a
5         human carcinogen and, thus, a Prop 65
6         warning for titanium dioxide (airborne,
7         unbound particles of respirable size) as
8         a substance known to the state of
9         California to cause cancer would be
10         false and misleading and not reflective
11         of the current and available scientific
12         evidence."
13    Q    Okay. I want -- we were talking about how IARC
14 classified TiO2 as a 2B possible carcinogen and Amy's --
15 excuse me -- Dr. Madl's opinion here is that a warning
16 stating that TiO2 is known to the State of California to
17 cause cancer is misleading.
18         Because you told us earlier that there's
19 inadequate data to determine whether TiO2 is known to
20 cause cancer in humans, is it fair to say, then, that
21 you don't have an opinion as to whether the warning
22 referenced here in paragraph 54 is false or misleading?
23         MR. HURTADO: Argumentative.
24         THE WITNESS: No. Because the data, the hazard
25 assessment for titanium dioxide, it meets the hazard

Page 77

20 (Pages 74 - 77)

1  criteria for identifying it as a 2B possible human
2  carcinogen. It's listed in the IARC monograph as a 2B
3  possible. IARC monographs have been identified by the
4  State of California as an authoritative source for
5  identifying carcinogens. And so since it's listed as a
6  carcinogen, there's a possible human carcinogen in the
7  IARC monograph, then it is -- upon -- you know, the
8  State of California is -- should be listing it under
9  Proposition 65 because the law says if IARC says it's a
10  carcinogen it should be identified by the State of
11  California to be a carcinogen.
12  BY MR. SPERLA:
13  Q  Okay.
14  A  That's just my reading on it.
15  Q  Okay. You said earlier that we don't have
16  enough evidence to conclude that TiO2 is a known
17  carcinogen; correct?
18  A  We don't have enough evidence to say it's a
19  known human carcinogen because the epidemiology data is
20  inadequate.
21  Q  Okay. Let's go off the record for a minute.
22  (Recess.)
23  MR. SPERLA: Back on the record, please.
24  Q  Dr. Jameson, we were talking about known versus
25  possible earlier. I have more questions on that.

Page 78

1  human carcinogen?
2  MR. HURTADO: Vague and ambiguous.
3  THE WITNESS: I would say no.
4  BY MR. SPERLA:
5  Q  It's not possible --
6  A  No, it is not possible that it's not probably a
7  human carcinogen.
8  Q  Okay.
9  A  Because the data indicates that it is probably
10  a human carcinogen.
11  Q  That's your opinion even though you said
12  earlier that there's inadequate human data on titanium
13  dioxide?
14  A  Yes. Because it meets the criteria for being
15  listed as a possible human carcinogen based on the
16  animal data and the mechanistic data.
17  Q  Okay. I guess this might be semantics, so bear
18  with me. If I say that something is possible, that
19  implies that the something can possibly not exist as
20  well; correct?
21  MR. HURTADO: Argumentative. Vague and
22  ambiguous.
23  THE WITNESS: Yeah. You're talking semantics
24  here because if you say something is possible, then why
25  would you turn around and say it's not possible?

Page 80

1  A  Okay.
2  Q  Has any other expert in the field of toxicology
3  expressed an opinion to your knowledge that titanium
4  dioxide is a known human carcinogen?
5  MR. HURTADO: Vague and ambiguous. Legal
6  analysis and conclusion. And speculation.
7  THE WITNESS: Not to my knowledge.
8  BY MR. SPERLA:
9  Q  We talked earlier about how you did not perform
10  a risk assessment for purposes of this case; correct?
11  A  That's correct.
12  Q  And it is your opinion that titanium dioxide
13  was properly classified as a 2B possible carcinogen?
14  A  That's correct.
15  Q  And to be clear, if titanium dioxide is a
16  possible carcinogen, then it is fair to say that it is
17  possibly not a carcinogen; correct?
18  MR. HURTADO: Argumentative.
19  THE WITNESS: All I can say is the criteria
20  that is available for titanium dioxide meets the
21  criteria to be identified as a possible human
22  carcinogen.
23  BY MR. SPERLA:
24  Q  Let me try asking it a different way. In your
25  opinion is it possible that titanium dioxide is not a

Page 79

1  BY MR. SPERLA:
2  Q  That sounds like you're contradicting yourself.
3  Okay. Let's go to page 6 of your report, I believe it
4  is marked Exhibit 2.
5  A  2.
6  Q  Thank you.
7  Okay. You say -- I'm sorry this is under the
8  third heading.
9  A  Okay.
10  Q  In the beginning of this paragraph you are
11  quoting Dr. Madl's report and bear with me, she says:
12  "A Prop 65 warning for titanium dioxide
13  (et cetera) as a substance known to the
14  State of California to cause cancer is
15  misleading because the underlying
16  research (both animal and human
17  evidence-including that which IARC
18  relies upon) does not support that
19  titanium dioxide in any form is a
20  carcinogen."
21  And then you go on to say:
22  "This is contradicted by the fact that
23  in the IARC working group's hazard
24  assessment of TiO2, it found that,"
25  quote, "'there is sufficient evidence in

Page 81

21 (Pages 78 - 81)

**Page 82**

1 experimental animals for the
2 carcinogenicity of titanium dioxide.'"
3 Is this the sole basis for your disagreement
4 with that statement by Dr. Madl that IARC classified
5 TiO2 as 2B?
6 MR. HURTADO: Argumentative. And report speaks
7 for itself.
8 THE WITNESS: No. I outlined in other portions
9 of the report why I disagree with that particular
10 statement because Dr. Madl, as she has indicated in the
11 report and also in her deposition, that she focused on
12 the inhalation studies for titanium dioxide and for --
13 in order to do a hazard assessment of the type IARC
14 does, you have to look at all the data, you can't -- I
15 won't say cherry -- you can't ignore pieces of the data
16 that is available. You have to look at all the data to
17 make your determination.
18 BY MR. SPERLA:
19 Q So what I'm getting at here is the -- is
20 Dr. Madl saying you can't say it's a known human
21 carcinogen and IARC is saying it's a possible carcinogen
22 and your disagreement with her statement.
23 So it's still true that no one has classified
24 TiO2 as a known human carcinogen; correct?
25 MR. HURTADO: Calls for speculation.

**Page 83**

1 Argumentative. Compound.
2 THE WITNESS: To the best of my knowledge I
3 don't know that anyone has identified titanium dioxide
4 as a known human carcinogen, but it has been identified
5 as a 2B possible human carcinogen.
6 BY MR. SPERLA:
7 Q Okay.
8 A And several U.S. regulatory agencies I believe,
9 including NIOSH, agrees with that determination so ...
10 Q IARC has classified substances as 2B possible
11 carcinogens on the basis of less than sufficient
12 evidence in experimental animals; correct?
13 A I believe that's accurate.
14 Q The IARC monograph for TiO2 was published in
15 2010; correct?
16 A I believe that's accurate, yes.
17 Q And they classify TiO2 as 2B based on the
18 criteria that is set forth in the monograph?
19 A Correct.
20 Q Let's actually bring the monograph into the
21 record.
22 A Okay.
23 Q So I'm not asking you to ...
24 A Is that the IARC monograph?
25 Q You thought Dr. Boffetta's report was long.

**Page 84**

1 A Well, this is a whole IARC monograph. It's for
2 more than just titanium dioxide.
3 Q It is. Okay. We're to mark this exhibit as
4 Exhibit 5.
5 (Exhibit 5 was marked for identification by
6 the court reporter and is attached hereto.)
7 BY MR. SPERLA:
8 Q I'm going to try to have you not go through the
9 whole thing. How do we do this?
10 The criteria for group classification is in the
11 IARC -- is in the preamble to the IARC monograph;
12 correct?
13 A That's correct.
14 Q And this monograph was published in 2010;
15 correct?
16 A Correct.
17 Q Has the preamble been amended by IARC since
18 2010?
19 A Yes, it has.
20 Q Okay. And when you reviewed the toxicological
21 evidence for TiO2 for this case, did you apply the
22 criteria as stated in the 2010 monograph?
23 A No. I would have used the most recent
24 up-to-date preamble to evaluate, use that criteria.
25 Q Okay. And you can set aside the monograph for

**Page 85**

1 a few minutes. I'm going to go back to your report,
2 page 7, please.
3 Top of the paragraph, at the top of 7 looks
4 like the first full sentence it says:
5 "Therefore, IARC's finding that there
6 was 'sufficient evidence in experimental
7 animals for the carcinogenicity of
8 titanium dioxide' meets the criteria for
9 listing a material as possibly
10 carcinogenic to humans (group 2B)."
11 Do you see that?
12 A Yes, sir.
13 Q It's your opinion that a finding of sufficient
14 evidence in animals as defined in the preamble is
15 sufficient for a 2B classification?
16 A Yes.
17 Q Page 8 of your report, please. Last sentence
18 of the first paragraph. It reads:
19 "The general population is mainly
20 exposed to titanium dioxide through
21 inhalation of dust in the workplace and
22 dermal contact from use in coatings in
23 cosmetics."
24 Do you see that?
25 A Where are you reading that from?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    A   So it's statutory that the listing in the ROC
2  is either known or reasonably anticipated.
3        IARC, on the other hand, had already come up
4  with their -- you know, their evaluations and that's
5  where they got known and probable and possible,
6  depending on the strength of the evidence.  So that's
7  why there's a difference in the criteria for each
8  review, you know, is almost identical if you look at it,
9  but it is to in one case find out if something is known
10  or reasonably anticipated to be a carcinogen and another
11  side is to be either a known or a possible -- a 2A
12  possible or a 2B -- a 2A probable or a 2B possible human
13  carcinogen.
14    Q   Let's go to page 18 of your report, please.
15  Under the heading -- fourth heading, you quote Dr. Madl.
16  She says that animal toxicology -- I'm sorry.  Are you
17  following?
18    A   Yes.
19    Q   She says that animal toxicology may be
20  informative if there is sufficient evidence for a common
21  mode of action between animals and humans.
22        And then you say, "While a common mode of
23  action would be ideal, it is usually the exception
24  rather than the rule."  You go on to say, "The two-year
25  toxicology and carcinogenesis experiments" -- did I say

Page 98

1  that right?
2    A   Yes.
3    Q   -- "in laboratory animals remain the most
4  definitive method for detecting chemical carcinogens."
5        By "most definitive," did you mean most
6  conservative?
7        MR. HURTADO:  Report speaks for itself.
8        THE WITNESS:  I don't understand why you would
9  think that would mean conservative.
10  BY MR. SPERLA:
11    Q   What -- what do you mean when you say "the most
12  definitive"?
13    A   The animal -- the animal bioassay is used to
14  screen chemicals to see if they potentially cause cancer
15  in laboratory animals.  It's used as a means for
16  identifying animal carcinogens, and if a material is an
17  animal carcinogen, then it is biologically plausible
18  that it can cause cancer in humans.
19    Q   When I say conservative, what I meant it's a
20  screening tool; correct?
21    A   It used to screen the chemicals to see if they
22  possibly cause cancer in animals.  And if it does cause
23  cancer in animals, then it's biologically plausible it
24  can cause cancer in humans and so it could raise red
25  flags for people to do more investigation if there isn't

Page 99

1  any human data.
2    Q   Okay.  But it's not always biologically
3  plausible that an incidence of -- an association between
4  rat lung cancer in an agent is -- occurs in humans;
5  correct?
6        MR. HURTADO:  Argumentative.
7        THE WITNESS:  It's an indication -- the fact
8  that it causes cancer in laboratory animals makes it
9  biologically plausible that it can cause cancer in
10  humans.  And the animal bioassay studies are not
11  designed to show concordance between tumor sites in
12  animals and humans.
13  BY MR. SPERLA:
14    Q   They assume a concordance.  I'm sorry.  I cut
15  you off.
16    A   No, they are not designed to show concordance
17  between animals and humans.  They are -- they are
18  designed to show if it causes cancer.
19        The majority of the carcinogens that have been
20  identified in animals that have also been identified to
21  cause cancer in humans, there's very little of
22  concordance with tumor size.
23    Q   Maybe what I should have said was:  That a rat
24  bioassay is useful for purposes of human health
25  assessment because one assumes that it is -- that the

Page 100

1  mechanism is biologically plausible in humans; is that
2  fair?
3    A   The mechanism of forming a cancer, not a
4  specific cancer, but cancer at any site in humans.
5    Q   We were talking about that because you say it
6  is the most definitive.
7    A   As a screening tool to identify chemical
8  carcinogens.
9    Q   And there are other screening tools; correct?
10    A   Oh, sure.  Yes.  I'm sorry.
11    Q   Either works.
12        And is the two-year rat bioassay the screening
13  tool that identifies the most potential carcinogens?
14    A   The animal bioassay in rats and mice is -- yes,
15  in my opinion it is the most definitive tool for
16  screening chemicals for their carcinogenic potential.
17    Q   So when I asked you if it identifies the most
18  potential carcinogens and your answer was it is the most
19  definitive, now I'm back to my first question.  Part of
20  your -- the reason you say it's the most definitive is
21  because it identifies the most potential carcinogens?
22    A   Not that it identifies the most.  But it is a
23  most effective screening mechanism or most effective way
24  for identifying potential carcinogens in humans.
25    Q   And we're talking about both rat and mice

Page 101

26 (Pages 98 - 101)

1  looking -- basically does the chemical cause cancer in
2  the animals.  And if it does, then it's an animal
3  carcinogen.
4    Q   And therefore it is a 2B possible carcinogen?
5    A   In this case it's 2B.  In other cases they may
6  call it a 2A or whatever.
7    Q   I guess I'm going to ask the same question a
8  little differently.  Because I want to get -- I want to
9  make sure I get this out.
10      You -- well, you just said that because there
11 is evidence in animals that's sufficient for 2B;
12 correct?
13   A   In this case for titanium dioxide, yes.
14   Q   And you reached that conclusion irrespective of
15 any data on the mechanism of action in rats?
16      MR. HURTADO:  Misquotes the deponent.  Leading.
17      THE WITNESS:  No.  I made that decision
18 considering mechanism of action in the rats.
19 BY MR. SPERLA:
20   Q   Okay.  Nevertheless it says here in your report
21 that the mechanism of action by which particles can form
22 tumors, et cetera, is not part of a hazard assessment.
23   A   Well, then I misspoke.  What I was trying --
24 the point I was trying to get across is that Dr. Madl's
25 argument that because of particle overload it is not a

Page 114

1    Q   Which is sufficient for 2B?
2    A   2B.  Sorry for the long-winded explanations.
3    Q   Mechanism of action can be the basis for
4  delisting a classified possible carcinogen; correct?
5    A   That's correct.
6    Q   Do you recall the NTP report or reports on
7  saccharine?
8    A   Yes.
9    Q   And saccharine was delisted?
10   A   Yes, it was.
11   Q   On the basis of mechanism of action data?
12   A   That's correct.
13      MR. HURTADO:  Out of scope.
14      THE WITNESS:  You want to know the mechanism?
15 Sorry.
16 BY MR. SPERLA:
17   Q   Not really.
18   A   Okay.
19   Q   Same for ethyl acrylate?
20      MR. HURTADO:  Same objection.
21      THE WITNESS:  I believe that's accurate, yes.
22 BY MR. SPERLA:
23   Q   But you weren't asked to evaluate whether TiO2
24 should be reclassified as group 3 based on mechanism of
25 action, were you?

Page 116

1  carcinogen is -- is not appropriate for a hazard
2  assessment determination.  That's what I was trying to
3  get across in here, but that's -- what's worded here is
4  not clear.
5      Dr. Madl is using the argument because of
6  particle overload, it caused -- she admits it causes
7  tumors in animals, it causes lung tumors in animals
8  because of the particle overload, but she is trying to
9  make the argument that would not be -- apparently is not
10 relevant to the human case because you don't have
11 particle overload, at least it hasn't been documented
12 there is particle overload in humans for titanium
13 dioxide as it relates to lung cancer, I guess is what
14 you could say.
15      So from a risk assessment standpoint, that may
16 be a valid argument because you can say, you know, the
17 particle overload doesn't happen in humans and that's
18 the mechanism for the causation of cancer in animals and
19 so therefore from a risk assessment standpoint, there
20 is -- there is no hazard -- or no risk for cancer under
21 those circumstances.
22      But nonetheless the particle overload in the
23 rats leads to lung tumors and so therefore it causes a
24 positive effect in the rats so it causes cancer in rats
25 and that is a definition of an animal carcinogen.

Page 115

1    A   No.
2    Q   Page 11 of your report.
3    A   Okay.
4    Q   Actually you cite Dr. Madl's report in the
5  first sentence of the last full paragraph.
6    A   Okay.
7    Q   It says:
8       "Dr. Madl's discussion of an adverse
9       outcome pathway AOP included a statement
10      that there has been considerable debate
11      over the last three decades about the
12      relevance of particle-overload-related
13      lung tumors in rats following chronic
14      inhalation exposures to poorly soluble
15      low toxicity particles for human risk
16      assessment."
17      Do you agree that there is a debate over that
18 issue still?
19   A   Yeah.  I hear that -- I hear that debate over
20 and over again, yes.
21   Q   And if it's true that poorly soluble low
22 toxicity particles only cause cancer in rats because of
23 a unique mechanism in rats, it would be true that the
24 TiO2 studies in rats would not be relevant to humans;
25 correct?

Page 117

30 (Pages 114 - 117)

1  of the debate?
2  A   Yes.
3  Q   And would you say -- would you agree that it is
4  at least debatable that the lung tumors -- that the
5  animal -- excuse me. Let me back up. Rephrase.
6      Is it at least debatable that the animal rat
7  data and the rat lung TiO2 studies is -- rephrase again.
8      Is it at least debatable that the tumors that
9  we saw in the rat studies were caused by overload
10 conditions in the rats and not by any intrinsic property
11 of titanium dioxide?
12 A   I don't think you know -- you can say that,
13 anything about the intrinsic properties of titanium
14 dioxide. The argument is that there was lung overload
15 which led to the irritation in the lungs which led to
16 the tumors.
17 Q   And that explanation is certainly possible in
18 your opinion; correct?
19 A   Sure. It causes lung tumors in the rats so
20 it's a rat carcinogen. It's an animal carcinogen.
21 Q   That's not what I asked. I meant the tumors
22 were caused by the effect of overload conditions
23 specifically.
24 A   Well, what the argument is is the lungs were
25 overloaded with titanium dioxide so they couldn't clear

Page 122

1  A   It didn't do it in the mice. The mouse -- the
2  study in mice is an inadequate study because of -- the
3  exposure is too short. I don't know if the dose levels
4  were high enough. It just wasn't a very well done
5  study.
6  Q   Lee looked at both male and female rats;
7  correct?
8  A   Correct.
9  Q   And there was only a statistically significant
10 increase in tumors in female rats; correct?
11 A   I believe that's correct.
12 Q   Okay. So you said earlier its lung overload --
13 that lung overload was the mechanism that -- I don't
14 want to misquote you. It was lung overload that was the
15 mechanism for carcinogenicity or tumorigenicity in the
16 rat TiO2 studies; correct?
17 A   That's the mechanism of action that led to the
18 lung tumors that identified it as an animal carcinogen.
19     MR. HURTADO: Calls for speculation -- sorry.
20 Incomplete hypothetical.
21 BY MR. SPERLA:
22 Q   Can you be more specific? The lung overload
23 condition in the rats is -- take me from, if you -- if I
24 can ask you, please, from lung overload conditions in
25 rats to tumor formation, please.

Page 124

1  it and that's what led to the tumors.
2  Q   And I understand that your opinion is that it
3  should nevertheless be -- nevertheless is the wrong
4  word. It should still be classified 2B. And my
5  question is: You would agree that it's possible that it
6  was lung overload conditions that caused the tumors in
7  the rats in the Lee and Heinrich studies?
8      MR. HURTADO: Incomplete hypothetical. Calls
9  for speculation.
10     THE WITNESS: The lung overload is the
11 mechanism by which the lungs -- by which the lung tumors
12 were formed in the rat lung.
13 BY MR. SPERLA:
14 Q   Wait. Can you repeat that?
15     (Record read.)
16 BY MR. SPERLA:
17 Q   It was still titanium dioxide in their lungs?
18 A   Right.
19 Q   Right. But the mechanism was overload
20 conditions in the rats?
21 A   Overload in titanium dioxide in the lungs of
22 the rats caused the lung tumors to be seen. Therefore
23 it caused lung cancer in rats, and it's an animal
24 carcinogen.
25 Q   But not mice?

Page 123

1      MR. HURTADO: Calls for a narrative.
2      THE WITNESS: I can only speculate as to how
3  the mechanism -- that part of the mechanism works. But
4  if you have -- like you have the exposure of titanium
5  dioxide in the lung, the titanium dioxide is deposited
6  in the lung. Titanium dioxide can be an irritant, a
7  very, very strong irritant. It has -- I think it's been
8  shown to cause oxidative stress and form reactive oxygen
9  species which are both known mechanisms for the
10 formation of cancer. You have the irritancy and
11 oxidative stress being done in the lung of the animal.
12 And those lead to the formation of tumors in the lung.
13 BY MR. SPERLA:
14 Q   The irritancy and oxidative stress in rat lungs
15 from -- from -- by TiO2 only occurs in lung overload
16 conditions; correct?
17     MR. HURTADO: Calls for speculation.
18 Incomplete hypothetical. Argumentative.
19     THE WITNESS: I don't know that that -- that
20 that is the case. I think in some of the lower dose
21 levels that were studied, they reported lung irritancy
22 and maybe lung -- I'm sorry. I can't remember the
23 exact -- exactly what they reported, but other effects
24 in the lung due to what -- at least what I thought
25 irritancy properties of the titanium dioxide. I'd have

Page 125

32 (Pages 122 - 125)

1 BY MR. SPERLA:
2    Q   No.  Sorry I was referring to the prior
3 sentence.
4    A   Okay.  So "The rat model-dosed in particle
5 overload condition is not appropriate for supporting
6 causal inference between exposure to titanium dioxide
7 and lung cancer."
8    Q   In humans.
9    A   In humans.
10      MR. HURTADO:  Same objections.
11      THE WITNESS:  And I still say that's an
12 inaccurate statement because -- wait a minute.  I'm
13 looking at the wrong sentence again.  Is not appropriate
14 for supporting causal inference.
15      It is appropriate between exposure to titanium
16 dioxide and lung cancer in humans, because it is -- when
17 you expose the rats to this high dose of titanium
18 dioxide, they get lung tumors.  When they get lung
19 tumors, that's a definition of an animal carcinogen and
20 so that leads to part of the evidence -- that's part of
21 the evidence, not all the evidence, but that's part of
22 the evidence that leads to the 2B possible human
23 carcinogen determination.
24 BY MR. SPERLA:
25    Q   And that's true regardless of whether the same

Page 154

1 that's -- the overload is the mechanism by which the
2 rats get the tumors.  And if the -- and the purpose of
3 the study is to determine if the rats get cancer or not.
4 They do get cancer from exposure of high dose of
5 titanium dioxide and so therefore it is an animal
6 carcinogen therefore biologically plausible that the
7 human -- that it could be a human carcinogen, not
8 necessarily a lung tumor, cause lung tumors, but it
9 could cause cancer in humans.
10      Now, if you had data that the lung overload was
11 not possible in humans or not working in humans, then
12 you couldn't say that lung overload would be a mechanism
13 that could lead to lung tumors in humans because it
14 doesn't exist in humans you're saying.
15      So -- but that's not to say inhalation of
16 titanium dioxide couldn't lead to cancer in humans.
17 BY MR. SPERLA:
18    Q   Thank you.
19      Does lung overload occur in humans?
20      MR. HURTADO:  Too general.  Speculation.
21      THE WITNESS:  I'm sorry.  I'm not aware of any
22 information on that.  Don't know.
23 BY MR. SPERLA:
24    Q   Okay.  I'm going to show you another document.
25 It's being passed out and will be marked Exhibit 10.

Page 156

1 mechanism would be present in humans?
2    A   If particle overload was in humans, sure that
3 would be the mechanism by which -- if it causes lung
4 tumors in humans, that would be the mechanism by which
5 is the cause of cancer.
6    Q   I said "regardless."
7    A   I'm sorry.
8    Q   It's okay.  I'll ask it again.  Shouldn't --
9 I'm sorry.
10      Will you repeat my question?
11      (Record read.)
12      MR. HURTADO:  Can you just ask your question
13 again.  I'm sorry.
14 BY MR. SPERLA:
15    Q   Dr. Jameson, is it appropriate to use the rat
16 model with dosing in particle overload conditions to
17 support a causal inference between exposure to TiO2 and
18 lung cancer in humans if particle overload conditions --
19 strike that.  If the mechanism of action at -- in effect
20 in the rats is not present in humans?
21      MR. HURTADO:  Incomplete hypothetical.
22      THE WITNESS:  I'm trying to grasp in my mind
23 what you're asking.  The rat -- the fact that when you
24 treat the rats at the high-dose levels and you get
25 particle overload and the rats get lung tumors,

Page 155

1      (Exhibit 10 was marked for identification by
2 the court reporter and is attached hereto.)
3 BY MR. SPERLA:
4    Q   Dr. Jameson, I get the impression you're
5 familiar with this textbook.
6    A   I'm familiar with Casarett and Doull.  What is
7 this?
8    Q   It's the sixth edition.
9    A   Sixth edition, but it looks like 2001,
10 copyright 2001 on the third page.
11    Q   Does look like that.
12      So, Dr. Jameson, the document marked as Exhibit
13 10 is what?
14    A   It's the cover of Casarett and Doull's
15 Toxicology the Basic Science of Poisons, the Sixth
16 Edition.
17    Q   And if you skip to -- well, I guess 83 on the
18 document.
19    A   Okay.
20    Q   Do you see that this is an excerpt from Chapter
21 4 of the text?
22    A   It looks like Chapter 4 on risk assessment.
23    Q   I'm going to ask you to turn to page 88, I
24 don't know if it's paginated, it's in the top left
25 corner.

Page 157

40 (Pages 154 - 157)

1  assessment?

2  A   No.

3      MR. HURTADO:  Vague.

4      THE WITNESS:  Sorry.  There's other data

5  available that also lends itself to identifying it as a

6  carcinogen in animals.

7  BY MR. SPERLA:

8  Q   Okay.  I want to go through these points then.

9  A   Okay.

10 Q   The one I read earlier, No. 1, do see that?

11 A   Correct.

12 Q   And are the differences in particle clearance

13 in rats compared to other rodent and non-rodent species?

14 A   Yes.  But that can be said with any chemical.

15 Not just titanium dioxide.

16 Q   At the very least, putting aside it's effect on

17 TiO2 toxicity, this statement is true; correct?

18 A   For all chemicals.

19 Q   For TiO2 and other chemicals?

20 A   For TiO2 and other chemicals.

21 Q   Let's go to No. 2.  Lung response differences

22 (different AOP) which is adverse outcome pathway --

23 A   Okay.

24 Q   -- in rats compared to other rodent and

25 non-rodent species.  Is this also true?

Page 138

1  A   It is true for all chemicals that you study.

2  Q   But it is true for TiO2?

3  A   It's true for TiO2 and all chemicals that you

4  do a rodent bioassay with.

5  Q   And the third point is -- I'm going to read it,

6  "Tumor types or lesions observed in rats following

7  particle overload in titanium dioxide have not been

8  observed in humans."

9      Is this also true?

10 A   Well, if you -- if you look at the sentence,

11 humans get lung cancer.  It doesn't say anything about

12 titanium dioxide exposure to humans.  They are talking

13 about titanium dioxide overload in rats.  So the lung

14 tumors you see in rats -- humans get lung tumors too so,

15 you know, that's ...

16 Q   Okay.  Tumor type -- what are the tumor types

17 or lesions observed in rats following particle overload

18 of titanium dioxide?

19     MR. HURTADO:  Speculation.

20     THE WITNESS:  There were lung tumors but also

21 tumors observed.  What were they?  Were they thyroid

22 tumors?  There were other tumors observed in the rat

23 studies other than lung tumors.

24 BY MR. SPERLA:

25 Q   What were the lung tumors?

Page 139

1  A   What were the lung tumors?

2  Q   Uh-huh.

3  A   What do you mean?  What type?

4  Q   Yes.

5  A   They were adenomas and carcinomas.

6  Q   So back to three.  Are those specific types of

7  tumors found in the rat lungs following particle

8  overload of titanium dioxide been observed in humans?

9      MR. HURTADO:  Too general.

10     THE WITNESS:  Adenomas and carcinomas of the

11 lung have also been observed in humans.

12 BY MR. SPERLA:

13 Q   Okay.  So you disagree with this third point?

14 A   Well, it's not clear.  Let's be clear.  She's

15 talking about titanium dioxide exposure to humans.  But

16 the way it's worded, I'm just being, you know, hard.

17 Q   Precise?  Is a nicer word?

18 A   Precise.  It didn't specifically say titanium

19 dioxide exposure to humans.  But the implication is

20 she's referring to titanium dioxide exposure to humans.

21     But there have been epidemiology studies where

22 there is an indication, although not statistically

23 significant, but they're significant positive responses

24 in lung tumors to workers who have been exposed to

25 titanium dioxide.  So there have been the same type of

Page 140

1  tumors observed in humans that have been observed in the

2  rat studies of titanium dioxide.

3  Q   Okay.  And my next question is:  Do you have

4  any other basis for your disagreement with point No. 3,

5  and if so, what is it?

6  A   Well, just what I said, the types of lesions

7  observed in rats following particle overload of titanium

8  dioxide have been observed in humans exposed to titanium

9  dioxide in the epidemiology studies.  Now, the results

10 were not statistically significant, but there were

11 significant positive findings of lung tumors in workers

12 exposed to titanium dioxide.

13 Q   I'm going to give you another exhibit.  We're

14 going to mark it as Exhibit 3?

15     MR. HURTADO:  3?

16     MR. SPERLA:  I'm sorry.  7.

17     (Exhibit 7 was marked for identification by

18 the court reporter and is attached hereto.)

19     THE WITNESS:  Okay.  This is the one, yeah.

20 BY MR. SPERLA:

21 Q   What is this, Dr. Jameson?

22 A   This is the Warheit paper, W-a-r-h-e-i-t,

23 addressing the relevance of the rat lung tumor response

24 to particle overload for human risk assessment.

25 Q   Keep going.

Page 141

36 (Pages 138 - 141)

1 trying to extrapolate from rodents to humans," to what
2 are you referring?
3     A   What I am referring to is when you design a
4 rodent bioassay using the maximum tolerated dose, you
5 are not designing a study where you can -- what's the
6 term used in there?  If you look at the beginning of
7 that paragraph, Dr. --
8     Q   Madl?
9     A   -- Madl, sorry -- Madl's discussion of an
10 adverse outcome pathway included a statement that there
11 has been considerable debate over the last three decades
12 about the relevance of particle overload relating to
13 lung tumors in rats following chronic inhalation
14 exposures to poorly soluble low toxicity particles for
15 risk assessment.
16         Dr. Madl, goes on to summarize by saying the
17 rat model dosed in particulate overload conditions is
18 not appropriate for supporting causal inference between
19 exposure to titanium dioxide and lung cancer.  And
20 referring to lung cancer in humans.  At least that's my
21 interpretation of it.  That's what I'm saying that this
22 is an accurate statement as it does not -- I'm sorry.
23         This is an inaccurate statement as it does not
24 support causal inference for lung tumors in rats.
25     Q   You misread.

Page 150

1     A   This is an inaccurate statement as it does
2 support causal inference for lung tumors in rats.  I'm
3 sorry.
4         This discussion by Dr. Madl suggests the
5 fundamental misunderstanding of the cancer hazard
6 identification process and requirements for maximum
7 tolerated dose bioassay for determining if a substance
8 is an animal carcinogen.
9         So could you repeat your question to me?
10     Q   I believe it was when you said it has nothing
11 to do with trying to extrapolate from rodents to humans,
12 what did you mean by "it"?
13     A   By "it," I meant the rodent bioassay study is
14 not designed to extrapolate from an animal carcinogen to
15 the human situation.  That is not the purpose of the
16 bioassay.  And what Dr. Madl is saying here is, she's
17 trying to say that if, you know, you can't -- you're
18 trying to say that because it's a rat carcinogen, it
19 will lead to the same tumor in humans and that's not the
20 case.  That's not what the studies are designed to do,
21 and that's not what they are saying.
22     Q   They are designed to identify possible
23 carcinogens?
24     A   An animal carcinogen.
25     Q   Now, she says, and you quote here:

Page 151

1         "The rat model-dosed in particle
2         overload conditions specifically that,
3         not rodent bioassays generally is not
4         appropriate for supporting causal
5         inference between exposure to TiO2 and
6         lung cancer."
7     A   But the rats were -- were conducted supposed to
8 be conducted in a maximum tolerated dose study.  That's
9 when you design a rat carcinogenicity study, you're --
10 one of the things you're trying to achieve is a maximum
11 tolerated dose in the animals.  So that's what I'm
12 referring to from that.  It just so happens that when
13 you try to do a maximum tolerated dose of titanium
14 dioxide in rats, you reach a particle overload or maybe
15 it's a particle overload, but the animal probably could
16 have a tolerated higher dose.  But that's the mechanism
17 by which the material causes cancer in the rat.
18     Q   I think this is clear to me now.  I think we're
19 good.
20     A   Okay.
21     Q   You just said the rats probably could have
22 tolerated a higher dose or something to that effect.
23     A   Yes.
24     Q   You don't actually know though; right?
25     A   I don't know if they were -- would be able to

Page 152

1 tolerate a higher one, but based on the results of the
2 bioassay studies that were reported, since the animal
3 survived and gained weight and -- compared to the
4 controls, then there's no indication that they had
5 reached the maximum tolerated dose, but you don't know
6 until you do it if they could have.
7     Q   And to be clear, we don't actually know that
8 there is such a thing as a maximum tolerated dose for
9 rat exposure to TiO2?
10     A   You just don't know.  That's true.  That's
11 fair.
12     Q   Actually I'm going to stay on this just a bit
13 longer.
14     A   Okay.
15     Q   Same quote from Madl that you have here in your
16 report.  And it ends with "lung cancer."  It's a
17 hypothetical.
18         Would you have disagreed if she had said "lung
19 cancer in humans"?
20         MR. HURTADO:  Hypothetical.  Incomplete
21 hypothetical.
22         THE WITNESS:  So you're referring to the
23 sentence that says, "This is an inaccurate statement, it
24 does not support causal inference for lung tumors in
25 rats"?

Page 153

39 (Pages 150 - 153)

BY MR. SPERLA:

Q   No.  Sorry I was referring to the prior sentence.

A   Okay.  So "The rat model-dosed in particle overload condition is not appropriate for supporting causal inference between exposure to titanium dioxide and lung cancer."

Q   In humans.

A   In humans.

MR. HURTADO:  Same objections.

THE WITNESS:  And I still say that's an inaccurate statement because -- wait a minute.  I'm looking at the wrong sentence again.  Is not appropriate for supporting causal inference.

It is appropriate between exposure to titanium dioxide and lung cancer in humans, because it is -- when you expose the rats to this high dose of titanium dioxide, they get lung tumors.  When they get lung tumors, that's a definition of an animal carcinogen and so that leads to part of the evidence -- that's part of the evidence, not all the evidence, but that's part of the evidence that leads to the 2B possible human carcinogen determination.

BY MR. SPERLA:

Q   And that's true regardless of whether the same

Page 154

mechanism would be present in humans?

A   If particle overload was in humans, sure that would be the mechanism by which -- if it causes lung tumors in humans, that would be the mechanism by which is the cause of cancer.

Q   I said "regardless."

A   I'm sorry.

Q   It's okay.  I'll ask it again.  Shouldn't -- I'm sorry.

Will you repeat my question?

(Record read.)

MR. HURTADO:  Can you just ask your question again.  I'm sorry.

BY MR. SPERLA:

Q   Dr. Jameson, is it appropriate to use the rat model with dosing in particle overload conditions to support a causal inference between exposure to TiO2 and lung cancer in humans if particle overload conditions -- strike that.  If the mechanism of action at -- in effect in the rats is not present in humans?

MR. HURTADO:  Incomplete hypothetical.

THE WITNESS:  I'm trying to grasp in my mind what you're asking.  The rat -- the fact that when you treat the rats at the high-dose levels and you get particle overload and the rats get lung tumors,

Page 155

that's -- the overload is the mechanism by which the rats get the tumors.  And if the -- and the purpose of the study is to determine if the rats get cancer or not.  They do get cancer from exposure of high dose of titanium dioxide and so therefore it is an animal carcinogen therefore biologically plausible that the human -- that it could be a human carcinogen, not necessarily a lung tumor, cause lung tumors, but it could cause cancer in humans.

Now, if you had data that the lung overload was not possible in humans or not working in humans, then you couldn't say that lung overload would be a mechanism that could lead to lung tumors in humans because it doesn't exist in humans you're saying.

So -- but that's not to say inhalation of titanium dioxide couldn't lead to cancer in humans.

BY MR. SPERLA:

Q   Thank you.

Does lung overload occur in humans?

MR. HURTADO:  Too general.  Speculation.

THE WITNESS:  I'm sorry.  I'm not aware of any information on that.  Don't know.

BY MR. SPERLA:

Q   Okay.  I'm going to show you another document.  It's being passed out and will be marked Exhibit 10.

Page 156

(Exhibit 10 was marked for identification by the court reporter and is attached hereto.)

BY MR. SPERLA:

Q   Dr. Jameson, I get the impression you're familiar with this textbook.

A   I'm familiar with Casarett and Doull.  What is this?

Q   It's the sixth edition.

A   Sixth edition, but it looks like 2001, copyright 2001 on the third page.

Q   Does look like that.

So, Dr. Jameson, the document marked as Exhibit 10 is what?

A   It's the cover of Casarett and Doull's Toxicology the Basic Science of Poisons, the Sixth Edition.

Q   And if you skip to -- well, I guess 83 on the document.

A   Okay.

Q   Do you see that this is an excerpt from Chapter 4 of the text?

A   It looks like Chapter 4 on risk assessment.

Q   I'm going to ask you to turn to page 88, I don't know if it's paginated, it's in the top left corner.

Page 157

40 (Pages 154 - 157)

1    A   Little value.
2    Q   Little value.
3    A   Uh-huh.
4    Q   So the study is of little value because the
5    dose was ...
6    A   Too low.
7    Q   Too low.
8    A   They only tested it in one dose level.  To do
9    an adequate bioassay, you need at least three dose
10   levels or two dose levels.
11   Q   Bear with me.  Let's introduce the Heinrich
12   study.
13   A   Okay.
14        (Exhibit 12 was marked for identification by
15   the court reporter and is attached hereto.)
16   BY MR. SPERLA:
17   Q   We're going to mark this as Exhibit 12.
18   Dr. Jameson, the document marked Exhibit 12, it is --
19   what is it?
20   A   It is entitled the "Chronic Inhalation Exposure
21   to Wistar Rats and Two Different Strains of Mice to
22   Diesel Engine Exhaust, Carbon Black, and Titanium
23   Dioxide."
24   Q   And what dose levels were the animals exposed
25   to for TiO2?

Page 178

1    A   Let me see if they have it.  Well, in Table 3
2    where they give the mean exposure concentrations of some
3    exhaust components and two test compounds measured in
4    the various exposure atmospheres for titanium dioxide it
5    was 10 milligrams per cubic meter, it looks like.
6    Q   Was there any other dose level for --
7    A   I don't know.  I'd have to look through the
8    paper to see if they did other dose levels.
9    Q   Let's look under Table 3.  You'll see it.
10   A   That's what I was looking at.
11   Q   Under Table 3.
12   A   I'm sorry.  7.2 for the first four months
13   followed by 14.8 for four months and 9.4 for 16 months,
14   one of those types.  I'm sorry.  That was a bad study.
15   Sorry.
16   Q   You think Heinrich is a bad study?
17   A   It's not a very good study.  I don't think it
18   was very -- well, the only -- he kept changing the dose
19   levels.  I don't know why.  Was he having problems with
20   his generator or they were seeing toxicity that they
21   didn't like or wanted to adjust for or why.
22   Q   It's because they didn't have a fresh chemistry
23   student working in their lab like the one sitting in
24   front of me.
25        That was a terrible question for the record.

Page 179

1        Okay.  No other rat cohorts were exposed to
2    different dose levels in the Heinrich study; correct?
3    A   Well, I'd have to look through the paper to
4    refresh my memory, but I don't believe they were.
5    Q   So we have one set of doses for one rat cohort
6    and I believe -- at least for the rats; correct?
7    A   Right.
8    Q   So Heinrich did, shall we call it, an
9    inexplicably varied set of doses for the rats and then
10   for the mice it was even stranger; right?
11   A   Yeah.
12        MR. HURTADO:  Vague and ambiguous.
13        THE WITNESS:  It appears to be, yes.
14   BY MR. SPERLA:
15   Q   And it was weird because of the duration, I
16   believe.
17   A   Well, yeah.  But he also didn't have a lot of
18   animals per group either.  There were a small number of
19   animals per group.
20   Q   Including the rats exposed to TiO2?
21   A   Correct.
22   Q   And were those -- I can't remember, female,
23   male, or both?
24   A   I think it was only females, but I'm not --
25   like I said, I need to --

Page 180

1    Q   It's okay.
2    A   Yeah.  Females.
3    Q   Female rats.  Okay.  Thank you.  Would you
4    agree that for a finding of 2B possible carcinogenicity
5    you need two well-designed animal bioassays?
6        MR. HURTADO:  Argumentative.  Vague.
7        THE WITNESS:  Well, if you look at the
8    criteria, the criteria allows for something to be
9    identified as an animal carcinogen if there was a high
10   incidence of rare or numbers of tumors to an unusual
11   degree.
12   BY MR. SPERLA:
13   Q   Just because --
14   A   I'm sorry.
15   Q   Please.
16   A   Just because a study is not designed very well,
17   it has a small number of animals or the exposures
18   don't -- they don't -- exposure for 24 months, you can
19   still get useful data out of those studies if you see a
20   positive response.  If you get a negative response, you
21   can't say anything because the study wasn't properly
22   designed, but if you -- if you have a study that isn't
23   properly designed, however, you get positive results
24   that you feel are caused by the exposure to the
25   material, then you can use that data to come to some

Page 181

46 (Pages 178 - 181)

1  to. This is me speculating. But -- so it calls into
2  question the conduct -- that the study was conducted
3  properly, but there's really -- you know, the fact that
4  they completed the study, they prepared a manuscript,
5  submitted it to a scientific journal which sent it out
6  for peer review. If it's a peer-reviewed scientific
7  journal, it had to be peer reviewed. So if it was peer
8  reviewed and published in an acceptable scientific
9  publication, and it's an acceptable study even though
10  the -- you have a question about the conduct of it.
11  BY MR. SPERLA:
12  Q   Sitting here today, you would not say that
13  you're certain that it is a well-conducted study? By
14  it, I mean the Heinrich study.
15        MR. HURTADO: Leading, vague and ambiguous.
16  Argumentative.
17        THE WITNESS: There are aspects of what's
18  reported in the paper that makes me raise an eyebrow,
19  but I really can't say it wasn't well -- you know,
20  overall a fairly well-conducted study that generated
21  some good data.
22  BY MR. SPERLA:
23  Q   I think that was my question. You just can't
24  say for certain it was a well-conducted study?
25        MR. HURTADO: Same objections. Asked and

Page 186

1  answered.
2        THE WITNESS: The fact that the study is
3  published in a scientific journal where it went through
4  peer review, the journal was satisfied that it was a
5  study worthy of publication. So being a study worthy of
6  publication, then it was appropriately conducted.
7  BY MR. SPERLA:
8  Q   Are you satisfied that it was a well-conducted
9  study?
10        MR. HURTADO: Same objections.
11        THE WITNESS: I have no reason to think -- to
12  say otherwise -- to say that it wasn't a well-conducted
13  study.
14  BY MR. SPERLA:
15  Q   Other than all the reasons you've testified to
16  earlier?
17        MR. HURTADO: Argumentative. Misquotes the
18  deponent.
19        Go ahead.
20        THE WITNESS: Other than what I said, you know,
21  my observation that because they had to change the dose
22  levels over time or adjust the dose levels over time, it
23  appeared that they might have had trouble with their
24  generation, but that's the only thing I would see from
25  that that would cause me any concerns.

Page 187

1  BY MR. SPERLA:
2  Q   And the number of the animals?
3  A   The design of study is poor because of the
4  number of animals. The low number of animals doesn't
5  give you a very high probability of finding something.
6  Q   That's true for both rats and mice; right?
7  A   Yes.
8  Q   Okay. Just a moment, please. Maybe more than
9  one moment. Okay. We're going to come back to Exhibit
10  6. Okay. Bottom of 11 of your report -- sorry. That's
11  Exhibit 2.
12  A   Okay.
13  Q   And it goes on to 12, we're talking about the
14  cystic keratinizing squamous cell carcinoma.
15        In your report there's a lot of discussion
16  about whether or not these lesions should have been
17  counted as tumors in the Lee study. Do you recall that?
18  A   Okay. Yes.
19  Q   Whether or not those lesions were cystic
20  keratinizing squamous cell carcinomas, would that have
21  changed your opinion in this case?
22  A   If they were carcinomas?
23  Q   Or weren't.
24  A   Or weren't. I think there was enough data that
25  it caused tumors in those animals.

Page 188

1  Q   Regardless of whether the pathology study done
2  after the fact was correct in classifying them?
3  A   They were carcinomas and adenomas in that study
4  independent of these keratinizing cysts.
5  Q   That's my point, yeah.
6  A   Yes.
7  Q   Okay. So thank you. Let me just ask the
8  question again so we're clear.
9        Your opinion in this case doesn't change
10  regardless of the classification of cystic keratinizing
11  squamous cell carcinomas in the Lee study?
12  A   That's correct. Because the author says in his
13  paper that even discounting those ones that are
14  questionable as only cysts, you still have a significant
15  number of adenomas and carcinomas in the study to say
16  it's positive.
17  Q   And is that your assessment as well?
18  A   Yes.
19  Q   Moving on to the epi data. Can you define for
20  us the confidence interval reported in the epi studies?
21  A   The confidence interval? The confidence
22  interval for most epidemiology studies is 95 percent
23  confident for statistical significance.
24  Q   What do you mean "for statistical
25  significance"?

Page 189

48 (Pages 186 - 189)

1    MR. HURTADO:  Misquotes the deponent.
2    THE WITNESS:  They are not -- they are not
3 negligible because they contribute to the level of
4 evidence in animals that it is an animal carcinogen and;
5 therefore, it being an animal carcinogen, it's
6 biologically plausible it could be a carcinogen in
7 humans, and it meets the criteria for a 2B possible
8 human carcinogen.
9    MR. SPERLA:  Thank you, Dr. Jameson.  I have no
10 more questions.
11    THE WITNESS:  You're welcome.
12    MR. HURTADO:  I do have questions, or do you
13 need a break or ...
14    THE WITNESS:  No.  I'm ready to get out of
15 here.
16          EXAMINATION
17 BY MR. HURTADO:
18    Q   So I do want to point you to Exhibit 3 which is
19 Dr. Madl's report.  Paragraph 14.  It's on page 4.
20    MR. SPERLA:  Sorry.  What page?
21    MR. HURTADO:  4.  Paragraph 14.
22    MR. SPERLA:  Thank you.
23 BY MR. HURTADO:
24    Q   Well, I'll read from lines 12 through 16
25 starting with "however."

Page 226

1    "However, as described in detail below,
2    a Prop 65 warning for titanium dioxide
3    airborne unbound particles of respirable
4    size as a substance known to the state
5    of California to cause cancer is
6    misleading because the underlying
7    research, both animal and human
8    evidence, including that work IARC
9    relies upon, does not support that
10   titanium dioxide in any form is a
11   carcinogen."
12    Mr. Sperla asked you whether you understood
13 whether -- or if you believe Dr. Madl's report
14 criticized IARC's determination.  Do you consider at
15 least the statement that I read to criticize IARC's
16 determination?
17    A   Yes.
18    Q   Okay.  Do you consider Dr. Madl's report to
19 criticize IARC's determination as a whole -- do you
20 consider -- let me rephrase that.
21    Do you consider Dr. Madl's report in general to
22 criticize IARC's determination?
23    A   I think the general tone of the whole report,
24 yes, is a criticism of the IARC evaluation of titanium
25 dioxide.

Page 227

1    Q   Okay.  At one point Mr. Sperla was asking you
2 about positive risk estimates or positive associations
3 of lung cancer in humans.  I believe you said epi data
4 does not support association of lung cancer in humans.
5    What did you mean by that?
6    MR. SPERLA:  Objection.  Ambiguous.  Misstates
7 the record.
8    THE WITNESS:  What I meant by that is that the
9 epi data for titanium dioxide is inadequate and is
10 determined by IARC, the studies are not adequate to make
11 a definitive determination on if it causes cancer in
12 humans or not.  And the reasons as outlined in the IARC
13 monograph indicate that the studies were -- suffered
14 from exposure misclassifications, data -- or documents
15 missing from earlier exposures which didn't allow for
16 good exposure estimates, and some of the studies were
17 not of a sufficient duration to allow for the latency
18 period of the formation of tumors like lung cancer in
19 the individuals.
20 BY MR. HURTADO:
21    Q   Okay.  At some point Mr. Sperla was asking you
22 about whether titanium dioxide meets the criteria for a
23 known carcinogen.  Whose criteria were you applying when
24 you were referring to known, the term "known"?
25    MR. SPERLA:  Objection.  Vague and ambiguous.

Page 228

1    THE WITNESS:  I took it to mean that he was
2 asking if it meant the IARC criteria for listing as a
3 known human carcinogen.
4 BY MR. HURTADO:
5    Q   At any point today were you applying the
6 Proposition 65 definition of "known"?
7    MR. SPERLA:  Objection.  Vague and ambiguous.
8    THE WITNESS:  No.
9    MR. SPERLA:  Calls for speculation.  And calls
10 for a narrative.
11    THE WITNESS:  Sorry.  No.  I was not.
12 BY MR. HURTADO:
13    Q   Okay.  I want to point you to Exhibit 5 which
14 is the monograph which I believe Mr. Sperla took from
15 you.
16    MR. SPERLA:  I did.
17    MR. HURTADO:  I have it here, but I don't know
18 if you want to hand him that one or ...
19    MR. SPERLA:  I would be happy to hand your copy
20 back with the disclaimer I did ruffle it a little bit.
21    THE WITNESS:  That's okay.
22    MR. HURTADO:  I want you to go to 232.
23    THE WITNESS:  Okay.
24 BY MR. HURTADO:
25    Q   I'm looking at the first paragraph under

Page 229

58 (Pages 226 - 229)

1  section 4.1.1.
2     A   Okay.
3     Q   If you can read that paragraph to yourself.
4     A   Okay.  You said the first paragraph.
5     Q   Yeah.  Just the first paragraph.
6     A   Okay.
7     Q   At some point Mr. Sperla was asking you about
8  exposures to titanium dioxide.  Is titanium dioxide in
9  cosmetics only -- do people only get exposed to titanium
10 dioxide when they are using cosmetics via a dermal
11 exposure?
12    MR. SPERLA:  Objection.  Calls for speculation.
13 Outside the scope.  And vague and ambiguous.
14    THE WITNESS:  Could you repeat the question,
15 please.
16 BY MR. HURTADO:
17    Q   Sure.  What are the exposures that an
18 individual can have if they are using cosmetics?  I'm
19 sorry.  That's not a good question.
20    I'm tired myself.
21    MR. SPERLA:  No judgment here.
22 BY MR. HURTADO:
23    Q   Okay.  Earlier you mentioned that if
24 individuals use cosmetics, they are exposed to titanium
25 dioxide through a dermal exposure; is that accurate?

1     MR. SPERLA:  Objection.  Leading.  Calls for a
2  narrative.  Vague and ambiguous.
3     THE WITNESS:  Okay.  Yes.  That's what I said.
4  BY MR. HURTADO:
5     Q   Okay.  Are there other possible exposures that
6  you're aware of?
7     MR. SPERLA:  Objection.  Vague and ambiguous.
8  Calls for speculation.
9     THE WITNESS:  I'm aware that because it's such
10 a good white pigment, I think, is used in other cosmetic
11 applications that -- such as powders that could possibly
12 lead to inhalation exposure, if applied close to the
13 respiratory system.
14 BY MR. HURTADO:
15    Q   Okay.  Is inhalation exposure different than
16 dermal exposure?
17    A   Yes.  Dermal exposure means the material is
18 exposed to the skin and absorbed through the skin
19 whereas inhalation exposure means that you breathe in
20 the material and it gets down into your lung and is
21 absorbed that way.
22    Q   Earlier today as well, moving away from the
23 monograph for a second, Mr. Sperla was asking you about
24 a debate surrounding particle overload conditions.
25    Do you recall that?

1     A   Yes, sir.
2     Q   Okay.  What debate -- what does that -- what is
3  the debate that you were discussing with Mr. -- or that
4  you meant when you were having that discussion with
5  Mr. Sperla?
6     MR. SPERLA:  Objection.  Vague.  Calls for
7  speculation.
8     THE WITNESS:  Well, the debate stems from the
9  fact that the lung overload in the rats which leads to
10 tumor formation in the lung of the rats is argued in a
11 number of papers that it is not relevant to the human
12 situation because humans don't have particle overload.
13 Or they haven't been documented that they have particle
14 overload.  But the issue to me in my mind is the
15 particle overload is a mechanism by which the titanium
16 dioxide causes tumors in the lungs of the animals.
17    And, again, as I've said too many times today,
18 since the overload leads to lung tumors in rats, it's an
19 animal carcinogen and therefore meets the criteria for
20 classifying as a group 2B possible human carcinogen.
21    And so that's what the debates are over, the
22 relevancy of the particle overload in the rats to human
23 risk assessment.  And I'm trying to argue that the lung
24 overload is part of the mechanisms that need to be
25 considered when you're doing a human risk assessment to

1  see -- to make that determination.
2     But the lung overload has -- the -- important
3  from the standpoint of the animal studies because it's
4  the mechanism by which it causes cancer in the lungs of
5  the rats.
6  BY MR. HURTADO:
7     Q   So is it the debate whether humans also suffer
8  from particle overload from exposure to titanium
9  dioxide?
10    MR. SPERLA:  Objection.  Leading.  Outside the
11 scope.  Calls for speculation.  And vague.
12    THE WITNESS:  No.  The argument isn't talking
13 about lung overload in humans.  The argument is that the
14 lung overload seen in rats has no relevancy to the human
15 situation of a possible lung overload.  So that's what
16 the debate is over.
17 BY MR. HURTADO:
18    Q   Do -- do the animal studies -- earlier you were
19 speaking about the term "concord"?
20    A   Concordance, yes.
21    Q   Concordance.  Do the animal studies -- when you
22 concord, I guess is the right term, with human cancer --
23 the potential human cancers that can develop in a human
24 body?
25    MR. SPERLA:  Objection.  Vague and unclear.

59 (Pages 230 - 233)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**Page 262**

9    I, CHARLES W. JAMESON, Ph.D., do hereby declare
10 under penalty of perjury that I have read the foregoing
11 transcript; that I have made any corrections as appear
12 noted, in ink, initialed by me; that my testimony as
13 contained herein, as corrected, is true and correct.
14    EXECUTED this _____ day of _____,
15 2024, at _____, _____.
            (City)            (State)

18    _____
    CHARLES W. JAMESON, Ph.D.
19  VOLUME I

**Page 264**

1 Rafael Hurtado
2 Rafael.Hurtado@doj.ca.gov
3              August 14, 2024
4 RE: The Personal Care Products Council v. Bonta, Rob
5 8/9/2024, Charles W. Jameson, Ph.D., (#6831015).
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10 to schedule a time to review the original transcript at
11 a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13 Transcript - The witness should review the transcript and
14 make any necessary corrections on the errata pages included
15 below, noting the page and line number of the corrections.
16 The witness should then sign and date the errata and penalty
17 of perjury pages and return the completed pages to all
18 appearing counsel within the period of time determined at
19 the deposition or provided by the Code of Civil Procedure.
20 Contact Veritext when the sealed original is required.
21 __ Waiving the CA Code of Civil Procedure per Stipulation of
22 Counsel - Original transcript to be released for signature
23 as determined at the deposition.
24 __ Signature Waived – Reading & Signature was waived at the
25 time of the deposition.

**Page 263**

1    I, the undersigned, a Certified Shorthand
2 Reporter of the State of California, do hereby certify:
3    That the foregoing proceedings were taken
4 before me at the time and place herein set forth; that any
5 witnesses in the foregoing proceedings, prior to
6 testifying, were administered an oath; that a record of
7 the proceedings was made by me using machine shorthand
8 which was thereafter transcribed under my direction; that
9 the foregoing transcript is a true record of the testimony
10 given; that if the foregoing proceedings were reported
11 stenographically remote from the witness and parties, the
12 transcript of the proceedings reflects the record that I
13 could hear and understand to the best of my ability.
14    Further, that if the foregoing pertains to
15 the original transcript of a deposition in a Federal
16 Case, before completion of the proceedings, review of
17 the transcript [ X ] was [ ] was not requested.
18    I further certify I am neither financially
19 interested in the action nor a relative or employee of any
20 attorney or any party to this action.
21    IN WITNESS WHEREOF, I have this date
22 subscribed my name.
23 Dated: August 14, 2024

25  RENEE DiMENNO ZEPEZAUER
    CSR #6275, RPR, CRR

**Page 265**

1 _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2 Transcript - The witness should review the transcript and
3 make any necessary corrections on the errata pages included
4 below, noting the page and line number of the corrections.
5 The witness should then sign and date the errata and penalty
6 of perjury pages and return the completed pages to all
7 appearing counsel within the period of time determined at
8 the deposition or provided by the Federal Rules.
9 __ Federal R&S Not Requested - Reading & Signature was not
10 requested before the completion of the deposition.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127