1   Rob Bonta, State Bar No. 202668
    Attorney General of California
2   Laura J. Zuckerman, State Bar No. 161896
    Supervising Deputy Attorney General
3   Megan K. Hey, State Bar No. 232345
    Rafael J. Hurtado, State Bar No. 292694
4   Deputy Attorneys General
      300 South Spring Street
5     Los Angeles, CA 90013
      Telephone: (213) 269-3344
6     Fax: (916) 731-2128
      E-mail:  Megan.Hey@doj.ca.gov
7   *Attorneys for Rob Bonta, in his Official Capacity as*
    *Attorney General of the State of California*

8                   IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12  | **THE PERSONAL CARE PRODUCTS COUNCIL,** | 2:23-CV-01006-TLN-JDP |
    |---|---|
13  | Plaintiff, | **ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO THE PERSONAL CARE PRODUCTS COUNCIL'S MOTION FOR SUMMARY JUDGMENT** |
14  | v. | |
15  | | Date: 11/14/2024 |
16  | **ROB BONTA, in his official capacity as Attorney General of the State of California,** | Time: 2:00 p.m.<br>Dept: Courtroom 2<br>Judge: Hon. Troy L. Nunley |
17  | Defendant. | Trial Date: None Set.<br>Action Filed: 5/26/2023 |
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction…………………………………………………………………………...1

Background………………………………………………………………………...2

    I.     Proposition 65…………………………………………………………...2

          A.     Proposition 65's Listing Requirement…………………………………..2

          B.     Proposition 65's Warning Requirement…………………………………3

    II.    Listed Titanium Dioxide Causes Cancer in Animals………………………………4

Legal Standard …………………………………………………………….............6

Argument………………………………………………………………………….7

    I.     PCPC Cannot Establish the Absence of a Dispute of Material Fact Over the Warning's Compliance with *Zauderer*  …………………………………………..7

          A.     Triable Issues of Material Fact Exist Regarding Whether or Not the Safe Harbor Warning Is "Purely Factual" and Not Misleading…………8

          B.     Triable Issues of Material Fact Exist Regarding Whether the Safe Harbor Warning Is Uncontroversial…………………………………12

          C.     A Triable Issue of Material Fact Exists as to Whether the Safe Harbor Warning for Listed Titanium Dioxide is Unjustified or Unduly Burdensome…………………………………………………………17

    II.    PCPC Cannot Establish the Absence of a Dispute of Material Fact Over the Warning's Compliance with Central Hudson……………………………………19

    III.   Any Injunction or Declaration Should Address Only the General Consumer Product Safe Harbor Warning Challenged Here…………………………………20

Conclusion………………………………………………………………………..20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*AFL-CIO v. Deukmejian*
212 Cal. App. 3d 425 (1989).................................................................*passim*

*Am. Chemistry Council v. Off. of Env't Health Hazard Assessment*
55 Cal. App. 5th 1113 (2020)............................................................ 3

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)........................................................................ 7

*Bd. of Trs. of State Univ. of N.Y. v. Fox*
492 U.S. 469 (1989)................................................................ 19, 20

*California Chamber of Commerce v. CERT*
29 F.4th 468 (9th Cir. 2022)..................................................... 7, 18, 19

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*
*447 U.S. 557* (1980) ............................................................ 2, 19, 20

*CTIA - The Wireless Ass'n v. City of Berkeley*
928 F.3d 832 (9th Cir. 2019)....................................................... 7, 8, 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
509 U.S. 579 (1993)...................................................................... 13

*Exxon Mobil Corp. v. OEHHA*
 169 Cal. App. 4th 1264 (2009) ..................................................... 3

*Hill v. Novartis Pharm. Corp.*
No. 1:06-CV-00939-AWI, 2012 WL 967577 (E.D. Cal. Mar. 21, 2012)................ 18

*National Ass'n of Wheat Growers et al. v. Bonta* (*NAWG*)
85 F.4th 1263 (9th Cir. 2023).................................................... 7, 10, 20

*National Institute of Family and Life Advocates v. Becerra*
138 S. Ct. 2372 (2018) ................................................................ 19

*People ex. rel. Lungren v. Superior Court*
14 Cal. 4th 294 ................................................................... 17, 18

*Pittsburgh Press Club v. United States*
579 F.2d 751 (3d Cir. 1978)........................................................... 13

ii

## TABLE OF AUTHORITIES
### (continued)

Page

*Platt v. Moore*
    15 F.4th 895 (9th Cir. 2021)........................................................................ 20

*S. California Gas Co. v. City of Santa Ana*
    336 F.3d 885 (9th Cir. 2003)........................................................................ 20

*Styrene Info. and Research Ctr. v. Office of Env't. Health Hazard Assessment*
    210 Cal. App. 4th 1082 ........................................................................ 3, 15

*United States v. JP Morgan Chase Bank Account No. Ending 8215 in the Name of
    Ladislao v. Samaniego*
    835 F.3d 1159 (9th Cir. 2016)........................................................................ 6

*Zauderer v. Office of Disciplinary Counsel*
    471 U.S. 626 (1985) ........................................................................ 1, 2, 7, 19

STATUTES

Cal. Code Regs. Title 27
    § 25601 *et seq.* ........................................................................ 4
    § 25603(a)(2)(A) ........................................................................ 7
    § 25607.2(b) ........................................................................ 4
    § 25701 ........................................................................ 8, 20
    § 25703(b) ........................................................................ 4
    § 25705 ........................................................................ 4
    § 25904(b) ........................................................................ 3

Cal. Health & Safety Code
    § 25249.5 ........................................................................ 9
    § 25249.6 ........................................................................ 3, 4, 7
    § 25249.8(a) ........................................................................ 2, 3, 4
    § 25249.8(b) ........................................................................ 3
    § 25249.10(c) ........................................................................ 4, 8, 20
    § 25603(a)(2)(A) ........................................................................ 4

California Labor Code
    § 6382(b)(1) ........................................................................ 3, 5, 11
    § 6382, subd. (d) ........................................................................ 11

California's Safe Drinking Water and Toxic Enforcement Act of 1986 ........................................................................ 2

CONSTITUTIONAL PROVISIONS

First Amendment........................................................................ 1, 20

# TABLE OF AUTHORITIES
## (continued)

**Page**

COURT RULES

Fed. R. Evid.
§ 702 ................................................................................................................ 13
§ 703 ................................................................................................................ 13

OTHER AUTHORITIES

29 C.F.R.
§ 1910.1200 ............................................................................................... 11, 13
§ 1910.1200, Appendix D ................................................................................. 5

80 Fed. Reg. 40,138, 40,424 (July 13, 2015) ................................................... 4

Ballot Pamphlet "Argument in Favor of Proposition 65" ................................ 17

*Monographs on the Evaluation of Carcinogenic Risks to Humans, Carbon Black,*
*Titanium Dioxide and Talc*, Vol. 93 ................................................................ 5

Report, Office of Science and Technology Policy, 50 Fed.Reg. 10375 (Mar. 14,
1985) ................................................................................................................ 10

1

**INTRODUCTION**

2    Plaintiff the Personal Care Products Council (PCPC) requests that the Court grant summary

3  judgment in its favor, grant declaratory relief, and issue a permanent injunction prohibiting future

4  Proposition 65 enforcement actions for a chemical it alleges its member companies use in a

5  variety of products—airborne, unbound particles of titanium dioxide of respirable size (Listed

6  Titanium Dioxide)—on the ground that the Proposition 65 warning requirement violates its

7  members' First Amendment right not to engage in compelled commercial speech. However,

8  PCPC has not shown that this case can be dispensed with summarily. Contrary to PCPC's

9  contentions, the general consumer product safe harbor warning that PCPC attacks, based on its

10  use of the phrase "known to the State to cause cancer," is not compelled; it merely provides one

11  warning option for businesses that must provide a Proposition 65 warning for Listed Titanium

12  Dioxide. However, even if the Court were to view this safe harbor warning as compelled, the

13  warning requirement comports with the First Amendment.

14    To begin with, PCPC cannot demonstrate the absence of a dispute of fact about the

15  warning's compliance with *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

16  PCPC has not shown that the safe harbor warning is factually inaccurate. To the contrary, the

17  scientific evidence shows that Listed Titanium Dioxide causes cancer in animals, which is critical

18  to the evaluation of its potential carcinogenicity in humans. Nor does PCPC's use of a flawed and

19  unreliable consumer survey demonstrate that the safe harbor warning is misleading. While the

20  Court held at the preliminary injunction stage that, although the "safe harbor warning contains

21  only factual information, it is nevertheless misleading to the average consumer," the Attorney

22  General respectfully requests that the Court reconsider. California voters passed Proposition 65

23  because they wanted businesses to be required to inform them of the presence of chemicals in

24  products that could potentially harm them. Ample scientific evidence supports the fact that

25  chemicals shown to cause cancer in animals—like titanium dioxide—can and does predict

26  carcinogenicity in humans. Warnings about exposures to such chemicals are not misleading;

27  rather, they convey information the voters wanted to receive. California law is clear: the omission

28  of any limitation in Proposition 65 to chemicals known to cause cancer in humans "implies that

1

chemicals are to be listed and hence subject to the Act even if they are known to be carcinogenic as to animals only, a fact conceded prior to the election by many if not most opponents of the Act." *AFL-CIO v. Deukmejian*, 212 Cal. App. 3d 425, 438 n.7 (1989).

Nor, for the reasons set forth above, can PCPC demonstrate the absence of a dispute of fact that the warning is unjustified, unduly burdensome, or over the warning's compliance with *Central Hudson*. The safe harbor warning reasonably relates to California's substantial interest in its citizens being provided with information about exposures to toxic chemicals in personal care products they may use. Because the warning requirement directly advances a "substantial" state interest and is "not more extensive than is necessary to serve that interest," even if the *Zauderer* exception did not apply, the warning requirement would be constitutional under *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 566* (1980).

California voters declared it their right to receive warnings about Listed Titanium Dioxide, a chemical that is considered a cancer hazard by authoritative scientific agencies. The motion should be denied.

## **BACKGROUND**

### I.   PROPOSITION 65

California's Safe Drinking Water and Toxic Enforcement Act of 1986, known as Proposition 65, is a "right-to-know" law. The statute requires the State to publish a "list of those chemicals known to the state to cause cancer . . . within the meaning of this chapter." Cal. Health & Safety Code § 25249.8(a).[1] Californians passed the law out of concern that "'hazardous chemicals pose a serious potential threat to their health and well-being, [and] that state government agencies have failed to provide them with adequate protection . . . .'" *Deukmejian*, 212 Cal. 3d at 430.

### A.   Proposition 65's Listing Requirement

A chemical is "known to the State to cause cancer" under Proposition 65 if a designated "authoritative body" has formally identified it as a carcinogen, or the chemical is identified in

---

[1] Unless otherwise specified, all subsequent statutory references are to the California Health and Safety Code.

1    California Labor Code sections 6382(b)(1) or (d), among other ways. § 25249.8(a), (b).

2          A chemical (like Listed Titanium Dioxide) is listed under the Labor Code if the United

3    Nations' World Health Organization's International Agency for Research on Cancer (IARC) has

4    classified it as carcinogenic to humans (Group 1), probably carcinogenic to humans (Group 2A),

5    or possibly carcinogenic to humans (Group 2B). Group 2A and 2B chemicals are only listed if

6    IARC has found sufficient evidence of carcinogenicity in experimental animals, as IARC found

7    in the case of Listed Titanium Dioxide. *Styrene Info. and Research Ctr. v. Office of Env't. Health*

8    *Hazard Assessment*, 210 Cal. App. 4th 1082, 1101; *see also* Cal. Code Regs. tit. 27, § 25904(b).

9          Proposition 65's list includes not just chemicals that cause cancer in humans, but many that

10   cause cancer in animals. *Deukmejian*, 212 Cal. App. 3d at 441. As the *Deukmejian* court held,

11   beyond the chemicals "for which there is sufficient evidence of carcinogenicity to humans," the

12   question is not "whether a chemical is 'probably' carcinogenic to humans, but whether it is in fact

13   a known carcinogen[,]" and "IARC Group 2 and supplemental category chemicals as to which

14   there is sufficient evidence that exposure causes cancer . . . in animals are also known

15   carcinogens." *Id*. at 437. For decades, chemicals have been listed as carcinogens under

16   Proposition 65 based on animal data. *See, e.g., Exxon Mobil Corp. v. Off. of Env't Health Hazard*

17   *Assessment,* 169 Cal. App. 4th 1264, 1288–89 (2009); *Am. Chemistry Council v. Off. of Env't*

18   *Health Hazard Assessment*, 55 Cal. App. 5th 1113, 1152 (2020).

19         The inclusion of such chemicals is important. "It is unethical to test humans, and because of

20   the 20-to 30-year latency period of many human cancers, epidemiological studies do not

21   adequately warn humans and protect them from the risk of exposure to new carcinogens."

22   *Deukmejian*, 212 Cal. App. 3d at 438 n.7. And "[a]ll known human carcinogens that have been

23   studied adequately for carcinogenicity in experimental animals have produced positive results in

24   one or more animal species [citations]." Def's Separate Statement of Material Facts (SSMF) 96.

25         **B.      Proposition 65's Warning Requirement**

26         Proposition 65 protects Californians by requiring businesses to notify them when a product

27   will expose them to a listed chemical. § 25249.6. However, no warning is required if use of the

28   product in question would expose the user to the chemical in an amount that "poses no significant

3

risk assuming lifetime exposure at the level in question." § 25249.10(c); Cal. Code. Regs. tit. 27, § 25703(b). Businesses can calculate this level for themselves, but the lead agency for Proposition 65, the Office of Environmental Health Hazard Assessment (OEHHA), has also adopted a regulatory "No Significant Risk Level" (NSRL) for many chemicals on the Proposition 65 list. *See, e.g.,* Cal. Code Regs. tit. 27, § 25705. The NSRL, or safe harbor level, is an exposure below which no warning is required. OEHHA is in midst of a rulemaking to create an NSRL for Listed Titanium Dioxide. Declaration of Megan Hey (Hey Decl.), ¶ 17. Once the NSRL is in effect, exposures below that level will be categorically exempt from Proposition 65's requirements.[2] *See* Cal. Code Regs. tit. 27, § 25705.

Where no such exemption exists, Proposition 65 allows a business to use any warning method and content that is "clear and reasonable." *See* § 25249.6; Cal. Code Regs. tit. 27, § 25601 *et seq.* To spare businesses the effort of developing their own warning, businesses may opt to use applicable "safe harbor" language that OEHHA has adopted by regulation and deemed "clear and reasonable" under Proposition 65. OEHHA has adopted several such optional safe-harbor warnings—including the general consumer product safe harbor warning that plaintiffs attack here, *see, e.g.,* § 25603(a)(2)(A), and more specific warnings for various other chemical exposures. *See, e.g.,* Cal. Code Regs. tit. 27, § 25607.2(b) (acrylamide). But none of these safe-harbor warnings displace a business's ability to use any other clear and reasonable warning of its own. *See* § 25249.6; Cal. Code Regs. tit. 27, § 25601 *et seq*.

## II.   LISTED TITANIUM DIOXIDE CAUSES CANCER IN ANIMALS

OEHHA listed Listed Titanium Dioxide because IARC deemed it "possible carcinogenic to humans" based on "sufficient evidence of carcinogenicity" in animals. Answer ¶¶ 5, 43, ECF No. 11. The U.S. Environmental Protection Agency has called IARC "a recognized international authority on the carcinogenic potential of chemicals and other agents[.]"[3] IARC is the only international agency considered authoritative under Proposition 65. Health & Safety Code §

---

[2] Notably, because PCPC has not identified its members, it is unknown to what extent they manufacture products that actually would cause a significant exposure, and thus be subject to the warning requirement under Proposition 65.

[3] 80 Fed. Reg. 40,138, 40,424 (July 13, 2015).

4

1    25249.8(a); Lab. Code § 6382(b)(1).[4]

2         IARC determines whether a chemical suspected of being carcinogenic is a cancer hazard. A

3    cancer "hazard" is an agent "capable of causing cancer under some circumstances." SSMF 93.

4    IARC, unlike certain other agencies, does not assess "risk"; i.e., the level of exposure that would

5    pose a significant risk of cancer. *Id.* "The distinction between hazard and risk is important, and

6    the Monographs identify cancer hazards even when risks are very low at current exposure levels,

7    because new uses or unforeseen exposures could engender risks that are significantly higher." *Id.*

8    In 2010, IARC released *Monographs on the Evaluation of Carcinogenic Risks to Humans,*

9    *Carbon Black, Titanium Dioxide and Talc*, Vol. 93. SSMF 103. For its evaluation, the IARC

10   Working Group "considered the human and animal evidence as well as the evidence regarding

11   potential mechanisms through which titanium dioxide might cause cancer in humans." SSMF

12   104. Because it found there was "*sufficient evidence* in experimental animals for the

13   carcinogenicity of titanium dioxide," but "inadequate evidence" in humans, it classified titanium

14   dioxide as "possibly carcinogenic to humans" (Group 2B). SSMF 105. "Sufficient evidence of

15   carcinogenicity" and "inadequate evidence of carcinogenicity" are descriptors used by IARC to

16   indicate the strength of the scientific evidence. SSMF 106. Neither term suggests that the

17   chemical is not associated with cancer. Listed Titanium Dioxide is in the form of airborne,

18   unbound particles of respirable size, not to other forms of titanium dioxide. SSMF 173.

19        IARC defines the term "carcinogenicity" to mean that an agent (e.g., Listed Titanium

20   Dioxide) "is capable of increasing the incidence of malignant [tumors], reducing their latency, or

21   increasing their severity or multiplicity." SSMF 107. [5] The term "sufficient evidence of

22   carcinogenicity" in animals is defined to mean that "[t]he Working Group considers that a causal

23   relationship has been established between the agent and an increased incidence of malignant

24   [tumors] or of an appropriate combination of benign and malignant [tumors] in…two or more

25   independent studies in one species carried out at different times or in different laboratories or

26

27        [4] Federal law specifically requires the SDS to state "Whether the hazardous chemical . . .
     has been found to be a potential carcinogen in the International Agency for Research on Cancer
     (IARC) Monographs (latest edition), or by OSHA." 29 C.F.R. § 1910.1200, App. D.

28        [5] IARC uses the terms "neoplasm" and "tumor" interchangeably. Hey Decl., Ex. A at 11.

5

1  under different protocols." SSMF 108. IARC determined that there was "sufficient evidence of

2  carcinogenicity" in animals based on three studies on experimental animals. SSMF 108. Based on

3  sufficient evidence of carcinogenicity in experimental animals, IARC found that Listed Titanium

4  Dioxide poses a carcinogenic hazard to humans. SSMF 109.

5         IARC's determination that titanium dioxide causes cancer in animals is supported by, and

6  consistent with, the analyses of numerous governmental organizations. The National Institute for

7  Occupational Safety and Health (NIOSH), a U.S. government research agency that is part of the

8  Centers for Disease Control and Prevention, in the Department of Health and Human Services,

9  examined occupational exposure to airborne titanium dioxide in 2011, and determined that

10  "Ultrafine TiO2 is a potential occupational carcinogen…." SSMF 127. NIOSH stated that it

11  "supports [IARC's] decision and the underlying analysis leading to this conclusion." SSMF 128.

12         The European Chemicals Agency classified titanium dioxide by inhalation as a Category 2

13  "suspected human carcinogen" in 2020. SSMF 129. In November 2022, a challenge from the

14  Titanium Dioxide Manufacturers Association resulted in a European court's annulling the

15  classification based in part on an alleged incorrect assessment; however, the annulment has since

16  been suspended, pending an appeal by France's Agency for Food Environmental and

17  Occupational Health & Safety (ANSES) filed in February 2023. SSMF 130. Therefore, the

18  Committee for Risk Assessment's classification remains in effect.

19         Japan's National Institute of Technology and Evaluation also endorsed IARC's

20  determination in 2017, finding that nanoparticles and non-nanoparticles of airborne titanium

21  dioxide cause possible human carcinogenicity. SSMF 132. And the Canadian Center for

22  Occupational Health and Safety lists titanium dioxide as a "possible carcinogen," noting it "[m]ay

23  cause cancer based on animal information. Has been associated with: lung cancer." SSMF 133.

24                                        **LEGAL STANDARD**

25         Summary judgment is appropriate when, viewing the evidence in the light most favorable to

26  the nonmoving party, 'there is no genuine dispute as to any material fact.' " *United States v. JP*

27  *Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao v. Samaniego, VL:*

28  *$446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). A material fact

1   is one that could affect the outcome of the case, and a genuine dispute about a material fact is one

2   that could permit a reasonable factfinder to enter a verdict in the non-moving party's favor.

3   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

4   **ARGUMENT**

5   **I.    PCPC CANNOT ESTABLISH THE ABSENCE OF A DISPUTE OF MATERIAL FACT OVER THE**
    **WARNING'S COMPLIANCE WITH *ZAUDERER***

6   Proposition 65 does not prescribe the precise content of a required warning, provided the

7   warning is "clear and reasonable." Cal. Health & Safety Code § 25249.6. But assuming,

8   arguendo, that a business whose product exposed consumers to a significant amount of Listed

9   Titanium Dioxide were compelled to use the general safe harbor warning, instead of its own, that

10  warning would satisfy the standard of *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626,

11  651 (1985), applicable here. Such a warning would read:

12  
13          This product can expose you to chemicals including titanium dioxide (airborne,
            unbound particles of respirable size), which is known to the State of California to
14          cause cancer. For more information go to www.P65Warnings.ca.gov.

15  Cal. Code Regs. tit. 27, § 25603(a)(2)(A).

16  Under *Zauderer*, a government-compelled warning passes constitutional muster if it is (1)

17  purely factual; (2) uncontroversial; (3) reasonably related to a substantial state interest; and (4)

18  neither unjustified nor unduly burdensome. *CTIA - The Wireless Ass'n v. City of Berkeley*, 928

19  F.3d 832, 842 (9th Cir. 2019); *see also National Ass'n of Wheat Growers et al. v. Bonta* (*NAWG*),

20  85 F.4th 1263, 1275 (9th Cir. 2023) (discussing *CTIA II*).[6] As explained below, at a minimum,

21  triable issues of material fact exist as to the safe harbor warning's compliance with this standard.[7]

22  _____

23          [7] Additionally, PCPC's reliance on *NAWG* and *California Chamber of Commerce  v. CERT*,
    29 F.4th 468 (9th Cir. 2022) ("*CERT* "), *aff'g Cal. Chamber of Com. v. Becerra* (*CalChamber*),
24  529 F. Supp. 3d 1099, 1103 (E.D. Cal. 2021) is misplaced. The *NAWG* Court found the safe
    harbor warning for a different chemical (glyphosate) implicitly misleading, because, in its view,
25  the warning implied that there was scientific consensus that glyphosate causes cancer when only a
    single agency had found it to be a probable human carcinogen. *See NAWG*, 85 F.4th at 1280.
26  Here, however, there is strong scientific consensus, and no legitimate debate about the fact that—
    as IARC found, and NIOSH and other governmental agencies have agreed—sufficient evidence
27  establishes that Listed Titanium Dioxide causes cancer in animals. And in *CERT,* the Court
    affirmed the trial court's granting of a preliminary injunction based on a finding that the trial
28  court did not abuse its discretion in so doing. The trial court has yet to hear the *CalChamber* case
                                                                                          (continued…)

7

1

2

**A. Triable Issues of Material Fact Exist Regarding Whether or Not the Safe Harbor Warning is "Purely Factual" And Not Misleading**

3

    i. <u>The Safe Harbor Warning is Factually Accurate</u>

4

5

As the Court found in the Preliminary Injunction Order, the safe harbor warning contains only factual information, ECF No. 40 at 15.

6

7

8

9

10

The first clause in the warning, "[t]his product can expose you to chemicals including titanium dioxide (airborne, unbound particles of respirable size)," is irrefutably factual. Businesses must provide a warning only if their products expose consumers to Listed Titanium Dioxide above a level that results in a significant risk, and no warning is required to be provided if there is no exposure. § 25249.10(c); Cal. Code Regs. tit. 27, § 25701.

11

12

13

14

15

16

The second clause, "which is known to the State of California to cause cancer," is factually accurate. The scientific evidence shows that Listed Titanium Dioxide "causes cancer." After assessing the available scientific evidence on titanium dioxide, the IARC Working Group concluded that there was "sufficient evidence of carcinogenicity" in experimental animals. Indeed, PCPC's experts agree that IARC's finding that titanium dioxide causes cancer in animals was based on "sufficient evidence of carcinogenicity." SSMF 109.

17

18

19

Finally, the last sentence of the safe harbor warning is not a statement of fact at all, but a direction to the consumer to consult an available resource for more information. *See CTIA II*, 928 F.3d at 838.

20

    ii. <u>Triable Issues of Material Fact Exist Regarding Whether or Not the Safe Harbor Warning is Not Misleading.</u>

21

22

    *a. The Safe Harbor Warning is Not Misleading Because Listed Titanium Dioxide May Cause Caner or Increase the Risk of Cancer*

23

24

25

In addition to the safe harbor warning being factually accurate, the warning is not misleading. The critical link that makes the warning both factually accurate and not misleading is the fact that a chemical found to cause cancer in animal studies *is* a possible human carcinogen,

26

on the merits, and the facts are materially different. Each chemical must be analyzed on its own, and not only does that case concern a different chemical, the safe harbor warnings also are different from the warning attacked here.

27

28

1    one that may cause cancer or increase the chance of cancer, regardless of the sufficiency of the

2    epidemiological evidence. This is entirely consistent with IARC's approach to hazard

3    determinations, under which a chemical like Listed Titanium Dioxide is deemed a possible

4    human carcinogen even when there is "inadequate evidence of carcinogenicity" in humans but

5    "sufficient evidence of carcinogenicity" in animals. *See* SSMF 105.

6          At the preliminary injunction motion stage, the Court found, without relying on PCPC's

7    expert's opinion, that a reasonable consumer would be misled by the safe harbor warning, stating

8    that, "[a]lthough the [general consumer product] safe harbor warning contains only factual

9    information, it is nevertheless misleading to the average consumer." ECF No. 40 at 15. The Court

10   reasoned that the California electorate that passed Proposition 65 did so out of an interest in

11   "chemicals that are carcinogenic to *humans*, not animals." *Id.* (original emphasis). In support, the

12   Court relied on Cal. Health & Safety Code § 25249.5 and language from *Deukmejian*. Thus, the

13   Court stated, "it is reasonable for the average consumer to read the warning requirement and

14   conclude that Listed Titanium Dioxide may cause them cancer or increase their chances of

15   obtaining cancer. But such a conclusion is misleading, particularly where, as here, the

16   organization that prompted Listed Titanium Dioxide's inclusion on the Prop 65 List—IARC—

17   specifically found that there is inadequate evidence for the carcinogenicity of titanium dioxide in

18   humans." ECF No. 40 at 16.

19         But the Attorney General submits that this analysis rests both on a misunderstanding of

20   the science and a misreading of *Deukmejian*. IARC's determination that titanium dioxide is

21   "possibly carcinogenic to humans" is consistent with scientific studies that demonstrate that "[a]ll

22   known human carcinogens that have been studied adequately for carcinogenicity in experimental

23   animals have produced positive results in one or more animal species. SSMF 96. As the

24   *Deukmejian court explained*, 212 Cal. App. 3d at 438 n.7.

25         It is unethical to test humans, and because of the 20–30 year latency period of many human
        cancers, epidemiological studies do not adequately warn humans and protect them from the
26      risk of exposure to new carcinogens. [Guidelines for Chemical Carcinogen Risk
        Assessments and their Scientific Rationale, California Health and Welfare Agency,
27      Department of Health Services (November 1985) (*California Cancer Guidelines*)], at p. B–
        10.) For recognized human carcinogens, the first evidence of carcinogenicity frequently is
28      found in test animals; only afterwards are cancer effects looked for, and found, in humans.

(*Id.,* at p. B–24.) Thus, the principle which supports qualitative animal to human extrapolation from carcinogenesis "has been accepted by all health and regulatory agencies and is regarded widely by scientists in industry and academia as a justifiable and necessary inference." (Report, Office of Science and Technology Policy, 50 Fed.Reg. 10375 (Mar. 14, 1985).)[8]

*Deukmejian*, 212 App. 3d at 438 n.7

Additionally, scientists must consider all relevant information to assess the available evidence that a chemical can cause cancer in humans. Authoritative scientific agencies like IARC consider toxicological, epidemiological, and mechanistic data, as well as other relevant information, and synthesize all the information to make an overall evaluation of an agent's potential to cause cancer in humans. SSMF 101. Like animal studies, epidemiological studies only *contribute* to the assessment of a chemical's potential to cause cancer in humans, and it would be inappropriate solely to consider the results of an insufficient number of epidemiological studies, as PCPC appears to suggest the Court should do. SSMF 135.

This is consistent with the reason that a majority of California voters passed Proposition 65, which states that the new statute was intended to warn the public of "the *potential* threat from hazardous chemicals." *Deukmejian*, 212 Cal. App. 3d at 430-431 (emphasis added). And against this backdrop, that court found that "IARC Group 2 and supplemental category chemicals as to which there is sufficient evidence that exposure causes cancer…in animals are also known carcinogens" that the State had to add to the Proposition 65 list. *Id.* at 437. "As noted, the Act is not expressly limited in its application to those chemicals known to cause cancer only in humans. The omission of any such limitation implies that chemicals are . . . subject to the Act even if they are known to be carcinogenic as to animals only, a fact conceded prior to the election by many if

---

[8] "Indeed, the *California Cancer Guidelines* promulgated prior to the passage of Proposition 65 note that between the IARC and [the National Toxicology Program], [s]ufficient evidence presently exists for the carcinogenicity in animals of about 200 chemicals . . . . For most of the 200 animal carcinogens for which there is 'sufficient evidence,' it is unlikely that we will ever know with certainty whether they cause cancer in humans because of the difficulty in obtaining appropriate populations suitable for epidemiological studies. Since it is unlikely we will ever confirm or deny the apparent carcinogenic potential of these 200 chemicals, it appears prudent in the interim to control exposure to them as if they had demonstrated effects in humans. (*Id.* at p. B–24.)" *Deukmejian*, 212 App. 3d at 438 n.7 (internal quotation marks omitted).

not most opponents of the Act." *Id.* at 438 n.7.[9] In sum, there is nothing misleading about the safe harbor warning.

      *b.   The Nowlis Opinions Are Unreliable, and The Court Should Accord Them No Weight*

     PCPC relies for its contention that the general consumer product safe harbor warning is misleading on the opinions of its expert Dr. Stephen Nowlis, who conducted a consumer survey. Regardless of what the warning actually conveys to consumers, Dr. Nowlis's opinions and survey are so unreliable they should be disregarded in their entirety. The Attorney General's rebuttal expert, Dr. Joseph Arvai, assessed Dr. Nowlis's opinions and survey, and identified "numerous design flaws that render its results neither valid nor credible." SSMF 150. These flaws included Dr. Arvai's opinion that Dr. Nowlis's survey was composed of respondents whose selection was "the product of selection bias and, therefore, are not representative of the target population." SSMF 150. Dr. Arvai also faulted the Nowlis survey because it "relies on features that create what consumer psychologists refer to as a 'demand bias' on the part of respondents; thus, its results lack credibility." SSMF 152. Dr. Arvai performed a re-analysis of Dr. Nowlis's data and found that the data does not support Dr. Nowlis's conclusions. SSMF Nos. 165-172.

     As Dr. Arvai explains, "selection bias" is the bias introduced when the selection of individuals selected for analysis does not reflect an appropriately high degree of randomization." SSMF 153. And without the appropriately high level of randomization, the researcher "is unable to claim that the sample obtained is representative of the population intended to be analyzed." *Id.* To avoid selection bias and be able to draw scientifically valid, credible conclusions from a sample of respondents, "it is essential for the sample to be representative of the population from which the sample was drawn." SSMF 154. However, Dr. Nowlis surveyed only "[q]ualified respondents [who were] males and females aged 13 and older who lived in California and indicated that they had personally purchased eyeshadow in the last three months or will

---

     [9] As the *Deukmejian* court noted, "[f]inally, the statutes and regulations governing both California and Federal OSHA are designed to protect humans in the workplace. Yet these regulatory schemes expressly impose controls on chemicals carcinogenic both to humans *and animals.* (Lab.Code, § 6382, subds. (b)(1), (d); 29 C.F.R., § 1910.1200.) Proposition 65 is in para materia and therefore must be read in harmony with these regulatory schemes." *Ibid*.

personally purchase eyeshadow in the next three months." SSMF 155.

Dr. Nowlis did not know whether, or to what extent, his survey participants included people of Hispanic heritage, or Black people, or transgendered people; he knew only that he believed the panel of potential participants did not exclude such people. SSMF 156. These groups are part of the population of California consumers. SSMF 157. Thus, while Dr. Nowlis opined that his survey could be generalized to reflect all California consumers, this is incorrect. "Because these data are not representative, it is impossible to draw scientifically valid and credible conclusions from the samples provided to Nowlis." SSMF 158. Thus, the data that Dr. Nowlis used as the basis for his opinions "are not valid for the purposes intended by Nowlis." SSMF 159.

In addition, to draw scientifically valid conclusions from a consumer perception survey, "the study design must be, to the extent possible, free of bias; that is, the study design should not bias respondents to answer survey questions in any specific way." SSMF 160. Dr. Nowlis's survey "primes respondents with the arrow pointing at the short-form or long-form California Proposition 65 warning," and employs "overt repetition of survey questions" to direct "the respondents to think about what might happen to them if they use eye shadow while an obvious arrow points at the California Proposition 65 warning on the package." SSMF 161-162. Then "the survey draws the respondents' attention to using eye shadow while pointing to a cancer warning and insinuating that something 'will happen to you' by repeating the words 'cancer' and 'risk' in the survey questions." SSMF 163. Such priming mechanisms create a bias that discredits Dr. Nowlis's results, and therefore his opinions. SSMF 164.

Dr. Nowlis concluded that 77.8% of respondents who saw the "long-form" warning (i.e., the general consumer product safe harbor warning at issue here), and 73.1% of respondents who saw the short-form warning perceived that using the product would increase their risk of cancer. Nowlis Report, ECF No. 43-20, ¶ 9. Dr. Arvai re-analyzed the raw data associated with the four open-ended survey questions, QF1, QF1a, QF3, and QF5. SSMF 165-172. Dr. Arvai applied his own, more specific codes to the responses to these same questions and found that a much smaller number of respondents actually perceived that using the product would expose them to cancer or an increased risk of cancer—ranging from as few as 4.4% for the short-form warning to 13.4%

12

1   for the long-form warning. ECF No. 42 at 19-21. Based on the defects in his survey, the Court

2   should accord Dr. Nowlis's opinions no weight. Fed. R. Evid. §§ 702,703; *Daubert v. Merrell Dow*

3   *Pharmaceuticals, Inc.*; 509 U.S. 579, 589-591 (1993); *Pittsburgh Press Club v. United States,* 579

4   F.2d 751, 758 (3d Cir. 1978)(stating that because "it involves hearsay, a survey "must be conducted

5   with proper safeguards to insure accuracy and reliability.").

6       Accordingly, the Court should find that the warning is not misleading; or, at a minimum,

7   that triable issues of material fact exist as to whether or not it is misleading.

8

9   **B.      Triable Issues of Material Fact Exist Regarding Whether The Safe Harbor
Warning Is Uncontroversial**

10      As discussed above, there can be no dispute that titanium dioxide causes cancer in animals.

11   However, triable issues of material fact exist.

12      As explained earlier (at page 6), there is no disagreement among authoritative scientific

13   agencies that titanium dioxide causes cancer in experimental animals and that it poses a cancer

14   hazard in humans. IARC and other health agencies, including NIOSH, Japan's National Institute

15   of Technology and Evaluation, the Canadian Center for Occupational Health and Safety, and

16   France's ANSES, found that titanium dioxide is a possible human carcinogen, based on positive

17   cancer findings in animal studies. For this reason, OSHA requires that employees who handle

18   products containing titanium dioxide powder must be informed of IARC's determination via

19   Safety Data Sheets. 29 C.F.R. § 1910.1200. App. D; Hey Decl., Ex. O. Just like these employees,

20   Californians have a need "[t]o be informed about exposures to chemicals that cause cancer…"

21   *Deukmejian*, 212 Cal. App. 3d at 431.

22      PCPC attempts to gin up a controversy by inaccurately characterizing the results of the

23   animal studies and Dr. Jameson's testimony, confusing hazard assessment principles with risk

24   assessment principles, and inaccurately characterizing the European Court of Justice's decision.

25      First, IARC's determination that titanium dioxide is "possibly carcinogenic to humans"

26   (Group 2B) was based on three studies—Heinrich, Lee, and Pott and Roller—not two. SSMF

27   109. This is important because based on these three studies, the criteria for "sufficient evidence of

28

carcinogenicity" in animals were met. SSMF 108, 109, 113, 115. In the Heinrich study, an increase in malignant and benign lung tumors in Wistar rats was observed. SSMF 110. Out of 100 rats exposed to titanium dioxide, 20 rats developed benign squamous-cell tumors, three rats developed squamous-cell carcinomas, four rats developed adenomas, and 13 rats developed adenocarcinomas. *Id.* In the Lee study, there was also an observed increase in benign and malignant tumors in rats. SSMF 111. Out of 77 male rats and 74 female rats exposed to 250 mg/m3 of titanium dioxide, 12 male and 13 female rats developed bronchioloalveolar adenomas. *Id.* Lastly, Pott and Roller (2005) observed statistically-significant increases in benign and/or malignant lung tumors in female rats. SSMF 113. Based on these three independent studies, conducted at different times and by different researchers, the IARC Working Group determined that the criteria for "sufficient evidence of carcinogenicity" in animals had been met. UMF Nos. 108 and 109. PCPC's expert, Dr. Madl, does not dispute that tumors were reported at the highest dose levels in the Heinrich and Lee studies. SSMF 112. While she emphasizes that these tumors were observed in "overload" conditions, she admits that tumors were observed. SSMF 25, 42. And Dr. Madl entirely ignored the Pott and Roller study, which exposed rats to titanium dioxide intratracheally, and where overload conditions were not reported. SSMF 20 and 113.

Second, although rat studies, and animal studies in general, are not designed to imply tumor site concordance between animals and humans, this simply means that a chemical that induces cancer in animals does not always induce cancer in humans in the same manner or at the same cancer site (e.g., lung cancer, bladder cancer, etc.). SSMF 120. PCPC ignores the scientific principle that a finding of animal carcinogenicity means that it is biologically plausible that the chemical poses a carcinogenic hazard to humans, even if at a different cancer site.[10] SSMF 98. PCPC further ignores the fact that "sufficient evidence of carcinogenicity" in experimental animals is part of the overall evaluation of a chemical's potential to cause cancer in humans. SSMF 101 and 104.

Third, PCPC's focus on lung overload misses the mark. Lung overload is relevant in cancer

---

[10] Table 21.3 of IARC Monograph, vol. 100, lists several agents for which cancer is observed in one or more sites for humans and different sites for animals.

1   *risk* assessments. SSMF 174. Risk assessments include several steps that must be followed to

2   determine "an estimate of the carcinogenic effects expected from exposure to a cancer hazard."

3   SSMF 89. The first step of a risk assessment is a cancer *hazard* assessment. SSMF 90. The

4   purpose of a hazard assessment is to determine whether an agent, such as a chemical, "is capable

5   of causing cancer under some circumstances." SSMF 91 and 93. IARC's Monographs "represent

6   the first step in carcinogen risk assessment." SSMF Nos. 90-91. IARC conducts hazard

7   assessments, not risk assessments. SSMF 6, 7, and 91. To determine whether there is "sufficient

8   evidence of carcinogenicity" in animals for a hazard assessment, the Working Group had to

9   determine whether there was an increased incidence of tumors after exposure to titanium dioxide.

10  SSMF 108. Because both the Heinrich and Lee studies were conducted using maximum tolerated

11  dose levels and statistically-significant increases in lung tumors were observed, IARC's "hazard

12  assessment criteria to determine that [titanium dioxide] is an animal carcinogen were met." SSMF

13  115. Additionally, Dr. Madl asserts that lung overload from exposure to titanium dioxide is

14  unique to rats. SSMF 29-30. Madl provides no documentation to support this assertion and

15  whether lung overload occurs in humans remains an open question. SSMF 122. Further, as

16  mentioned above, Dr. Madl did not address the Pott and Roller intratracheal study, where lung

17  overload conditions were not observed. SSMF 20 and 113.

18      In considering the lung overload issue, the IARC Working Group noted the observed high

19  retained mass lung burdens and decreased lung clearance (i.e., ability to clear the airway) in coal

20  miners and concluded that animal data obtained even under conditions of impaired lung clearance

21  (as in the case of lung overload) are relevant to humans for purposes of cancer hazard assessment.

22  SSMF 123. Further, while lung overload is a mechanism of action by which exposure to particles

23  can cause tumors, it is not the sole mechanism that can cause cancer. SSMF 124. In considering

24  the mechanistic data, IARC also noted that Listed Titanium Dioxide causes inflammation, cell

25  injury, and DNA damage. SSMF 125. The ability to induce chronic inflammation is a

26  characteristic of many human carcinogens, and is recognized as a key characteristic of

27  carcinogens. SSMF 126.

28      Fourth, PCPC relies on Dr. Jameson's statement that the Heinrich study is poorly designed.

15

1   But Dr. Jameson went on to explain that "[j]ust because a study is not designed very well…you

2   can still get useful data out of those studies if you see a positive response…[y]ou have to look at

3   the data. That's the most important thing when you're looking at doing any kind of assessment,

4   but especially a hazard assessment." SSMF 117. Dr. Jameson further explained that despite not

5   being a well-designed study, the Heinrich study still showed that there was an increased incidence

6   of tumors observed in rats, which supports IARC's finding of "sufficient evidence of

7   carcinogenicity" in animals. SSMF 118.

8        Fifth, Dr. Jameson's testimony is consistent with that of the European Chemicals Agency's

9   Committee for Risk Assessment. PCPC asserts that the Lee and Heinrich studies were discredited

10  by the Committee for Risk Assessment and the European Court of Justice. The Committee for

11  Risk Assessment did raise issues with the Lee study, finding that the "study should not have a

12  'determining influence' on the classification of titanium dioxide . . ." SSMF 176. Yet the

13  Committee for Risk Assessment still considered the data from the study, which contributed to its

14  overall evaluation and conclusion that titanium dioxide is "a substance suspected of being a

15  category 2 carcinogen by inhalation." SSMF 175.

16       In addition to Lee and other studies, the Committee for Risk Assessment considered results

17  from the Heinrich study. SSMF 131. Again, while the Committee for Risk Assessment found that

18  the "Heinrich study had not been carried out in accordance with standard testing guidelines, its

19  results were 'sufficiently reliable, relevant and adequate for the assessment of the carcinogenic

20  potential of [titanium dioxide]'." *Id.* Further, while the European Court of Justice annulled an EU

21  regulation, it did so, in part, because it found that the Committee for Risk Assessment allegedly

22  had not taken into account "all the relevant factors in order to calculate the lung overload in the

23  Heinrich study by means of the Morrow overload calculation and therefore committed a manifest

24  error of assessment." SSMF 177. In other words, it was the Committee for Risk Assessment's

25  evaluation of the data from Heinrich– the alleged failure to take into account the characteristics of

26  the particles tested in the Heinrich study - that the European Court of Justice took issue with, not

27  the Heinrich study itself. *Id.* This case is now on appeal. SSMF 130.

28       Sixth, as to the epidemiological evidence, there is no dispute that IARC concluded that

16

1   there was "inadequate [epidemiological] evidence of carcinogenicity." SSMF 105. However,

2   epidemiological studies are not the sum of a hazard determination. SSMF 101 and 104. Rather, a

3   hazard determination includes consideration of animal studies, mechanistic data, and

4   epidemiological studies. *Id.* IARC evaluated several epidemiological studies, including the

5   Boffetta (2004) study. SSMF 178. It found there was "[I]inadequate evidence of carcinogenicity",

6   meaning "[t]he available studies are of insufficient quality, consistency or statistical power to

7   permit a conclusion regarding the presence *or absence* of a causal association between exposure

8   and cancer, or no data on cancer in humans are available." SSMF 16 (emphasis added). Dr.

9   Jameson's testimony that the epidemiological evidence was "very weak" is in accord with

10  IARC's determination that the epidemiological evidence is inadequate. But just as the

11  epidemiological evidence is inadequate to conclude that there is a causal association between

12  exposure to Listed Titanium Dioxide and cancer, it is also inadequate to conclude that there is an

13  *absence* of a causal association. *See* SSMF 16 and 144. IARC's determination rests on

14  consideration of all relevant categories of information, including animal studies and mechanistic

15  data, to conclude that Listed Titanium Dioxide is "possibly carcinogenic *to humans*" (Group 2B).

16  SSMF 101 and 104.

17      While there is no dispute that Listed Titanium Dioxide causes cancer in experimental

18  animals, the parties dispute hotly that there is scientific controversy about Listed Titanium

19  Dioxide's carcinogenicity to humans. PCPC's stance depends an incorrect characterization of the

20  evidence. At minimum, triable issues of material fact remain regarding whether or not the general

21  consumer safe harbor warning is "controversial."

22      **C.    A Triable Issue of Material Fact Exists as to Whether the Safe Harbor Warning
            for Listed Titanium Dioxide is Unjustified or Unduly Burdensome.**

23

24      PCPC contends that a Proposition 65 warning for Listed Titanium Dioxide is "unjustified"

25  because it allegedly addresses a "purely hypothetical harm." Motion at 16. To advance its

26  argument, PCPC quotes *People ex. rel. Lungren v. Superior Court*, 14 Cal. 4th 294, 306-307, and

27  adds "in humans" after the quote included from the decision. *Id.* In truth, the *Lungren* court cites

28  a Ballot Pamphlet "Argument in Favor of Proposition 65" which states in relevant part, "[t]here

1    are certain chemicals that are scientifically known—not merely suspected, but known—to cause

2    cancer and birth defects. Proposition 65 would: [¶] Keep these chemicals out of our drinking

3    water." 14 Cal. 4th at 307 (citations and internal quotation marks omitted). The "in humans"

4    limitation does not appear either in the ballot pamphlet or in the *Lungren* case, and the

5    *Deukmejian* court debunks this precise argument. 212 Cal. App. 3d at 436-437 ("IARC Group 2

6    and supplemental category chemicals as to which there is sufficient evidence that exposure causes

7    cancer…in animals are also known carcinogens.").

8         Moreover, as discussed above, a finding that a chemical causes cancer in animals

9    contributes to the determination whether the chemical is a human carcinogen. "For recognized

10   human carcinogens, the first evidence of carcinogenicity frequently is found in test animals; only

11   afterwards are cancer effects looked for, and found, in humans." *Deukmejian*, 212 Cal. 3d at

12   438, n.7. A determination that there is "[s]ufficient evidence of carcinogenicity" in experimental

13   animals generally means that it is biologically plausible that a chemical can cause cancer in

14   humans. *See* SSMF 98. "Accordingly, in the absence of additional scientific information,

15   [chemicals that cause cancer in animals] are considered to pose a carcinogenic hazard to

16   humans." SSMF 99. Requiring businesses exposing Californians to significant levels of Listed

17   Titanium Dioxide to warn is therefore not unjustified.

18        Nor is it unduly burdensome. Proposition 65 does not require PCPC's members to use any

19   specific warning language. Where a warning is required, PCPC's members are free to develop

20   any warning that is "clear and reasonable," in accordance with the statute. To the extent that

21   PCPC protests that a business incurs an expense to determine whether its product exposes

22   consumers to Listed Titanium Dioxide at a level that requires a warning, that is simply a cost of

23   doing business in California. *See Hill v. Novartis Pharm. Corp.*, No. 1:06-CV-00939-AWI, 2012

24   WL 967577, at *9 (E.D. Cal. Mar. 21, 2012) (reasoning that the "increased economic exposure" a

25   New Jersey company faced in California product liability lawsuit applying California punitive

26   damages law was "nothing more than the cost of doing business"). PCPC encourages the Court to

27   "not linger on this point," stating incorrectly that the Ninth Circuit's decision in *CERT* is

28   "dispositive." Motion at 16. Not so. The *CERT* panel held that the district court's conclusion in

1   that case that the warning was burdensome was not an abuse of discretion. 29 F.4th at 480. The

2   *CERT* decision presumably permits this Court to come to the same decision the *CERT* district

3   court did; but it does not hold or imply that an opposite conclusion would be incorrect.

4        In sum, although the Attorney General contends that use of the general consumer product

5   safe harbor warning would be neither unjustified nor unduly burdensome, at a minimum, there

6   exists a triable issue of material fact on this issue.

7   **II.    PCPC CANNOT ESTABLISH THE ABSENCE OF A DISPUTE OF MATERIAL FACT OVER THE
8           WARNING'S COMPLIANCE WITH *CENTRAL HUDSON***

9        Even a compelled disclosure that does not qualify as "purely factual and uncontroversial

10  under *Zauderer* may nonetheless be constitutional if it "directly advances" a "substantial" state

11  interest and is "not more extensive than is necessary to serve that interest." *Cent. Hudson Gas &

12  Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). Thus, should this Court

13  determine that the *Zauderer* exception does not apply to Proposition 65 warnings for Listed

14  Titanium Dioxide, it must analyze the warnings under *Central Hudson. See National Institute of

15  Family and Life Advocates v. Becerra* , 138 S. Ct. 2372, 2361 (2018). Pursuant to *Central

16  Hudson*, the State "must assert a substantial interest to be achieved," the law must directly

17  advance that interest, and it may not be "more extensive than is necessary to serve that interest."

18  *Central Hudson*, 447 U.S. at 564. The Supreme Court has rejected the contention that "no more

19  extensive than necessary" equals the "least-restrictive-means" standard, cautioning that

20  substantial deference must be accorded to the state as to restrictions on commercial speech. *Bd. of

21  Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477-481 (1989). *Central Hudson* simply requires

22  a "'fit' between the legislature's ends and the means chosen to accomplish those ends, a fit that is

23  not necessarily *perfect*, but reasonable…." *Id.* at 480 (citation omitted) (emphasis added).

24       "There is no question that protecting the health and safety of consumers is a substantial

25  government interest." *CTIA II*, 928 F.3d at 845. Californians passed Proposition 65 out of concern

26  that the State was failing to protect them from exposure to toxic chemicals. *See Deukmejian*, 212

27  Cal. App. 3d at 430. As explained above, chemicals that cause cancer in animals are relevant to

28  human health. *Deukmejian*, 212 Cal. App. 3d at 437; *id*. at 438, n.7; Monograph at 23. The

19

warning, which is truthful and is not misleading, not only relates to, but directly advances, California's interest in protecting public health. Businesses are not required to provide a warning when the anticipated exposure falls below a certain level. *See* § 25249.10(c); Cal. Code Regs. tit. 27, § 25701. Businesses may also provide alternative "clear and reasonable" warning that are "narrowly drawn," addressing the Listed Titanium Dioxide exposure without using the "known to cause cancer" language in the general consumer product safe harbor warning. *See Cent. Hudson*, 447 U.S. at 565. Thus, there is a "reasonable" fit between the required disclosure and California's interest in protecting consumers from exposure to carcinogens. *Fox*, 492 U.S. at 480. At a minimum, there exists a triable issue of material fact regarding whether Listed Titanium Dioxide warnings can be compelled under *Central Hudson*.

### III.   ANY INJUNCTION OR DECLARATION SHOULD ADDRESS ONLY THE GENERAL CONSUMER PRODUCT SAFE HARBOR WARNING CHALLENGED HERE

If the Court were inclined to grant PCPC's motion for summary judgment, which it should not, any injunction or declaration should be limited to the general consumer product "known to the State" safe harbor warning language described in PCPC's moving papers. This is not like the case in *NAWG*, where the rulemaking body (OEHHA) and the parties presented a variety of warning options to the Court for consideration. There is no basis for the Court to conclude, based on the evidence and arguments before it, that no other safe harbor warning could be constitutional. PCPC has offered no evidence about the factual accuracy or effect on consumers of other warnings, as would be necessary to demonstrate that no safe harbor warning that complies with the First Amendment is possible. *See S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) ), and the Court should not entertain a request for such an advisory opinion, *see, e.g.*, *Platt v. Moore*, 15 F.4th 895, 910 (9th Cir. 2021)(court held it had no jurisdiction to grant request for a cross-appeal) ("[i]n effect, Arizona is seeking an advisory opinion as to the validity of its forfeiture scheme in circumstances not now before us.").

### CONCLUSION

For the foregoing reasons, the motion should be denied.

1

2    Dated:  September 24, 2024                    Respectfully submitted,

3                                                  ROB BONTA
                                                   Attorney General of California
4                                                  LAURA J. ZUCKERMAN
                                                   Supervising Deputy Attorney General
5

6

7
                                                   */S/ Megan K. Hey*
8                                                  MEGAN K. HEY
                                                   RAFAEL J. HURTADO
9                                                  Deputy Attorneys General
                                                   *Attorneys for Rob Bonta, in His Official*
10                                                 *Capacity as Attorney General of the State of*
                                                   *California*
11   LA2023950048
     84734560.docx
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorney General's Opposition to PCPC's Motion for Summary Judgment (Case No. 2:23-CV-01006-TLN-JDP)

# CERTIFICATE OF SERVICE

Case Name: **Personal Care Products Council v. Bonta - Prop 65 First Amendment Defense**  No.  **2:23-CV-01006-TLN-JDP**

I hereby certify that on <u>September 24, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO THE PERSONAL CARE PRODUCTS COUNCIL'S MOTION FOR SUMMARY JUDGMENT**

2. **ATTORNEY GENERAL ROB BONTA'S SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS**

3. **ATTORNEY GENERAL ROB BONTA'S OBJECTIONS TO THE DECLARATION OF TRENTON H. NORRIS, ECF NO. 43-3 CITED IN SUPPORT OF THE PERSONAL CARE PRODUCTS COUNCIL'S MOTION FOR SUMMARY JUDGMENT**

4. **ATTORNEY GENERAL ROB BONTA'S OBJECTIONS TO THE DECLARATION OF THOMAS MYERS, ECF NO. 27-19, CITED IN SUPPORT TO THE PERSONAL CARE PRODUCTS COUNCIL'S MOTION FOR SUMMARY JUDGMENT**

5. **ATTORNEY GENERAL ROB BONTA'S OBJECTIONS TO THE DECLARATION OF STEPHEN M. NOWLIS, Ph.D., ECF NO. 43-20, CITED IN SUPPORT OF THE PERSONAL CARE PRODUCTS COUNCIL'S MOTION FOR SUMMARY JUDGMENT**

6. **DECLARATION OF MEGAN K. HEY IN SUPPORT OF ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO THE PERSONAL CARE PRODUCTS COUNCIL'S MOTION FOR SUMMARY JUDGMENT**

7. **EXHIBITS A - O TO DECLARATION OF MEGAN K. HEY IN SUPPORT OF ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO THE PERSONAL CARE PRODUCTS COUNCIL'S MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 24, 2024</u>, at Los Angeles, California.

| J. Sissov | /s/ J. Sissov |
|-----------|---------------|
| Declarant | Signature |