1   ROB BONTA
    Attorney General of California
2   LAURA J. ZUCKERMAN
    Supervising Deputy Attorney General
3   MEGAN K. HEY, State Bar No. 232345
    RAFAEL J. HURTADO, State Bar No. 292694
4   Deputy Attorneys General
      300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6221
6     Fax:  (916) 731-2128
      E-mail:  Megan.Hey@doj.ca.gov
7   *Attorneys for Rob Bonta, in his Official Capacity as*
    *Attorney General of the State of California*

8

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13  | **THE PERSONAL CARE PRODUCTS COUNCIL,** | 2:23-CV-01006-TLN-JDP |
    |---|---|

14  |  Plaintiff, | **ATTORNEY GENERAL ROB BONTA'S SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS** |

15  |  v. | |

16  | | Date:           November 14, 2024 |
    | | Time:           2:00 p.m. |
17  | **ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA** | Courtroom:    2 |
    | | Judge:          Hon. Troy L. Nunley |
18  | | Trial Date:     None |
    | | Action Filed:  May 26, 2023 |
    |  Defendant. | |

19

20

21

22

23        Pursuant to Local Rule 260(b), Defedant Rob Bonta, in his official capcity as Attorney

24  General of California, hereby responds to Plaintiff The Personal Care Products Council's

25  Separate Statement of Undisputed Facts in support of its Motion for Summary Judgment (ECF

    No. 43-2).

26

27

28

| Plaintiff's Alleged Undisputed Facts and Supporting Evidence | Defendant's Response and Supporting Evidence |
|---|---|
| 1. Titanium dioxide (TiO2) is a mineral used as an ingredient in cosmetic and personal care products, including color cosmetics (e.g., eyeshadow), sunscreens, and toothpastes.<br><br>Expert Report of Amy Madl ("Madl Report") ¶ 13; IARC Monographs on the Evaluation of Carcinogenic Risks to Humans (Vol. 93) ("IARC Monograph Vol. 93"), Norris Decl. Ex. A at 7-10. | Undisputed. |
| 2. Titanium dioxide has been used as a whitening pigment (among other things) since the 1930s, in the United States and most other countries around the world.<br><br>Declaration of Thomas Myers ("Myers Decl.") ¶ 6, ECF No. 27-19; IARC Monograph Vol. 93, Norris Decl. Ex. A at 7-10. | Undisputed. |
| 3. The U.S. Food & Drug Administration (FDA) has concluded that titanium dioxide may be safely used as a color additive in many products, including cosmetics, food and supplements, drugs, and sunscreen.<br><br>21 C.F.R. § 73.2575(b) (cosmetics); *id.* § 73.575 (food and supplements); *id.* § 73.157 (drugs); 21 U.S.C. § 355h(a)(2) (sunscreen). | Disputed as phrased.<br><br>The FDA's statements about "safe" use of titanium dioxide as a color additive in cosmetics, food and supplements, drugs, and sunscreens are risk determinations that provide specific levels at which the chemical is generally regarded as safe. Also, the PCPC's citations for use of titanium dioxide in drugs and sunscreen are incorrect.<br><br>21 C.F.R. § 73.2575(a) (cosmetics); *id.* § 73.575(c) (food and supplements); *id.* § 73.1575(a) and (b) (drugs); *id.* § 352.10(p) (sunscreen). |
| 4. In 2010, the International Agency for Research on Cancer (IARC) classified titanium dioxide as a Group 2B agent ("possibly carcinogenic") based on "sufficient evidence in | Undisputed. |

| | |
|---|---|
| experimental animals" but "inadequate evidence [of carcinogenicity] in humans."<br><br>Madl Report ¶ 14; IARC Monograph Vol. 93, Norris Decl. Ex. A at 81, 83. | |
| 5.   As to human evidence, IARC stated that "the studies d[id] not suggest an association between occupational exposure to titanium dioxide . . . and risk for cancer."<br><br>*Id.* | Disputed as phrased.<br>The IARC Monograph speaks for itself and states that "the studies do not suggest an association between occupational exposure to titanium dioxide as it occurred in recent decades in western Europe and North America and risk for cancer."<br><br>Norris Decl. Ex. A at 81. |
| 6.   IARC performs hazard assessments of various substances or agents; it does not make health or policy recommendations.<br><br>IARC Monographs on the Identification of Carcinogenic Hazards to Humans, *Questions and Answers* (Dec. 10, 2019) ("IARC Q&A"), Norris Decl. Ex. B at 3-4. | Undisputed. |
| 7.   Findings from IARC's assessments are published as Monographs, in which IARC "identified cancer hazards but does not evaluate the risks associated with specific levels or circumstances of exposure."<br><br>*Id.* | Undisputed. |
| 8.   An agent is considered a cancer hazard by IARC if it is capable of causing cancer under some circumstances.<br><br>IARC Q&A, Norris Decl. Ex. B at 4. | Undisputed. |
| 9.   Risk measures the probability that cancer will occur, taking into account the level of exposure to the agent. | Undisputed. |

3

| | |
|---|---|
| IARC Q&A, Norris Decl. Ex. B at 4. | |
| 10.  IARC identifies cancer hazards even when risks are very low with known patterns of use or exposure.<br><br>IARC Q&A, Norris Decl. Ex. B at 4. | Disputed as phrased. The IARC Q&A speaks for itself and states: "The *IARC Monographs* Programme may identify cancer hazards even when risks are very low with known patterns of use or exposure. Recognition of such carcinogenic hazards is important because new uses or unforeseen exposures could lead to risks that are much higher than those currently seen."<br><br>Norris Decl. Ex. B 4. |
| 11.  IARC classifies agents into four groups—Group 1, Group 2A, Group 2B, and Group 3—based on the strength of evidence that an exposure is carcinogenic. Group 1 agents have stronger evidence than Group 2A agents, which have stronger evidence than Group 2B agents.<br><br>IARC Monograph Preamble (Jan. 2019), at 31, 35 [attached as Ex. C to Norris Decl.]; Norris Decl. Ex. J at 73:6-16; *see also* Order Granting Preliminary Injunction, ECF No. 40, at 4 n.2. | Disputed as phrased. IARC classifies agents into four categories-Group 1, Group 2A, Group 2B, and Group 3-based on an overall evaluation of the evidence and criteria outlined in its Preamble.<br><br>Norris Decl. Ex. C at 38-40; Ex. J at 73:6-16. |
| 12.  Group 1 ("carcinogenic to humans") applies whenever there is "sufficient evidence of carcinogenicity in humans."<br><br>IARC Monograph Preamble, Norris Decl. Ex. C at 35. | Disputed. "Carcinogenic to humans" (Group 1) can also apply when there is "limited" or "inadequate" evidence in humans and" there is both *strong evidence in exposed humans that the agent exhibits key characteristics of carcinogens* and *sufficient evidence of carcinogenicity* in experimental animals."<br><br>Norris Decl. Ex. C at 38 and 40. |
| 13.  Group 2A ("probably carcinogenic to humans") applies when IARC has made at least two of the following evaluations, including at least one that involves either exposed humans or human cells or tissues: | Disputed. The IARC Preamble speaks for itself and says in addition:<br><br>"If there is *inadequate evidence regarding carcinogenicity* in humans, there should be *strong evidence in human cells or tissues that the agent exhibits key characteristics of carcinogens*. If there is *limited evidence of carcinogenicity in humans*, then the second individual evaluation may be from |

4

| | |
|---|---|
| • Limited evidence of carcinogenicity in humans,<br>• Sufficient evidence of carcinogenicity in experimental animals,<br>• Strong evidence that the agent exhibits key characteristics of carcinogens.<br><br>IARC Monograph Preamble, Norris Decl. Ex. C at 35. | experimental systems (i.e. *sufficient evidence of carcinogenicity* in experimental animals or *strong evidence in experimental systems that the agent exhibits key characteristics of carcinogens*).<br><br>Additional considerations apply when there is *strong evidence that the mechanism of carcinogenicity in experimental animals does not operate in humans* for one or more tumour sites. Specifically, the remaining tumour sites should still support an evaluation of *sufficient evidence in experimental animals* in order for this evaluation to be used to support an overall classification in Group 2A.<br><br>Separately, this category generally applies if there is *strong evidence that the agent belongs, based on mechanistic considerations, to a class of agents for which one or more members have been classified in Group 1 or Group 2A.*"<br><br>Norris Decl. Ex. C at 38 and 40. |
| 14. Group 2B ("possibly carcinogenic to humans") applies when only one of the following evaluations has been made:<br><br>• Limited evidence of carcinogenicity in humans,<br>• Sufficient evidence of carcinogenicity in experimental animals,<br>• Strong evidence that the agent exhibits key characteristics of carcinogens.<br><br>IARC Monograph Preamble, Norris Decl. Ex. C at 36.; Norris Decl. Ex. J at 73:12-16. | Disputed. The IARC Preamble speaks for itself and says in addition:<br><br>"Because this category can be based on evidence from studies in experimental animals alone, there is no requirement that the strong mechanistic evidence be in exposed humans or in human cells or tissues. This category may be based *on strong evidence in experimental systems that the agent exhibits key characteristics of carcinogens.*<br><br>As with Group 2A, additional considerations apply when there is *strong evidence that the mechanism of carcinogenicity in experimental animals does not operate in humans* for one or more tumour sites. Specifically, the remaining tumour sites should still support an evaluation of *sufficient evidence in experimental animals* in order for this evaluation to be used to support an overall classification in Group 2B."<br><br>Norris Decl. Ex. C at 38 and 40. |
| 15. Group 3 applies when the agent is "not classifiable as to its carcinogenicity to humans." | Disputed. The IARC Preamble speaks for itself as says: |

5

| | |
|---|---|
| IARC Monograph Preamble, Norris Decl. Ex. C at 36. | "Agents that do not fall into any other group are generally placed in this category.<br><br>This includes the case when there is *strong evidence that the mechanism of carcinogenicity in experimental animals does not operate in humans* for one or more tumour sites in experimental animals, the remaining tumour sites do not support an evaluation of *sufficient evidence in experimental animals*, and other categories are not supported by data from studies in humans and mechanistic studies.<br><br>An evaluation in Group 3 is not a determination of non-carcinogenicity or overall safety. It often means that the agent is of unknown carcinogenic potential that there are significant gaps in research.<br><br>If the evidence suggests that the agent exhibits no carcinogenic activity, either through *evidence suggesting lack of carcinogenicity* in both humans and experimental animals, or through *evidence suggesting lack of carcinogenicity* in experimental animals complemented by strong negative mechanistic evidence in assays relevant to human cancer, then the Working Group may add a sentence to the evaluation to characterize the agent as well-studied and without evidence of carcinogenic activity.<br><br>Norris Decl. Ex. C at 39-40. |
| 16. Under IARC's framework, a strength of evidence indicator of "inadequate evidence" is assigned where the "available studies are of insufficient quality, consistency, or statistical precision" to demonstrate the presence or absence of a causal relationship "or no data on cancer in humans is available."<br><br>IARC Monograph Preamble, Norris Decl. Ex. C at 31. | Disputed as to the term "relationship." The IARC Preamble speaks for itself and defines "inadequate evidence regarding carcinogenicity" in humans as, "The available studies are of insufficient quality, consistency, or statistical precision to permit a conclusion to be drawn about the presence or the absence of a causal association between exposure and cancer, or no data on cancer in humans are available. Common findings that lead to a determination of inadequate evidence of carcinogenicity include: (a) there are no data available in humans; (b) there are data available in humans, but they are of poor quality or informativeness; and (c) there are studies of sufficient quality available in humans, but their results are inconsistent or otherwise inconclusive." |

6

| | |
|---|---|
| | IARC Monograph Preamble, Norris Decl. Ex. C at 34-35 (per Plaintiff's exhibit numbering). |
| 17.   "Inadequate evidence regarding carcinogenicity" is the second weakest strength of evidence indicator under IARC's framework.<br><br>IARC Monograph Preamble Norris Decl. Ex. C at 31-32. | Undisputed. |
| 18.   IARC assigns its weakest indicator, "evidence suggesting lack of carcinogenicity," only where "several high-quality studies covering the full range of levels of exposure that humans are known to encounter" are "mutually consistent in not showing a positive association."<br><br>IARC Monograph Preamble, Norris Decl. Ex. C at 32. | Disputed as phrased. The IARC Monograph Preamble speaks for itself. The sentence applies to "evidence suggesting lack of carcinogenicity" in humans. The complete definition is, "[t]here are several high-quality studies covering the full range of levels of exposure that humans are known to encounter, which are mutually consistent in not showing a positive association between exposure to the agent and the studied cancers at any observed level of exposure. The results from these studies alone or combined should have narrow confidence intervals with an upper limit below or close to the null value (e.g. a relative risk of unity). Bias and confounding were ruled out with reasonable confidence, and the studies were considered informative. A conclusion of evidence suggesting lack of carcinogenicity is limited to the cancer sites, populations and life stages, conditions and levels of exposure, and length of observation covered by the available studies. In addition, the possibility of a very small risk at the levels of exposure studied can never be excluded."<br><br>IARC Monograph Preamble, Norris Decl. Ex. C at 35. |
| 19.   If sufficient evidence does not exist to demonstrate that a chemical should be classified in this lowest threshold, IARC conservatively assigns the "inadequate evidence" indicator. | Disputed. IARC classifies the evidence relevant to carcinogenicity in human studies as "inadequate evidence of carcinogenicity" and "evidence suggesting lack of carcinogenicity" based on the criteria in the Preamble.<br><br>"Inadequate evidence regarding carcinogenicity" in humans is defined as, "[t]he available studies are of insufficient |

| | |
|---|---|
| IARC Monograph Preamble, Norris Decl. Ex. C at 31-32. | quality, consistency, or statistical precision to permit a conclusion to be drawn about the presence or the absence of a causal association between exposure and cancer, or no data on cancer in humans are available. Common findings that lead to a determination of inadequate evidence of carcinogenicity include: (a) there are no data available in humans; (b) there are data available in humans, but they are of poor quality or informativeness; and (c) there are studies of sufficient quality available in humans, but their results are inconsistent or otherwise inconclusive." |
| | "Evidence suggesting lack of carcinogenicity" in humans is defined as, "[t]here are several high-quality studies covering the full range of levels of exposure that humans are known to encounter, which are mutually consistent in not showing a positive association between exposure to the agent and the studied cancers at any observed level of exposure. The results from these studies alone or combined should have narrow confidence intervals with an upper limit below or close to the null value (e.g. a relative risk of unity). Bias and confounding were ruled out with reasonable confidence, and the studies were considered informative. A conclusion of evidence suggesting lack of carcinogenicity is limited to the cancer sites, populations and life stages, conditions and levels of exposure, and length of observation covered by the available studies. In addition, the possibility of a very small risk at the levels of exposure studied can never be excluded." |
| | IARC Monograph Preamble, Norris Decl. Ex. C at 34-35. |
| 20.  IARC based its Group 2B designation of TiO2 on two animal studies involving rodent inhalations:<br><br>•  K.P. Lee, et al., Pulmonary response of rats exposed to titanium dioxide (TiO2) by inhalation for two years, 79 Toxicology and Applied | Disputed. IARC determined that there was "sufficient evidence of carcinogenicity" in animals based on three studies on experimental animals. In addition to the Lee (1985) and Heinrich (1995) studies, IARC also based its determination on Pott F, Roller M (2005), Carcinogenicity study with nineteen granular dusts in rats. Eur. J Oncol, 10:249-281.<br><br>IARC Monograph Vol. 93, Norris Decl. Ex. A at 34-35 and 83-84. |

8

| | |
|---|---|
| Pharmacology 179-92 (1985); and<br>• U. Heinrich, et al., Chronic Inhalation Exposure of Wistar Rats and two Different Strains of Mice to Diesel Engine Exhaust, Carbon Black, and TiO2, 7 Inhalation Toxicology 533-56 (1995).<br><br>Madl Report ¶ 27; IARC Monograph Vol. 93, Norris Decl. Ex. A at 33-34.. | |
| 21. The two studies relied upon by IARC for its 2B classification of TiO2 exposed rats to lung overload conditions.<br><br>Madl Report ¶¶ 27-32 (explaining that Lee and Heinrich studies involved lung overload conditions); Norris Decl. Ex. J 123:2-12 ("The lung overload [wa]s the mechanism by which . . . the lung tumors were formed in the rat lung."). | Undisputed that Lee (1985) reported lung overload conditions at the 50 mg/m$^3$ and 250 mg/m$^3$ dose levels.<br><br>However, disputed that Lee (1985) reported lung overload conditions at the 10 mg/m$^3$ dose level.<br>Declaration of Megan Hey (Hey Decl.), Ex. B at 1, 3<br><br>Also disputed that Heinrich (1995) reported lung overload conditions.<br>Hey Decl., Ex. C *generally* at 1-23.<br><br>Also disputed that IARC relied on two studies. IARC determined that there was "sufficient evidence of carcinogenicity" in animals based on three studies on experimental animals. In addition to the Lee (1985) and Heinrich (1995) studies, IARC also based its determination on Pott F, Roller M (2005), Carcinogenicity study with nineteen granular dusts in rats. *Eur. J Oncol*, 10:249-281.<br><br>IARC Monograph Vol. 93, Norris Decl. Ex. A at 34-35 and 83-84. |
| 22. The Lee and Heinrich studies have been shown by governmental bodies and other scientists to have little to no relevance to humans.<br><br>Madl Report ¶ 32 (describing them as "scientifically unreliable for informing the potential carcinogenic nature of | Disputed. IARC determined that there was "sufficient evidence of carcinogenicity" in animals based on three studies on experimental animals: Lee (1985), Heinrich (1995), and Pott (2005). The three studies contributed to IARC's determination that titanium dioxide is "possibly carcinogenic to humans" (Group 2B). The European Chemicals Agency's, Committee for Risk Assessment considered the data from the Lee |

| | |
|---|---|
| titanium dioxide of any form and predicant effects in humans in non-overload conditions"); *id.* (citing researchers, international inhalation toxicology experts, and government bodies that have come to the same conclusion). | (1985), Heinrich (1995), and other studies to conclude that inhalable titanium dioxide is a "suspected human carcinogen" (Category 2). IARC Monograph Vol. 93, Norris Decl. Ex. A at 33-34 and 83-84; European Chemicals Agency, Committee for Risk Assessment, Opinion regarding risk assessment of TiO2 (Sept. 14, 2017), Norris Decl. Ex. D at 13-20 and 41-43. |
| 23. Rats in both inhalation studies were exposed to excessive doses of titanium dioxide—for 6 hours (Lee) or 18 hours (Heinrich) per day, 5 days per week for 2 years<br><br>Madl Report ¶¶ 28-32 (citing Heinrich et al. 1995; Lee, *et al.* 1985a, 1985b, 1986). | Undisputed that rats in the Lee (1985) study were exposed to titanium dioxide for six hours per day, five days per week for two years and that the rats in Heinrich (1995) were exposed to titanium dioxide for 18 hours per day, five days per week for two years.<br><br>Disputed that the doses were "excessive." The doses given were under the maximum tolerated dose.<br><br>Jameson Report, ECF No. 42 at 18-19. |
| 24. The excessive doses to which the rats in both inhalation studies were exposed were well beyond overload thresholds for retained particulate mass in the lungs.<br><br>*Id.* | Disputed. The doses in Lee (1985) and Heinrich (1995) were not "excessive." The doses given were under the maximum tolerated dose.<br><br>Jameson Report, ECF No. 42 at 18-19. |
| 25. The mechanism by which TiO2 caused cancer in rats in the Lee and Heinrich studies is lung overload.<br><br>Norris Decl. Ex. J 233:2-5 (stating that lung overload is "important" from "the standpoint of the animal studies because it's the mechanism by which it causes cancer in the lungs of the rats"); *see also id.* at 123:10-22. Madl Report ¶¶ 28-29, 32. | Disputed.<br><br>In addition to lung overload, titanium dioxide may also cause cancer via other mechanisms, and there is no evidence to suggest that lung overload is a prerequisite to all possible mechanisms.<br>As described in NIOSH (2011), "Particle-induced pulmonary inflammation, oxidative stress, lung tissue damage, and epithelial cell proliferation are considered to be the key steps leading to lung tumor development in the rat acting through a secondary genotoxic mechanism [Knaapen et al. 2004; Baan 2007]. Oxidative stress is considered the underlying mechanism of the proliferative and genotoxic responses to |

DEFENDANT'S SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS
(2:23-CV-01006-TLN-JDP)

| | |
|---|---|
| | poorly soluble particles including TiO2 and other PSLT [Donaldson et al. 1996; Shi et al. 1998; Vallyathan et al. 1998; Knaapen et al. 2002; Donaldson and Stone 2003]." |
| | Further, "[a]lthough the mechanism of particle-elicited lung tumors remains to be fully elucidated, the rat and human lung responses to poorly soluble particles of low or high toxicity (e.g., coal dust and silica) are qualitatively similar in many of the key steps for which there are data, including pulmonary inflammation, oxidative stress, and alveolar epithelial cell hyperplasia [Vallyathan et al. 1998; Castranova 2000; Green et al. 2007; Baan 2007]. Case studies of lung responses in humans exposed to TiO2 are consistent in showing some similarities with rat responses." |
| | Additionally, "[C]hronic pulmonary inflammation appears to be required in the development of lung tumors in rats following chronic inhalation exposure to TiO2; i.e., acting through a secondary genotoxic mechanism involving oxidative DNA damage. An implication of this mechanism is that maintaining exposures below those causing inflammation would also prevent tumor development, although the distribution of inflammatory responses in human populations is not known and a direct genotoxic mechanism cannot be ruled out for discrete nanoscale TiO2." |
| | Thus, multiple mechanisms may contribute to lung tumor development. There is no evidence to suggest that lung overload is a prerequisite to all possible mechanisms. |
| | Hey Decl., Ex. F at 7-9. |
| 26.  Humans have not been shown to experience particle overload stemming from exposure to TiO2.

Norris Decl. Ex. J 115:11-14 ("[I]t hasn't been documented there is particle overload in humans for titanium dioxide as it relates to lung | Undisputed. |

| | |
|---|---|
| cancer"); *see also id.* at 232:12-13; *id.* at 156:19-22 ("I'm not aware of any information on [whether lung overload occurs in humans].") Madl Report ¶ 32. | |
| 27.  Particle clearance—the process by which respirable solid particles like titanium dioxide are cleared from the lungs— and translocation pathways vary between rodents and non-rodent species like humans.<br><br>Madl Report ¶¶ 21, 36; Norris Decl. Ex. J. 138:12-20. | Undisputed. |
| 28.  The variance in particle clearance between rodents and humans is due in part to anatomical and physiological differences including the size and number of pulmonary macrophages between the species.<br><br>*Id.* | Undisputed. |
| 29.  Adverse outcome pathways (AOP)—the sequential progression of events in an organism from the first contact of a toxicant at a molecular level to a final adverse outcome at the individual level—are species-specific.<br><br>Madl Report ¶¶ 25, 35-36, 39, 41; Norris Decl. Ex. J 138:21-139:4. | Disputed. Mechanisms of action may occur across species.<br><br>IARC Monograph Vol. 93, Hey Decl. Ex A at 8-9. |
| 30.  The AOP for particle overload leading to tumorigenic responses is exclusive to rats.<br><br>*Id.* | Disputed. Aside from data on mice and hamsters, there is no definitive data on other species, including humans, to conclude that particle overload leading to tumorigenic responses is exclusive to rats.<br><br>Jameson Report (ECF No. 42) at 12. |
| 31.  In 2017, the Committee for Risk Assessment of the European | Disputed. The Opinion regarding risk assessment of TiO2 (Sept. 14, 2017) speaks |

| | |
|---|---|
| Chemicals Agency determined that the Lee study was not reliable, finding that the "exposure conditions represent excessive exposure which invalidates the results of the Lee et al. (1985) study."<br><br>European Chemicals Agency, Committee for Risk Assessment, *Opinion regarding risk assessment of TiO2* (Sept. 14, 2017), Norris Decl. Ex. D at 39; Madl Report ¶ 32. | for itself and the complete sentence says, "[the Committee for Risk Assessment] takes the view, that these exposure conditions represent excessive exposure which invalidates the results of the Lee et al. (1985) study on their own for classification purposes." The Committee for Risk Assessment considered the data from the Lee (1985), Heinrich (1995), and other studies to conclude that inhalable titanium dioxide is a "suspected human carcinogen" (Category 2).<br><br>European Chemicals Agency, Committee for Risk Assessment, Opinion regarding risk assessment of TiO2 (Sept. 14, 2017), Norris Decl. Ex. D at 13-20, 39, and 41-43. |
| 32. In 2022, the European Court of Justice annulled an EU regulation for titanium dioxide after determining that reliance on the Heinrich (1995) study was "manifest error" because the excessive lung overload conditions "invalidated the results."<br><br>European Court of Justice, Judgment and Decision re *CWS Powder Coatings GmbH v. European Commission* (Nov. 23, 2022), Norris Decl. Ex. E at 14, ¶¶ 78-103; Madl Report ¶ 32. | Undisputed that the EU had classified titanium dioxide by inhalation as a Category 2 "suspected human carcinogen" in 2020, and in November 2022, a challenge from the Titanium Dioxide Manufacturers Association resulted in a European Court of Justice annulling the classification.<br><br>Disputed to the extent Plaintiff contends that this reflects the current status of titanium dioxide regulation in the EU. The court's annulment has since been suspended, pending an appeal by France's Agency for Food Environmental and Occupational Health & Safety (ANSES) filed in February 2023.<br><br>Hey Decl. Ex. D. (French Ministry press release) at 1-2. |
| 33. Based solely on IARC's classification of TiO2, in 2011, California's Office of Environmental Health Hazard Assessment (OEHHA) added titanium dioxide (airborne, unbound particles of respirable size) ("Listed TiO2") to the Proposition 65 list of chemicals that are known to the State to cause cancer.<br><br>Answer ¶¶ 5, 43; OEHHA's Notice of Intent to List Titanium Dioxide (2011), Norris Decl. Ex. H. | Undisputed that as a result of the IARC determination that titanium dioxide was a possible human carcinogen, in 2011, OEHHA added "titanium dioxide (airborne, unbound particles of respirable size)" to the Proposition 65 list, pursuant to Health and Safety Code section 25249.8, subdivision (a), and California Labor Code sections 6382, subdivision (b)(1), which are incorporated into Proposition 65. Answer ¶¶ 5, 43, ECF No. 11. |

| | |
|---|---|
| 34.  OEHHA made no determination that Listed Titanium Dioxide or any other form of titanium dioxide causes cancer in humans, and it has not done so in the intervening 13 years since listing Listed Titanium Dioxide.<br><br>Answer ¶ 6. | Undisputed that OEHHA has not made a determination that any form of titanium dioxide causes cancer in humans.<br><br>Disputed to the extent that Plaintiff seeks to establish any such determination is required for the listing of a chemical on the Proposition 65 list, which it is not. *See* Health and Safety Code section 25249.8, and California Labor Code sections 6382, subdivision (b)(1), which are incorporated into Proposition 65. |
| 35.  IARC classified glyphosate as a Group 2A ("probably carcinogenic to humans") agent, concluding that there is "limited evidence in humans" but "sufficient evidence in experimental animals for the carcinogenicity of glyphosate."<br><br>IARC Monographs on the Evaluation of Carcinogenic Risks to Humans (Vol. 112), Norris Decl. Ex. F at 398. | Objection. IARC's hazard classification of glyphosate is not relevant to any material issue in this case. Fed. R. Evid. 401; *see also Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("A court can award summary judgment only when there is no genuine dispute of *material* fact. It cannot rely on irrelevant facts"). |
| 36.  IARC classified acrylamide as a Group 2A ("probably carcinogenic to humans") agent, concluding that there is "inadequate evidence in humans" but "sufficient evidence in experimental animals for the carcinogenicity of acrylamide."<br><br>IARC Monographs on the Evaluation of Carcinogenic Risks to Humans (Vol. 60), Norris Decl. Ex. G at 425. | Objection. IARC's hazard classification of acrylamide is not relevant to any material issue in this case. Fed. R. Evid. 401; *see also Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("A court can award summary judgment only when there is no genuine dispute of *material* fact. It cannot rely on irrelevant facts"). |
| 37.  PCPC's expert, Dr. Stephen Nowlis, conducted a survey to assess how consumers understand a Proposition 65 cancer warning on cosmetic products ("Nowlis Survey"). The findings from the Nowlis Survey show that the majority of respondents (73.1 to 77.8 | Undisputed that the PCPC hired Dr. Stephen Nowlis to conduct a survey (referred to as the Nowlis Survey).<br><br>Disputed that the Nowlis Survey was to "assess how consumers understand a Proposition 65 cancer warning on cosmetic products." The Nowlis Report, which speaks for itself, states Nowlis "was asked by |

| | |
|---|---|
| percent) reading a cancer warning for Listed Titanium Dioxide on a cosmetic product understood it to convey that the product will cause them to get cancer or increase their risk of cancer.<br><br>Expert Report of Stephen Nowlis ("Nowlis Report") ¶¶ 6-9. | counsel for Plaintiff to evaluate the potential impact on consumer perceptions of a Proposition 65 cancer warning for titanium dioxide on the label of cosmetic products sold in California." Nowlis Report, ECF No. 43-20, ¶ 6.<br><br>Disputed that the Nowlis Survey shows "that the majority of respondents (73.1 to 77.8 percent) reading a cancer warning for Listed Titanium Dioxide on a cosmetic product understood it to convey that the product will cause them to get cancer or increase their risk of cancer." The Nowlis Report, which speaks for itself, states that 77.8 "of eyeshadow purchasers (net of the control) who reviewed the long-form warning "interpret the warning on an eyeshadow package to convey the message that using the product increases their risk of getting cancer" and 73.1% of "eyeshadow purchasers (net of the control) who reviewed the short-form warning interpret the warning on an eyeshadow package to convey the message that using the product increases their risk of getting cancer." Nowlis Report, ECF No. 43-20, ¶ 9. |
| 38.  Dr. Nowlis previously designed and conducted a consumer survey similar to the one here in another lawsuit, the CalChamber case.  That survey examined whether California consumers interpret a Prop 65 cancer warning for acrylamide on food to convey that consuming the product increases their chances of getting cancer.  The results of that survey indicated that upwards of 70 percent of consumers believed that consuming the food would increase their risk of cancer.<br><br>Nowlis Report ¶ 10 n.4;<br>*California Chamber of Commerce v. Becerra* ("*CalChamber*"), Case No. 2:19-cv-02019-KJM (E.D. Cal.) (Declaration of Stephen M. Nowlis, ECF No. 95-25). | Undisputed that Dr. Nowlis is also an expert for industry in the *CalChamber,* matter, which is pending.<br><br>Disputed to the extent Plaintiffs seek to establish that Dr. Nowlis' opinions in *CalChamber* are material or relevant to this matter. |

| | |
|---|---|
| 39.  The consumer survey Dr. Nowlis designed in the CalChamber case was accepted by Chief Judge Mueller and cited in support of her opinion granting plaintiff's motion for a preliminary injunction.  That decision was affirmed by the U.S. Court of Appeals for the Ninth Circuit, which also cited the Nowlis survey in concluding that the Prop 65 warning at issue was misleading. | Undisputed that a reference to the Nowlis Declaration appears in the trial court ruling at the preliminary injunction stage of *California Chamber of Commerce v. Becerra*, and that the U.S. Court of Appeals for the Ninth Circuit affirmed that the trial court had not abused its discretion in granting the motion for preliminary injunction, referring to the consumer survey when it held that the "district court did not abuse its discretion when it concluded the warning is misleading" at the preliminary injunction stage. *California Chamber of Commerce v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022). |
| *California Chamber of Commerce v. Becerra*, 529 F. Supp. 3d 1099, 1117 (E.D. Cal. 2021), *aff'd sub nom. California Chamber of Commerce v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022). | Disputed to the extent plaintiff seeks to establish more, including by taking these holdings out of the context of the motion for preliminary injunction to which they relate. |
| 40.   Defendant retained a professor of environmental studies, Dr. Joseph Arvai, to critique the design of the Nowlis Survey and audit whether the Nowlis Report's conclusions were supported by the survey data. | Undisputed that the Attorney General retained Dr. Joseph Arvai as a rebuttal expert in this matter. |
| Expert Report of Joseph Arvai ("Arvai Report"), ECF No. 42 at 5, 7-8 | Disputed that Dr. Arvai is only a "professor of environmental studies." Plaintiff mischaracterizes Dr. Arvai's qualifications on risk perception and decision making, omitting that, as the Arvai Report states, among other things, he is the David and Dana Dornsife Professor of Psychology at USC, a Senior Researcher at the Decision Science Research Institute, holds a Ph.D. in risk and decision sciences, and he researches and publishes on risk perceptions, risk communication, and judgment and decision-making (e.g., by consumers, technical experts, and others) under conditions of risk, uncertainty, and conflicting objectives. |
| | Arvai Report, ECF No. 42 at 5, 24-36 (his CV). |
| 41.   Dr. Arvai has never conducted a survey or designed a survey for use in litigation. | Undisputed that Dr. Arvai stated at his deposition in this matter that he has not conducted, or designed, a survey for use in litigation. |
| Norris Decl. Ex. K at 35:18-20. | Disputed to the extent that Plaintiff seeks to argue that Dr. Arvai is unqualified to offer expert rebuttal opinion of Dr. Nowlis' |

| | opinion. |
| | |
| | Arvai Report, ECF No. 42 at 5, 24-36 (his CV). |
| 42.   Dr. Arvai has never published an evaluation of another expert's survey.<br><br>Norris Decl. Ex. K at 37:12-14. | Undisputed that Dr. Arvai stated at his deposition in this matter that has not published an evaluation of another expert's survey.<br><br>Disputed to the extent that Plaintiff seeks to argue that Dr. Arvai is unqualified to offer expert rebuttal opinion of Dr. Nowlis' opinion.<br><br>Arvai Report, ECF No. 42 at 5, 24-36 (his CV). |
| 43.   Dr. Arvai has never published a study evaluating warnings.<br><br>Norris Decl. Ex. K at 41:15-42:7. | Undisputed that Dr. Arvai stated at his deposition in this matter that he has not published "studies that specifically focus on a warning or a label warning. But many studies have talked about situations in which people would potentially be at risk."<br><br>Norris Decl., Ex. K at 41:25-42:3.<br><br>Disputed to the extent that Plaintiff seeks to argue that Dr. Arvai is unqualified to offer expert rebuttal opinion of Dr. Nowlis' opinion.<br><br>Arvai Report, ECF No. 42 at 5, 24-36 (his CV). |
| 44.   Dr. Arvai did not conduct a survey on the Proposition 65 warning at issue in this litigation.<br><br>Norris Decl. Ex. K at 47:22-24. | Undisputed that Dr. Arvai stated at his deposition in his matter that he did not conduct a survey on the Proposition 65 warning at issue in this litigation.<br><br>Disputed to the extent that Plaintiff seeks to argue that Dr. Arvai is unqualified to offer expert rebuttal opinion of Dr. Nowlis' opinion.<br><br>Arvai Report, ECF No. 42 at 5, 24-36 (his CV). |
| 45.   Dr. Arvai performed a reanalysis of the raw data associated with the open-ended responses to QF1, QF1a, Q3, | Undisputed. |

| | |
|---|---|
| and Q5 of the Nowlis survey. Dr. Arvai coded these responses according to a modified key that he created to assess whether the Nowlis Report's conclusions are supported by the survey data. Responses were assigned one of six codes.<br><br>Arvai Report, ECF No. 42 at 19-21. | |
| 46.  In this reanalysis by Dr. Arvai, only responses that were coded a (4) or (5) were factored into Dr. Arvai's calculation of the percentage of respondents interpreting the warning on the eyeshadow package to convey the message that using the product increases their risk of getting cancer.<br><br>Arvai Report, ECF No. 42 at 20. | Disputed as phrased. As the Arvai Report, which speaks for itself, states, code (4) meant "Respondent provides a response that suggests that using the eye shadow shown to the respondent will cause cancer or will lead to an increased risk of cancer" and code (5) meant "Respondent provides a response that suggests that the respondent will think twice about using the eye shadow, stop using the eye shadow altogether, etc. We can infer from this kind of response that the respondent assumes that the respondent will either get cancer or will be exposed to an increased risk of cancer." Arvai Report, ECF No. 42 at 19-20. And applying these codes showed the number of respondents who perceive that they will be exposed to an increased cancer risk or that they will get cancer." *Id.* at 20. |
| 47.  In this reanalysis by Dr. Arvai, a response was assigned a code (4) if it suggested that using the eye shadow "will cause cancer" or "will lead to an increased risk of cancer."<br><br>Arvai Report, ECF No. 42 at 19. | Undisputed. |
| 48.  Also in this reanalysis by Dr. Arvai, a response was assigned a code (5) if it suggested that the respondent would "think twice about using the eye shadow" or "stop using the eye shadow altogether. Arvai inferred from this that the respondent believed using the eye shadow will cause cancer or increase their risk of cancer. | Undisputed. |

18

| | |
|---|---|
| Arvai Report, ECF No. 42 at 19-21. | |
| 49. A response was assigned a code (3) if it indicated that using the eyeshadow can or might increase their risk of cancer (as opposed to will increase their risk of cancer). Dr. Arvai explained that "[t]hese are important distinctions because consumers understand that many products have been linked to cancer risk" but "may not (a) increase their level of risk relative to their current baseline, or (b) definitively cause cancer."<br><br>Arvai Report, ECF No. 42 at 19. | Disputed as phrased. The Arvai Report, which speaks for itself, states that code (3) applied where a Respondent provides a response that effectively repeats the language or reflects the intent of the California Proposition 65 label. Respondents indicate that using the eye shadow shown to them can expose them to a carcinogenic chemical (titanium dioxide) (vs. will lead to an increased cancer risk). These are important distinctions because consumers understand that many products have been linked to cancer risks, but, on aggregate, may not (a) increase their level of risk relative to their current baseline, or (b) definitively cause cancer."<br><br>Arvai Report, ECF No. 42 at 19. |
| 50. Applying Dr. Arvai's methodology, Nowlis assessed the net percentage of respondents associated with codes (4) or (5) across all open-ended questions (Q1, Q1a, QF3, and QF5) of Test Survey 1, as well as Test Survey 2.<br><br>Norris Decl. Ex. I at 175:16–177:2; Supplemental Declaration of Stephen Nowlis ("Suppl. Nowlis Decl.") ¶ 3, Ex. A. | Undisputed that Dr. Nowlis tallied up the number of responses that Dr. Arvai re-coded as codes (4) and (5) across all of the open-ended survey questions for both test groups.<br><br>Disputed to the extent Plaintiff relies on this methodology as analogous to Dr. Arvai's reanalysis of Dr. Nowlis' data. |
| 51. Recoding the open-ended responses in Test Survey 2 (short-form warning) with Dr. Arvai's methodology, Dr. Nowlis determined that – across QF1, Q1a, QF3, and QF5 – 25.49% of respondents who read the short-form warning indicated that using the eyeshadow product will increase their risk of cancer.<br><br>Norris Decl. Ex. I at 177:7-22; Suppl. Nowlis Decl. ¶ 3, Ex. A. | Undisputed that Dr. Nowlis stated that his tallying up of Dr. Arvai's codes (4) and (5) across all of the open-ended questions resulted in 25.49% for test group 2.<br><br>Disputed to the extent Plaintiff relies on this methodology as analogous to Dr. Arvai's reanalysis of Dr. Nowlis' data. |

| | |
|---|---|
| 52. Across the open-ended questions in Test Survey 1, 27.86% of respondents who read the long-form warning indicated that using the eyeshadow product will increase their risk of cancer.<br><br>Norris Decl. Ex. I at 177:2-7; Suppl. Nowlis Decl. ¶ 3, Ex. A. | Undisputed that Dr. Nowlis stated that his tallying up of Dr. Arvai's codes (4) and (5) across all of the open-ended questions resulted in 27.86% for test group 1.<br><br>Disputed to the extent Plaintiff relies on this methodology as analogous to Dr. Arvai's reanalysis of Dr. Nowlis' data. |
| 53. No scientist or government authority has concluded that titanium dioxide is a human carcinogen.<br><br>Expert Report of Paolo Boffetta ("Boffetta Report"), ¶ 50 ("[N]o scientific or medical organization has identified TiO2 exposure as a risk factor for lung, bladder, or any other cancer in humans."); Norris Decl. Ex. J 74:18 – 75:1 ("The data is not strong enough to satisfy the criteria of a known human carcinogen."); *id.* at 79:2-7 (admitting that, to his knowledge, no "expert in the field of toxicology" has opined that titanium dioxide is a "known human carcinogen"). | Undisputed. |
| 54. The authors of the Lee study acknowledged that, "based on the excessive dust loading and overwhelmed clearance mechanisms in the lungs of [the] [experimental] rats," the "biological relevance of lung tumors to man appears to be negligible."<br><br>Madl Report ¶ 29 ("[T]he relevancy of these lung tumors and other TiO2-induced lesions under excessive exposure conditions is questionable relative to the human-use situation.") (quoting Lee et al. 1985, 1986). | Undisputed that the authors Lee (1985) wrote "[b]ased on the excessive dust loading and overwhelmed clearance mechanism in the lungs of rats exposed chronically at 250 mg/m3, the biological relevance of lung tumors to man appears negligible."<br><br>Disputed to the extent Plaintiff asserts that the results from Lee (1985) have no relevance to the evaluation of titanium dioxide's potential to pose a carcinogenic hazard to humans.<br><br>IARC Monograph Vol. 93, Norris Decl. Ex. A at 33-34, 81, 83-84; Jameson Report, ECF No. 42 at 11. |
| 55. There is a decades-long debate | Undisputed. |

| | |
|---|---|
| over the human risk relevance of chronic inhalation studies where rats exposed to poorly soluble low toxicity particles develop particle-overload related lung tumors.<br><br>Madl Report ¶ 35; Norris Decl. Ex. J 117:4-20; *id.* at 232:8-23. | |
| 56.  Cosmetic and personal care product companies, including PCPC's members, experience a significant burden as a result of Proposition 65 enforcement on Listed Titanium Dioxide.<br><br>Declaration of Thomas Myers ("Myers Decl.") ¶¶ 8-14 (ECF No. 27-19); Norris Decl. ¶¶ 17-41. | Disputed as phrased; objection. Plaintiff's assertion lacks foundation and contains inadmissible hearsay. Fed. R. Evid. 602, 802. |
| 57.  PCPC members currently embroiled in dozens of lawsuits alleging failure to warn of Listed Titanium Dioxide and threatened with additional claims will continue to incur expenses and damages for litigation, reformulation and testing, and/or unwarranted warnings.<br><br>Norris Decl. ¶¶ 15-23. | Disputed as phrased; objection.<br><br>The Attorney General objects that this statement is speculative, and plaintiffs' declarant lacks foundation to offer an opinion about events that might occur in the future. Fed. R. Evid. 602, 701, 702. |
| 58.  Since titanium dioxide was listed under Proposition 65, six private enforcers have issued 572 notices of violation and have pursued enforcement actions against manufacturers and retailers of cosmetics and personal care products, securing hundreds of thousands of dollars in settlement payments.<br><br>Norris Decl. ¶ 16. | Disputed as phrased; objection. Plaintiff's assertion contains inadmissible hearsay (the screen shot of the Attorney General's Proposition 65 database attached to the Norris Declaration as Ex. N) offered for the truth of the number of notices of violations and recipients of those notices that Plaintiff asserted private enforcers have issued since titanium dioxide was listed under Proposition 65; Plaintiff also offers no foundation or evidence for its assertion about settlements. Fed. R. Evid. 602, 802. |
| 59.  This includes 561 notices of violation to manufacturers and | Disputed as phrased; objection. Plaintiff's assertion contains inadmissible hearsay (the |

21

| | |
|---|---|
| retailers since July 7, 2021 which have resulted in settlement agreements with more than 50 companies for $221,100 in civil penalties and $1,998,900 in attorney's fees.<br><br>Norris Decl. ¶ 20. | screen shot of the Attorney General's Proposition 65 database attached to the Norris Declaration as Ex. N) offered for the truth of the number of notices of violations and recipients of those notices that Plaintiff asserted were received by manufacturers and retailers; Plaintiff also offers no foundation or evidence for its assertion about settlements, civil penalties or attorney's fees. Fed. R. Evid. 602, 802. |
| 60.  The notices field since July 2021 have to date resulted in 124 lawsuits by private enforcers, most of which are now consolidated before the San Francisco Superior Court.<br><br>Norris Decl. ¶ 21. | Disputed as phrased; objection. Plaintiff's assertion contains inadmissible hearsay (the screen shot of the Attorney General's Proposition 65 database attached to the Norris Declaration as Ex. N) offered for the truth of the number of lawsuits by private enforcers based on notices of violations that Plaintiff asserted private enforcers sent since July 2021; Plaintiff also offers no foundation or evidence for its assertion that "most of which are now consolidated before the San Francisco Superior Court." Fed. R. Evid. 602, 802. |
| 61.  Notices of violation of Proposition 65 as to Listed Titanium Dioxide continue to be served on cosmetic companies, with the most recent one issued on August 29, 2024.<br><br>Norris Decl. ¶ 22. | Disputed as phrased; objection. Plaintiff's assertion contains inadmissible hearsay (the screen shot of the Attorney General's Proposition 65 database attached to the Norris Declaration as Ex. N) offered for the truth of the number of notices of violations and recipients of those notices that Plaintiff asserted; Plaintiff also offers no foundation or evidence for its assertion about settlements, civil penalties or attorney's fees. Fed. R. Evid. 602, 802. |
| 62.  The epidemiological data to date does not support the hypothesis that exposure to titanium dioxide, in any form, increases the risk of lung or any other cancer in humans.<br><br>Boffetta Report ¶¶ 7, 75, 97-99. | Undisputed that Dr. Boffetta opined that the epidemiological studies he reviewed do not support the hypothesis that exposure to titanium dioxide in any form causes lung or any other cancer.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 63.  The studies instead suggest that exposure to titanium dioxide does not cause cancer. | Undisputed that Dr. Boffetta opined that the epidemiological studies he reviewed support his hypothesis that exposure to titanium dioxide does not cause cancer. |

22

| | |
|---|---|
| *Id.* | Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 64. There is one study of mortality among workers employed in TiO2 production in Europe: Paolo Boffetta, Anne Soutar, John Cherrie, et al., Mortality among workers employed in the titanium dioxide production industry in Europe, 15 Cancer Causes Control, 697, 697–706 (2004) ("Boffetta 2004").<br><br>Boffetta Decl. ¶ 58. | Undisputed.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 65. Boffetta 2004 was a mortality follow-up study of 15,017 TiO2 production workers (95% male) first employed before 1990 and employed for more than a year in one of eleven (11) plants in six European countries (Finland, France, Germany, Italy, Norway, and the United Kingdom).<br><br>Boffetta Decl. ¶ 58. | Undisputed that the Boffetta Declaration, which speaks for itself, characterized the Boffetta 2004 study as asserted.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 66. Boffetta 2004 did not find a dose-response effect from exposure to TiO2.<br><br>Boffetta Decl. ¶ 59. | Undisputed that the Boffetta Declaration, which speaks for itself, characterized the Boffetta 2004 study as asserted.<br><br>Disputed to the extent Plaintiff seeks to deny that the Boffetta 2004 study found a statistically significant 23% increase in lung cancer mortality among the six European countries studied, which included a statistically significant 51% increased risk of lung cancer in German workers, a positive though not statistically significant 42% increase in risk of lung cancer in French workers, and a positive though not statistically significant increase of 9% in risk of lung cancer in UK workers. Boffetta Decl., ECF No. 43-21, ¶ 58; Madl Decl., ECF No. 43-22 at ¶ 47; Hey Decl. Ex. L (Boffetta |

| | |
|---|---|
| | Deposition) 17:12-23 (nominal pages 128:12-23); 18:16-23 (nominal pages 131:16-23). |
| 67. Overall, the results of Boffetta 2004 do not support the hypothesis that exposure to TiO2 is a cause of lung or other cancers.<br><br>Boffetta Decl. ¶ 61. | Undisputed that the Boffetta Declaration, which speaks for itself, came to this conclusion.<br><br>Disputed to the extent Plaintiff seeks to deny that the Boffetta 2004 study found a statistically significant 23% increase in lung cancer mortality among the six European countries studied. Boffetta Decl. ¶ 58. And this included a statistically significant 51% increased risk of lung cancer in German workers, a positive though not statistically significant 42% increase in risk of lung cancer in French workers, and a positive though not statistically significant increase of 9% in risk of lung cancer in UK workers. Madl Decl., ECF 43-22 at ¶ 47; Hey Decl. Ex. L (Boffetta Deposition) 17:12-23 (nominal pages 128:12-23); 18:16-23 (nominal pages 131:16-23). |
| 68. There are three original studies of TiO2 exposure in examining the U.S. DuPont cohort: Chen and Fayerweather 1998, Ellis 2010, and Ellis 2013.<br><br>Boffetta Decl. ¶¶ 72, 74-76. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses a study of workers at two DuPont titanium dioxide plants in the US by Chen and Fayerweather in 1988 (Boffetta Decl., ¶ 72), a study by Ellis in 2010 of workers at three titanium dioxide plants in the US including the two DuPont plants studied in the Chan and Fayerweather 1988 study (Boffetta Decl., ¶ 74), and a "follow-up study of workers at the same three TiO2 production facilities" in the Ellis 2010 study, by Ellis in 2013. Boffetta Decl., ECF No. 43-21, ¶ 75.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 69. Chen and Fayerweather (1998) examined mortality and cancer incidence in a cohort of 1,576 male workers exposed to TiO2 who were employed for at least a year before 1984 at two DuPont TiO2 production plants in the U.S. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Chen and Fayerweath 1998 study as asserted.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L  (Boffetta Deposition), |

| | |
|---|---|
| Boffetta Decl. ¶ 72. | 4:24-5:10 (nominal pages 52:24-53:10 |
| 70. Chen and Fayerweather (1998) found that the observed rate of lung cancer deaths in the study population was significantly lower than the expected lung cancer mortality rate in the U.S.<br><br>Boffetta Decl. ¶ 72. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Chen and Fayerweath 1998 study as asserted.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L  (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 71. Chen and Fayerweather (1998) concluded: (1) Their "cohort analyses suggested that the risks of developing lung cancer and other fatal respiratory diseases were no higher for TiO2-exposed employees than for the rest of the DuPont Company or for the overall U.S. white population.  In fact, statistically significant deficits of lung cancer deaths were observed for this cohort based on the general population"; and (2) "Nested case-control analyses found no significant associations between TiO2 exposure and risk of lung cancer…."<br><br>Boffetta Decl. ¶ 72. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L  (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 72. Ellis 2010 examined mortality among 5,054 workers between ages 31 to 60 employed at three TiO2 plants in the U.S, including the two plants included in the analyses above, with an average length of follow-up of 29 years.<br><br>Boffetta Decl. ¶ 74. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Ellis 2010 study as asserted.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 73. Fewer lung cancer deaths were observed in the Ellis 2010 study population compared to the U.S. general population, although the difference was not | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Ellis 2010 study as asserted.<br><br>Disputed to the extent Plaintiff seeks to |

25

| | |
|---|---|
| statistically significant (SMR = 0.90; 95% CI: 0.75-1.05) ("With lung, the target organ of interest, no increases in malignant or nonmalignant respiratory disease were observed").<br><br>Boffetta Decl. ¶ 74. | establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 74.  Elizabeth Ellis, Janice Watkins, William Tankersley, et al., Occupational exposure and mortality among workers at three titanium dioxide plants, 56 Am. J. Ind. Med., 282, 282–291 (2013)("Ellis 2013") was a follow-up study of workers at the same three TiO2 production facilities and examined the exposure–response relationship between cumulative exposure to TiO2 and TiCl4, and mortality.<br><br>Boffetta Decl. ¶ 75. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Ellis 2013 study as asserted.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 75.  When comparing the observed mortality rates of the exposed workers with the U.S. mortality rates, the authors of Ellis 2013 observed fewer deaths from (1) all causes (SMR 0.84 (95% CI: 0.78-0.90); all cancers (SMR 0.93 (95% CI: 0.82-1.06); and (3) lung cancer (SMR 0.98 (95% CI 0.78-1.21).<br><br>Boffetta Decl. ¶ 75. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Ellis 2013 study as asserted.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 76.  Ellis 2013 concluded that "the results of this study are consistent with those of other studies of TiO2. There is no indication of a positive association between occupational exposure to TiO2 … and death from all causes, all cancer, non-malignant respiratory disease or all heart disease." | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |

| | |
|---|---|
| Boffetta Decl. ¶ 75. | |
| 77.  None of these studies of the U.S. DuPont Cohort supports the hypothesis that exposure to TiO2 is a cause of lung or other cancers.<br><br>Boffetta Decl. ¶ 76. | Undisputed that the Boffetta Declaration, which speaks for itself, states: "[w]hile each of these industry studies had limitations, none supports the hypothesis that exposure to TiO2 is a cause of lung or other cancers." Boffetta Decl. ¶ 76<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 78.  There is one study of the U.S. muli-plant cohort studying exposure to TiO2 in workers: Jon Fryzek, Bandana Chadda, Donald Marano, et al., A cohort mortality study among titanium dioxide manufacturing workers in the United States, 45 J Occup. Environ. Med., 400, 400–409 (2003)("Fryzek 2003").<br><br>Boffetta Decl. ¶ 77. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Fryzek, 2003 study, and identifies the authors, date, and publication asserted.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 79.  Fryzek 2003 conducted a retrospective cohort mortality study of 4,241 workers (90% male, 58% white, and 20% unknown race) employed for more than 6 months after January 1, 1960 at four TiO2 production facilities in the United States and followed the workers through December 31, 2000.<br><br>Boffetta Decl. ¶ 77. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Fryzek 2003 study as asserted.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 80.  Fryzek 2003 concluded that "[t]he data indicate that workers at the United States plants have not experienced risks of lung cancer or other significant adverse health | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, |

| | | |
|---|---|---|
| 1<br>2 | effects as a result of their occupational exposure to TiO2." | which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 3<br>4 | Boffetta Decl. ¶ 77. | |
| 5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22 | 81.  There are four case-control studies from Montreal studying exposure to TiO2 in workers: Jack Siemiatycki, Risk Factors for Cancer in the Workplace, Boca Raton, FL, CRC Press (1991)("Siemiatycki 1991"); Jack Siemiatycki, R. Dewar, L. Nadon, et al.., Occupational risk factors for bladder cancer: results from a case-control study in Montreal, Quebec, Canada, 140 Am. J. Epi. 1061, 1061–1080 (1994) ("Siemiatycki 1994"); Paolo Boffetta, V. Gaborieau, L. Nadon, et al., Exposure to titanium dioxide and risk of lung cancer in a population-based study from Montreal, 27 Scand. J. Work Environ. Health, 227, 227–232 (2001)("Boffetta 2001"); and Agnihotram Ramanakumar, Marie-Elise Parent, Benoit Latreille, et al., Risk of lung cancer following exposure to carbon black, titanium dioxide and talc: results from two case-control studies in Montreal, 122 Int. J. Cancer, 183, 183–189 (2008) ("Ramanakumar 2008").<br><br>Boffetta Decl. ¶¶ 79-83. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Siemiatycki 1991, Siemiatycki 1994, Boffetta 2001, and Ramanakumar 2008 studies as asserted.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 23<br>24<br>25<br>26<br>27<br>28 | 82.  Siemiatycki 1991 observed no excess lung cancers for any exposure to TiO2.<br><br>Boffetta Decl. ¶ 79. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Siemiatycki 1991 study, stating "No excess lung cancers were observed for any exposure to TiO2 (RR 1.0; 90% CI, 0.7-1.5; 38 cases) or for cancer at several other sites"<br><br>Disputed to the extent Plaintiff seeks to ignore the rest of the Siemiatycki 1991 study's findings that Dr. Boffetta noted, which included that a statistically significant |

| | |
|---|---|
| | 70% "increased risk of urinary bladder cancer causes was observed (RR 1.7; 90% CI, 1.1-2.6)."<br>Boffetta Decl., ECF No. 43-21, ¶ 79. |
| 83. Siemiatycki 1994 reported additional results on bladder cancer.<br><br>Boffetta Decl. ¶ 80. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Siemiatycki 1994 study as asserted. |
| 84. In Siemiatycki 1994, the corresponding fully adjusted Odds Ratio for non-substantial exposure were 1.3 (95% CI 0.8-2.2) and for substantial exposure was 1.8 (95% CI 0.4-7.6). The Odds Ratio was higher for medium/high exposure concentration than for low concentration but was higher for 1-10 years of exposure than it was for exposures greater than 10 years.<br><br>Boffetta Decl. ¶ 80. | Undisputed that the Boffetta Declaration, which speaks for itself, discusses the Siemiatycki 1994 study as asserted.<br><br>Disputed to the extent Plaintiff seeks to argue that non statistically significant but still positive associations between agent and outcome have no value, which they do. Hey Decl., Ex. L (Boffetta Deposition), 11:6-15 (nominal page 97:6-15).<br><br>Further disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not. Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 85. Boffetta 2001 assessed the risk of lung cancer from TiO2 exposure, and concluded that ""occupational exposure to titanium dioxide is probably not associated with a substantial increase in lung cancer risk."<br><br>Boffetta Decl. ¶ 81. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br><br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 86. Ramanakumar 2008 concluded that "workers in our study base with occupational exposure to carbon black, titanium dioxide, industrial talc and cosmetic talc did not experience any excess risk of lung cancer. These findings are consistent with the evaluations of the IARC working group that reviewed these substances." | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiff seeks to establish that epidemiological studies are the only consideration in any hazard assessment, which they are not.<br><br>Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |

29

| | |
|---|---|
| Boffetta Decl. ¶ 82. | |
| 87.  In its assessment of 13 substances in the Titanium-containing Substances Group (of which titanium dioxide is a part), the Canadian Government conclude that those 13 substances "are not harmful to human health or the environment at levels of exposure considered in the assessment." | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiff takes the quotation out of content. The Canadian government assessment cited also state that "[s]ubstances in the Titanium-containing Substances Group are associated with health effects through inhalation" and notes that "assessment focuses on 13 substances" and that "nanomaterials containing titanium are not explicitly considered in this assessment." |
| Government of Canada, *Titanium-Containing Substances Group - Information Sheet*, (Dec. 11, 2023), [attached as Ex. L to Norris Decl.]; *see also* Government of Canada, Titanium-containing Substances Group, available at https://www.canada.ca/en/health-canada/services/chemical-substances/chemicals-management-plan-3-substances/titanium-containing-substances-group.html. | Norris Decl., Ex. L, pp 1-2. |
| 88.  The World Health Organization's Joint Expert Committee on Food Additives (JECFA) has concluded that "the available data d[oes] not provide convincing evidence of genotoxicity" of titanium dioxide and reaffirmed its "not specified" acceptable daily intake level first established in 1969. | Undisputed that the quoted text appears in the cited document.<br><br>Disputed to the extent Plaintiff takes the quotation out of content. The sentence also states:<br><br>"Recognizing the limitations and some equivocal findings in the available data on genotoxicity JECFA noted that the available data did not provide convincing evidence of genotoxicity for [titanium dioxide]."<br><br>Further disputed to the extent Plaintiff applies the JECFA finding about titanium dioxide in food to Listed Titanium Dioxide (airborne particles of respirable size).<br><br>Norris Decl., Ex. M. |
| World Health Organization, Joint Expert Committee on Food Additives, "ECFA's Risk Assessment of Titanium Dioxide Risk Released – Background Information" (Nov. 24, 2023) [attached as Ex. M to Norris Decl.]. | |

The Attorney General also contends that the following other material facts are in dispute:

| Statement of Disputed Facts | Supporting Evidence |
|---|---|
| 89. Risk assessments include several steps that must be followed to determine "an estimate of the carcinogenic effects expected from exposure to a cancer hazard." | IARC Monograph Vol. 93, Hey Decl. Ex. A at 4; Hey Decl., Ex. K (Madl Deposition) at 4:18-22 (nominal page 44:18-22). |
| 90. The first step of a risk assessment is a cancer hazard assessment. | IARC Monograph Vol. 93, Hey Decl. Ex. A at 4; Hey Decl., Ex. K (Madl Deposition) at 4:18-22 (nominal page 44:18-22). |
| 91. IARC determines whether a chemical suspected of being carcinogenic is a cancer hazard. | IARC Monograph Vol. 93, Hey Decl. Ex. A at 3. |
| 92. IARC's classification of titanium dioxide as "possibly carcinogenic to humans" (Group 2B) is based on its evaluation of the chemical as a hazard, not as a risk. | IARC Monograph Vol. 93, Hey Decl. Ex. A at 4; Jameson Report, ECF No. 42 at 5. |
| 93. A cancer "hazard" is an agent "capable of causing cancer under some circumstances." | IARC Monograph Vol. 93, Hey Decl. Ex. A at 4; Jameson Report, ECF No. 42 at 6. |
| 94. IARC does not assess "risk"; i.e., the level of exposure that would pose a significant risk of cancer. | IARC Monograph Vol. 93, Hey Decl. Ex. A at 4. |
| 95. "The distinction between hazard and risk is important, and the Monographs identify cancer hazards even when risks are very low at current exposure levels, because new uses or unforeseen exposures could engender risks that are significantly higher." | IARC Monograph Vol. 93, Hey Decl. Ex. A at 4. |
| 96. "All known human carcinogens that have been studied adequately for carcinogenicity in experimental animals have produced positive results in one or more animal species [citations]." | IARC Monograph Vol. 93, Hey Decl. Ex. A at 7; Jameson Report, ECF No. 42 at 6. |
| 97. For several agents, "carcinogenicity in experimental animals was established or highly suspected before epidemiological studies confirmed their carcinogenicity in humans [citation]." | IARC Monograph Vol. 93, Hey Decl. Ex. A at 7; Jameson Report, ECF No. 42 at 6-7. |

31

| | |
|---|---|
| 98. An agent that causes cancer in experimental animals may also causes cancer in humans, because it is biologically plausible that agents for which there is sufficient evidence of carcinogenicity in experimental animals also present a carcinogenic hazard to humans. | IARC Monograph Vol. 93, Hey Decl. Ex. A at 7. |
| 99. "[I] n the absence of additional scientific information, [agents that cause cancer in experimental animals] are considered to pose a carcinogenic hazard to humans." | IARC Monograph Vol. 93, Hey Decl. Ex. A at 7; Jameson Report, ECF No. 42 at 7. |
| 100. "Additional scientific information" may include, "data that demonstrate that a given agent causes cancer in animals through a species-specific mechanism that does not operate in humans or data that demonstrate that the mechanism in experimental animals also operates in humans[.]" | IARC Monograph Vol. 93, Hey Decl. Ex. A at 7. |
| 101. IARC considers toxicological, epidemiological (human studies), and mechanistic data, as well as other relevant information, and then synthesizes all the information to make an overall evaluation as to a chemical's potential to cause cancer in humans. | IARC Monograph Vol. 93, Hey Decl. Ex. A at 9. |
| 102. Animal studies and epidemiological studies contribute to the assessment of a chemical's potential to cause cancer in humans. | IARC Monograph Vol. 93, Hey Decl. Ex. A at 6 and 9-11. |
| 103. In 2010, IARC released *Monographs on the Evaluation of Carcinogenic Risks to Humans, Carbon Black, Titanium Dioxide and Talc*, Vol. 93. | IARC Monograph Vol. 93, Hey Decl. Ex. A at 1. |

| | |
|---|---|
| 104. As part of an overall evaluation of all the scientific evidence, the IARC Working Group "considered the human and animal evidence as well as the evidence regarding potential mechanisms through which titanium dioxide might cause cancer in humans." | IARC Monograph Vol. 93, Hey Decl. Ex. A at 13; Jameson Report, ECF No. 42 at 7-9. |
| 105. Because IARC found there was "sufficient evidence in experimental animals for the carcinogenicity of titanium dioxide," but "inadequate evidence" in humans, it classified titanium dioxide as "possibly carcinogenic to humans" (Group 2B). | IARC Monograph Vol. 93, Hey Decl. Ex. A at 13-14; Hey Decl. Ex. L (Boffetta Deposition) at 6:18-8:18 (nominal pages 58:18-60:18). |
| 106. "Sufficient evidence of carcinogenicity" and "inadequate evidence of carcinogenicity" are descriptors used by IARC to indicate the strength of the scientific evidence. | IARC Monograph Vol. 93, Hey Decl. Ex. A at 13-14. |
| 107. IARC defines the term "carcinogenicity" to mean that an agent (e.g., Titanium Dioxide) "is capable of increasing the incidence of malignant [tumors], reducing their latency, or increasing their severity or multiplicity." | IARC Monograph Vol. 93, Hey Decl. Ex. A at 5. |
| 108. The term "sufficient evidence of carcinogenicity" in animals means, in part, that "[t]he Working Group considers that a causal relationship has been established between the agent and an increased incidence of malignant [tumors] or of an appropriate combination of benign and malignant [tumors] in…two or more independent studies in one species carried out at different times or in different laboratories or under different protocols." | IARC Monograph Vol. 93, Hey Decl. Ex. A at 8. |
| 109. IARC determined that there was "sufficient evidence of carcinogenicity" in animals based on three studies on experimental animals: two inhalation studies, Heinrich (1995) and Lee (1985), and one intratracheal study, Pott and Roller (2005). | IARC Monograph Vol. 93, Norris Decl. Ex. A at 34-35 and 83-84; see also, Hey Decl., Ex. K (Madl Deposition) at 10:1-10 (nominal page 93:1-10); Hey Decl., Ex. L (Boffetta Deposition) at 58:18-60:18; see also, Hey Decl., Ex. A at 13. |

| | |
|---|---|
| 110. In the Heinrich (1995) study, out of 100 rats exposed to titanium dioxide, 20 rats developed benign squamous-cell tumors, three rats developed squamous-cell carcinomas, four rats developed adenomas, and 13 rats developed adenocarcinomas. | Hey Decl., Ex. K (Madl Deposition) at 5:10-7:3 (nominal pages 82:10-84-3). |
| 111. In the Lee (1985) study, out of 77 male rats and 74 female rats exposed to 250 mg/m3 of titanium dioxide, 12 male and 13 female rats developed broncholoalveolar adenomas. | Hey Decl., Ex. K (Madl Deposition) at 8:4-14 (nominal pages 87:4-14); Hey Decl., Ex. B at 7. |
| 112. Tumors were reported at the highest dose levels in the Heinrich and Lee studies. | Hey Decl., Ex. K (Madl Deposition) at 9:22-10:5 (nominal pages 92:22-93:5) |
| 113. Pott and Roller (2005) observed statistically significant increases in benign and/or malignant lung tumors and lung overload conditions were not reported. | IARC Monograph Vol. 93, Norris Decl. Ex. A at 35. |
| 114. The Heinrich (1995) and Lee (1985) studies were conducted under the maximum tolerated dose. | Jameson Report, ECF No. 42 at 13 and 18. |
| 115. Because the Lee (1985) and Heinrich (1995) studies were conducted under maximum tolerated dose levels and statistically significant increases in lung tumors were observed, IARC's hazard assessment criteria to determine that titanium dioxide is an animal carcinogen were met. | Jameson Report, ECF No. 42 at 11. |
| 116. The maximum tolerated dose is "the dose the animal can tolerate for its lifetime without showing outward signs of toxicity as indicated by a less than 10% decrease in weight gain or a 10% increase in spontaneous deaths compared to controls. The purpose of the study is to give the animal the maximum amount of material it can tolerate for its lifetime to determine if an increase in cancers is observed compared to concurrent controls. If a significant increase is observed, then the material tested is considered to be an animal carcinogen." | Jameson Report, ECF No. 42 at 18-19. |

| | |
|---|---|
| 117. "Just because a study is not designed very well…[scientists] can still get useful data out of those studies if [scientists] see a positive response…[scientists] have to look at the data. That's the most important thing when [scientists are] looking at doing any kind of assessment, but especially a hazard assessment." | Hey Decl., Ex. J (Jameson Deposition), 4:16-5:9 (nominal pages 181:16-182:9). |
| 118. Despite not being a well-designed study, the Heinrich study still showed that there was an increased incidence of tumors observed in rats, which supports IARC's finding of "sufficient evidence of carcinogenicity" in animals. | Hey Decl., Ex. J (Jameson Deposition), 4:16-5:9 (nominal pages 181:16-182:9). |
| 119. Studies on experimental animals are not designed to imply tumor site concordance between animals and humans. | Hey Decl. Ex. J (Jameson Deposition) at 8:3-9:22 (nominal pages 234:3-235:22). |
| 120. A chemical that induces cancer in animals does not always induce cancer in humans in the same manner or in the same cancer site (e.g., lung cancer, bladder cancer, etc.). | Hey Decl. Ex. J (Jameson Deposition) at 8:3-9:22 (nominal pages 234:3-235:22). |
| 121. Table 21.3 of IARC Monograph Vol. 165, lists several agents for which cancer is observed in one or more sites for humans and different sites for animals. | IARC Monograph Vol. 165, Hey Decl. Ex. E at 2-4. |
| 122. Whether lung overload occurs in humans remains an open question. | European Chemicals Agency, Committee for Risk Assessment, Opinion regarding risk assessment of TiO2 (Sept. 14, 2017), Norris Decl. Ex. D at 5, 16, and 25. |
| 123. In considering the lung overload issue, the IARC Working Group noted the observed high retained mass lung burdens and decreased lung clearance in coal miners and concluded that animal data obtained under conditions of impaired lung clearance are relevant to humans for purposes of cancer hazard assessment. | IARC Monograph Vol. 93, Hey Decl. Ex. A at 12. |
| 124. Agents that cause cancer may involve different mechanisms | IARC Monograph Vol. 93, Hey Decl. Ex. A at 5. |

35

| | |
|---|---|
| 125. Titanium dioxide caused inflammation, cell injury, DNA damage, in studies considered by IARC. | IARC Monograph Vol. 93, Norris Decl. Ex. A at 82. |
| 126. Inflammation is a known characteristic of cancer in both animals and humans. | Hey Decl. Ex. J (Jameson Deposition) at 6:20-7:6 (nominal pages 221:20-222:6); IARC Monograph Preamble (Jan. 2019) Norris Decl. Ex. C at 30. |
| 127. The National Institute for Occupational Safety and Health (NIOSH) examined occupational exposure to airborne titanium dioxide in 2011, and determined that "Ultrafine TiO2 is a potential occupational carcinogen." | Hey Decl., Ex. F at 5. |
| 128. NIOSH stated that it "supports [IARC's] decision and the underlying analysis leading to IARC's conclusion. | Hey Decl., Ex. F at 10. |
| 129. The European Chemicals Agency classified titanium dioxide by inhalation as a Category 2 "suspected human carcinogen" in 2020. | European Chemicals Agency, Committee for Risk Assessment, Opinion regarding risk assessment of TiO2 (Sept. 14, 2017), Norris Decl. Ex. D at 40. |
| 130. The judgment by the European Court of Justice annulling an EU regulation for titanium dioxide was suspended, pending an appeal by France's Agency for Food Environmental and Occupational Health & Safety (ANSES) filed in February 2023. | Hey Decl., Ex. D at 1-2. |
| 131. The Committee for Risk Assessment found that the "Heinrich study had not been carried out in accordance with standard testing guidelines," but "its results were 'sufficiently reliable, relevant and adequate for the assessment of the carcinogenic potential of [titanium dioxide]'." | European Chemicals Agency, Committee for Risk Assessment, Opinion regarding risk assessment of TiO2 (Sept. 14, 2017), Norris Decl. Ex. D at 12; European Court of Justice, Judgment and Decision re *CWS Powder Coatings GmbH v. European Commission*, Norris Decl. Ex. E at 14, ¶ 75. |
| 132. Japan's National Institute of Technology and Evaluation upheld IARC's determination in 2017, basing its finding that nanoparticles and non-nano particles of airborne titanium dioxide are category 2, possible human carcinogenicity. | Hey Decl., Ex. G at 10, 21. |

| | |
|---|---|
| 133. The Canadian Center for Occupational Health and Safety lists titanium dioxide as a "possible carcinogen," noting it "[m]ay cause cancer based on animal information. Has been associated with: lung cancer." | Hey Decl., Ex. H at 2. |
| 134. Non statistically significant positive associations between an agent and an outcome have scientific value. | Hey Decl., Ex. L  (Boffetta Deposition) 11:6-15 (nominal page 97:6-15). |
| 135. Epidemiological studies are the not only consideration in any hazard assessment. | Hey Decl., Ex. L (Boffetta Deposition), 4:24-5:10 (nominal pages 52:24-53:10). |
| 136. Epidemiological studies of occupational exposures are particularly susceptible to confounding. | Boffetta Decl., ¶ 35; Hey Decl., Ex. L (Boffetta Deposition) 12:7-25 (nominal page 110:7-25) |
| 137. It was not possible for an epidemiologist to ask a study participant of one of the cohort studies whether or not they used products that contained titanium dioxide outside of work. | Hey Decl., Ex. L  (Boffetta Deposition) 14:9-22 (nominal page 116:9-22). |
| 138. It was possible for an epidemiologist to ask a participant of one of the case controlled studies whether or not they used products that contained titanium dioxide outside of work, but this "was simply not done. It was only investigated as part of the occupational sector or occupational environment." | Hey Decl., Ex. L  (Boffetta Deposition) 14:2-6 (nominal page 116:2-6). |
| 139. Dr. Boffetta reviewed only epidemiological studies for his opinions in this matter. | Hey Declaration (Hey Decl.) Ex. L (Boffetta Deposition) 9:11-14 and 9:17-19 (nominal page 72:11-14 and 72:17-19). |
| 140. All of the epidemiological studies Dr. Boffetta reviewed were of occupational exposures. | Hey Decl., Ex. L  (Boffetta Deposition) 13:13-15 (nominal page 115:13-15). |
| 141. Occupational exposure rates of titanium dioxide have decreased over time because of regulations. | Hey Decl., Ex. L  (Boffetta Deposition) 15:8-10 (nominal page 119:8-10). |
| 142. Exposure to titanium dioxide in titanium dioxide plants has decreased over time because of changes in | Hey Decl., Ex L (Boffetta Deposition) 19:5-25 (nominal page 135:5-25). |

| | |
|---|---|
| technology and most likely also personal protection equipment being used. | |
| 143. Dr. Boffetta was not aware of any epidemiological studies about consumer exposures to titanium dioxide. | Hey Decl., Ex. L  (Boffetta Deposition) 16:12-15 (nominal page 124:12-15). |
| 144. Null results from epidemiological studies do not prove the absence of carcinogenic effects. | Hey Decl., Ex. L  (Boffetta Deposition) 10:6-19 (nominal page 93:6-19). |
| 145. The Boffetta 2004 study found a statistically significant 23% increase in lung cancer mortality among the six European countries studied. | Boffetta Decl., ECF 43-21 at ¶ 58. |
| 146. The Boffetta 2004 study found a statistically significant 51% increased risk of lung cancer in German workers, a positive though not statistically significant 42% increase in risk of lung cancer in French workers, and a positive though not statistically significant increase of 9% in risk of lung cancer in UK workers. | Madl Decl., ECF 43-22 at ¶ 47; Hey Decl. Ex. L (Boffetta Deposition) 17:12-23 (nominal page 128:12-23); 18:16-23 (nominal page 131:16-23). |
| 147. The Boffetta 2004 study found a statistically significant 23% increase in lung cancer mortality among the six European countries studied, which included a statistically significant 51% increased risk of lung cancer in German workers, a positive though not statistically significant 42% increase in risk of lung cancer in French workers, and a positive though not statistically significant increase of 9% in risk of lung cancer in UK workers. | Boffetta Decl. ¶ 58; Madl Decl., ECF 43-22 at ¶ 47; Hey Decl. Ex. L (Boffetta Deposition) 17:12-23 (nominal page 128:12-23); 18:16-23 (nominal page 131:16-23).. |
| 148. The Siemiatycki 1991 study's findings, included that a statistically significant 70% "increased risk of urinary bladder cancer causes was observed (RR 1.7; 90% CI, 1.1-2.6)." | Boffetta Decl. ¶ 79. |
| 149. The Ellis 2013 report found when mortality was compared between two groups of DuPont workers, one exposed to titanium dioxide and the other not, there was a | Madl Decl. at ¶ 45; Hey Decl., Ex. L (Boffetta Deposition) 20:8-20 (nominal page 156:8-20). |

| | |
|---|---|
| "statistically significant increased" mortality of 35% of the workers exposed to titanium dioxide. | |
| 150. The Attorney General's rebuttal expert, Dr. Joseph Arvai, assessed Dr. Nowlis's opinions and survey, and identified "numerous design flaws that render its results neither valid nor credible." | Arvai Report, ECF No. 42 at 5. |
| 151. These flaws included Dr. Arvai's opinion that Dr. Nowlis's survey was composed of respondents whose selection was "the product of selection bias and, therefore, are not representative of the target population." | Arvai Report, ECF No. 42 at 5. |
| 152. Dr. Arvai faulted the Nowlis survey because it "relies on features that create what consumer psychologists refer to as a 'demand bias' on the part of respondents; thus, its results lack credibility." | Arvai Report, ECF No. 42 at 5. |
| 153. In the field of consumer survey research, the term "selection bias" is the bias introduced when the selection of individuals selected for analysis does not reflect an appropriately high degree of randomization." | Arvai Report, ECF No. 42 at 9. |
| 154. To avoid selection bias and be able to draw scientifically valid, credible conclusions from a sample of respondents, "it is essential for the sample to be representative of the population from which the sample was drawn." | Arvai Report, ECF No. 42 at 9. |
| 155. Dr. Nowlis surveyed only "[q]ualified respondents [who were] males and females aged 13 and older who lived in California and indicated that they had personally purchased eyeshadow in the last three months or will personally purchase eyeshadow in the next three months." | ECF No. 43-20 Nowlis Report, ¶ 16. |
| 156. Dr. Nowlis did not know whether, or to what extent, his survey participants included people of | Hey Decl. Ex. M, Nowlis Depo,4:2-17 (nominal page 92:2-17); 5:24-6:7 (nominal pages 93:24-94:7) and, 7:18-8:21 (nominal |

| | |
|---|---|
| Hispanic heritage, or Black people, or transgendered people; he knew only that he believed the panel of potential participants did not exclude such people and was of sufficiently large size. | pages 95:18-96:21). |
| 157. People of Hispanic heritage, Black people, and transgendered people are part of the population of California consumers. | Hey Decl., Ex N at 2, 8. |
| 158. No scientifically valid or credible conclusions can be drawn from Dr. Nowlis's survey data because they are not representative of the actual population of California consumers. | Arvai Report, ECF No. 42 at 11. |
| 159. The data that Dr. Nowlis used as the basis for his opinions "are not valid for the purposes intended by Nowlis." | Arvai Report, ECF No. 42 at 11. |
| 160. To draw scientifically valid conclusions from a consumer perception survey, "the study design must be, to the extent possible, free of bias. In other words, the study design should not bias respondents to answer survey questions in any specific way." | Arvai Report, ECF No. 42 at 13. |
| 161. Dr. Nowlis's survey includes an arrow pointing at the California Proposition 65 warning on the mock product. | Arvai Report, ECF No. 42 at 14. |
| 162. Dr. Nowlis's survey employs "overt repetition of survey questions" to direct "the respondents to think about what might happen to them if they use eye shadow while an obvious arrow points at the California Proposition 65 warning on the package." | Arvai Report, ECF No. 42 at 14. |
| 163. Dr. Nowlis's survey draws the respondents' attention to using eye shadow while pointing to a cancer warning and insinuating that something 'will happen to you' by repeating the words 'cancer' and 'risk' in the survey questions." | Arvai Report, ECF No. 42 at 15. |

| | |
|---|---|
| 164. The priming mechanisms in Dr. Nowlis' survey create a bias that discredits Dr. Nowlis's results, and therefore his opinions. | Arvai Report, ECF No. 42 at 15. |
| 165. Dr. Arvai's reanalysis of the raw data associated with responses to question QF1 of the Nowlis survey found that 13.4% of the survey's respondents believed that they will be exposed to an increased cancer risk or that they will get cancer when shown the mock eye shadow package with the long-form of the safe harbor warning. | Arvai Report, ECF No. 42 at 19-21. |
| 166. Dr. Arvai's reanalysis of the raw data associated with responses to question QF1a of the Nowlis survey found that 5.5% of the survey's respondents believed that they will be exposed to an increased cancer risk or that they will get cancer when shown the mock eye shadow package with the long-form of the safe harbor warning | Arvai Report, ECF No. 42 at 19-21. |
| 167. Dr. Arvai's reanalysis of the raw data associated with responses to question QF3 of the Nowlis survey found that 7.5% of the survey's respondents believed that they will be exposed to an increased cancer risk or that they will get cancer when shown the mock eye shadow package with the long-form of the safe harbor warning | Arvai Report, ECF No. 42 at 19-21. |
| 168. Dr. Arvai's reanalysis of the raw data associated with responses to question QF5 of the Nowlis survey found that 9% of the survey's respondents believed that they will be exposed to an increased cancer risk or that they will get cancer when shown the mock eye shadow package with the long-form of the safe harbor warning | Arvai Report, ECF No. 42 at 19-21. |
| 169. Dr. Arvai's reanalysis of the raw data associated with responses to question QF1 of the Nowlis survey found that 12.7% of the survey's respondents believed that they will be | Arvai Report, ECF No. 42 at 19-21. |

41

| | |
|---|---|
| exposed to an increased cancer risk or that they will get cancer when shown the mock eye shadow package with the short-form of the safe harbor warning. | |
| 170. Dr. Arvai's reanalysis of the raw data associated with responses to question QF1a of the Nowlis survey found that 4.4% of the survey's respondents believed that they will be exposed to an increased cancer risk or that they will get cancer when shown the mock eye shadow package with the short -form of the safe harbor warning | Arvai Report, ECF No. 42 at 19-21. |
| 171. Dr. Arvai's reanalysis of the raw data associated with responses to question QF3 of the Nowlis survey found that 8.3% of the survey's respondents believed that they will be exposed to an increased cancer risk or that they will get cancer when shown the mock eye shadow package with the short -form of the safe harbor warning | Arvai Report, ECF No. 42 at 19-21. |
| 172. Dr. Arvai's reanalysis of the raw data associated with responses to question QF5 of the Nowlis survey found that 11.8% of the survey's respondents believed that they will be exposed to an increased cancer risk or that they will get cancer when shown the mock eye shadow package with the short -form of the safe harbor warning | Arvai Report, ECF No. 42, at 19-21. |
| 173.  Listed Titanium Dioxide is in the form of airborne, unbound particles of respirable size, not to other forms of titanium dioxide. | Hey Decl., Ex. I., at 1. |
| 174.  Lung overload is relevant in cancer *risk* assessments. | Jameson Report, ECF No. 42, at 11. |
| 175. The Committee for Risk Assessment considered the data from the Lee (1985), Heinrich (1995), and other studies to conclude that inhalable titanium dioxide is a "suspected human carcinogen" (Category 2). | European Chemicals Agency, Committee for Risk Assessment, Opinion regarding risk assessment of TiO2 (Sept. 14, 2017), Norris Decl. Ex. D at 13-20, 39, and 41-43. |

| | |
|---|---|
| 176. The Committee for Risk Assessment raised issues with the Lee study, finding that the "study should not have a 'determining influence' on the classification of titanium dioxide . . ." | European Chemicals Agency, Committee for Risk Assessment, Opinion regarding risk assessment of TiO2 (Sept. 14, 2017), Norris Decl. Ex. D at 36. |
| 177. The European Court of Justice annulled an EU regulation in part, because it found that the Committee for Risk Assessment allegedly had not taken into account "all the relevant factors in order to calculate the lung overload in the Heinrich study by means of the Morrow overload calculation and therefore committed a manifest error of assessment." | European Court of Justice, Judgment and Decision re *CWS Powder Coatings GmbH v. European Commission* (Nov. 23, 2022), Norris Decl. Ex. E at 17, ¶¶ 100 and 103. |
| 178. IARC evaluated several epidemiological studies, including the Boffetta (2004) study. | IARC Monograph Vol. 93, Norris Decl. Ex. A at 27. |

Dated:  September 24, 2024           Respectfully submitted,

ROB BONTA
Attorney General of California
LAURA J. ZUCKERMAN
Supervising Deputy Attorney General


*/s/ Megan K. Hey*
MEGAN K. HEY
RAFAEL J. HURTADO
Deputy Attorneys General
*Attorneys for Rob Bonta, in his Official Capacity as Attorney General of the State of California*

LA2023950048

43