# Exhibit A

**WORLD HEALTH ORGANIZATION
INTERNATIONAL AGENCY FOR RESEARCH ON CANCER**



# *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans*

# VOLUME 93
# Carbon Black, Titanium Dioxide, and Talc



**LYON, FRANCE
2010**

## NOTE TO THE READER

The term 'carcinogenic risk' in the *IARC Monographs* series is taken to mean that an agent is capable of causing cancer under some circumstances. The *Monographs* evaluate cancer hazards, despite the historical presence of the word 'risks' in the title.

Inclusion of an agent in the *Monographs* does not imply that it is a carcinogen, only that the published data have been examined. Equally, the fact that an agent has not yet been evaluated in a *Monograph* does not mean that it is not carcinogenic.

The evaluations of carcinogenic risk are made by international working groups of independent scientists and are qualitative in nature. No recommendation is given for regulation or legislation.

Anyone who is aware of published data that may alter the evaluation of the carcinogenic risk of an agent to humans is encouraged to make this information available to the Section of IARC Monographs, International Agency for Research on Cancer, 150 cours Albert Thomas, 69372 Lyon Cedex 08, France, in order that the agent may be considered for re-evaluation by a future Working Group.

Although every effort is made to prepare the monographs as accurately as possible, mistakes may occur. Readers are requested to communicate any errors to the Section of IARC Monographs, so that corrections can be reported in future volumes.

IARC was established. The global burden of cancer is high and continues to increase: the annual number of new cases was estimated at 10.1 million in 2000 and is expected to reach 15 million by 2020 (Stewart & Kleihues, 2003). With current trends in demographics and exposure, the cancer burden has been shifting from high-resource countries to low- and medium-resource countries. As a result of *Monographs* evaluations, national health agencies have been able, on scientific grounds, to take measures to reduce human exposure to carcinogens in the workplace and in the environment.

The criteria established in 1971 to evaluate carcinogenic risks to humans were adopted by the Working Groups whose deliberations resulted in the first 16 volumes of the *Monographs* series. Those criteria were subsequently updated by further ad-hoc Advisory Groups (IARC, 1977, 1978, 1979, 1982, 1983, 1987, 1988, 1991; Vainio *et al.*, 1992; IARC, 2005, 2006).

The Preamble is primarily a statement of scientific principles, rather than a specification of working procedures. The procedures through which a Working Group implements these principles are not specified in detail. They usually involve operations that have been established as being effective during previous *Monograph* meetings but remain, predominantly, the prerogative of each individual Working Group.

**2. Objective and scope**

The objective of the programme is to prepare, with the help of international Working Groups of experts, and to publish in the form of *Monographs*, critical reviews and evaluations of evidence on the carcinogenicity of a wide range of human exposures. The *Monographs* represent the first step in carcinogen risk assessment, which involves examination of all relevant information in order to assess the strength of the available evidence that an agent could alter the age-specific incidence of cancer in humans. The *Monographs* may also indicate where additional research efforts are needed, specifically when data immediately relevant to an evaluation are not available.

In this Preamble, the term 'agent' refers to any entity or circumstance that is subject to evaluation in a *Monograph*. As the scope of the programme has broadened, categories of agents now include specific chemicals, groups of related chemicals, complex mixtures, occupational or environmental exposures, cultural or behavioural practices, biological organisms and physical agents. This list of categories may expand as causation of, and susceptibility to, malignant disease become more fully understood.

A cancer 'hazard' is an agent that is capable of causing cancer under some circumstances, while a cancer 'risk' is an estimate of the carcinogenic effects expected from exposure to a cancer hazard. The *Monographs* are an exercise in evaluating cancer hazards, despite the historical presence of the word 'risks' in the title. The distinction between hazard and risk is important, and the *Monographs* identify cancer hazards even when risks are very low at current exposure levels, because new uses or unforeseen exposures could engender risks that are significantly higher.

In the *Monographs*, an agent is termed 'carcinogenic' if it is capable of increasing the incidence of malignant neoplasms, reducing their latency, or increasing their severity or multiplicity. The induction of benign neoplasms may in some circumstances (see Part B, Section 3a) contribute to the judgement that the agent is carcinogenic. The terms 'neoplasm' and 'tumour' are used interchangeably.

The Preamble continues the previous usage of the phrase 'strength of evidence' as a matter of historical continuity, although it should be understood that *Monographs* evaluations consider studies that support a finding of a cancer hazard as well as studies that do not.

Some epidemiological and experimental studies indicate that different agents may act at different stages in the carcinogenic process, and several different mechanisms may be involved. The aim of the *Monographs* has been, from their inception, to evaluate evidence of carcinogenicity at any stage in the carcinogenesis process, independently of the underlying mechanisms. Information on mechanisms may, however, be used in making the overall evaluation (IARC, 1991; Vainio *et al.*, 1992; IARC, 2005, 2006; see also Part B, Sections 4 and 6). As mechanisms of carcinogenesis are elucidated, IARC convenes international scientific conferences to determine whether a broad-based consensus has emerged on how specific mechanistic data can be used in an evaluation of human carcinogenicity. The results of such conferences are reported in IARC Scientific Publications, which, as long as they still reflect the current state of scientific knowledge, may guide subsequent Working Groups.

Although the *Monographs* have emphasized hazard identification, important issues may also involve dose–response assessment. In many cases, the same epidemiological and experimental studies used to evaluate a cancer hazard can also be used to estimate a dose–response relationship. A *Monograph* may undertake to estimate dose–response relationships within the range of the available epidemiological data, or it may compare the dose–response information from experimental and epidemiological studies. In some cases, a subsequent publication may be prepared by a separate Working Group with expertise in quantitative dose–response assessment.

The *Monographs* are used by national and international authorities to make risk assessments, formulate decisions concerning preventive measures, provide effective cancer control programmes and decide among alternative options for public health decisions. The evaluations of IARC Working Groups are scientific, qualitative judgements on the evidence for or against carcinogenicity provided by the available data. These evaluations represent only one part of the body of information on which public health decisions may be based. Public health options vary from one situation to another and from country to country and relate to many factors, including different socioeconomic and national priorities. Therefore, no recommendation is given with regard to regulation or legislation, which are the responsibility of individual governments or other international organizations.

from both developed and developing countries. Some of these data are not distributed widely and may be available from government reports and other sources. In the case of mixtures, industries, occupations or processes, information is given about all agents known to be present. For processes, industries and occupations, a historical description is also given, noting variations in chemical composition, physical properties and levels of occupational exposure with date and place. For biological agents, the epidemiology of infection is described.

### (e)   Regulations and guidelines

Statements concerning regulations and guidelines (e.g. occupational exposure limits, maximal levels permitted in foods and water, pesticide registrations) are included, but they may not reflect the most recent situation, since such limits are continuously reviewed and modified. The absence of information on regulatory status for a country should not be taken to imply that that country does not have regulations with regard to the exposure. For biological agents, legislation and control, including vaccination and therapy, are described.

## 2. Studies of cancer in humans

This section includes all pertinent epidemiological studies (see Part A, Section 4). Studies of biomarkers are included when they are relevant to an evaluation of carcinogenicity to humans.

### (a)   Types of study considered

Several types of epidemiological study contribute to the assessment of carcinogenicity in humans — cohort studies, case–control studies, correlation (or ecological) studies and intervention studies. Rarely, results from randomized trials may be available. Case reports and case series of cancer in humans may also be reviewed.

Cohort and case–control studies relate individual exposures under study to the occurrence of cancer in individuals and provide an estimate of effect (such as relative risk) as the main measure of association. Intervention studies may provide strong evidence for making causal inferences, as exemplified by cessation of smoking and the subsequent decrease in risk for lung cancer.

In correlation studies, the units of investigation are usually whole populations (e.g. in particular geographical areas or at particular times), and cancer frequency is related to a summary measure of the exposure of the population to the agent under study. In correlation studies, individual exposure is not documented, which renders this kind of study more prone to confounding. In some circumstances, however, correlation studies may be more informative than analytical study designs (see, for example, the *Monograph* on arsenic in drinking-water; IARC, 2004).

### 3. Studies of cancer in experimental animals

All known human carcinogens that have been studied adequately for carcinogenicity in experimental animals have produced positive results in one or more animal species (Wilbourn *et al.*, 1986; Tomatis *et al.*, 1989). For several agents (e.g. aflatoxins, diethylstilbestrol, solar radiation, vinyl chloride), carcinogenicity in experimental animals was established or highly suspected before epidemiological studies confirmed their carcinogenicity in humans (Vainio *et al.*, 1995). Although this association cannot establish that all agents that cause cancer in experimental animals also cause cancer in humans, it is biologically plausible that agents for which there is *sufficient evidence of carcinogenicity* in experimental animals (see Part B, Section 6b) also present a carcinogenic hazard to humans. Accordingly, in the absence of additional scientific information, these agents are considered to pose a carcinogenic hazard to humans. Examples of additional scientific information are data that demonstrate that a given agent causes cancer in animals through a species-specific mechanism that does not operate in humans or data that demonstrate that the mechanism in experimental animals also operates in humans (see Part B, Section 6).

Consideration is given to all available long-term studies of cancer in experimental animals with the agent under review (see Part A, Section 4). In all experimental settings, the nature and extent of impurities or contaminants present in the agent being evaluated are given when available. Animal species, strain (including genetic background where applicable), sex, numbers per group, age at start of treatment, route of exposure, dose levels, duration of exposure, survival and information on tumours (incidence, latency, severity or multiplicity of neoplasms or preneoplastic lesions) are reported. Those studies in experimental animals that are judged to be irrelevant to the evaluation or judged to be inadequate (e.g. too short a duration, too few animals, poor survival; see below) may be omitted. Guidelines for conducting long-term carcinogenicity experiments have been published (e.g. OECD, 2002).

Other studies considered may include: experiments in which the agent was administered in the presence of factors that modify carcinogenic effects (e.g. initiation–promotion studies, co-carcinogenicity studies and studies in genetically modified animals); studies in which the end-point was not cancer but a defined precancerous lesion; experiments on the carcinogenicity of known metabolites and derivatives; and studies of cancer in non-laboratory animals (e.g. livestock and companion animals) exposed to the agent.

For studies of mixtures, consideration is given to the possibility that changes in the physicochemical properties of the individual substances may occur during collection, storage, extraction, concentration and delivery. Another consideration is that chemical and toxicological interactions of components in a mixture may alter dose–response relationships. The relevance to human exposure of the test mixture administered in the animal experiment is also assessed. This may involve consideration of the following aspects of the mixture tested: (i) physical and chemical characteristics, (ii) identified

*Inadequate evidence of carcinogenicity*: The available studies are of insufficient quality, consistency or statistical power to permit a conclusion regarding the presence or absence of a causal association between exposure and cancer, or no data on cancer in humans are available.

*Evidence suggesting lack of carcinogenicity*: There are several adequate studies covering the full range of levels of exposure that humans are known to encounter, which are mutually consistent in not showing a positive association between exposure to the agent and any studied cancer at any observed level of exposure. The results from these studies alone or combined should have narrow confidence intervals with an upper limit close to the null value (e.g. a relative risk of 1.0). Bias and confounding should be ruled out with reasonable confidence, and the studies should have an adequate length of follow-up. A conclusion of *evidence suggesting lack of carcinogenicity* is inevitably limited to the cancer sites, conditions and levels of exposure, and length of observation covered by the available studies. In addition, the possibility of a very small risk at the levels of exposure studied can never be excluded.

In some instances, the above categories may be used to classify the degree of evidence related to carcinogenicity in specific organs or tissues.

When the available epidemiological studies pertain to a mixture, process, occupation or industry, the Working Group seeks to identify the specific agent considered most likely to be responsible for any excess risk. The evaluation is focused as narrowly as the available data on exposure and other aspects permit.

### (b)   Carcinogenicity in experimental animals

Carcinogenicity in experimental animals can be evaluated using conventional bioassays, bioassays that employ genetically modified animals, and other in-vivo bioassays that focus on one or more of the critical stages of carcinogenesis. In the absence of data from conventional long-term bioassays or from assays with neoplasia as the end-point, consistently positive results in several models that address several stages in the multistage process of carcinogenesis should be considered in evaluating the degree of evidence of carcinogenicity in experimental animals.

The evidence relevant to carcinogenicity in experimental animals is classified into one of the following categories:

*Sufficient evidence of carcinogenicity*: The Working Group considers that a causal relationship has been established between the agent and an increased incidence of malignant neoplasms or of an appropriate combination of benign and malignant neoplasms in (a) two or more species of animals or (b) two or more independent studies in one species carried out at different times or in different laboratories or under different protocols. An increased incidence of tumours in both sexes of a single

biological plausibility and by coherence of the overall database. Strong support can be obtained from studies that challenge the hypothesized mechanism experimentally, by demonstrating that the suppression of key mechanistic processes leads to the suppression of tumour development. The Working Group considers whether multiple mechanisms might contribute to tumour development, whether different mechanisms might operate in different dose ranges, whether separate mechanisms might operate in humans and experimental animals and whether a unique mechanism might operate in a susceptible group. The possible contribution of alternative mechanisms must be considered before concluding that tumours observed in experimental animals are not relevant to humans. An uneven level of experimental support for different mechanisms may reflect that disproportionate resources have been focused on investigating a favoured mechanism.

For complex exposures, including occupational and industrial exposures, the chemical composition and the potential contribution of carcinogens known to be present are considered by the Working Group in its overall evaluation of human carcinogenicity. The Working Group also determines the extent to which the materials tested in experimental systems are related to those to which humans are exposed.

### (d)    Overall evaluation

Finally, the body of evidence is considered as a whole, in order to reach an overall evaluation of the carcinogenicity of the agent to humans.

An evaluation may be made for a group of agents that have been evaluated by the Working Group. In addition, when supporting data indicate that other related agents, for which there is no direct evidence of their capacity to induce cancer in humans or in animals, may also be carcinogenic, a statement describing the rationale for this conclusion is added to the evaluation narrative; an additional evaluation may be made for this broader group of agents if the strength of the evidence warrants it.

The agent is described according to the wording of one of the following categories, and the designated group is given. The categorization of an agent is a matter of scientific judgement that reflects the strength of the evidence derived from studies in humans and in experimental animals and from mechanistic and other relevant data.

**Group 1:**    **The agent is *carcinogenic to humans*.**

This category is used when there is *sufficient evidence of carcinogenicity* in humans. Exceptionally, an agent may be placed in this category when evidence of carcinogenicity in humans is less than *sufficient* but there is *sufficient evidence of carcinogenicity* in experimental animals and strong evidence in exposed humans that the agent acts through a relevant mechanism of carcinogenicity.

**Group 2.**

This category includes agents for which, at one extreme, the degree of evidence of carcinogenicity in humans is almost *sufficient*, as well as those for which, at the other extreme, there are no human data but for which there is evidence of

PREAMBLE                                                                                   35

carcinogenicity in experimental animals. Agents are assigned to either Group 2A (*probably carcinogenic to humans*) or Group 2B (*possibly carcinogenic to humans*) on the basis of epidemiological and experimental evidence of carcinogenicity and mechanistic and other relevant data. The terms *probably carcinogenic* and *possibly carcinogenic* have no quantitative significance and are used simply as descriptors of different levels of evidence of human carcinogenicity, with *probably carcinogenic* signifying a higher level of evidence than *possibly carcinogenic*.

**Group 2A:**     **The agent is *probably carcinogenic to humans*.**

This category is used when there is *limited evidence of carcinogenicity* in humans and *sufficient evidence of carcinogenicity* in experimental animals. In some cases, an agent may be classified in this category when there is *inadequate evidence of carcinogenicity* in humans and *sufficient evidence of carcinogenicity* in experimental animals and strong evidence that the carcinogenesis is mediated by a mechanism that also operates in humans. Exceptionally, an agent may be classified in this category solely on the basis of *limited evidence of carcinogenicity* in humans. An agent may be assigned to this category if it clearly belongs, based on mechanistic considerations, to a class of agents for which one or more members have been classified in Group 1 or Group 2A.

**Group 2B:**     **The agent is *possibly carcinogenic to humans*.**

This category is used for agents for which there is *limited evidence of carcinogenicity* in humans and less than *sufficient evidence of carcinogenicity* in experimental animals. It may also be used when there is *inadequate evidence of carcinogenicity* in humans but there is *sufficient evidence of carcinogenicity* in experimental animals. In some instances, an agent for which there is *inadequate evidence of carcinogenicity* in humans and less than *sufficient evidence of carcinogenicity* in experimental animals together with supporting evidence from mechanistic and other relevant data may be placed in this group. An agent may be classified in this category solely on the basis of strong evidence from mechanistic and other relevant data.

**Group 3:**     **The agent is *not classifiable as to its carcinogenicity to humans*.**

This category is used most commonly for agents for which the evidence of carcinogenicity is *inadequate* in humans and *inadequate* or *limited* in experimental animals.

Exceptionally, agents for which the evidence of carcinogenicity is *inadequate* in humans but *sufficient* in experimental animals may be placed in this category when there is strong evidence that the mechanism of carcinogenicity in experimental animals does not operate in humans.

Agents that do not fall into any other group are also placed in this category.

36                    IARC MONOGRAPHS VOLUME 93

An evaluation in Group 3 is not a determination of non-carcinogenicity or overall safety. It often means that further research is needed, especially when exposures are widespread or the cancer data are consistent with differing interpretations.

**Group 4:         The agent is *probably not carcinogenic to humans*.**

This category is used for agents for which there is *evidence suggesting lack of carcinogenicity* in humans and in experimental animals. In some instances, agents for which there is *inadequate evidence of carcinogenicity* in humans but *evidence suggesting lack of carcinogenicity* in experimental animals, consistently and strongly supported by a broad range of mechanistic and other relevant data, may be classified in this group.

*(e)    Rationale*

The reasoning that the Working Group used to reach its evaluation is presented and discussed. This section integrates the major findings from studies of cancer in humans, studies of cancer in experimental animals, and mechanistic and other relevant data. It includes concise statements of the principal line(s) of argument that emerged, the conclusions of the Working Group on the strength of the evidence for each group of studies, citations to indicate which studies were pivotal to these conclusions, and an explanation of the reasoning of the Working Group in weighing data and making evaluations. When there are significant differences of scientific interpretation among Working Group Members, a brief summary of the alternative interpretations is provided, together with their scientific rationale and an indication of the relative degree of support for each alternative.

**References**

Bieler GS, Williams RL (1993). Ratio estimates, the delta method, and quantal response tests for increased carcinogenicity. *Biometrics*, 49:793–801 doi:10.2307/2532200. PMID:8241374

Breslow NE, Day NE (1980). Statistical methods in cancer research. Volume I - The analysis of case-control studies. *IARC Sci Publ*, (32):5–338. PMID:7216345

Breslow NE, Day NE (1987). Statistical methods in cancer research. Volume II–The design and analysis of cohort studies. *IARC Sci Publ*, (82):1–406. PMID:3329634

Buffler P, Rice J, Baan R *et al.*, editors (2004). Workshop on Mechanisms of Carcinogenesis: Contributions of Molecular Epidemiology. Lyon, 14-17 November 2001. Workshop report. *IARC Sci Publ*, (157):1–450.

Capen CC, Dybing E, Rice JM, Wilbourn JD (1999). Species Differences in Thyroid, Kidney and Urinary Bladder Carcinogenesis.Proceedings of a consensus conference. Lyon, France, 3-7 November 1997. *IARC Sci Publ*, (147):1–225. PMID: 10627184

Cogliano V, Baan R, Straif K *et al.* (2005). Transparency in IARC Monographs. *Lancet Oncol*, 6:747 doi:10.1016/S1470-2045(05)70380-6.

Cogliano VJ, Baan RA, Straif K *et al.* (2004). The science and practice of carcinogen identification and evaluation. *Environ Health Perspect*, 112:1269–1274. PMID:15345338

CARBON BLACK                                                              191

production of reactive oxygen species that eventually lead to mutations, was well supported by experimental evidence, although some data also supported alternative pathways. High retained mass lung burdens and decreased lung clearance have been observed in coal miners, which led the Working Group to conclude that animal cancer data obtained under conditions of impaired lung clearance are relevant to humans. There was a minority opinion in the Working Group that would support the classification of carbon black in Group 2A, and invoked the analogy with quartz particles, which are carcinogenic in the lung of rats and humans. However, based on current evidence, the Working Group considered that the degree to which all elements of the above-mentioned mechanism may operate in humans is not clear and, thus, the mechanistic information did not alter the overall evaluation of Group 2B.

another study, no enhanced oxidative DNA damage was observed in lung tissues of rats that were intratracheally instilled with titanium dioxide.

Most in-vitro genotoxicity studies with titanium dioxide gave negative results.

# 6. Evaluation and Rationale

### 6.1     Cancer in humans

There is *inadequate evidence* in humans for the carcinogenicity of titanium dioxide.

### 6.2     Cancer in experimental animals

There is *sufficient evidence* in experimental animals for the carcinogenicity of titanium dioxide.

### 6.3     Overall evaluation

Titanium dioxide is *possibly carcinogenic to humans (Group 2B)*.

### 6.4     Rationale

In making this evaluation the Working Group considered the human and animal evidence as well as the evidence regarding potential mechanisms through which titanium dioxide might cause cancer in humans.

The Working Group found little evidence of an increased risk for cancer among humans based on epidemiological data, although relatively few studies were available. The single most informative study was a multicountry study of titanium dioxide production workers that found a slightly increased risk for lung cancer compared with the general population and a suggestive dose–response, but no overall excess risk for kidney cancer. The two other cohort studies reported no increased risks and evidence from the case–control study did not indicate an increased risk for either lung or kidney cancer. Overall, these results led the Working Group to conclude that there was *inadequate evidence* from epidemiological studies to assess whether titanium dioxide causes cancer in humans.

In two studies of rats that inhaled titanium dioxide, one observed an excess incidence of lung tumours in both sexes and another in females only. Studies of rats exposed intratracheally found increases in the incidence of lung tumours. No increases were observed among mice and hamsters exposed intratracheally. Other studies that used different routes of administration did not observe excesses in tumour incidence. On the basis of the results of an increased incidence of lung tumours in rats, the Working Group

276                    IARC MONOGRAPHS VOLUME 93

concluded that there was *sufficient evidence* that titanium dioxide is carcinogenic in experimental animals.

The Working Group considered the body of evidence regarding the pathways and mechanisms by which titanium dioxide or other poorly soluble particles may cause cancer. Following the same line of reasoning as that for the other particles reviewed in this volume, the Working Group considered that the available mechanistic evidence for titanium dioxide was not strong enough to warrant a classification other than Group 2B.