# Exhibit F

# CURRENT INTELLIGENCE BULLETIN 63

# Occupational Exposure to Titanium Dioxide




200 µm

500 nm

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Centers for Disease Control and Prevention
National Institute for Occupational Safety and Health




On the cover left to right: (1) Scanning electron microscopy (SEM) image of agglomerated particles of pigment-grade rutile $TiO_2$; (2) SEM image of agglomerated ultrafine-sized particles of rutile $TiO_2$. Images courtesy of Bill Fox, Altairnano, Inc., and Dr. Aleks Stefaniak and Dr. Mark Hoover, NIOSH Nanotechnology Field Research Team. Used with permission.

# Current Intelligence Bulletin 63

# Occupational Exposure to Titanium Dioxide

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Centers for Disease Control and Prevention
National Institute for Occupational Safety and Health

This document is in the public domain and may be freely copied or reprinted.

## Disclaimer

Mention of any company or product does not constitute endorsement by the National Institute for Occupational Safety and Health (NIOSH). In addition, citations to Web sites external to NIOSH do not constitute NIOSH endorsement of the sponsoring organizations or their programs or products. Furthermore, NIOSH is not responsible for the content of these Web sites.

## Ordering Information

To receive NIOSH documents or other information about occupational safety and health topics, contact NIOSH at

>Telephone: 1–800–CDC–INFO (1–800–232–4636)
>TTY: 1–888–232–6348
>E-mail: cdcinfo@cdc.gov

or visit the NIOSH Web site at www.cdc.gov/niosh.

For a monthly update on news at NIOSH, subscribe to *NIOSH eNews* by visiting www.cdc.gov/niosh/eNews.

DHHS (NIOSH) Publication No. 2011–160

**April 2011**

Safer • Healthier • People™

# Foreword

The purpose of the Occupational Safety and Health Act of 1970 (Public Law 91–596) is to assure safe and healthful working conditions for every working person and to preserve our human resources. In this Act, the National Institute for Occupational Safety and Health (NIOSH) is charged with recommending occupational safety and health standards and describing exposures that are safe for various periods of employment, including (but not limited to) the exposures at which no worker will suffer diminished health, functional capacity, or life expectancy as a result of his or her work experience.

Current Intelligence Bulletins (CIBs) are issued by NIOSH to disseminate new scientific information about occupational hazards. A CIB may draw attention to a formerly unrecognized hazard, report new data on a known hazard, or disseminate information about hazard control. CIBs are distributed to representatives of academia, industry, organized labor, public health agencies, and public interest groups as well as to federal agencies responsible for ensuring the safety and health of workers.

Titanium dioxide ($TiO_2$), an insoluble white powder, is used extensively in many commercial products, including paint, cosmetics, plastics, paper, and food, as an anticaking or whitening agent. It is produced and used in the workplace in varying particle-size fractions, including fine and ultrafine sizes. The number of U.S. workers currently exposed to $TiO_2$ dust is unknown.

This NIOSH CIB, based on our assessment of the current available scientific information about this widely used material, (1) reviews the animal and human data relevant to assessing the carcinogenicity and other adverse health effects of $TiO_2$, (2) provides a quantitative risk assessment using dose-response information from the rat and human lung dosimetry modeling and recommended occupational exposure limits for fine and ultrafine (including engineered nanoscale) $TiO_2$, and (3) describes exposure monitoring techniques, exposure control strategies, and research needs. This report only addresses occupational exposures by inhalation, and conclusions derived here should not be inferred to pertain to nonoccupational exposures.

NIOSH recommends exposure limits of 2.4 mg/m³ for fine $TiO_2$ and 0.3 mg/m³ for ultrafine (including engineered nanoscale) $TiO_2$, as time-weighted average (TWA) concentrations for up to 10 hours per day during a 40-hour work week. NIOSH has determined that ultrafine $TiO_2$ is a potential occupational carcinogen but that there are insufficient data at this time to classify fine $TiO_2$ as a potential occupational carcinogen. However, as a precautionary step, NIOSH used all of the animal tumor response data when conducting dose-response modeling and determining separate

iii

RELs for ultrafine and fine $TiO_2$. These recommendations represent levels that over a working lifetime are estimated to reduce risks of lung cancer to below 1 in 1,000. NIOSH realizes that knowledge about the health effects of nanomaterials is an evolving area of science. Therefore, NIOSH intends to continue dialogue with the scientific community and will consider any comments about nano-size titanium dioxide for future updates of this document. (Send comments to nioshdocket@cdc.gov.)

NIOSH urges employers to disseminate this information to workers and customers and requests that professional and trade associations and labor organizations inform their members about the hazards of occupational exposure to respirable $TiO_2$.

John Howard, M.D.
Director, National Institute for Occupational
  Safety and Health
Centers for Disease Control and Prevention

In a study of male and female Fischer 344 rats fed diets containing up to 5% $TiO_2$-coated mica for up to 130 weeks, no treatment-related toxicologic or carcinogenic effects were reported [Bernard et al. 1990].

### 3.3.3 Intraperitoneal Injection

Female Wistar rats received intraperitoneal injections of P25 ultrafine anatase $TiO_2$ (2 ml 0.9% NaCl solution) of either (1) a total dose of 90 mg per animal (once per week for five weeks); (2) a single injection of 5 mg; or (3) a series of injections of 2, 4, and 4 mg at weekly intervals [Pott et al. 1987]. Controls received a single injection of saline alone. The average lifespan of rats in the three treatment groups were 120, 102, and 130, respectively, and 120 weeks for controls. In the first treatment group, 6 out of 113 rats developed sarcomas, mesotheliomas, or abdominal cavity carcinomas, compared to 2 carcinomas in controls. No intra-abdominal tumors were found in the other two treatment groups. This study may not be relevant to inhalation exposure to $TiO_2$ since studies have not shown that either fine or ultrafine $TiO_2$ would be likely to reach the peritoneum after depositing in the lungs.

## 3.4 Particle-Associated Lung Disease Mechanisms

### 3.4.1 Role of Pulmonary Inflammation

Chronic pulmonary inflammation is characterized by persistent elevation of the number of PMNs (measured in BALF) or by an increased number of inflammatory cells in interstitial lung tissue (observed by histopathology). Pulmonary inflammation is a defense mechanism against foreign material in the lungs. PMNs are recruited from the pulmonary vasculature in response to chemotactic stimuli (cytokines) generated by lung cells including alveolar macrophages, which patrol the lungs as part of the normal lung defense to phagocytose and clear foreign material [Lehnert 1993; Snipes 1996]. Additional alveolar macrophages are recruited from blood monocytes into the lung alveoli in response to particle deposition. Typically, the PMN response is short-lived but may become chronic in response to persistent stimuli, e.g., prolonged particle exposure [Lehnert 1993].

Particle-induced pulmonary inflammation, oxidative stress, lung tissue damage, and epithelial cell proliferation are considered to be the key steps leading to lung tumor development in the rat acting through a secondary genotoxic mechanism [Knaapen et al. 2004; Baan 2007]. Oxidative stress is considered the underlying mechanism of the proliferative and genotoxic responses to poorly soluble particles including $TiO_2$ and other PSLT [Donaldson et al. 1996; Shi et al. 1998; Vallyathan et al. 1998; Knaapen et al. 2002; Donaldson and Stone 2003]. Reactive oxygen or nitrogen species (ROS/RNS) are released by inflammatory cells (macrophages and PMNs) and/or by particle reactive surfaces. Oxidative stress results from an imbalance of the damaging oxidants and the protective antioxidants. Oxidants can damage the lung epithelial tissue and may also induce genetic damage in proliferating epithelial cells, increasing the probability of neoplastic transformation [Driscoll et al. 1997]. The mechanisms linking pulmonary inflammation with lung cancer may involve (1) induction of *hprt* mutations in DNA of lung epithelial cells by inflammatory cell-derived oxidants and increased cell proliferation [Driscoll et al. 1996], and (2) inhibition of the nucleotide excision repair of DNA (with adducts from other exposures

such as polycyclic aromatic hydrocarbons) in the lung epithelial cells [Güngör et al. 2007]. Both of these mechanisms involve induction of cell-derived inflammatory mediators, without requiring particle surface-generated oxidants.

A secondary genotoxic mechanism would, in theory, involve a threshold dose that triggers inflammation and overwhelms the body's antioxidant and DNA repair mechanisms [Greim and Ziegler-Skylakakis 2007]. Antioxidant defense responses vary across species, and interindividual variability is generally greater in humans than in laboratory animals [Slade et al. 1985, 1993]. Limited quantitative data in humans make the identification of a population-based threshold difficult in practice [Bailer et al. 1997], and the quantitative aspects of the inflammatory response (level and duration) that are sufficient to cause a high probability of lung tumor development are not known. While there is a clear association between inflammation and genotoxicity, the specific linkages between key cellular processes such as cell cycle arrest, DNA repair, proliferation, and apoptosis are not well understood [Schins and Knaapen 2007].

Thus, chronic pulmonary inflammation appears to be required in the development of lung tumors in rats following chronic inhalation exposure to $TiO_2$; i.e., acting through a secondary genotoxic mechanism involving oxidative DNA damage. An implication of this mechanism is that maintaining exposures below those causing inflammation would also prevent tumor development, although the distribution of inflammatory responses in human populations is not known and a direct genotoxic mechanism cannot be ruled out for discrete nanoscale $TiO_2$ (see Section 3.5.2.1).

### 3.4.2 Dose Metric and Surface Properties

High mass or volume dose of PSLT fine particles in the lungs has been associated with overloading, while ultrafine particles impair lung clearance at lower mass or volume doses [Bellmann et al. 1991; Morrow et al. 1991; Oberdörster et al. 1994b; Heinrich et al. 1995]. The increased lung retention and inflammatory response of ultrafine PSLT particles compared to fine PSLT particles correlates better to the particle surface area dose [Tran et al. 2000]. Some evidence suggests that reduced lung clearance of ultrafine particles may involve mechanisms other than high-dose overloading, such as altered alveolar macrophage function (phagocytosis or chemotaxis) [Renwick et al. 2001, 2004] and greater ability to enter the lung interstitium [Ferin et al. 1992; Adamson and Bowden 1981; Oberdörster et al. 1994b; Adamson and Hedgecock 1995].

The quantitative relationships between the particle dose (expressed as mass or surface area) and the pulmonary responses of inflammation or lung tumors can be determined from the results of subchronic or chronic inhalation studies in rats. When the rat lung dose is expressed as particle mass, several different dose-response relationships are observed for pulmonary inflammation following subchronic inhalation of various types of poorly soluble particles (Figure 3–1). However, when dose is converted to particle surface area, the different types ($TiO_2$ and $BaSO_4$) and sizes (ultrafine and fine $TiO_2$) of PSLT particles can be described by the same dose-response curve (Figure 3–2), while crystalline silica, $SiO_2$ (a high-toxicity particle) demonstrates a more inflammogenic response when compared to PSLT particles of a given mass or surface area dose.

cancer risks to humans because the rat lung tumor response has been attributed as a rat-specific response to the overloading of particle clearance from the lungs [Levy 1996; Watson and Valberg 1996; Hext et al. 2005; Warheit and Frame 2006]. While some of the tumors (keratinizing cystic tumors) may not be relevant to humans, other types of tumors (adenomas, adenocarcinoma, squamous cell carcinoma) do occur in humans.

Mice and hamsters are known to give false negatives to a greater extent than rats in bioassays for some particulates that have been classified by the IARC as human carcinogens (limited or sufficient evidence), including crystalline silica and nickel subsulfide; and the mouse lung tumor response to other known human particulate carcinogens—including beryllium, cadmium, nickel oxide, tobacco smoke, asbestos, and diesel exhaust—is substantially less in mice than that in rats [Mauderly 1997]. These particulates may act by various plausible mechanisms, which are not fully understood [Schins and Knaapen 2007; Castranova 1998]. The risks of several known human particulate carcinogens would thus be underestimated by using dose-response data from rodent models other than the rat. Although the mechanism of particle-elicited lung tumors remains to be fully elucidated, the rat and human lung responses to poorly soluble particles of low or high toxicity (e.g., coal dust and silica) are qualitatively similar in many of the key steps for which there are data, including pulmonary inflammation, oxidative stress, and alveolar epithelial cell hyperplasia [Vallyathan et al. 1998; Castranova 2000; Green et al. 2007; Baan 2007]. Case studies of lung responses in humans exposed to $TiO_2$ are consistent in showing some similarities with rat responses (see Section 3.5.2.3). Semiquantitative comparisons of the lungs of rats and humans exposed to diesel exhaust, coal dust, silica, or talc indicate both similarities and differences, including similar regions of particle retention in the lungs but at different proportions [Nikula et al. 2001], and greater fibrotic response in humans but greater inflammation and epithelial hyperplasia responses in rats [Green et al. 2007]. These sensitive inflammatory and proliferative responses to particles in the lungs are considered key to the rat lung tumor response [ILSI 2000]. Although the data are limited for quantitative comparison of rat and human dose-response relationships to inhaled particles, the available data (e.g., crystalline silica and diesel exhaust particles) indicate that the rat-based estimates are not substantially greater, and some are lower, than the human-based risk estimates [Stayner et al. 1998; Kuempel et al. 2001c, 2002]. Collectively, these studies indicate that, while there are uncertainties about the rat as a model for particle-related lung cancer in humans, and specifically for $TiO_2$, there is insufficient evidence for concluding that the rat is not a valid model. Expert advisory panels have concluded that chronic inhalation studies in rats are the most appropriate tests for predicting the inhalation hazard and risk of fibers to humans [Vu et al. 1996] and that, in the absence of mechanistic data to the contrary, it is reasonable to assume that the rat model can identify potential carcinogenic hazards of poorly soluble particles to humans [ILSI 2000], including PSLT such as $TiO_2$.

100 mg/m$^3$ are not currently standard methodology in inhalation toxicity studies [Lewis et al. 1989], and NIOSH questions the relevance of the 250 mg/m$^3$ dose for classifying exposure to TiO$_2$ as a carcinogenic hazard to workers, the tumor-response data are consistent with that observed for ultrafine TiO$_2$ when converted to a particle surface area metric. Thus to be cautious, NIOSH used all of the animal tumor response data when conducting dose-response modeling and determining separate RELs for ultrafine and fine TiO$_2$. With chronic exposure to airborne ultrafine TiO$_2$, lung tumors were seen in rats exposed to an average of approximately 10 mg/m$^3$ (ranged from 7.2 mg/m$^3$ to 14.8 mg/m$^3$) over the exposure period.

It would be a better reflection of the entire body of available data to set RELs as the inhaled surface area of the particles rather than the mass of the particles. This would be consistent with the scientific evidence showing an increase in potency with increase in particle surface area (or decrease in particle size) of TiO$_2$ and other PSLT particles. For this reason, the basis of the RELs for fine and ultrafine TiO$_2$ is the rat dose-response data for particle surface area dose and pulmonary response. However, current technology does not permit the routine measurement of the surface area of airborne particles; therefore, NIOSH recommends sampling the mass airborne concentration of TiO$_2$ as two broad primary particle size categories: fine (< 10 μm) and ultrafine (< 0.1 μm). These categories reflect current aerosol size conventions, although it is recognized that actual particle size distributions in the workplace will vary.

### 5.1.3 Cancer Classification in Humans

Since the public comment and peer review draft of this document was made available, NIOSH has learned that the IARC has reassessed TiO$_2$. IARC now classifies TiO$_2$ as an IARC Group 2B carcinogen, "possibly carcinogenic to humans" [IARC 2010]. NIOSH supports this decision and the underlying analysis leading to this conclusion.

Based on the animal studies described in Chapter 3 and the quantitative risk assessment in Chapter 4, NIOSH has concluded that ultrafine but not fine TiO$_2$ particulate matter is a potential occupational carcinogen. However, as a precautionary step, NIOSH conducted a quantitative risk assessment based on the tumor data for both fine and ultrafine TiO$_2$.

The potency of ultrafine TiO$_2$, which has a much higher surface area per unit mass than fine TiO$_2$, was many times greater than fine TiO$_2$, with malignant tumors observed at the lowest dose level of ultrafine TiO$_2$ tested (10 mg/m$^3$).

The lack of an exposure-response relationship in the epidemiologic studies of workers exposed to TiO$_2$ dust in the workplace should not be interpreted as evidence of discordance between the mechanism presumed to operate in rats and the human potential for carcinogenicity. As demonstrated by the quantitative comparison between the animal and human studies (see Section 4.4 and Appendix C), the responses were not statistically inconsistent: the epidemiologic studies were not sufficiently precise to determine whether they replicated or refuted the animal dose-response. This is not a surprising finding for carcinogens of lower potency, such as fine-sized TiO$_2$.

The mechanistic data reviewed above, however, leave open the possibility of species differences beyond what would be anticipated for a genotoxic carcinogen. Although it is plausible that the secondary genotoxic mechanism

proposed here operates in humans exposed to $TiO_2$ dust, there is insufficient evidence to corroborate this. In addition, there is limited information on the kinetics or specific physiological response to $TiO_2$ particles in humans. The evidence suggests that inhalation of lower surface area $TiO_2$ is not likely to result in carcinogenicity in any test species. This concept is reflected in the quantitative risk assessment, in which the curvilinear dose response predicts that lower exposures have disproportionally less risk than higher exposures. For workers, this suggests that exposure to concentrations lower than the RELs will be less hazardous and may pose a negligible risk.

Although the analysis in this document is limited to consideration of the workplace hazard posed by $TiO_2$, these findings suggest that other PSLT particles inhaled in the workplace may pose similar hazards, particularly nano-sized particles with high surface areas. NIOSH is concerned that other nano-sized PSLT particles may have similar health effects to those observed for $TiO_2$, in which ultrafine $TiO_2$ particles were observed to be more carcinogenic and inflammogenic on a mass basis than fine $TiO_2$ [Heinrich et al. 1995; Lee et al. 1985, 1986a].

## 5.2 Recommended Exposure Limits

NIOSH recommends airborne exposure limits of 2.4 mg/m$^3$ for fine $TiO_2$ and 0.3 mg/m$^3$ for ultrafine (including engineered nanoscale) $TiO_2$ as TWA concentrations for up to 10 hr/day during a 40-hour work week, using the international definitions of respirable dust [CEN 1993; ISO 1995] and the NIOSH Method 0600 for sampling airborne respirable particles [NIOSH 1998]. NIOSH selected these exposure limits for recommendation because they would reduce working lifetime risks for lung cancer to below 1/1000. Cancer risks greater than 1/1000 are considered significant and worthy of intervention by OSHA. NIOSH has used this risk level in a variety of circumstances, including citing this level as appropriate for developing authoritative recommendations in Criteria Documents and risk assessments published in scientific journal articles [NIOSH 1995; NIOSH 2006; Rice et al. 2001; Park et al. 2002; Stayner et al. 2000; Dankovic et al. 2007]. It is noted that the true risk of lung cancer due to exposure to $TiO_2$ at these concentrations could be much lower than 1/1000. To account for the risk that exists in work environments where airborne exposures to fine and ultrafine $TiO_2$ occur, exposure measurements to each size fraction should be combined using the additive formula and compared to the additive REL of 1 (unitless) (see Figure 6–1 Exposure assessment protocol for $TiO_2$).

Because agglomerated ultrafine particles are frequently measured as fine-sized but behave biologically as ultrafine particles due to the surface area of the constituent particles, exposures to agglomerated ultrafine particles should be controlled to the ultrafine REL.

"Respirable" is defined as particles of aerodynamic size that, when inhaled, are capable of depositing in the gas-exchange (alveolar) region of the lungs [ICRP 1994]. Sampling methods have been developed to estimate the airborne mass concentration of respirable particles [CEN 1993; ISO 1995; NIOSH 1998]. "Fine" is defined in this document as all particle sizes that are collected by respirable particle sampling (i.e., 50% collection efficiency for particles of 4 μm, with some collection of particles up to 10 μm). "Ultrafine" is defined as the fraction of respirable particles with primary particle diameter < 0.1 μm (< 100 nm), which is a widely used definition. Additional methods

**Delivering on the Nation's promise:**
**safety and health at work for all people**
**through research and prevention**

To receive NIOSH documents or more information about occupational safety and health topics, contact NIOSH at

**1–800–CDC–INFO** (1–800–232–4636)
TTY: 1–888–232–6348
E-mail: cdcinfo@cdc.gov
or visit the NIOSH Web site at **www.cdc.gov/niosh**.

For a monthly update on news at NIOSH, subscribe to NIOSH eNews by visiting **www.cdc.gov/niosh/eNews**.

DHHS (NIOSH) Publication No. 2011–160

**SAFER • HEALTHIER • PEOPLE**™

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Centers for Disease Control and Prevention
National Institute for Occupational Safety and Health
4676 Columbia Parkway
Cincinnati, Ohio 45226–1998

Official Business
Penalty for Private Use $300

12