# Exhibit J

```
 1                 UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF CALIFORNIA
 3
     THE PERSONAL CARE PRODUCTS         )
 4   COUNCIL,                           )
                                        )
 5             Plaintiff,               )
                                        )Case No.
 6         vs.                          )2:23-cv-01006-TLN-JDP
                                        )
 7   BOB BONTA, IN HIS OFFICIAL         )
     CAPACITY AS ATTORNEY GENERAL       )
 8   OF THE STATE OF CALIFORNIA,        )
                                        )
 9             Defendant.               )
     _____)
10
11
12
13        DEPOSITION OF CHARLES W. JAMESON, Ph.D.
14                  Los Angeles, California
15                  Friday, August 9, 2024
16                         VOLUME I
17
18
19
20   Stenographically Reported by:
     RENEE D. ZEPEZAUER, RPR, CRR
21   CSR No. 6275
     JOB No. 6831015
22   PAGES 1 - 266
23
24
25

                                                    Page 1
```

```
 1                  UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF CALIFORNIA
 3
     THE PERSONAL CARE PRODUCTS         )
 4   COUNCIL,                           )
                                        )
 5            Plaintiff,                )
                                        )Case No.
 6         vs.                          )2:23-cv-01006-TLN-JDP
                                        )
 7   BOB BONTA, IN HIS OFFICIAL         )
     CAPACITY AS ATTORNEY GENERAL       )
 8   OF THE STATE OF CALIFORNIA,        )
                                        )
 9            Defendant.                )
     _____)
10
11
12
13            Deposition of CHARLES W. JAMESON,
14       Ph.D., VOLUME I, taken on behalf of
15       Plaintiff at 2000 Avenue of the Stars,
16       Suite 400, North Tower, Los Angeles,
17       California, beginning at 9:07 a.m. and
18       ending at 6:37 p.m., Friday, August 9,
19       2024, before RENEE D. ZEPEZAUER,
20       Certified Shorthand Reporter No. 6275.
21
22
23
24
25
                                                    Page 2
```

```
 1    APPEARANCES:
 2
 3    For Plaintiff:
 4            DLA PIPER LLP (US)
 5            BY:  GREGORY G. SPERLA and ALBERTO CORONA
 6            Attorneys at Law
 7            555 Mission Street, Suite 2400
 8            San Francisco, California  94105-2933
 9            (415)836-2500
10            Greg.Sperla@us.dlapiper.com
11            Alberto.Corona@us.dlapiper.com
12
      For Defendant Rob Bonta, in his Official Capacity as
13    Attorney General of the State of California:
14            ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA
15            BY:  RAFAEL J. HURTADO
16            Deputy Attorney General
17            600 West Broadway, Suite 1800
18            San Diego, California  92101
19            (619)321-5780
20            Rafael.Hurtado@doj.ca.gov
21
22
23
24
25
```

Page 3

1         Q    It's okay.
2         A    Yeah.  Females.
3         Q    Female rats.  Okay.  Thank you.  Would you
4    agree that for a finding of 2B possible carcinogenicity
5    you need two well-designed animal bioassays?
6              MR. HURTADO:  Argumentative.  Vague.
7              THE WITNESS:  Well, if you look at the
8    criteria, the criteria allows for something to be
9    identified as an animal carcinogen if there was a high
10   incidence of rare or numbers of tumors to an unusual
11   degree.
12   BY MR. SPERLA:
13        Q    Just because --
14        A    I'm sorry.
15        Q    Please.
16        A    Just because a study is not designed very well,
17   it has a small number of animals or the exposures
18   don't -- they don't -- exposure for 24 months, you can
19   still get useful data out of those studies if you see a
20   positive response.  If you get a negative response, you
21   can't say anything because the study wasn't properly
22   designed, but if you -- if you have a study that isn't
23   properly designed, however, you get positive results
24   that you feel are caused by the exposure to the
25   material, then you can use that data to come to some

Page 181

1  conclusions.
2  　　　So just because a study is poorly designed, you
3  can't just throw it in the trash.  You have to look at
4  the data.  That's the most important thing when you're
5  doing any kind of assessment, but especially a hazard
6  assessment.  You have to look at all of the data.  You
7  can't just look at some of the data.  All of the data
8  needs to be considered for you to make an informed
9  evaluation of what the data is telling you.
10 　　Q    What I want to ask you, though, is about the
11 limited evidence classification that IARC uses.  You're
12 familiar with that; correct?
13 　　A    Yes.
14 　　Q    I don't know how to say this.  Normally --
15 that's the wrong word.
16 　　　Where there is not two well-designed animal
17 studies with a positive association, the typical result
18 is a finding of limited evidence in animals; correct?
19 　　　MR. HURTADO:  Calls for speculation.  Criteria
20 speaks for itself.
21 　　　THE WITNESS:  You know, I guess that's
22 possible.
23 BY MR. SPERLA:
24 　　Q    You don't know if that's -- go ahead.
25 　　A    I need some clarifications of the situations

Page 182

1   are the other limitations of the endotracheal study?
2           MR. HURTADO:  Incomplete hypothetical.
3           THE WITNESS:  I don't know what -- I don't know
4   of what particular limitations you are referring to or
5   would think happened.  I don't know of any limitations
6   of it, to be honest with you.  It's just a screening
7   method.  It's just another method like intravenous or
8   intraperitoneal, or those type of studies that are
9   conducted to screen a chemical to see if they cause an
10  effect in the animals.
11  BY MR. SPERLA:
12      Q    I guess it goes back to what we were talking
13  about earlier, you can define a limitation, but you have
14  to first know the purpose of the study?
15      A    Right.
16      Q    And the purpose of this study was -- by "this,"
17  I mean Pott and Roller, that -- to merely screen for the
18  possibility of a cancer response in the rat?
19      A    Right.
20      Q    You can't -- one possible limitation of an
21  endotracheal administration study is that the bolus dose
22  can cause a unique inflammatory response in the animal?
23      A    I don't know if you can say that or not.  I
24  mean it -- you know, it would depend on the chemical, it
25  would depend on the technique, all of that is -- you

Page 221

1   know, possibly lead to that, but you just don't know.
2           I mean, the fact that titanium dioxide is known
3   to cause inflammation, I wouldn't be surprised that it
4   caused inflammation, but, then, again, inflammation is a
5   known characteristic of carcinogen formation in humans
6   and animals.
7       Q    Bear with me another minute.  Let's mark one
8   last exhibit.
9           (Exhibit 17 was marked for identification by
10  the court reporter and is attached hereto.)
11  BY MR. SPERLA:
12      Q    And, Dr. Jameson, I assume you recognize the
13  document marked Exhibit 17.
14      A    Yes.
15      Q    What is it?
16      A    It's a 1985 publication by Lee, et al.,
17  "Pulmonary Response of Rats Exposed to Titanium Dioxide
18  by Inhalation for Two Years."
19      Q    Let's go to page 179, please.  We're on 179.
20  In the chunk of text centered at the beginning.
21      A    Yes.
22      Q    The last sentence in that block states:
23  "Therefore, the biological relevance of these lung
24  tumors and other pulmonary lesions for man is
25  negligible."

Page 222

1   Calls for speculation.  Pardon me.
2           MR. HURTADO:  I'll strike my question.
3       Q   What do you mean by "concordance"?
4           MR. SPERLA:  Objection.  Vague and ambiguous.
5           THE WITNESS:  When you speak about concordance
6   in animal studies, what people try to look at is if you
7   do a study in animals and you get a tumor at a
8   particular site, can you expect to get a tumor at the
9   same site in humans.  And that -- in the vast majority
10  of the cases, in my experience in looking at animal bio
11  assay data, is that you can have a very strong animal
12  carcinogen.
13          And if it turns out the material is also a
14  human carcinogen, the tumor sites are not the same.
15  There's no concordance between the animal tumor site and
16  the human tumor site.
17          In fact, there was a work group, a workshop put
18  together by IARC where -- and I was a member of that
19  work group, where we were asked to look at all of the
20  known human carcinogens that have been identified by
21  IARC, and then look at the animal data that was used in
22  the review of the known human carcinogens and see if we
23  could determine if there was concordance, i.e., the same
24  tumor sites seen in the animal studies and the human
25  studies.  And we found very little concordance between

Page 234

1   the tumor sites and the animals and the humans, when you
2   look at all the known human carcinogens listed by IARC.
3           But I will say that as a result of that effort,
4   the characteristics of the mechanistic characteristics
5   of carcinogens in humans and animals was developed and
6   published and is widely used now in evaluations of the
7   mechanism of action in -- for animals and humans.
8   BY MR. HURTADO:
9       Q   So whether particle overload is specific to
10  rats or not, what would that mean for cancers to
11  potentially develop in humans?
12          MR. SPERLA:  Objection.  Vague and ambiguous.
13  Calls for speculation.  Calls for a narrative.
14          THE WITNESS:  The fact that you get lung tumors
15  in rats indicates that, to me, okay, my interpretation
16  of this, is what it means to me, the fact that you get a
17  lung tumor in the rat means that you should be looking
18  at the human studies to see if there is also lung tumors
19  in the humans.  But you should also be looking at other
20  cancer sites because it's not -- it is not usually a
21  concordance between the animals and the human tumor
22  sites.
23  BY MR. HURTADO:
24      Q   Were other cancer sites studied in some of the
25  studies referenced in your report?

Page 235

```
 1
 2
 3
 4
 5
 6
 7
 8
 9          I, CHARLES W. JAMESON, Ph.D., do hereby declare
10     under penalty of perjury that I have read the foregoing
11     transcript; that I have made any corrections as appear
                on the attached errata sheet
12     noted, in ink, initialed by me; that my testimony as
13     contained herein, as corrected, is true and correct.
14          EXECUTED this  21  day of  August  ,
15     2024, at   Cape Canal  ,   FL   .
                        (City)              (State)
16
17
18                          _____
                            CHARLES W. JAMESON, Ph.D.
19                          VOLUME I
20
21
22
23
24
25
                                                    Page 262
```

```
 1              I, the undersigned, a Certified Shorthand
 2    Reporter of the State of California, do hereby certify:
 3              That the foregoing proceedings were taken
 4    before me at the time and place herein set forth; that any
 5    witnesses in the foregoing proceedings, prior to
 6    testifying, were administered an oath; that a record of
 7    the proceedings was made by me using machine shorthand
 8    which was thereafter transcribed under my direction; that
 9    the foregoing transcript is a true record of the testimony
10    given; that if the foregoing proceedings were reported
11    stenographically remote from the witness and parties, the
12    transcript of the proceedings reflects the record that I
13    could hear and understand to the best of my ability.
14              Further, that if the foregoing pertains to
15    the original transcript of a deposition in a Federal
16    Case, before completion of the proceedings, review of
17    the transcript [ X  ] was [  ] was not requested.
18              I further certify I am neither financially
19    interested in the action nor a relative or employee of any
20    attorney or any party to this action.
21              IN WITNESS WHEREOF, I have this date
22    subscribed my name.
23    Dated: August 14, 2024
24
                          _____
25                        RENEE DiMENNO ZEPEZAUER
                          CSR #6275, RPR, CRR
```

Page 263

# Errata Sheet for Deposition of Dr. Charles W. Jameson, Ph.D.

## *The Personal Care Products Council v. Bonta*

#6831015

| Page and Line | Change | Reason |
|---|---|---|
| 12:24 | "endotracheal implantation" to "intratracheal instillation" | Transcription error. |
| 25:15 | "essentially" to "eventually" | Transcription error. |
| 38:3 | "--" to "the NTP" | Clarification to make testimony more precise. |
| 56:8 | "endotracheal" to "intratracheal" | Transcription error. |
| 56:9 | "endotracheal implantation" to "intratracheal instillation" | Transcription error. |
| 74:2 | "with" to "and with" | I misspoke inadvertently. |
| 82:15 | "cherry" to "cherry pick" | I misspoke inadvertently. |
| 96:12 | "NIHS" to "NIEHS" | Transcription error. |
| 96:13 | "revived" to "revised since then" | Clarification to make testimony more precise. |
| 100:22 | "size" to "site" | Transcription error. |
| 102:3 | "sections" to "sexes" | Transcription error. |
| 113:4 | "performed" to "formed" | Transcription error. |
| 139:20 | "but also" to "but also other" | I misspoke inadvertently. |
| 165:15 and 19 | "Ethel" to "Ethyl" | Transcription error. |
| 166:19-20 | "are the NTP ROC and" to "is the NTP" | I misspoke inadvertently. |
| 167:18 | "IARC" to "IARC Monographs" | I misspoke inadvertently. |
| 175:7-8 | "toner titanium dioxide" to "toner, titanium dioxide" | Transcription error. |

| 177:20 | "to 250 in" to "to 250 milligrams per cubic meter. In" | Transcription error; Clarification to make testimony more precise. |
|---|---|---|
| 177:20 | "meter" to "meter dose level" | Clarification to make testimony more precise. |
| 191:23 | "in or" to "in order" | Transcription error. |
| 194:11 | "98 or 99" to "0.98 or 0.99" | Transcription error. |
| 217:1, 3, 4, and 12 | "endotracheal" to "intratracheal" | Transcription error. |
| 218:12 | "possibly" to "possible" | I misspoke inadvertently. |
| 218:16 | "endotracheal" to "intratracheal" | Transcription error. |
| 219:25 | "endotracheal" to "intratracheal" | Transcription error. |
| 220:14 | "endotracheal" to "intratracheal" | Transcription error. |
| 221:1 and 21 | "endotracheal" to "intratracheal" | Transcription error. |
| 223:11 | "and" to "and are" | I misspoke inadvertently. |
| 244:3 | "would" to "would not" | I misspoke inadvertently. |

_/s/ Cuo Jameson_  _August 20, 2024_
WITNESS                                        DATE

2

13