# Exhibit L

# Deposition Transcript

Case Number: 2:23-cv-01006-TLN-JDP

Date: July 30, 2024

In the matter of:

# THE PERSONAL CARE PRODUCTS COUNCIL v ROB BONTA

# Paolo Boffetta, M.D., M.P.H.



Reported by:
Linda Wolfe

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

PAOLO BOFFETTA, M.D., M.P.H.                               JOB NO. 1087575
JULY 30, 2024

1          PAOLO BOFFETTA, M.D., M.P.H.        JOB NO. 1087575
           JULY 30, 2024   IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF CALIFORNIA

3
    THE PERSONAL CARE PRODUCTS
4   COUNCIL,

5

6           Plaintiff,     Case No. 2:23-cv-01006-TLN-JDP

7   vs.

8   ROB BONTA, in his official
    capacity as Attorney General
9   of the State of California,

10          Defendant.

11  _____/

12

13

14          WEBCONFERENCE DEPOSITION OF

15          PAOLO BOFFETTA, M.D., M.P.H.

16             Pages 1 through 191

17            Tuesday, July 30, 2024

18         12:55 p.m. to 7:21 p.m. EST

19

20

21

22

23        LOCATION:  Via Zoom Webconference

24        Stenographically reported via Zoom by:

25          Linda R. Wolfe, RMR, FCRR, FPR-C

STENO.COM
(310) 573-8380

PAOLO BOFFETTA, M.D., M.P.H.                                    JOB NO. 1087575
JULY 30, 2024

PAOLO BOFFETTA, M.D., M.P.H.                                    JOB NO. 1087575
JULY 30, 2024

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3           GREGORY G. SPERLA, Attorney at Law
             ALBERTO CORONA, Attorney at Law
 4           DLA PIPER LLP
             1415 L. Street, Suite 270
 5           Sacramento, CA  95814-3976
             (916)930-3244
 6           greg.sperla@dlapiper.com

 7   On behalf of Defendants:

 8           MEGAN K. HEY, Deputy Attorneys General
             RAFAEL J. HURTADO, Deputy Attorneys General
 9           STATE OF CALIFORNIA, DEPARTMENT OF JUSTICE
             300 South Spring Street, Suite 1702
10           Los Angeles, CA  90013-1230
             (213)269-6221
11           megan.hey@doj.ca.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

PAOLO BOFFETTA, M.D., M.P.H.                                    JOB NO. 1087575
JULY 30, 2024

1   hazard assessment or hazard identification is a part of

2   risk assessment?

3           MR. SPERLA:  Same objection.

4       A.   Yes, it can be seen this way, but it can also

5   be seen as an independent exercise.

6   BY MS. HEY:

7       Q.   Which can be seen as an independent exercise?

8       A.   Hazard identification.

9       Q.   Got it.

10           At the IARC Monographs program, does it make

11   determinations about cancer risk?

12      A.   No, it does not.

13      Q.   Does it make determinations about cancer

14   hazard?

15      A.   Yes, this -- it does.

16      Q.   Okay.  Dr. Boffetta, are you familiar with the

17   term "streams of evidence"?

18      A.   "Streams"?

19      Q.   Streams of evidence.

20      A.   Not really, no.

21      Q.   What goes into a cancer hazard identification?

22           MR. SPERLA:  Objection.  Vague and ambiguous.

23      A.   Well, it's -- I'll try to give a short answer.

24           By and large, hazard identification, it

25   consists of an integration of the evidence coming from

PAOLO BOFFETTA, M.D., M.P.H.                    JOB NO. 1087575
JULY 30, 2024

1   multiple lines or sources of evidence.

2          If we talk about cancer hazard, like in the

3   IARC Monograph, these are mainly human data coming from

4   epidemiology or possibly clinical studies, on the one

5   hand, animal toxicology data, results from animal

6   experiments, and also other types of data on the

7   metabolism, what happens after the agent enters the

8   body, what are the possible mode of actions in terms of

9   the determining or not determining cancer, et cetera.

10         So all these pieces of evidence go together.

11  And IARC has a formal way to do it, but other -- other

12  approaches have been also proposed.

13         So I think that's really the key I can answer,

14  not to go too much in detail.

15  BY MS. HEY:

16     Q.   So if I heard you right, you identified three

17  lines of evidence that comprise the hazard

18  identification.  Did I hear you right?

19     A.   At least for cancer, yes.

20     Q.   For cancer.

21     A.   Maybe heart disease would be different, of

22  course.

23     Q.   Got it.

24         What other approaches did you have in mind

25  when you said there are other approaches?

```
 1        exhibit.  We're up to 5.

 2            (Defendant's Exhibit 5, IARC Monographs,

 3        Volume 93, was marked for identification.)

 4            MS. HEY:  Can everybody see the Exhibit 5 I've

 5        just marked?

 6            MR. SPERLA:  Not yet.

 7            MS. HEY:  Sorry.  My bad.

 8            Okay.  How about now?

 9            MR. SPERLA:  Yes.

10            THE WITNESS:  Yes.

11            MS. HEY:  Everyone can see?

12            MR. SPERLA:  Yes.

13            MS. HEY:  Great.  It says something went

14        wrong, but I'm just going to ignore that.

15            Let's go to -- it's a rather large document.

16        Here we are.

17   BY MS. HEY:

18        Q.   So what I have on the screen is the IARC

19   Monograph that includes titanium dioxide.  This is the

20   "Evaluation and Rationale" section.

21            Section 6.1 states, "There is inadequate

22   evidence in humans for the carcinogenicity of titanium

23   dioxide."

24            Section 6.2 says, "There is sufficient

25   evidence in experimental animals for the carcinogenicity
```

1    of titanium dioxide."

2    PAOLO BOFFETTA, M.D., M.P.H.                    JOB NO. 1087575
     JULY 30, 2024 There is no mention of the third line of

3    evidence you identified as other data.

4           Section 6.3 says, The overall evaluation of

5    "titanium dioxide is possibly carcinogenic to humans,

6    Group 2B."

7           Do you see the words I just read?

8       A.   Yes.

9       Q.   Is this consistent with the integration of

10   evidence for multiple lines of evidence that you just

11   described?

12          MR. SPERLA:   Objection to the form of the

13      question.   Vague.   Ambiguous.   Leading.   Calls for

14      speculation.   Outside the scope.

15      A.   It is consistent with the IARC cancer hazard

16   identification scheme.

17   BY MS. HEY:

18      Q.   Does it make sense to you?

19          MR. SPERLA:   Objection.   Vague and ambiguous.

20      Leading.

21      A.   I don't -- I did not participate in this

22   evaluation.

23      Q.   Does it make sense to you, though?

24          MR. SPERLA:   Same objection.

25      A.   I'm not here to do evaluations according to

1   the IARC Monograph scheme.  Sorry.  So I don't -- I

2   donPAOLO BOFFETTA, M.D., M.P.H.                          JOB NO. 1087575
    JULY 30, 2024

3   BY MS. HEY:

4       Q.   Do you have an opinion on whether or not it

5   makes sense?

6           MR. SPERLA:   Same objections and

7       argumentative.

8       A.   I agree on the evaluation of the human data,

9   which is my own area of expertise.

10          I think that according to the IARC Monograph

11  scheme for assessing human data, what was available at

12  that time was consistent with an evaluation of

13  inadequate evidence.

14          I think there where positive studies in

15  animals which would justify the second evaluation of

16  sufficient evidence in the animals.

17          And the different classification could be 2B,

18  as it was done in this case.

19          There is a section below, Section 6.4, which

20  discusses the third type of data or mechanism.  And, in

21  particular, there is the last paragraph which addresses

22  the issue of whether the studies on -- showing an

23  increased risk of lung cancer in rats were relevant to

24  humans or not.  And some people say that these are not

25  relevant.

STENO.COM
(310) 573-8380

1  is the only line of evidence that's relevant to this

2  purpose?

3      A.   No.  I think the first sentence is a bit too

4  broad.  And in a way, instead of saying "share my

5  opinions on whether exposure to titanium dioxide creates

6  an increased risk," I would say "whether the human data

7  are supporting this."

8           This is really what I was pertaining to my

9  opinion, and that's what I express in the total

10 sentence.

11     Q.   Okay.  So, really, the way to read your report

12 is that you're just talking about epidemiological

13 evidence.  Am I hearing you right?

14     A.   Yes.

15     Q.   You are not talking about --

16     A.   In this report, yes.

17     Q.   Okay.  You're not considering or did not

18 consider animal studies or mechanistic data; correct?

19     A.   In this report, no, I did not.

20          MR. CORONA:  This is Alberto.

21          Greg's Zoom just crashed, so he's not able to

22     hear us anymore.

23          Can we just take a quick break off the record?

24          MS. HEY:  Sure.

25          THE COURT REPORTER:  Off the record.

1  you're looking at to not just the relative risk but to

2  the likely bias.

3          So I cannot agree with your statement.  Sorry.

4  BY MS. HEY:

5      Q.   Well, harkening back to our discussion about

6  hazard identification, epidemiological studies alone

7  would not comprise a hazard identification; would they?

8      A.   Well, for IARC, they can.  So, I mean --

9      Q.   They can?

10     A.   Yes.  If -- If the evidence from epidemiology

11 is considered sufficient, this will lead to a

12 classification of Group 1 irrespective of results from

13 other lines of evidence.  So it can.

14     Q.   Uh-huh.  Okay.  But absent sufficient

15 epidemiological studies, in the IARC world, it then

16 considers the other lines of evidence; correct?

17     A.   Yes.

18          MR. SPERLA:  Objection.  Vague and ambiguous.

19     A.   Yes.  Correct.

20 BY MS. HEY:

21     Q.   So with respect to the epidemiological

22 studies, a null association means that, as you said here

23 in paragraph 22, "The exposed group is just as likely as

24 the unexposed group to experience the outcome being

25 studied, indicating no association between exposure and

```
 1  statistically significant, and the study showed it was

 2  possible that there was no association between the

 3  exposure and the study outcome.

 4          Am I getting this right?

 5      A.   Yes.

 6      Q.   Okay.  Does non-statistically significant but

 7  still positive data have any value as to the

 8  relationship between agent and outcome?

 9          MR. SPERLA:  Objection.  Vague and ambiguous.

10      A.   Yes, they have.

11  BY MS. HEY:

12      Q.   What is the value that they have?

13      A.   They are suggestive of an association, and

14  they should be considered together with all the other

15  data, for example, in a meta-analysis.

16          By themselves, known statistically significant

17  results obviously cannot demonstrate that an association

18  exists because, by definition, they are compatible with

19  no association.  But if -- for example, if the study is

20  very small, there can be a positive association which is

21  not statistically significant.

22          And there are many such results that could be

23  put together in a meta-analysis showing maybe that the

24  combined data do reach statistical significance.  It's

25  possible.
```

```
 1            So the short answer is yes.  It is a sort of
 2   new development in epidemiology, and it's not
 3   insignificant.
 4       Q.   Oh, it's not.
 5       A.   It may require a lot of additional effort.
 6   It's not easy to do.
 7       Q.   Okay.  In paragraph 35, you wrote that
 8   "Confounding is of particular concern in occupational
 9   agents," -- right here on line 9 and 10 -- "since
10   workers are often exposed to multiple agents, any of
11   which could potentially increase the worker's risk of a
12   particular disease."
13            The term "occupational agents," are you
14   referring to agents used in a particular occupation --
15   well, let me just ask.
16            What do you mean by "occupational agents"
17   here?
18       A.   Well, any agent the people in a study -- in a
19   particular study may have been exposed -- an
20   occupational agent, people could be exposed in their
21   occupational history.
22       Q.   Okay.  And would you consider titanium dioxide
23   to be an occupational agent?
24       A.   Well, obviously, it is an agent that we are
25   studying in the occupational setting, yes.
```

PAOLO BOFFETTA, M.D., M.P.H.                    JOB NO. 1087575
JULY 30, 2024

1    three things, I think; or am I reading this wrong?

2        A.   I think there are three.  But in my

3    interpretation, or whatever you want to say, the last

4    two are very similar.  That's why I put them together.

5             So the first really covers the classic cohort

6    studies of production workers.

7             The second one covers everything else, which

8    basically are the people classified as exposed to

9    titanium dioxide in case-control studies.  So they can

10   be exposed in many different industries, and sometimes

11   they just say "I've been exposed." So that's really the

12   main difference.

13       Q.   But all in an occupational setting; correct?

14       A.   Yes, all these studies are occupational

15   settings.

16       Q.   Okay.  So fair to say that only the people

17   exposed to titanium dioxide in these studies that you

18   reviewed were exposed through applying it as a personal

19   care product to themselves?

20       A.   Obviously, I don't know.  Maybe they did.  But

21   it's not what the studies measured.  It's not what the

22   studies investigated.

23       Q.   Okay.  Well, just to be super clear or as

24   clear as possible, the self-reported exposure to

25   titanium dioxide, could that have included applications

PAOLO BOFFETTA, M.D., M.P.H.                    JOB NO. 1087575
JULY 30, 2024

1    of personal care products?

2        A.    No, no.  It was self-reported occupational

3    exposure.

4        Q.    Okay.

5        A.    It's only occupational exposures.

6        Q.    Okay.  The reported exposures were all

7    occupational, is what you're saying?

8        A.    Yes.

9        Q.    Okay.  Would an epidemiologist ask a

10   participant in one of these studies whether or not they

11   used products that contain titanium dioxide outside of

12   work?

13            MR. SPERLA:  Objection.  Vague and ambiguous.

14       Calls for speculation.

15       A.    This was not possible in the cohort studies

16   because the workers in these cohorts were not really

17   contacted individually.

18            The studies were based on their employment

19   records, on the environmental measures.  They can be

20   factories, et cetera.  But there was no direct contact

21   with the workers, so there was no way to ask this

22   question or any other question.

23   BY MS. HEY:

24       Q.    Hmm.

25       A.    Sorry?

1          MR. SPERLA:  Objection.  Vague and ambiguous.

2     Leading.

3     A.    I don't know if it's high or low.  It is a

4  number which has been reported in a few studies.

5          I have to say that the more recent studies

6  provide a lower number.  For example, we just published

7  another paper with about only 6 percent, 5 percent or

8  6 percent.  And that's because, I think, the role of

9  occupational exposures has been going down over time

10  because of regulations.  So that's a good thing.

11  BY MS. HEY:

12     Q.    Uh-huh.

13     A.    Studies done in the '90s and early 2000s, like

14  this one I quoted which was done in France, came out in

15  this number, in that range, around 10 percent.

16          Obviously, it's hard to have a precise

17  estimate.  I don't really know what it is.  I haven't

18  really thought about it.

19     Q.    Do occupational agents -- well, have

20  epidemiological studies shown that occupational agents

21  are responsible for other types of cancer in

22  industrialized country that are higher than 10 percent?

23     A.    The only cancer for which the proportion is

24  higher, I think, is mesothelioma because of the very

25  strong association with asbestos.

1      Q.   Are you aware of any risk reduction measures

2  that, say, the DuPont Company that manufactures a lot of

3  titanium dioxide implemented because of the results of

4  occupational exposure studies?

5           MR. SPERLA:  Objection.  Vague and ambiguous.

6      A.   No, I'm not.

7  BY MS. HEY:

8      Q.   Do you consider titanium dioxide to only be an

9  occupational agent?

10     A.   No.  I think it's present in consumer products

11 as well.

12     Q.   But there are no epidemiological studies about

13 consumer exposures; correct?

14          MR. SPERLA:  Objection.  Vague and ambiguous.

15     A.   Correct.

16 BY MS. HEY:

17     Q.   Paragraph 44.  Here you're discussing genetic

18 factors and the role that familial and genetic factors

19 play in the development of cancer; correct?

20     A.   Yes, of lung cancer in particular.

21     Q.   Uh-huh.  Okay.

22          So you say, "A positive familial history of

23 lung cancer has been found to be a risk factor in

24 several studies."

25          And then you discuss how a relative risk for

1   scientific or medical organizations as a risk factor for

2   cancer?

3          MR. SPERLA:  Objection.  Vague and ambiguous.

4      A.   Well, it is -- there is none coming to my mind

5   like that, but I cannot exclude.  I -- One should go and

6   check.

7          I mean, there are -- if I remember correctly,

8   there are about 200, 250 agents who need to be, so I

9   cannot say.  But there is no examples which come to my

10  mind.

11  BY MS. HEY:

12     Q.   Okay.  Let's talk about your European

13  multi-plant cohort study in 2004.

14         This study found that among men the standard

15  mortality rate for lung cancer was 1.23 for lung cancer.

16  Reading this here.  And the confidence interval was 1.10

17  to 1.38.

18         This is a statistically significant positive

19  association; isn't it?

20     A.   Yes, it is.

21     Q.   And this means that there was a 23 percent

22  increased risk for lung cancer in this cohort; correct?

23     A.   Yes.  Overall, correct.

24     Q.   Okay.  Was this result of 1.23 based on a

25  fixed-effects model of statistics?

```
 1        following commenced at 5:16 p.m. EST.)

 2              MS. HEY:  Back on the record.  Let me

 3        introduce Number 6.

 4              (Defendant's Exhibit 6, Expert Report of Dr.

 5        Amy Madl, was marked for identification.)

 6   BY MS. HEY:

 7        Q.   So this is the Expert Report of Dr. Amy Madl,

 8   who is also an expert for the PCPC.  She talks about her

 9   study here at paragraph 47 and notes lung cancer

10   evaluated by country.

11              Okay.  Yeah.  So line 12.

12              MR. SPERLA:  It's on page 22.  Sorry.

13              MS. HEY:  Hmm?  Yeah.  Bottom of page 19, PDF

14        page 22.  Sorry.

15   BY MS. HEY:

16        Q.   Paragraph 47, line 12:  "Significantly

17   significant increased SMR in German, 1.51."  So

18   51 percent.

19              And where were the other two we talked about?

20              France.  Nonsignificant increases in France

21   and the UK.  The range was 9 percent to 42 percent.

22              So does that sound right?

23        A.   Yes.  This is what I was talking, basically.

24        Q.   It's a little bit more than what you had

25   remembered, but --
```

1   these European multi-plant --

2       A.   Well, we published a detail report together

3   with a paper.  And in the report, there are all these

4   details.

5            One very important feature is that, as one

6   would expect, in all plants, in all factories, exposure

7   to titanium dioxide decreased very much over time.  It

8   was much higher early -- "early" means in the 15s or

9   whatever -- and much lower in more recent years, which

10  is a common trait one can see in all industry, almost

11  all industries, you know, which is a very positive

12  trait.

13      Q.   Uh-huh.  Is that because of, like, PPE,

14  personal protection equipment being used?

15      A.   And also changes in technology, I think, all

16  the time.

17           Obviously, the change is varied from one

18  factory to the other and the timeframe.  But the trend

19  was very consistent.

20      Q.   So you did say yes to the PPE use?

21      A.   Probably, yes.  Probably, yes.  I need to go

22  back and check exactly how each of these factors entered

23  into the estimate of exposure.

24           But most likely also PPEs were used more

25  frequently in more recent times.

1  BY MS. HEY:

2      Q.   Okay.  Well, apologies for bouncing back to

3  Dr. Madl's report.  I'm going to have to stop presenting

4  that.

5           MR. SPERLA:  Exhibit 6?

6           MS. HEY:  6.

7  BY MS. HEY:

8      Q.   Take a quick look at Exhibit 6.  We are at

9  paragraph 45.  She talks about this study.

10          So here she says, "When mortality was compared

11  to other DuPont workers, there was a slightly

12  statistically significant increased SMR" of 35 percent.

13     A.   Yes.  This was the internal comparison between

14  the two groups in these plants.  I think there were

15  three -- three facilities altogether in the last paper.

16     Q.   Uh-huh.

17     A.   And I really don't know what to do with this

18  because it may be due to the fact that the other workers

19  had a lower mortality from lung cancer because they

20  smoked less or whatever.  There could be many reasons.

21          So it is comparing two groups of workers but

22  not the exposed versus the general population like in

23  the other studies.  So that's why I relied more on the

24  SMR based on the U.S. population, as it was done in the

25  other studies.

PAOLO BOFFETTA, M.D., M.P.H.                                    JOB NO. 1087575
JULY 30, 2024

```
 1                    CERTIFICATE OF OATH
 2    STATE OF FLORIDA  )
 3    COUNTY OF SARASOTA)
 4         I, Linda R. Wolfe, Associate in Applied
 5    Science/Court and Conference Reporting (AAS);
 6    Federal Certified Realtime Reporter (FCRR);
 7    Registered Merit Reporter (RMR); Registered
 8    Professional Reporter (RPR), Florida Professional
 9    Reporter-Certified (FPR-C), Notary Public, State of
10    Florida, certify that PAOLO BOFFETTA, M.D., M.P.H.
11    appeared before me via Zoom producing a New York
12    D.L. for identification on Tuesday, July 30, 2024,
13    and was duly sworn.
14         Signed this 6th day of August, 2024.
15
16
17
18
19    _____
      Linda R. Wolfe, AAS, RPR, RMR, FCRR, FPR-C
20    Registered Professional Reporter
      Registered Merit Reporter
21    Federal Certified Realtime Reporter
      Notary Public, State of Florida at Large
22    Commission #HH011946; Expires 9/15/24
23
24
25
```

PAOLO BOFFETTA, M.D., M.P.H.                                    JOB NO. 1087575
JULY 30, 2024

21

PAOLO BOFFETTA, M.D., M.P.H.                                      JOB NO. 1087575
JULY 30, 2024

1                   DEPOSITION CERTIFICATE

2     STATE OF FLORIDA  )

3     COUNTY OF SARASOTA)

4         I, Linda R. Wolfe, AAS, RPR, RMR, FCRR, FPR-C,

5     Certified Stenographic Court Reporter, certify that

6     I was authorized to and did stenographically report

7     the foregoing deposition; and that the transcript

8     is a true record of the testimony given by the

9     witness.

10        I further certify that I am not a relative,

11    employee, attorney, or counsel of any of the

12    parties, nor am I a relative or employee of any of

13    the parties' attorney or counsel connected with the

14    action, nor am I financially interested in the

15    action.

16        Dated this 6th day of August, 2024.

17

18

19    _____

20    LINDA R. WOLFE, AAS, RPR, RMR, FCRR, FPR-C
      Certified Stenographic Court Reporter.

21

22

23

24

25

```
 1   Job No. 1087575
 2   Date: July 30, 2024
 3   Witness Name: Paolo Boffetta, M.D., M.P.H.
 4   Case Caption: THE PERSONAL CARE PRODUCTS COUNCIL v ROB BONTA
 5
 6       DECLARATION UNDER PENALTY OF PERJURY
 7        I declare under penalty of perjury
 8   that I have read the entire transcript of
 9   my Deposition taken in the captioned matter
10   or the same has been read to me, and
11   the same is true and accurate, save and
12   except for changes and/or corrections, if
13   any, as indicated by me on the DEPOSITION
14   ERRATA SHEET hereof, with the understanding
15   that I offer these changes as if still under
16   oath.
17        Signed on the  13th   day of
18   August        , 20 24  .
19
20   _____ Paolo Boffetta _____
21   Signature  Paolo Boffetta, M.D., M.P.H.
22
23
24
25              PAGE 1 OF 3
```

PAOLO BOFFETTA, M.D., M.P.H.
JULY 30, 2024

```
1              DEPOSITION ERRATA SHEET
2    Page No. 41    Line No. 6-7   Change to: _____
3    So are trials of patients
4    Reason for change: Misunderstanding
5    Page No. 42    Line No. 23   Change to: _____
6    you know, glasswool,
7    Reason for change: Misunderstanding
8    Page No. 47    Line No. 17   Change to: _____
9    modify an existing facility
10   Reason for change: Misunderstanding
11   Page No. 65    Line No. 5    Change to: _____
12   and two European programs.
13   Reason for change: Misunderstanding
14   Page No. 66    Line No. 7    Change to: _____
15   so-called pooled analyses
16   Reason for change: Misunderstanding
17   Page No. 69    Line No. 19   Change to: _____
18   formation of lung cancer
19   Reason for change: Misunderstanding
20   Page No. 101   Line No. 21   Change to: _____.
21   random error
22   Reason for change: Misunderstanding
23
24
25              PAGE 2 OF 3
```

PAOLO BOFFETTA, M.D., M.P.H.                                JOB NO. 1087575
JULY 30, 2024

1          DEPOSITION ERRATA SHEET

2   Page No. 97  Line No. 16  Change to:

3   non-statistically significant results

4   Reason for change: Misunderstanding

5   Page No. 146  Line No. 14  Change to:

6   there is one issue which shows

7   Reason for change: Misunderstanding

8   Page No. 141  Line No. 5-6  Change to:

9   if they had stayed in the factory

10  Reason for change: Misunderstanding

11  Page No. 170  Line No. 11-12 Change to:

12  it does whether something

13  Reason for change: Misunderstanding

14  Page No.____ Line No.____ Change to:

15

16  Reason for change:

17  Page No.____ Line No.____ Change to:

18

19  Reason for change:

20  Page No.____ Line No.____ Change to:

21

22  Reason for change:

23

24

25          PAGE 2 OF 3

PAOLO BOFFETTA, M.D., M.P.H.                                   JOB NO. 1087575
JULY 30, 2024

| | |
|---|---|
| 1 | DEPOSITION ERRATA SHEET |
| 2 | Page No. 138 Line No. 3 Change to: _____ |
| 3 | But we did it in our study |
| 4 | Reason for change: Misunderstanding |
| 5 | Page No. 145 Line No. 4-5 Change to: _____ |
| 6 | it adds to the discussion about whether |
| 7 | Reason for change: Misunderstanding |
| 8 | Page No. 148 Line No. 15-16 Change to: _____ |
| 9 | did not include any non-European |
| 10 | Reason for change: Misunderstanding |
| 11 | Page No. 163 Line No. 20 Change to: _____ |
| 12 | is what they found |
| 13 | Reason for change: Misunderstanding |
| 14 | Page No. 180 Line No. 23-24 Change to: _____ |
| 15 | with me taking the job |
| 16 | Reason for change: Misunderstanding |
| 17 | Page No. 181 Line No. 5-6 Change to: _____ |
| 18 | sort of scientific status of people |
| 19 | Reason for change: Misunderstanding |
| 20 | Signed on the 13 day of |
| 21 | August , 20 24 . |
| 22 | |
| 23 | SIGNATURE: ab9facc4-7066-470c-9 Digitally signed by ab9facc4-7066-470c-9a41-9d6bdb9e5fed a41-9d6bdb9e5fed Date: 2024.08.13 19:58:51 -04'00' DATE: _____ |
| 24 | Paolo Boffetta, M.D., M.P.H. |
| 25 | PAGE 3 OF 3 |

26